USDC SCAN INDEX SHEET

















LLH   1/26/00   9:30

3:99-CV-01151   HANSON V. GEICO CORPORATION

*20*

*NTCLDG.*

1  Kathryn A. Bernert, State Bar No. 127418
   Julie A. Vogelzang, State Bar No. 174411
2  Luce, Forward, Hamilton & Scripps LLP
   600 West Broadway, Suite 2600
3  San Diego, California 92101-3391
   Telephone: (619) 236-1414
4  Facsimile: (619) 232-8311

5  Attorneys for Defendant
   Government Employees Insurance Company
6

7

FILED

JAN 25 2000

CLERK, U.S DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
                           DEPUTY

8              UNITED STATES DISTRICT COURT

9          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10

11  ALAYNE HANSON,                  ) Case No.: 99CV1151 TW (RBB)
                                    )
12          Plaintiff,              ) **NOTICE OF LODGMENT OF EXHIBITS**
                                    ) **IN SUPPORT OF DEFENDANT**
13      v.                          ) **GOVERNMENT EMPLOYEES**
                                    ) **INSURANCE COMPANY'S MOTION FOR**
14  GEICO CORPORATION; GEICO DIRECT;) **SUMMARY JUDGMENT OR, IN THE**
    BERKSHIRE HATHAWAY CORP., and    ) **ALTERNATIVE, PARTIAL SUMMARY**
15  DOES 1 through 25, inclusive,   ) **JUDGMENT**
                                    )
16          Defendants.             ) Date:  February 22, 2000
                                    ) Time:  10:30 a.m.
17  _____ ) Ctrm:  7

18  TO PLAINTIFF ALAYNE HANSON AND HER ATTORNEY OF RECORD:

19         PLEASE TAKE NOTICE that defendant Government Employees Insurance Company

20  ("GEICO")  hereby lodges a true and correct copies of Exhibits 1 and 6 filed in support of the

21  above-referenced motion:

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28

                                                    99CV1151 TW (RBB)

| Exhibit | Description |
|---------|-------------|
| 1 | Excerpts from Deposition Transcript of Alayne Hanson, taken on July 1 and 6, 1999; |
| 2 | Excerpts from Deposition Transcript of Martha Furnas, taken on July 12, 1999; |
| 3 | Excerpts from Deposition Transcript of Jennifer Adair, taken on July 22, 1999; |
| 4 | Excerpts from Deposition Transcript of Queen Scales, taken on July 16, 1999; |
| 5 | Excerpts from Deposition Transcript of Lynn Bartlett, taken on July 8, 1999; |
| 6 | Mentoring Notes Related to Alayne Hanson's Performance, April 1998. |

Dated: January 24 2000

LUCE, FORWARD, HAMILTON & SCRIPPS LLP


By: _____
Kathryn A. Bernert
Julie A. Vogelzang
Attorneys for Defendant
Government Employees Insurance Company

1461935.1

2

# Mark R. Dahlberg

COURT REPORTER
CSR#8487

1

2

3      IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

4              FOR THE COUNTY OF SAN DIEGO

5

6      ALAYNE A. HANSON,

7                      Plaintiff, ) Case No. 730276

8          vs.                    )

9      GEICO, CORPORATION; GEICO

10     DIRECT; BERKSHIRE HATHAWAY

11     CORP., and DOES 1 through

12     25, inclusive,

13                      Defendants.) Pages 1 ~ 250

14     --------------------------

15

16                    **CERTIFIED COPY**

17     DEPOSITION OF:

18              ALAYNE A. HANSON

19              JULY 1, 1999

20              9:00 A.M.

21

22

23     REPORTED BY:

24          MARK R. DAHLBERG                **DISK
                                            ENCLOSED**

25          CSR No. 8487

                                                      1

1    before?

2          A.    No.

3          Q.    And when was that?

4          A.    That was on January 7th, '98.

5          Q.    And did you fly in that day?

6          A.    Yes, I did.

7          Q.    What time did you arrive in San Diego

8    that day?

9          A.    It was in early afternoon.  Probably

10   around three.

11         Q.    When you arrived in San Diego?

12         A.    Yes.

13         Q.    And what time was your interview?

14         A.    6:30.

15               MR. LOKER:  If there's no question

16   pending, I'd like to speak to my client again.

17               MS. BERNERT:  Okay.

18                    (Recess taken from

19                    11:10 a.m. to 11:12 a.m.)

20               MR. LOKER:  I'm sorry, Ms. Bernert,

21   in fairness to you, we have tweaked these dates a

22   little bit in the complaint, in which you're

23   getting the dates from.

24               MS. BERNERT:  No, I have my own

25   source of information with dates in mind.

                                                    85

1   blizzards and what have you --

2        Q.    This would have been in the Christmas

3   -- or excuse me, the birthday card that you got

4   in December of '97?

5        A.    Probably -- yeah, yeah.  Or -- no,

6   the previous birthday.

7        Q.    The year before.  Okay.

8        A.    And I had been thinking about it in

9   my head.  I lived in the cold, you know, north

10  for so long I was just -- I wrecked so many cars

11  and broke so many bones I'd had it, so....

12           MR. LOKER:  Plus the postcard had a

13  big muscular man in a bathing suit on it?

14  BY THE WITNESS:

15       A.    And so I picked up a newspaper and

16  saw the GEICO ad and I stopped at a borders kind

17  of place they had in Dayton and picked up one of

18  the -- you know, where they sell all the

19  newspapers from around the country, and was

20  looking at the ads.

21  BY MS. BERNERT:

22       Q.    Okay.  And there was a GEICO

23  employment ad?

24       A.    Mm-hmm.

25       Q.    Is that a "yes"?

                                              90

           MARK R. DAHLBERG   (619) 296-4530

```
1          A.     Yes, yes.  That's a "yes".

2          Q.     And tell me about the ad that you

3   saw?

4          A.     Well, when I saw the ad, I was really

5   excited about it because I was doing the exact

6   same job right there, you know, in the snow and

7   so I called and happened to get somebody on the

8   line, there was actually a live person when I

9   called, Betsy, and I told her of my experiences

10  and qualifications and education and all of that

11  and she right then and there set up an interview

12  for me for that day -- or for the 7th.

13         Q.     Okay.  Was it -- do you recall

14  Betsy's last name?

15         A.     I don't know Betsy's last name,

16  unfortunately.  She just said, when I asked her

17  -- or she said, "This is Betsy, just ask for

18  Betsy", because I had to call her back and ask

19  about setting up a date for a drug screen.

20         Q.     Okay.  Does Betsy Shue ring a bell?

21         A.     I don't know.

22         Q.     You never heard her last name?

23         A.     It could have been, I just don't

24  recall at this time.

25         Q.     Okay.  So you called in response to
```

91

MARK R. DAHLBERG   (619) 296-4530

1   over?

2        A.    I told her during this phone -- this

3   first phone conversation, that the very next day

4   when I go into work I'll fax over my resume' to

5   her and got her fax number, which I did, and at

6   that point I told her that I'm gonna go ahead and

7   make airline arrangements, you know, as soon as I

8   hang up this call, and she said she could set me

9   up with an interview at 6:30 on January 7th.

10        Q.    Did she tell you anything about a job

11   fair that was going on that day?

12        A.    Somewhat.

13        Q.    What did she tell you?

14        A.    She told me that there will probably

15   be a job fair that will be going on that evening

16   and I am to go right past the line, you know,

17   they had a line where they were weeding out

18   people or whatever, to get to these interviews

19   and to tell the person there that I had an

20   interview with Janet at 6:30.

21        Q.    Did Betsy tell you what the interview

22   process would consist of?

23        A.    Gosh, I can't really recall what it

24   was all about.  I was just very excited about

25   what she was saying, you know, what, you know,

95

1    what was offered here, you know, in San Diego.  I

2    do know she said it was a training class, I do

3    remember that, and that's as much as I can recall

4    right now.

5        Q.    Did Betsy tell you anything about

6    what the training classes would consist of?

7        A.    Well, I think it was just understood

8    between us that since I was already in insurance

9    and was doing the very job that she needed -- you

10   know, wanted, I think it was just understood that

11   I already knew it was insurance, except it was

12   auto.

13       Q.    Okay.

14             MR. LOKER:  That wasn't the question,

15   however.

16   BY THE WITNESS:

17       A.    Oh, I'm sorry.

18             MR. LOKER:  Watch it, you started to

19   go off a little bit.  You'll get a chance to tell

20   your story.  Just listen to the question.

21   BY THE WITNESS:

22       A.    Okay.

23   BY MS. BERNERT:

24       Q.    It's hard.  Did she tell you exactly

25   how the training class would work or what would

                                            96

            MARK R. DAHLBERG  (619) 296-4530

1    be taught or covered in the training class?

2         A.   She mentioned the lengths of the

3    training class.

4         Q.   And what did she tell you?

5         A.   She said it was 8 weeks, I believe.

6    As much as I can recall.

7         Q.   Did she tell you that you needed to

8    successfully complete the training class in order

9    to become an employee at GEICO?

10        A.   No.

11        Q.   Was there any discussion at all of

12   the fact that you needed to pass the training

13   class?

14        A.   No.

15        Q.   At MetLife had there been any

16   individuals in your training class who didn't

17   make it through training?

18        A.   Yes.

19        Q.   And do you recall what happened to

20   those individuals?  Were they terminated?

21        A.   I don't know what happened to them

22   because it was -- we moved on to the next phase

23   and all I know is that they didn't come with us.

24        Q.   Okay.  Anything else that you can

25   recall discussing with Betsy on the phone that

                                            97

MARK R. DAHLBERG   (619) 296-4530

1    at around 3 o'clock in the afternoon, is that

2    correct?

3            A.    Yes, that's correct.

4            Q.    Okay.  Other than going to GEICO on

5    Wednesday evening, did you have any other --

6    strike that.

7                  Were you at the GEICO facility at any

8    time during this particular visit, other than

9    Wednesday evening?

10           A.    Yes.

11           Q.    And when did you go back to GEICO?

12           A.    On January 9th.

13           Q.    Which would have been Friday?

14           A.    Yes.

15           Q.    And what did you do on Friday there?

16           A.    I was asked to come back for a second

17   interview and -- first of all, I was asked to

18   come back, yeah, for a second interview.

19           Q.    Okay.  We're gonna go back, just

20   trying to get a time line here.

21                  Any other visits to the GEICO

22   facility during that first visit?

23           A.    During the one on the 7th?

24           Q.    No, during the first time that you

25   were in San Diego, from Wednesday to Sunday --

MARK R. DAHLBERG   (619) 296-4530

```
 1                    (At 1:02 p.m. the deposition
 2                    was reconvened with the same
 3                    persons present.).
 4
 5                    EXAMINATION (CONTINUED)
 6
 7   BY MS. BERNERT:
 8        Q.    Good afternoon, Ms. Hanson.  We are
 9   back for the afternoon session of your
10   deposition, at least for today.
11                    Anything that you've thought of
12   during the lunch break that you need to correct
13   or modify from this morning's testimony?
14        A.    Yes, there is.
15        Q.    Okay.
16        A.    I forgot to mention the conversation
17   I had with Betsy, our first conversation, the one
18   on December 30th.  She had mentioned to me that
19   GEICO's plans was to hire upwards of 2,000
20   people.  They were going to be moving over into a
21   new call center and for all these people that
22   would be hired, they needed approximately four
23   supervisors for every 50 people and --
24        Q.    Four supervisors per 50 people?
25        A.    Per 50 people, and she said that
```

109

MARK R. DAHLBERG  (619) 296-4530

```
 1    would be something that would be -- you know,

 2    that I could look forward to, you know, or

 3    something with my record, considering my record

 4    and experience and education and everything,

 5    there was a possibility of that.

 6         Q.    Okay.  She didn't tell you you would

 7    be a supervisor, she told you that there were

 8    opportunities?

 9         A.    Opportunities.

10         Q.    Okay.  Anything else you can think of

11    that Betsy told you during that conversation?

12         A.    No.

13         Q.    Okay.  At this point you have

14    referred to some notes that you're working from.

15    Counsel, at this point could I get a copy of

16    those notes?

17              MR. LOKER:  Yep.  Give me everything

18    you got and I'll copy them.  Because she is going

19    to be refreshing her recollection with these.  We

20    don't need the complaint.  She can ask you what

21    you wrote on that.

22                    (Recess taken from

23                    1:05 p.m. to 1:08 p.m.)

24    BY MS. BERNERT:

25         Q.    Okay.  We will go ahead and mark a
```

110

MARK R. DAHLBERG   (619) 296-4530

1    cut it out of the newspaper?

2         A.    Yes.

3         Q.    Okay.  And the second page of Exhibit

4    3, what is that?

5         A.    These are some other ads that I had

6    just written down -- or not written down, but

7    also cut out that were possibilities.

8         Q.    These are all human resource

9    positions?

10        A.    Yes.

11        Q.    And you were interested, perhaps, in

12   working in a human resources capacity as well?

13        A.    Well, I figured with my education,

14   that could be a temporary kind of thing, you

15   know, also.

16        Q.    So you were considering positions at

17   places other than GEICO in San Diego?

18        A.    Not really, no.  Once I -- no.

19        Q.    Well, why did you clip these ads

20   then?

21        A.    Just to be looking at them.  Just

22   because I look at job ads.

23        Q.    So you were looking at job ads in San

24   Diego, other than the one for GEICO?

25        A.    No.

                                                    116

1    it would be better for you to start then?

2         A.    It would just look better.  I assumed

3    she meant it would look better if I started on

4    February 2nd.

5         Q.    You assumed that.  Did she say that?

6         A.    No, but she -- she went on to say

7    that it would be better if I started on February

8    2nd and I took her to mean for me.

9         Q.    Okay.  So you don't recall her

10   actually ever saying it would be better for you?

11        A.    Yes, she did say that.

12        Q.    Okay.  She did.  And as far as why it

13   would be better for you, she simply said it would

14   be better for you to get started sooner, the

15   class?

16        A.    Yes.

17        Q.    Okay.  Did you ever talk to anyone

18   else during the interview process about whether

19   or not you could start in the March class?

20        A.    No.

21        Q.    Never asked anyone else whether that

22   would be possible?

23        A.    No.

24        Q.    Did Betsy ever tell you how long you

25   could expect to be employed at GEICO?

                                              129

1          A.     She made comments that after being

2     there a year, there was a good possibility of

3     promotion with my experience and background.

4          Q.     Did she tell you that you would be

5     employed for a year?

6          A.     No, she just said -- no.

7          Q.     Okay.  Did anyone ever tell you you'd

8     be employed for a year?

9          A.     No.

10         Q.     Okay.  If you take a look back at the

11    first page of this Exhibit 3, which is the ad,

12    there's some handwriting on it as well.  Up at

13    the top it looks, I guess directions again, is

14    that the case?

15         A.     Yeah, she gave me directions.

16         Q.     Okay.  Down at the bottom?

17         A.     This was the person that she told me

18    to just walk in the building and see and tell

19    them that I had an interview with this person on

20    January 7th.

21         Q.     Okay.  You had earlier said you had

22    been told to report to a person named Janet.

23                Does this refresh your recollection

24    that it was Paula?

25         A.     Did I say "Janet"?

MARK R. DAHLBERG  (619) 296-4530

```
1        Q.    Was alone with you the whole time?

2        A.    Yes.

3        Q.    How long did the interview last?

4        A.    I'd say about 20 minutes altogether.

5        Q.    And of the 20 minutes, can you break

6   it down, roughly, as to what part of that time

7   were you talking versus what part of the time was

8   she talking?

9        A.    I'd say she was probably talking 50

10  percent of the time and I was talking 50 percent

11  of the time.

12       Q.    Okay.  You said that she discussed

13  GEICO benefits with you.

14             What did she tell you about the

15  benefits?

16       A.    She told me that there was a great

17  opportunity in San Diego to grow with GEICO, they

18  were growing very rapidly and people were being

19  promoted quickly and I think I asked her about

20  some of the other benefits.  I asked her about

21  tuition reimbursement and she told me that was

22  offered also.

23       Q.    Any other benefits that you recall

24  specifically discussing?

25       A.    Just the fact that they had a great
```

137

MARK R. DAHLBERG   (619) 296-4530

1      benefit plan there, you know, with the 401K and,

2      you know, things like that.

3           Q.      Okay.  You mentioned opportunities at

4      GEICO.  Are those opportunities that you've

5      already discussed, as far as the quick

6      promotions?

7           A.      Yes.

8           Q.      Anything else discussed about

9      opportunities at GEICO?

10          A.      Not that I recall.

11          Q.      Okay.  You said that you discussed

12     your education.

13                  What did you tell her about your

14     education?

15          A.      I told her, and I had a copy of my

16     resume' in my hand and slid a copy over to her,

17     and told her that I have three years of college

18     and did have intentions of getting -- or

19     finishing my Bachelor's degree as soon as

20     possible.

21          Q.      Let's take a look at what we're going

22     to mark as Exhibit 4.

23                          (The document referred to

24                          was marked as Deposition

25                          Exhibit 4 for identification,

138

MARK R. DAHLBERG  (619) 296-4530

1          Q.    Okay.  And the phone number that's

2     handwritten in, that's --

3          A.    That's his telephone number.

4          Q.    Okay.  Did you discuss with Betsy the

5     fact that you were relocating to California?

6          A.    Yes.

7          Q.    I'm sorry; Betsy.  The woman that you

8     were interviewing with that night?

9          A.    Yes, I did.  And I explained to

10    her --

11               MR. LOKER:  She didn't ask you what

12    you explained.

13    BY THE WITNESS:

14          A.    Yes, I did.

15    BY MS. BERNERT:

16          Q.    What did you discuss with her about

17    the fact that you were relocating?

18          A.    I told her that I had just saw the

19    ad, I flew in, and if I got the job I would have

20    to go back and relocate, begin relocating and I

21    gave -- I told her about the address on here.  I

22    said this is a local address and I gave her the

23    other address back in Ohio and the telephone

24    number, which is -- this is my telephone number

25    back there, too.

                                              141

1    Q.    You say you gave her the address back

2  in Ohio.  How did you give her that?

3    A.    I think she wrote it down.

4    Q.    Okay.  Do you recall -- did she write

5  it on your resume'?

6    A.    I don't know.  She was writing some

7  notes on a piece of paper.

8    Q.    Okay.  What did she tell you about

9  the position of customer service rep at GEICO, if

10  anything?

11            MR. LOKER:  Are you done with this?

12            MS. BERNERT:  For right now, mm-hmm.

13  BY THE WITNESS:

14    A.    She said it involved a training class

15  and I would take calls from clients about auto

16  insurance and the training class would last

17  approximately 8 weeks.

18  BY MS. BERNERT:

19    Q.    Did she tell you anything else about

20  the position at GEICO?

21    A.    Not that I recall.

22    Q.    What did she tell you was going to be

23  the next step as far as your obtaining employment

24  at GEICO?

25    A.    The next step would be -- well, I'm

142

MARK R. DAHLBERG  (619) 296-4530

1    not certain what she did say about the next

2    step.  But I was given another date to return.

3         Q.    Okay.  That date was given to you

4    that night?

5         A.    Yes.

6         Q.    Okay.  So you left GEICO that evening

7    knowing that you had an appointment to return?

8         A.    Yes.

9         Q.    Did you talk to anyone else besides

10   the gentleman who had first greeted you when you

11   walked into GEICO that night and this woman who

12   interviewed you in the cafeteria?

13        A.    I don't believe so, no.  No.

14        Q.    Okay.  Did the woman that you

15   interviewed with in the cafeteria tell you who

16   you'd be meeting with when you came back?

17        A.    I think -- well, at that part I

18   really don't recall, but I think she was -- I

19   just don't recall, but I think she was gonna have

20   an interview for me with whoever was available

21   that day.  I just don't recall.

22        Q.    Did she tell you what the next

23   interview would consist of?

24        A.    Well, one of the things that she said

25   is when I do come back, I would have to do actual

                                              143

MARK R. DAHLBERG  (619) 296-4530

1    simulated phone calls and be tested on a

2    fictitious company and have clients call me on

3    the phone with problems and concerns and I was

4    given a certain amount of time to resolve their

5    issues, and there were five of these test calls,

6    that's one of the things that I was told to come

7    back for.  That kind of testing.

8            Q.    Okay.  Any other testing?

9            A.    Yes.  There was a typing test and

10   math tests and vocabulary.

11                 MR. LOKER:  There's no question

12   pending.  I'd like to speak to my client one

13   minute.

14                 MS. BERNERT:  Sure.

15                 (Recess taken from

16                 1:56 p.m. to 1:58 p.m.)

17   BY MS. BERNERT:

18           Q.    Now, are you sure that you didn't

19   take any tests that evening?

20           A.    I don't understand what you mean.

21           Q.    Okay.  We're at GEICO on the evening

22   of your first interview, it's January 7, 1998.

23                 Are you sure you didn't take any

24   tests that night at GEICO?

25           A.    I just really don't recall.  I don't

                                              144

MARK R. DAHLBERG  (619) 296-4530

1          Q.    And I'm entitled to keep working to

2     see if I can't help you put things in context.

3          A.    Sure.

4          Q.    So you can't just say "I don't know"

5     and quit trying.  We get to keep working here.

6                Can you remember what the different

7     things you did that day were, even if you don't

8     remember the order?

9          A.    Yes.

10         Q.    Okay.  What did you do that day?

11         A.    I took a simulated calls -- five

12    simulated calls test, I had an interview with

13    April Gomez and had an interview with Silvana

14    Jackson.

15         Q.    Take any other tests that day?

16         A.    Not that I can recall.

17         Q.    So if you took any other tests, then

18    it would have been --

19         A.    I just can't recall at this time what

20    day it was on.

21         Q.    Okay.  But you do recall taking a

22    typing test?

23         A.    Yes, I do.

24         Q.    And you do recall taking a math and

25    vocabulary test?

                                               150

1          A.     Yes, I do.   I just can't recall what

2     day.

3          Q.     Okay.  Anything else you recall

4     happening on the second day?  You've listed three

5     items; 5 simulated call test, interview with

6     April Gomez and interview with Silvana Jackson.

7          A.     I think -- oh, I was -- I'm not sure

8     if it was Silvana, but I was taken out on the

9     floor and shown the phones and the cubicles and

10    how the area was set up.

11         Q.     Anything else you can recall being

12    part of that day?

13         A.     No, I can't recall anymore.

14         Q.     Okay.  Now, can you put these in any

15    order at all?  Do you know what was the last

16    thing you did, for example?

17         A.     Yes, I do.

18         Q.     What was the last thing?

19         A.     The last thing, Silvana Jackson told

20    me I was hired.

21         Q.     And you had only one interview with

22    her that day?

23         A.     Yes.

24         Q.     So the interview with Silvana was the

25    last thing that you did?

                                        151

                MARK R. DAHLBERG   (619) 296-4530

```
 1          Q.    All right.  You had testified earlier
 2    that you were pretty sure the last thing that you
 3    did was your interview with Silvana Jackson, but
 4    you're not sure of that?
 5          A.    It was the last thing I did before I
 6    left the building.
 7          Q.    So that means that you did not see
 8    the floor and look at the cubicles after Silvana
 9    Jackson, correct?
10          A.    Correct, yes.
11          Q.    All right.  Let's turn to your
12    interview with April Gomez.
13                How long do you recall that interview
14    lasting?
15          A.    That was approximately 20 minutes.
16          Q.    And what was discussed during that
17    interview?
18          A.    My resume'.
19          Q.    Anything else?
20          A.    I expanded on my resume' and she
21    asked me questions about my skills.
22          Q.    What types of questions?
23          A.    My experience on the phones,
24    insurance experience, she asked me about my
25    education and, oh, computers.  She wanted to know
```

153

MARK R. DAHLBERG   (619) 296-4530

```
1    if I had computer skills.

2         Q.    Anything else she asked you about?

3         A.    That's as much as I can recall at

4    this time.

5         Q.    What did you tell her about your

6    insurance skills and experience?

7         A.    I said I had call center -- insurance

8    call center experience with MetLife.

9         Q.    Did you elaborate?

10        A.    Yes.  I elaborated on all the points

11   on my resume'.

12        Q.    Did you discuss any particular

13   computer systems with her?

14        A.    Not particular computers systems.  I

15   did elaborate on my awards.

16        Q.    Okay.  Did April Gomez ask you why

17   you wanted to relocate to San Diego?

18        A.    No.

19        Q.    Do you recall her discussing the

20   issue at all that you weren't presently living in

21   San Diego?

22        A.    Yes.

23        Q.    What do you recall about that topic?

24        A.    I told her that I was very interested

25   in working for GEICO and I'd heard good things
```

1   about GEICO from the interviewees and I was very

2   anxious to work at GEICO and to come to San Diego

3   to work for GEICO.

4        Q.    Okay.  Anything else that you recall

5   discussing with April Gomez?

6        A.    No.

7        Q.    Did she tell you about the job?

8        A.    Yes.

9        Q.    What did she tell you about the job?

10       A.    She said it involved counseling

11  clients or customers about auto insurance and it

12  would involve an 8-week training course.

13       Q.    Did you talk about the hours,

14  schedule, anything like that?

15       A.    No.

16       Q.    Did you think if you went to GEICO

17  you were going to be working 9 to 5?

18       A.    I wasn't sure at that point, you

19  know.

20       Q.    Had people -- well, the ad had talked

21  about different shifts, is that correct?

22       A.    Mm-hmm.

23       Q.    Is that a "yes"?

24       A.    Yes.

25       Q.    So you understood that you might be

                                              155

              MARK R. DAHLBERG   (619) 296-4530

1        A.      Yes.

2        Q.      And what did he tell you?

3        A.      He said you've done great.

4        Q.      Okay.  Was there any break in time

5    before your interview with Silvana Jackson?  In

6    other words, was there any break during this

7    second day in the interviews?

8        A.      No.

9        Q.      Okay.  So you don't remember the

10   order, but you did the simulated calls, had your

11   interview with April Gomez, went and looked

12   around the floor and the last thing you did was

13   talk to Silvana Jackson?

14       A.      Yes.

15       Q.      How long did the interview with

16   Silvana Jackson last?

17       A.      Probably 30 to 40 minutes.

18       Q.      And what did you discuss with Silvana

19   Jackson?

20       A.      My resume', I gave her, of course, a

21   copy of my resume'; my achievements at MetLife;

22   my experience; my education; and she was very

23   enthusiastic about what I had told her and said I

24   had great promise there with my education and the

25   call center experience and mentioned needing

1    supervisors.

2         Q.     Did she talk to you at all about what

3    the job consisted of?

4         A.     Yes.

5         Q.     What did she tell you about the job?

6         A.     She said it was a training class and

7    8 weeks' length of time and it was dealing with

8    customers about their auto insurance and

9    resolving issues.

10         Q.     Did she tell you anything else about

11    the position?

12         A.     She told me benefits, vacations.

13         Q.     Did she talk about hours?

14         A.     Yes, she talked about hours.

15         Q.     What did she tell you?

16         A.     She just mentioned some general

17    shifts.

18         Q.     Did Ms. Jackson tell you that you

19    needed to pass the training course in order to

20    remain employed at GEICO?

21              MR. LOKER:  It's been asked and

22    answered.  You may answer it again, however.

23    BY THE WITNESS:

24         A.     No.

25    BY MS. BERNERT:

                                              159

1     to her.

2          Q.     When you say you explained the

3     situation, what is it that you told her?

4          A.     I told her that I was currently

5     residing in Dayton, Ohio, and I would have to

6     make moving arrangements.

7          Q.     Okay.  Did you elaborate what those

8     arrangements needed to be?

9          A.     I really didn't elaborate a lot, but

10    I just said I need to make moving arrangements.

11         Q.     Okay.  Did you inquire as to whether

12    or not GEICO would pay for relocation?

13         A.     No, I did not.

14         Q.     Did anyone ever volunteer to you that

15    GEICO does not pay the relocation at the

16    counselor level?

17         A.     No.

18         Q.     Did anyone on either of the two days

19    that you interviewed at GEICO prior to -- well,

20    let's just strike that.

21              On January 7th or January 9th of

22    1998, did anyone at either of those two places

23    ask you why you were interested in moving across

24    country?

25         A.     If I recall correctly, yes.

                                                  169

                  MARK R. DAHLBERG   (619) 296-4530

1    Q.    You indicated that Silvana Jackson

2    mentioned needing supervisors.  Did she tell you

3    that you would be a supervisor?

4    A.    She told me that with my education

5    and experience, this was the kind of person that

6    they were looking for to hire on at GEICO to fill

7    these needed supervisory positions.

8    Q.    Did she tell you that you'd first

9    have to master GEICO's way of doing business at

10   the customer service rep level before you could

11   be considered for a supervisory position?

12   A.    Not that I recall.

13   Q.    Did you understand that that was the

14   case?

15         MR. LOKER:  Vague and ambiguous and

16   compound.  But you may answer.

17   BY THE WITNESS:

18   A.    I'm not sure.

19   BY MS. BERNERT:

20   Q.    Okay.  Did anyone ever tell you that

21   they hired directly into supervisory positions?

22   A.    Not that I recall.

23   Q.    Was it your understanding that people

24   had to come in and work at the representative

25   level or counselor level before they could be

1   considered for a supervisory position?

2       A.   I wasn't sure at that point.

3       Q.   Did you ever become sure one way or

4   the other about that?

5       A.   No.

6       Q.   Did you accept the position when Ms.

7   Jackson offered it to you in that meeting?

8       A.   Yes.

9       Q.   Did you tell her you'd take the job

10  and you'd get back to Dayton and move?

11      A.   Yes.

12      Q.   Okay.  Was a starting date set?

13      A.   I don't understand.

14      Q.   Was a date set for you to start your

15  employment at GEICO?

16      A.   No.

17      Q.   Okay.  I thought you had been talking

18  about the February 2 training class.  Was it not

19  decided at that point that you were gonna be in

20  the February 2 training class?

21      A.   Correct.

22      Q.   Okay.  When was it set that you were

23  going to be in the February 2 training class?

24      A.   Betsy told me and I'm not certain

25  when.

MARK R. DAHLBERG   (619) 296-4530

1    in that training class?

2          A.    Yes.

3          Q.    Was it your understanding that yours

4    was the only training class that was starting on

5    that particular day?

6          A.    I don't know that information.

7          Q.    Okay.  Tell me who -- first of all,

8    who was the trainer?

9          A.    Jennifer Adair.

10         Q.    And did anyone else do any

11   introduction on that first day of training or did

12   Jennifer walk in and she was the first person at

13   GEICO who had anything to do with your training?

14         A.    I really don't recall.

15         Q.    Okay.  Was there any discussion about

16   how the training was going to go?  How it was

17   going to work on a day-to-day basis?

18         A.    I can't remember any of that

19   information either.

20         Q.    Okay.  Do you recall what the

21   schedule was, the daily schedule for training?

22         A.    We were told the hours and given

23   materials for the class study.

24         Q.    Okay.  What were the hours that you

25   were told?

                                              202

1  how the training program worked.  It just wasn't

2  something that was given out general knowledge.

3  BY MS. BERNERT:

4       Q.    Well, okay, let me ask a different

5  question.

6            How did the training program end up

7  working?

8            MR. LOKER:  Still vague and

9  ambiguous.  You may answer, if you --

10  BY THE WITNESS:

11       A.    I just don't know.

12  BY MS. BERNERT:

13       Q.    What did you do on a day-to-day

14  basis, Ms. Hanson, in the training class?  How

15  did it progress?

16       A.    We were given study materials on

17  insurance and told to study those.

18       Q.    And did you study them during the

19  day?

20       A.    Yes, we had discussions and study

21  periods.

22       Q.    Okay.  Was there any lecture

23  component?

24       A.    Yes, there was some lecture

25  component.

MARK R. DAHLBERG  (619) 296-4530

1       Q.      And how much time on a daily basis

2   was spent being lectured to?

3       A.      I really don't know.  It was

4   different all the time.

5       Q.      Okay.  Can you give me an estimate?

6       A.      I can't -- I can't really tell you.

7   I have no idea.

8       Q.      Well, did Jennifer Adair leave the

9   classroom during the training or was she always

10  there?

11      A.      She was always there.

12      Q.      But she wasn't always talking?

13      A.      No.

14      Q.      Would there be hours at a time that

15  you were just sitting there studying these

16  printed materials that were given to you?

17      A.      Sometimes there would be periods of

18  time where we have self-study.

19      Q.      Okay.  Did that happen every day?

20      A.      Not every day.

21      Q.      Okay.  How many times a week?

22      A.      I really can't say.  It's different

23  all the time.

24      Q.      What do you mean it was different all

25  the time? It changed throughout the course?

                                          206

MARK R. DAHLBERG  (619) 296-4530

```
1        A.    Yeah.  It's hard to say, you know.

2        Q.    Okay.  I'm trying to get an estimate

3   here.

4        A.    Mm-hmm.

5        Q.    Or an approximation.

6        A.    I really -- I don't know.  I don't

7   know.

8        Q.    Other than Ms. Adair speaking to you

9   and self-study, what else did you do in training?

10       A.    Went over the training manual.

11       Q.    Anything else?

12       A.    And -- yeah, that's -- that's it.

13   Went over the training manual.

14       Q.    Did you ever take tests or quizzes?

15       A.    Yes.

16       Q.    How often did you take tests or

17   quizzes?

18       A.    They were taken -- that was various

19   times, also.  There was nothing regular.

20       Q.    Did you have a test every week?

21       A.    Sometimes.

22       Q.    Were there weeks that went by where

23   you had no test or quiz --

24       A.    Yes.

25       Q.    -- the entire week?
```

MARK R. DAHLBERG  (619) 296-4530

1   BY MS. BERNERT:

2        Q.    Okay.  Who were the other people who

3   were in your training class?

4        A.    There were 11 people but I don't

5   recall all their names.

6        Q.    Can you give me the names that you do

7   recall?

8        A.    Lynn Bartlett, Debbie Stewart, Randy

9   Torres, Eddie Clifford and the rest of the people

10  I just have -- I just remember their first names;

11  Jerry, Michelle, Tracy.

12       Q.    Jerry Davis, Michelle Davis as well?

13       A.    Michelle Davis and Tracy.

14       Q.    Stansfield.

15       A.    Okay.  Yeah.  And Charles Bates.

16       Q.    Okay.  That's nine people rather than

17  11, but I believe that that's everyone.

18             So are you sure it was 11?

19       A.    It must -- no.  It must have been

20  nine.

21       Q.    Because you believe that that's a

22  complete list, the people that we just went

23  through?

24       A.    Yes.  Yes, I do.

25       Q.    Okay.  At the beginning of the class

                                              211

MARK R. DAHLBERG   (619) 296-4530

1    or somewhere near the beginning of the class,

2    were you told that Jennifer Adair would only be

3    your trainer for a certain portion of the class

4    and that she would then leave and another person

5    would come in mid way through?

6        A.    No.

7        Q.    That is eventually what happened,

8    correct?

9        A.    No.

10       Q.    Well, didn't Queen Scales take over

11   in about the middle of the training class?

12       A.    Yes.

13       Q.    So that did happen, Jennifer Adair

14   left and another trainer came in and took over,

15   correct?

16       A.    Yes.

17       Q.    How far ahead of when that took place

18   did you learn that that was going to happen?

19       A.    I had no knowledge.

20       Q.    So the first day that Queen Scales

21   came into your class was the first time you

22   became aware that there was going to be a change?

23       A.    That's correct.

24       Q.    Was there any pattern at all to the

25   days during training, as far as in the morning

212

MARK R. DAHLBERG   (619) 296-4530

1          MR. LOKER:   If you don't understand

2    the question, tell her.

3    BY THE WITNESS:

4          A.    Yeah, I don't understand the

5    question.

6    BY MS. BERNERT:

7          Q.    Well, I asked you if you thought

8    Jennifer Adair was a good trainer and you said

9    you weren't sure.  I asked you if you thought she

10    was teaching you the materials and you said no.

11    And I asked you why not?  What led you to have

12    the impression that she wasn't teaching you the

13    materials?

14          A.    She -- for long periods of time or

15    long stretches of time, she would let someone

16    else in the classroom, Charles Bates, take over

17    the class.

18          Q.    Okay.  And how would that happen?

19    How would he take over the class? What would he

20    do?

21          A.    He would just interrupt in the middle

22    of anything.

23          Q.    And what would he say when he

24    interrupted?

25          A.    He would just -- if it wasn't

220

1    sexually offensive joking or comments, it was

2    rambling-on stories.

3         Q.    Well, can you give me an example of

4    one of his rambling-on stories?

5         A.    About his -- I really can't recall.

6    There was a lot.

7              MR. LOKER:  Not sexual innuendo, but

8    the rambling-on stories.

9              Do you understand the question?

10   BY THE WITNESS:

11        A.    Yeah, yeah.  Well, the sexual

12   remarks --

13              MR. LOKER:  She hasn't asked you

14   about those yet.

15   BY THE WITNESS:

16        A.    The other remarks I don't recall at

17   this time.  There was too many.  Too numerous.

18   BY MS. BERNERT:

19        Q.    Can you give me one example?

20        A.    Talking about how great his military

21   background was.

22        Q.    Anything else you can remember?

23        A.    Boasting that he had always been a

24   supervisor in previous jobs.

25        Q.    Anything else you can think of, as

                                              221

        MARK R. DAHLBERG  (619) 296-4530

```
 1    far as his rambling stories?

 2         A.    I can't recall any.

 3         Q.    Okay.  What do you recall him making,

 4    as far as sexual remarks, during class when he

 5    was taking over?  Let's -- can you give me any

 6    answers without referring to your notes?

 7         A.    Sure.

 8         Q.    Okay.

 9         A.    I remember there was jokes, comments,

10    stories; in particular, there was one about the

11    word "fornication" and about a person that had an

12    accent and he mispronounced the word and it came

13    out F-U-C-K-I-N-G.

14         Q.    Mispronouncing "fornication"?

15         A.    Because they had -- they were a

16    foreign accent.

17         Q.    Okay.

18         A.    And he said the word out in class.

19         Q.    I'm asking you not -- I want to make

20    sure I get everything that you can recall without

21    referring to your notes and then we'll refer to

22    the notes, okay?

23              Can you recall any other comments of

24    a sexual nature that he made during class?

25         A.    Sure.  There was a joke about a
```

222

MARK R. DAHLBERG  (619) 296-4530

1    woman's vaginal orifice.

2         Q.    What was the joke?

3         A.    I don't recall the exact joke.

4         Q.    And did he use that way of describing

5    it, "vaginal orifice"?

6         A.    No, he said "cunt".

7         Q.    And that was on one occasion?

8         A.    Yes.

9         Q.    Okay.  And the fornication joke, was

10   that made on more than one occasion?

11        A.    That was on -- yes.

12        Q.    How many occasions?

13        A.    On one occasion that I can -- that I

14   can recall.

15        Q.    On one occasion?

16        A.    That I can recall.

17        Q.    Okay.  Any other sexual jokes or

18   comments or stories that you can recall without

19   referring to your notes?  And again, I want to

20   make a distinction here, okay?  Between what took

21   place during the class period and what took place

22   at breaks or during lunch periods.  Or after.

23             Anything else that you can recall

24   without referring to your notes that took place

25   during the class time?

1          MR. LOKER:  I'm not sure she was done

2     with her previous answer.

3     BY MS. BERNERT:

4          Q.    I'm sorry.

5          A.    And also the fact that --

6     descriptions of penises with sexually transmitted

7     diseases; sores.

8          Q.    Okay.  Have you finished your answer?

9          A.    Mm-hmm, yes.

10          Q.    Let me go back and ask you, how many

11     occasions did he start to tell a joke during

12     class and you'd ask him not to?

13          A.    The best I can remember, I asked him

14     probably more than half a dozen times in front of

15     the whole class.

16          Q.    Okay.  And on each of those occasions

17     the joke that he was telling was one of a sexual

18     nature?

19          A.    Yes.

20          Q.    And he would tell it anyway?

21          A.    He'd tell it anyway.

22          Q.    Let's turn now to the comments about

23     penises.

24                How many times did you hear him make

25     comments about penises in class?

                                        225

MARK R. DAHLBERG   (619) 296-4530

1          A.    I don't recall.  I just remember.

2          Q.    More than once?

3          A.    Yes.  Could have been.

4          Q.    But you're not sure if it was more

5    than once?

6          A.    I'm not sure.

7          Q.    Okay.  Was it more than twice?

8          A.    I'm not really sure.

9          Q.    Okay.  Was it more than five?  Is

10   there any point where you can say it was clearly

11   not that many?

12               MR. LOKER:  Vague and ambiguous.  You

13   may answer.

14   BY THE WITNESS:

15         A.    I just don't know.  There was --

16   BY MS. BERNERT:

17         Q.    So at least more than once?

18         A.    Yes.

19         Q.    What is the comment that you recall,

20   if any, that you recall him making about the size

21   of a penis?

22         A.    Something about bragging about the

23   size.  That's all I can remember.

24         Q.    Okay.  Did he actually use the word

25   "penis" or did he make some allusion?

226

MARK R. DAHLBERG  (619) 296-4530

```
 1    haven't written it down.  So there were jokes
 2    about oral sex, too, in class?
 3          A.    Yes.  Cocksucker and oral sex.
 4          Q.    How many times did you hear that, a
 5    comment or a joke?
 6          A.    I can't really say.
 7          Q.    More than once?
 8          A.    Yes.
 9          Q.    In class?
10          A.    Yes.
11          Q.    More than twice?
12          A.    I really can't recall.
13          Q.    Now, you say he used the term
14    "cocksucker".  Is that what you interpret to be
15    a comment about oral sex or was there a separate
16    actual comment or joke about oral sex, other than
17    him using that term?
18          A.    Yes.
19          Q.    He used that term and that's what you
20    mean by that?
21          A.    Yes.
22          Q.    Okay.  Anything else?
23          A.    Not without referring to my notes.
24    There was just so many.
25          Q.    Okay.  Let's refer to your notes and
```

228

MARK R. DAHLBERG   (619) 296-4530

1    they are Exhibit 2.  And can you please direct me

2    to where on Exhibit 2 you're referring?

3          A.    On number -- on page 1, on No. 5, I

4    remember him joking -- it wasn't really a joke,

5    or commenting or trying to be entertaining, he

6    thought, by mentioning sexual intercourse

7    positions.

8          Q.    And what was the comment that he

9    made?

10          A.    I don't know.  They were always just

11    off the wall stuff that would just -- he'd just

12    shoot them out there.  You know.  They were out

13    there before you knew it.

14          Q.    But you don't remember what the

15    comment was that he made?

16          A.    I just remember it was some -- I

17    remember him saying some fucking, you know,

18    doggie style position or something to that

19    regards.

20          Q.    And this was during class?

21          A.    Yes.

22          Q.    And how many times did you hear him

23    make reference to sexual positions?

24          A.    I'm not really sure.  I just know

25    they were different comments constantly all the

                                             229

1    time every day.

2         Q.    But you don't recall if there was --

3    on more than one occasion that you heard him

4    reference a sexual position?

5              MR. LOKER:  I believe that's been

6    asked and answered.  You may answer.

7    BY THE WITNESS:

8         A.    No, I don't.

9    BY MS. BERNERT:

10        Q.    Okay.  Are there any more?

11        A.    Yes.

12        Q.    Okay.

13        A.    He would, if not every day or every

14   morning, give us a report about his sexual

15   exploits the night before.

16        Q.    And what did he tell you about his

17   sexual exploits?

18        A.    Getting laid.

19        Q.    What would he say?

20        A.    All I'd hear as he walked by was

21   something about getting laid and then he was on

22   the other end of the floor from me, but I would

23   know, you know, what he was talking about.  I

24   know he would start in talking about getting

25   laid, having sex the night before.

                                              230

MARK R. DAHLBERG  (619) 296-4530

1        Q.    This is as he was walking in?

2        A.    Yeah.

3        Q.    So it wasn't during the class period

4   while the class was being taught?

5        A.    It would be sometimes before,

6   sometimes during, sometimes after, sometimes at

7   lunch, sometimes on breaks.  It was always.  All

8   the time.

9        Q.    Okay.  So is it your testimony that

10  he talked about whether or not he'd had sex the

11  night before during the class time?

12       A.    Yes.

13       Q.    And on how many occasions?

14       A.    Numerous.

15       Q.    Now, were there any -- strike that.

16  Anything else that you can recall him making as

17  far as comments, jokes, stories, of a sexual

18  nature during the time that class was actually

19  being taught?

20       A.    Yes.  There were stories about him

21  having first sex and masturbation, him performing

22  masturbation.

23       Q.    And these were stories that were told

24  during the class period?  In other words, he'd

25  interrupt Jennifer Adair and start telling one of

                                              231

                MARK R. DAHLBERG  (619) 296-4530

1          Q.      Okay.  All right.  So that includes

2     his first sex stories and masturbation stories?

3          A.      Yes.

4          Q.      Do you recall any of his first sex

5     stories?  What did he tell you about that?

6          A.      Nothing.  He talked about how he was

7     a little Don Juan and how he had sex very early,

8     at than early age.

9          Q.      And what did he tell you about

10    masturbation?

11         A.      Masturbation was -- I don't know,

12    that was just -- that's a kind word, the

13    masturbation.  He'd use the other word, "jacking

14    off".

15         Q.      And how would he use it?

16         A.      In reference to being, you know, a

17    young boy.

18         Q.      Can you give me an example of how he

19    used that in context?

20         A.      I just -- not really, no.  But I

21    would hear this stuff and it come droning through

22    her lectures.

23         Q.      What do you mean?  She's still

24    talking while he's doing this?

25         A.      She would stop because she couldn't

234

1        A.      At least a half a dozen.

2        Q.      And that was actually during class?

3        A.      During class and on, I remember one

4    specific occasion, during lunch.

5        Q.      Okay.  And tell me about the one

6    specific occasion during lunch that you

7    remember.

8        A.      That was our first day of training

9    and we went down to lunch together and he said

10   "Does anybody mind if I tell a joke?"  And I

11   said, "Is it a dirty joke?" And he goes, "yeah"

12   and I said, "Well, I mind.  I wish you couldn't

13   tell the joke."  And he went ahead and told it

14   anyway, before I even had a chance to say

15   anything.  The joke was out.

16       Q.      Do you recall what the joke was?

17       A.      That was the one about "cunt".

18       Q.      What was the joke?

19       A.      I don't know.  I was in shock.

20       Q.      And did you tell anybody about that?

21       A.      The whole group heard it.

22       Q.      Okay.  Did you tell anybody in

23   management about that?

24       A.      Not at that time.

25               MR. LOKER:  She didn't ask you that.

                                                238

1   She asked if you had -- she asked you if you told

2   anybody in management.  She didn't say when.

3   BY THE WITNESS:

4        A.    Yes, I did.

5   BY MS. BERNERT:

6        Q.    When was the first time you told

7   anyone in management that you had any concerns

8   about Mr. Bates?

9        A.    I need to refer to my calendar here.

10  As much as I can recall, on the 9th of February.

11       Q.    Is the first time that you

12  complained?

13       A.    As much as I can recall.

14       Q.    Okay.  Now, let me ask you a

15  question:  Earlier you said that you had heard

16  the "cunt" joke one time, correct?

17       A.    Mm-hmm.

18       Q.    And you said that it was during class

19  and you just testified that it was during lunch.

20            So are you sure that all these

21  comments that you said you heard during class

22  were actually during the class period, Ms.

23  Hanson?

24       A.    No, and -- no.

25       Q.    Okay.  Do we need to go through the

                                              239

MARK R. DAHLBERG   (619) 296-4530

1    referring to?

2         A.    Page 3.

3         Q.    Okay.

4         A.    Page 3.

5         Q.    Item about halfway down the page, it

6    says "2/9/98".

7         A.    Yes.

8         Q.    Now, you said that you created these

9    notes about a month ago.  What is it about a

10   month ago that reminded you on that February 9th

11   of 1998, you complained to Jennifer Adair about

12   sexually -- sexual offensive atmosphere?

13        A.    Because I know it was about a week

14   after class had started that I had waited and I'd

15   heard enough.

16        Q.    Okay.  Well, that would actually have

17   been your fourth day with Jennifer Adair, right?

18        A.    The 9th would be the fifth day.

19        Q.    Okay.  So it was a Monday?

20        A.    Yes.

21        Q.    All right.  And -- but you're just

22   guessing because you thought it was about a

23   week.  So there's nothing that makes you

24   absolutely certain that it was February 9th, is

25   that correct?

                                              242

          MARK R. DAHLBERG  (619) 296-4530

# Mark R. Dahlberg

COURT REPORTER
CSR#8487

1

2

3        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

4               FOR THE COUNTY OF SAN DIEGO

5

6    ALAYNE A. HANSON,

7                    Plaintiff, ) Case No. 730276

8         vs.                )

9    GEICO, CORPORATION; GEICO

10   DIRECT; BERKSHIRE HATHAWAY

11   CORP., and DOES 1 through

12   25, inclusive,

13                   Defendants.) Pages 251 - 454

14   --------------------------    VOLUME II

15

                    CERTIFIED COPY

16

17   DEPOSITION OF:

18               ALAYNE A. HANSON

19               JULY 6, 1999

20               9:00 A.M.

21

22

23   REPORTED BY:

24        MARK R. DAHLBERG                    **DISK**

25        CSR No. 8487                     **ENCLOSED**

                                          251

1        Q.     Okay.  Why did you go to her

2    approximately a week later?

3        A.     Because the behavior had gotten

4    worse.

5        Q.     Okay.  And how had it gotten worse?

6        A.     The jokes and sexual comments and

7    remarks had increased.

8        Q.     Increased in number?  Increased in

9    profanity?  How had they increased?

10       A.     They just increased overall in every

11   way.

12       Q.     So it did increase in number or in

13   amount?

14       A.     Yes.

15       Q.     And in your impression, the comments

16   became, what, more sexual?  More offensive?

17       A.     They were -- yes.  Yes.

18       Q.     When you went to Ms. Adair on this

19   second occasion, did you go with anyone else?

20       A.     No.

21       Q.     And how is it that you had this

22   conversation with her?  Where was it?

23       A.     It was, again, after class.

24       Q.     In the training area?

25       A.     Yes.

267

MARK R. DAHLBERG  (619) 296-4530

1      Q.    And nobody else participated in the

2    meeting?

3      A.    Not at this time.

4      Q.    Okay.  What did you tell Ms. Adair on

5    this second occasion?

6      A.    I told her, again, that I found the

7    sexual remarks extremely upsetting and I'd asked

8    Charles repeatedly to stop.

9            MR. LOKER:  Would you use last names

10   in addition to first.

11   BY THE WITNESS:

12     A.    Charles Bates, and it had not stopped

13   and I thought it would be taken care of.

14   BY MS. BERNERT:

15     Q.    And what was Ms. Adair's response?

16     A.    She said not to worry, that she would

17   -- she could handle -- she would handle it.

18     Q.    Did she say anything else?

19     A.    Not that I can recall at the time.

20     Q.    During your conversation with Ms.

21   Adair, did you complain to her about Mr. Bates'

22   monopolizing the conversation during the training

23   time?

24     A.    Not -- not that I recall.

25     Q.    Do you recall ever expressing to her

                                        268

1    -- these complaints being made on a Friday

2    afternoon at the end of a week?  Is that how

3    you're --

4           A.    I just don't recall what dates --

5    days they were.

6           Q.    Okay.  And was there anything in

7    particular that triggered your going to Ms. Adair

8    on this third occasion?

9           A.    On the third occasion Lynn Bartlett

10   -- yes, there is.

11          Q.    And what was that?

12          A.    Lynn Bartlett and Debbie Stewart and

13   myself decided to go to Jennifer Adair.

14          Q.    And how is it that the group had

15   decided to go to Jennifer Adair?

16          A.    We had talked about the sexual

17   atmosphere in the classroom and how it hadn't

18   changed and just gotten worse and we felt that

19   since -- since I had been dismissed by Jennifer

20   Adair about everything I had said, that hopefully

21   the three of us, you know, she would pay more

22   attention to what we had to say.

23          Q.    Based on your discussions with Lynn

24   Bartlett and Debbie Stewart, did you have an

25   understanding as to whether either of them had

                                                   275

              MARK R. DAHLBERG  (619) 296-4530

1   if going to Jennifer Adair didn't work?

2         A.    No.

3               MR. LOKER:  If there are no questions

4   pending, I'd like to speak to my client just one

5   moment.  It does not require a break.  Just one

6   minute.

7                     (Recess taken from

8                     9:36 a.m. to 9:40 a.m.)

9   BY MS. BERNERT:

10        Q.    Why don't we go back on.

11              Ms. Hanson, after the break, do you

12   have anything you need to clarify or change on

13   the record?

14        A.    Yes, I do.

15        Q.    Okay.

16        A.    This ad --

17        Q.    Let's make sure we make a clear

18   record.  You're referring to Exhibit 3 and you're

19   referring to the two columns of human resource

20   ads that are, I think, page 2 of Exhibit 3 as

21   we've marked it.

22        A.    Right.  And there's a date on the

23   insurance -- Golden Eagle Insurance Corporation

24   ad.

25              MR. LOKER:  I guess that's the right

                                                   288

MARK R. DAHLBERG   (619) 296-4530

1   column, third -- fourth from the bottom.

2               MS. BERNERT:  Uh-huh.

3   BY THE WITNESS:

4        A.    And there's a date that's asking you

5   to refer to another ad in a previous edition.

6               MR. LOKER:  The dates are --

7   BY THE WITNESS:

8        A.    So I believe that this ad came out of

9   a newspaper that was around about the time of

10  either before or maybe even after the GEICO job.

11  BY MS. BERNERT:

12       Q.    Okay.  Well, let's follow-up on that

13  a little bit.

14               Does that mean that you were looking

15  for positions other than insurance call center

16  positions, as far as exploring opportunities in

17  California?

18       A.    Not really.  I saw it was an

19  insurance company.  I didn't notice it said human

20  resources on it.

21       Q.    Okay.  Well, why then did you cut out

22  the other column of human resource ads?

23       A.    Well, I thought with my education

24  that possibly I could find some work in those

25  kinds of job opportunities.

                                                289

MARK R. DAHLBERG   (619) 296-4530

1          Q.    Okay.  So these were then

2     opportunities in California, other than in the

3     insurance industry, correct?

4          A.    Not necessarily.  I thought I could

5     use these jobs right here to advance myself and

6     my education and also apply what I had had in the

7     insurance industry to work some of these jobs.

8          Q.    Well, Ms. Hanson, the question is,

9     were you then open to taking a position in

10    California that was not in the insurance

11    industry?

12         A.    Not really, no, I was not.

13         Q.    Then why were you cutting out these

14    ads?

15         A.    I don't know -- I don't recall why I

16    cut these out.

17         Q.    Okay.  Let's go back to where we

18    were.

19              Ms. Hanson, after the meeting with

20    Jennifer Adair and Lynn Bartlett and Debbie

21    Stewart, you and Ms. Bartlett and Ms. Stewart

22    apparently talked about what you could do if this

23    latest conversation with Ms. Adair didn't result

24    in any changes, correct?

25         A.    No.

                                        290

1        A.      No.

2    BY MS. BERNERT:

3        Q.      Okay.  So the only person that you

4    ever complained to about Charles Bates at GEICO

5    is Jennifer Adair?

6        A.      Yes.

7        Q.      Are you aware of anyone else making

8    complaints to anyone else in management, other

9    than Jennifer Adair?

10       A.      Yes.

11       Q.      And who are you aware of complaining?

12       A.      Lynn Bartlett.

13       Q.      You're aware of anyone besides Lynn

14   Bartlett making a complaint to anyone in

15   management about Charles Bates, besides Jennifer

16   Adair?

17       A.      Not that I'm aware of.

18       Q.      What are you aware of, as far as Lynn

19   Bartlett complaining to someone else in

20   management?

21       A.      She relayed a story to me that she

22   had gone to Martha Furnas.

23       Q.      Okay.  Can you tell me when did Lynn

24   Bartlett tell you -- strike that.  This is going

25   to be a little bit unclear.  I want to know two

                                                    308

1        Q.      Okay.  So you knew she was still at

2    GEICO?

3        A.      Yes.

4        Q.      On the occasion that you passed her

5    in the hallway, did you have anything to say to

6    her?

7        A.      I just said hello.

8        Q.      Did she say hello to you?

9        A.      Yes.

10        Q.      Part of the allegations contained in

11    your complaint are that Queen Scales threatened

12    you.

13            Do you understand that to be one of

14    your claims in this lawsuit?

15        A.      Yes.

16        Q.      And is it your impression that Queen

17    Scales threatened you?

18        A.      Yes.

19        Q.      Can you tell me how she did that,

20    please?

21        A.      In front of the entire class she had

22    said that the complainers must stop or leave and

23    she'd heard about our issues, is what she called

24    them, and it's to stop, the complaining must

25    stop.

                                                    321

                MARK R. DAHLBERG  (619) 296-4530

1          Q.     And when did she make this statement?

2          A.     The first day of our training.

3          Q.     Did she tell you what complaints and

4    issues she had heard about?

5          A.     No.

6          Q.     During that -- and this was a speech,

7    for want of a better word, that she made to the

8    entire class?

9          A.     Yes.

10         Q.     Did she single out anybody at all as

11   far as who was a complainer and who had issues?

12         A.     I'm not sure.  I'm not aware of that.

13         Q.     At any point in time during the time

14   that she had that class, did she single anyone

15   out as being a complainer or person who had an

16   issue?

17         A.     I don't know.

18         Q.     Well, did you ever witness that?

19         A.     I don't understand.

20         Q.     Did you ever witness her singling

21   anyone out?

22         A.     I don't understand the question.

23         Q.     Did you at any point in time during

24   the time that Queen Scales was your instructor,

25   in that first class, see her in any way indicate

                                              322

1    an individual who was a "complainer", or who had

2    an issue?

3         A.    Yes.

4         Q.    And how did she do that?

5         A.    I felt it was directed towards me.

6         Q.    And why?

7         A.    Because I had complained.

8         Q.    Okay.  But did she do anything to

9    indicate specifically that it was you she was

10   talking to or were her remarks always addressed

11   to the entire training class?

12        A.    She was up in -- she was up in front

13   of the class when she said it, but I felt they

14   were directed towards me.

15        Q.    And why?  Did she point at you?

16        A.    No.

17        Q.    Did she look at you only when she

18   made the comments?

19        A.    No.

20        Q.    Okay.

21        A.    Just her manner.

22        Q.    And what about her manner indicated

23   to you that you were being singled out or

24   addressed?

25        A.    She was angry when she said it and I

                                              323

MARK R. DAHLBERG  (619) 296-4530

1   thought it was directed towards me and the others

2   that complained.

3        Q.   Okay.  Did you ever talk with Lynn

4   Bartlett about whether or not she thought those

5   comments were addressed to you?

6        A.   No.

7        Q.   Did Lynn Bartlett ever tell you that

8   she thought the comments were addressed to her?

9        A.   Yes.

10        Q.   Did you ever discuss, "no, no,

11   they're addressed at me" or "they're addressed at

12   us" or --

13        A.   Yes.

14             MR. LOKER:  That's vague and

15   ambiguous.  You may answer.

16   BY MS. BERNERT:

17        Q.   Tell me about that conversation?

18             MR. LOKER:  Well, the question

19   assumes there was one conversation and in that

20   sense it might misstate the testimony, but you

21   may answer.

22   BY THE WITNESS:

23        A.   We discussed at the next break, you

24   know, how we were kind of scared and frightened

25   that we were all gonna lose our jobs.

                                           324

             MARK R. DAHLBERG   (619) 296-4530

1          A.     Not that I recall.

2          Q.     Did you feel that Ms. Scales

3    threatened you on any other occasion, other than

4    that first day when she made that speech?

5          A.     Yes.

6          Q.     And on how many other occasions do

7    you feel she threatened you?

8          A.     It was a week after the first threat.

9          Q.     Okay.  But again, I'm trying to get a

10   feel for on how many occasions you felt that she

11   threatened you, and again, I'm in the first

12   class, not the --

13         A.     Three or four occasions.

14         Q.     Okay.  And the second time was about

15   a week later?

16         A.     Yes.

17         Q.     And Ms. Scales had taken over your

18   class on March 9th, is that what you recall?

19         A.     The best I can recall, yes.

20         Q.     Okay.  So you think then that

21   sometime the week of March 16th she threatened

22   you again?

23         A.     Yes.

24         Q.     And how did she threaten you on the

25   second occasion?

                                            326

1    A.    It was, again, in front of the class,

2    and she said that the complaining must cease, and

3    at that point Lynn said to her, she hollered out

4    in class to her, "Well, does this mean nothing's

5    gonna change?"

6         MR. LOKER:  Would you use last names,

7    please?

8    BY THE WITNESS:

9    A.    Lynn Bartlett said -- or Lynn

10   Bartlett asked, "Does that mean nothing's going

11   to change?"  And Queen Scales snapped back at

12   her, "Just get back to work."

13   BY MS. BERNERT:

14   Q.    Well, had you complained about

15   anything to Queen Scales, as far as Charles

16   Bates?

17   A.    No.

18   Q.    Had you complained -- strike that.

19   Had there been complaints of any other nature

20   made about the training?

21        MR. LOKER:  By the plaintiff?

22        MS. BERNERT:  By anyone that you're

23   aware of.

24        MR. LOKER:  That's vague and

25   ambiguous.  You may answer the question, if you

327

MARK R. DAHLBERG   (619) 296-4530

1   understand it.

2   BY THE WITNESS:

3        A.    I don't understand it.  I don't

4   understand.

5   BY MS. BERNERT:

6        Q.    Well, again, you said that she made a

7   comment, "The complaining must cease."   What

8   complaining, if any, were you aware of that was

9   going on at that time?

10       A.    I didn't -- I didn't know of any.  I

11   wasn't aware of any.

12       Q.    Okay.  So you hadn't heard people

13   complaining about not feeling that they were up

14   to speed or where they should be because Jennifer

15   Adair hadn't been a good instructor?

16       A.    I'm not certain.

17       Q.    Did you ever hear any comments along

18   those lines?

19       A.    Not that I recall.

20            MR. LOKER:  Do you need a -- we've

21   been going awhile.  Do you need a short break?

22            MS. BERNERT:  Sure.

23   BY THE WITNESS:

24       A.    That would be good.

25            MS. BERNERT:  Help yourself.

                                          328

         MARK R. DAHLBERG  (619) 296-4530

```
 1                    (Recess taken from

 2                10:20 a.m. to 10:35 a.m.)

 3   BY MS. BERNERT:

 4        Q.    Let's go back on the record.  Ms.

 5   Hanson, you indicated that the second occasion

 6   that Ms. Scales threatened you or threatened --

 7   made a comment that you perceived to be

 8   threatening was about a week after the first time

 9   that she made such a comment.

10              You also indicated that she made

11   comments that you thought were threatening on

12   three or four occasions.

13              Can you tell me about the third

14   occasion that she made such a comment?

15        A.    It was in the retraining class.

16        Q.    So only two times during the original

17   class?

18        A.    Yes.

19        Q.    And then how many times in the

20   retraining class?

21        A.    Once.

22        Q.    Okay.  We'll get to the retraining

23   class.  There's something else I want to go

24   through before we get there.

25              Do you recall at some point in time
```

329

MARK R. DAHLBERG   (619) 296-4530

1     there was an investigation into Charles Bates'

2     behavior in the training class?

3          A.     Yes.

4          Q.     And how did you become aware that

5     there was an investigation?

6          A.     I was asked to give a statement.

7          Q.     Okay.  And who asked you to give a

8     statement?

9          A.     I don't recall the person's name.

10         Q.     Okay.  Was it April Gomez?

11         A.     Yes, it was, now that you mention it;

12    yes.

13         Q.     And she's the person that you

14    actually gave the statement to?

15         A.     Yes.

16         Q.     Okay.  Now, do you recall that this

17    investigation took place the third day that Queen

18    Scales was your instructor in the first class?

19         A.     No.

20         Q.     When do you recall the investigation

21    taking place?

22         A.     I don't really recall when it had

23    taken place.  I can't remember when and over what

24    course of time the investigation was on.  We were

25    not given any information.

                                                    330

MARK R. DAHLBERG  (619) 296-4530

1    recall"?

2    BY THE WITNESS:

3         A.    I don't recall.

4    BY MS. BERNERT:

5         Q.    When you went to meet with April

6    Gomez, as you were on the way to meet with her,

7    did you know why you were going to meet with her?

8         A.    I wasn't really sure.

9         Q.    Had you been told that it had

10   something to do with Charles Bates?

11        A.    It was kind of in the air in the

12   classroom.

13        Q.    Okay.  How long did you meet with

14   April Gomez?

15        A.    About 15 minutes.

16        Q.    And where did you meet with her?

17        A.    In her office.

18        Q.    Was anyone else present?

19        A.    No.

20        Q.    Do you recall what you told her?

21        A.    I told her that I found Charles

22   Bates' behavior very offensive and I told her of

23   the sexual nature of his behavior and the

24   constant joking and comments that were sexual in

25   nature.

MARK R. DAHLBERG   (619) 296-4530

1    BY THE WITNESS:

2         A.    Yes.

3    BY MS. BERNERT:

4         Q.    Although it apparently was not during

5    the classroom portion of the day.

6         A.    Yes.

7         Q.    Okay.  Is it one such comment that

8    you recall or more than one?

9         A.    There were occasional remarks.

10        Q.    Okay.  Do you recall any of them?

11        A.    Not that I recall the exact nature

12   of, but I do know it was offensive.

13        Q.    Was it sexual?

14        A.    Lewd, offensive.

15        Q.    How?

16        A.    Not that I -- I don't recall the

17   exact words.

18             MR. LOKER:  Objection, vague and

19   ambiguous.  You may answer.

20   BY MS. BERNERT:

21        Q.    So you don't recall any examples of

22   anything that he said after --

23        A.    I --

24        Q.    Strike that.  And let me finish the

25   question and counsel can make his objection if

                                              340

MARK R. DAHLBERG  (619) 296-4530

1   you want and then you can answer.   Okay?   We all

2   need to let each other talk.

3              *So is it your testimony you cannot*

4   recall the substance of any offensive comment

5   that Charles Bates made after Queen Scales became

6   the instructor in the training class?

7        A.    That's correct.

8        Q.    All right.   Do you recall having

9   discussions with anyone else in the class about

10   the fact that Mr. Bates continued to make

11   inappropriate comments after the investigation?

12       A.    No.

13       Q.    Did anyone else ever complain to you

14   that they thought that Mr. Bates continued to

15   make inappropriate comments after the

16   investigation?

17       A.    Not that I recall.

18       Q.    Did Lynn Bartlett ever talk with you

19   about what she perceived to be as a change in

20   Charles Bates' behavior after the investigation?

21       A.    Not that I recall.

22       Q.    Did Debbie Stewart ever comment to

23   you that she perceived a change in Charles Bates'

24   behavior following the investigation?

25       A.    No.

MARK R. DAHLBERG   (619) 296-4530

```
 1    he -- it diminished somewhat.

 2         Q.    Okay.  Did you ever discuss that with

 3    anybody else in the class?

 4         A.    No, I did not.

 5         Q.    And I believe you testified that it

 6    wasn't your understanding that your training

 7    class -- that the classroom portion was extended

 8    by a week after Queen Scales took over, is that

 9    correct?

10         A.    Yes.

11         Q.    Were you aware that Charles Bates had

12    a meeting during the investigation with anyone?

13         A.    I was not.

14         Q.    Did Charles Bates ever discuss in the

15    class what had happened during the investigation?

16         A.    No.

17         Q.    I believe you went on to the

18    mentoring portion of the training on March 30th

19    of 1998.

20               Does that sound correct to you?

21         A.    Yes.

22         Q.    After you went to the mentoring

23    portion of the class, what interaction, if any,

24    did you have with Charles Bates?

25         A.    None.
```

344

MARK R. DAHLBERG  (619) 296-4530

1      Q.     Did you ever even see him after you
2  went to the mentoring portion of the training?
3      A.     Yes.
4      Q.     And where would you see him?
5      A.     He was in another area.
6      Q.     Could you hear him from where you
7  were sitting?
8      A.     Not really.
9      Q.     Okay.  Did Charles Bates ever do
10  anything that you thought was inappropriate once
11  the mentoring portion of the training started?
12      A.     No, I don't believe so.  Not that I'm
13  aware of.
14      Q.     Okay.  Did anyone in management ever
15  share with you what the outcome of the
16  investigation was?
17      A.     Never; no, never.
18      Q.     Did you ever ask?
19      A.     In a sense, after the comment that
20  Queen Scales made in answer to Lynn's question,
21  "Will anything change", I decided I didn't want
22  to ask.
23      Q.     Had the investigation already taken
24  place the time that Lynn Bartlett made that
25  comment?

345

MARK R. DAHLBERG  (619) 296-4530

1    portion -- strike that.

2              How long did you understand the

3    mentoring portion of the training was gonna last?

4         A.    I understood it to be three weeks.

5         Q.    Okay.  And did anyone ever tell you

6    what needed to be accomplished during that

7    mentoring section of the training?

8         A.    I didn't really understand the goals.

9         Q.    Okay.  Well, let me back up.

10              Was there ever any discussion as to

11    what the mentoring was all about, even if you

12    didn't understand it?  Did anyone get up and try

13    to explain what was going to happen during

14    mentoring?

15        A.    I understood it to mean that I would

16    be on the telephones and learning how to use the

17    phones and how to access the computer screens for

18    the clients' insurance information.

19        Q.    And how did you come about to have

20    that information?

21        A.    Things I picked up and heard.

22        Q.    Okay.  So there was no discussion at

23    all by the instructor that you were going to move

24    on to mentoring and here's how the process

25    worked?

                                                  351

MARK R. DAHLBERG   (619) 296-4530

1          A.     Oh, yes, there was.  After the -- I

2    passed the final, then I was told you now move on

3    to the mentoring and your gonna work the phones

4    and become accustomed to the phones and become

5    accustomed to the computer and the screens.

6          Q.     Okay.  Had you been working with the

7    computer and the screens in the classroom portion

8    of the training?

9          A.     Yes.

10          Q.     And who told you this, that you were

11    gonna move on?

12          A.     We were -- I was told this by Queen

13    Scales.

14          Q.     Okay.  Who told you that you passed

15    the test?

16          A.     Queen Scales.

17          Q.     And did she tell you that you had

18    done well or just simply that you had passed the

19    test?

20          A.     She said I had done well.

21          Q.     Okay.  I understand that you knew you

22    were going to be working on the phones.  I

23    believe that the mentoring portion has to do with

24    moving on to the phones but working with a

25    mentor, I-E, somebody who would be sitting with

                                                    352

1    you during that next stage.

2                    Did you understand that to be part of

3    the process?

4          A.    Yes, that's what they told us.

5          Q.    Okay.  So you weren't going to be

6    assigned a cubicle and just start working, you

7    were actually going to be sitting with an

8    experienced service counselor as you started to

9    work the phones, is that the case?

10         A.    No.

11         Q.    Okay.  What was your understanding?

12         A.    Well, my understanding is I would be

13   given a mentor but what really happened is

14   different.

15         Q.    What happened?

16         A.    I was given a cubicle, a phone and a

17   computer and just left to myself.

18         Q.    Was it your understanding that there

19   were two new trainees assigned to each mentor?

20         A.    I'm not really sure.

21         Q.    Did you have any idea whether or not

22   anyone was even assigned to you when you went on

23   to the mentoring portion of the training?

24         A.    At times, yes, and that would change.

25         Q.    Okay.  Well, let me ask you, the

                                                   353

                MARK R. DAHLBERG  (619) 296-4530

1              MR. LOKER:  Asking for a what?

2              MS. BERNERT:  It's a term of art at

3    GEICO.  P-H-A-P.

4              MR. LOKER:  Thank you.

5    BY MS. BERNERT:

6         Q.   Now, I guess you've testified that

7    other than at least one conversation with April

8    Gomez and perhaps more, you don't recall anyone

9    expressing any concerns about your performance

10   during the mentoring portion of your training,

11   correct?

12        A.   Yes, that's correct.

13        Q.   Tell me about how you learned that

14   you were going to be sent back for retraining?

15        A.   I was called in April Gomez's office

16   and told that I was gonna be sent back to

17   retraining.

18        Q.   And who was in April Gomez's office?

19        A.   I was and April Gomez.

20        Q.   No one else?

21        A.   Not that I can recall.

22        Q.   And what did she tell you was the

23   reason that you were going back to retraining?

24        A.   She said I needed to be retrained and

25   I don't recall the exact conversation.  The

                                              364

1    at GEICO about the fact that you were back in a

2    training class?

3         A.    No.

4         Q.    You indicated that Queen Scales made

5    a threat, at least something that you perceived

6    to be a threat, after you went back into the

7    retraining class.

8              Can you tell me about that, please.

9         A.    I told her that I didn't understand

10   what she was trying to tell me, she was giving me

11   instruction on something, I don't remember, and I

12   remember her making the comment, "Don't you think

13   you've complained enough?"

14        Q.    And do you recall where in the

15   retraining that was?

16        A.    I don't remember the time line or

17   time frame in that.  I just know I was already in

18   the classroom.

19        Q.    After you went back into retraining,

20   did you complain about things that you perceived

21   to be problems in the retraining class?

22        A.    No.

23        Q.    Never made any complaints at all

24   during that retraining?

25        A.    No.

374

MARK R. DAHLBERG   (619) 296-4530

1          Q.     Did you comment to Queen Scales on

2     any occasion that you didn't know why you had

3     been sent back for retraining?

4          A.     No.

5          Q.     At any point during the time that you

6     were at GEICO, did you have any discussions with

7     Martha Furnas, one-on-one basis?

8          A.     No.

9          Q.     How did you learn that you were going

10    to be terminated from GEICO?

11         A.     I was called into April Gomez's

12    office and told.

13         Q.     And what were you told?

14                (Phone interruption.)

15                (Recess taken from

16                11:30 a.m. to 11:36 a.m.)

17    BY MS. BERNERT:

18         Q.     Let's go back on the record.  Ms.

19    Hanson, during the, I believe it was the

20    approximately two weeks that you were in the

21    retraining class, correct?

22         A.     Yeah, little less than two weeks, I

23    believe.

24         Q.     Do you recall Nancy Funderbank

25    talking to you about problems that you were

                                              375

            MARK R. DAHLBERG   (619) 296-4530

1        Q.     Okay.   Are you aware of it as you sit

2   here today?

3        A.     Yes.

4        Q.     Okay.  Have you had the opportunity

5   to review any of those notes?

6        A.     Yes.

7        Q.     Okay.  Those notes talk about various

8   issues or problems that the person who wrote

9   those notes perceived in your performance.

10             Do you understand that?

11       A.     Yes.

12       Q.     Okay.  Do you think that those notes

13  are inaccurate?

14             MR. LOKER:  I'll object.  First of

15  all, the question is impossibly compound.  There

16  are tons of notes in there, so I think it's

17  impossibly compound.  If you understand you can

18  answer.

19             MS. BERNERT:  I'm trying to be brief,

20  Counsel, and not having to go through every

21  single one.  Let me just try and see what I can

22  get and see if I'm satisfied and not go through.

23             MR. LOKER:  Yeah.  She may answer the

24  question if she understands it.

25  BY THE WITNESS:

                                                    385

MARK R. DAHLBERG  (619) 296-4530

1        A.      I'm sorry, can you repeat the

2   question.

3   BY MS. BERNERT:

4        Q.      Having reviewed those notes, do you

5   think that the issues reflected in those notes

6   are inaccurately recorded?

7        A.      Yes.

8        Q.      Okay.  Do you have any idea why these

9   individuals would have written down performance

10  problems that you weren't having?

11       A.      I -- I don't really have a good

12  answer, other than the fact I thought it was

13  maybe hostility because of the fact I had

14  complained.

15       Q.      Did anyone of the mentors that you

16  worked with ever indicate to you in any way that

17  they were aware of the complaints that you had

18  made regarding Charles Bates?

19       A.      No, but they would often sit

20  together, the mentors would sit -- sit with Queen

21  Scales and take their breaks together and have

22  lunch together.

23       Q.      Okay.  Again, though, from any source

24  whatsoever, did anyone tell you or did you become

25  aware that any of these mentors knew anything

                                              386

1  about the complaints you had made with respect to

2  Charles Bates?

3          A.     No.   No.

4          Q.     Well, I guess I just don't think I

5  have any choice, unfortunately.

6                 MR. LOKER:   I beg your pardon?

7                 MS. BERNERT:   I think I'm going to

8  have to go through all the mentoring docs so she

9  can tell me how they're wrong.   So you want to

10  take the lunch break now?

11                 MR. LOKER:   Yeah, if it's a good time

12  for you, sure.

13                 MS. BERNERT:   Sure.

14                 (At 11:45 a.m. the noon

15                 recess was taken.)

16  ///                                         ///

17  ///                                         ///

18

19

20

21

22

23

24

25

                                                387

1    gone, to make a record about our first amended

2    complaint.  You still can ask her about them.

3                    MS. BERNERT:  Sure.

4                    MR. LOKER:  But virtually, there is

5    in being a first amended complaint, Counsel, and

6    I have discussed it briefly off the record, and

7    with the exception of some -- well, the

8    substantive change, in my opinion in the

9    complaint, is the -- is the nature of our

10   misrepresentation and Labor Code 970 complaint,

11   and I believe the allegations we've made, while

12   false, cannot be shown by testimony to be -- to

13   have been false while made.  So I want to make it

14   clear that our misrepresentation and Labor Code

15   970 claim in the first amended complaint, and the

16   four corners of it will be this:

17                    She is alleging that

18   misrepresentation was made in that she was not --

19   not only not informed or suggested as a condition

20   of her employment, was to pass this basic

21   training class and, in fact, on the application

22   documents, there are conditions spelled out that

23   do not include those.

24                    So -- and further, that she was

25   actually led to believe that was not a

                                                    425

1    condition.

2              So anyway, I wanted to make it clear,

3    Counsel, I may not object if you need further

4    time in lieu of our FAC to question her, probably

5    would not object to a redeposition, but I say it

6    in the hopes that you won't feel or that nobody

7    sandbagged and if you want to ask questions,

8    you'll take the time today.

9              These misrepresentations on this

10   exhibit, therefore, some of it's simply

11   information and you may ask her, but those will

12   not be the basis of the FAC on the fraud, Labor

13   Code 970 claim.

14             MS. BERNERT:  Okay.

15             MR. LOKER:  Furthermore, as an item

16   of cleanup, we would like to, as to the

17   complaint, represent also, if this reflects our

18   agreement, we are going forward on 2, 4 and 5 and

19   dismissing 1 and 2, each party to bear costs and

20   fees.

21             MS. BERNERT:  Well, actually I think

22   you've got 2 in.  You're dismissing 1 and 3,

23   Counsel.

24             MR. LOKER:  2 is in.  What did I say?

25             MS. BERNERT:  You said you were

                                                426

1    need to come back and do anything further after I

2    actually get the amended complaint.  Okay?

3              MR. LOKER:  Very well.

4    BY MS. BERNERT:

5         Q.    All right.  Ms. Hanson, with respect

6    to -- we're back on Exhibit 2, we're on page 2,

7    the heading on the top of this page is

8    Misrepresentation.  And item No. 1 appears to be

9    a listing of the things that you felt were said

10   to you that were not true, is that correct?

11        A.    Yes.

12        Q.    All right.  So these items included

13   the fact that there were educational benefits

14   available at GEICO, is that correct?

15        A.    Yes.

16        Q.    And indeed there are education

17   benefits available at GEICO, correct?

18        A.    Yes.

19        Q.    And there was discussion about the

20   possibility of advancement, is that correct?

21        A.    Yes.

22        Q.    Was there -- strike that.  And to

23   your knowledge, were any -- strike that.

24              There was also discussion about the

25   possibility of promotions?

                                             428

1          A.     Yes.

2          Q.     But you were not promised any

3   specific advancement or promotion, as I recall,

4   correct?

5          A.     I was told that after a year, because

6   they needed so many supervisors with all these

7   new people they were hiring, that I had a very

8   good chance of getting a promotion with my

9   education, my background in insurance and also

10  the insurance courses I was taking.

11         Q.     You were taking or you had taken?

12         A.     I had taken.

13         Q.     But you were not specifically

14  promised that you would be a supervisor, were

15  you?

16         A.     Well, I was led to believe that there

17  were promotions after a year and there were

18  supervisory positions.  I was told that I would

19  qualify for those.

20         Q.     Were you specifically told that you

21  would be a supervisor after a year?

22         A.     I was not told I'd be a supervisor

23  after a year.

24         Q.     Okay.

25         A.     But I was told that I would have a

                                                    429

MARK R. DAHLBERG   (619) 296-4530

1    chance at a promotion of a supervisory level with

2    my education and experience, which is the reason

3    they hired me so quickly.

4         Q.    Okay.  Did you understand that you

5    were being hired more quickly than other people

6    at that time?

7         A.    They were very enthusiastic and

8    thrilled with my qualifications.

9         Q.    I understand that you felt that way.

10   My understanding -- my question is, however, did

11   you understand that you were hired more quickly

12   in any way than other applicants that were being

13   hired at the time?

14        A.    Well, I felt like because of the

15   information I'd given them and what I'd shown

16   them, yes, I was.

17        Q.    Okay.  What led you to believe that

18   you were hired in any way more quickly than any

19   other applicant?

20             MR. LOKER:  She just asked and

21   answered that, but you may answer.

22   BY THE WITNESS:

23        A.    I'm not really sure, but I got hired

24   two days after I arrived here.

25   BY MS. BERNERT:

                                                430

MARK R. DAHLBERG  (619) 296-4530

1 on board as a trainee?

2   A. Yes.

3   Q. Okay.  So you had made your decision

4 to go to GEICO before this speech?

5   A. Yes.

6   Q. Your counsel also just indicated when

7 he was making his statement regarding the amended

8 complaint, that no one ever told you that

9 completing the training course was necessary for

10 keeping your job, is that true?

11   A. Yes.

12   Q. What did you think would happen if

13 you couldn't do the job at GEICO?

14   A. Well, I thought with my experience

15 and the fact that I had, you know, worked in

16 insurance and done so wonderfully well on my past

17 job, that I didn't really even think there would

18 be a problem.

19   Q. Okay.  And as you sit here today, do

20 you understand that there were perceived problems

21 with your performance?

22   A. GEICO thought there was perceived

23 problems with my performance.

24   Q. Okay.  And when April Gomez told you

25 that you were being let go, did you believe that

432

1         A.    Yeah, as best I can recall, yes,

2    that's what was said in the first -- the first

3    threatening statement.

4    BY MS. BERNERT:

5         Q.    Okay.

6         A.    I have to make a correction here, is

7    that --

8               MR. LOKER:   Where is "here"?   Page 9,

9    line...

10   BY THE WITNESS:

11        A.    Page 9, line 2.   She had heard about

12   our complaints and our issues.   She used the word

13   "issues".

14   BY MS. BERNERT:

15        Q.    Okay.   Did she use the word

16   "complaints"?

17        A.    Yes.

18        Q.    Ms. Hanson, did you ever have any

19   conversations with Charles Bates that you

20   considered to be pleasant conversations?

21        A.    Not that I can recall.

22        Q.    Other than the fact that you were not

23   informed that successfully completing the

24   training class was a prerequisite to keeping your

25   job at GEICO, is there anything else that you

448

MARK R. DAHLBERG   (619) 296-4530

```
 1    feel was misrepresented to you by GEICO?

 2          A.    Well, other than the things I've

 3    already stated before, you know.

 4          Q.    The conversations during the hiring

 5    process?

 6          A.    Yes, yes, the conversations during

 7    the hiring process.

 8          Q.    Okay.

 9          A.    And about promotions, with

10    advancements, training.

11          Q.    We've covered those.

12          A.    Yes.

13          Q.    Anything other than that?

14          A.    Nothing I can think of.

15          MS. BERNERT:  Okay.  I have no

16    further questions.

17          MR. LOKER:  I have no questions.  Oh.

18

19                 EXAMINATION

20

21    BY MR. LOKER:

22          Q.    On Exhibit 2, there was one item, you

23    got through all the list, but you did not mention

24    the penis and the popcorn box.  Not sure it bears

25    repeating, but since we did everything else on
```

                                                    449

# Mark R. Dahlberg

COURT REPORTER
CSR#8487

1

2

3    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

4                FOR THE COUNTY OF SAN DIEGO

5

6    ALAYNE A. HANSON,

7                    Plaintiff, ) Case No. 730276

8         vs.                   )

9    GEICO, CORPORATION; GEICO

10   DIRECT; BERKSHIRE HATHAWAY

11   CORP., and DOES 1 through

12   25, inclusive,

13                    Defendants.) Pages 1 - 125

14   ---------------------------

15

                        CERTIFIED COPY
16

17   DEPOSITION OF:

18              MARTHA T. FURNAS

19              JULY 12, 1999

20              10:30 A.M.

21

22

23   REPORTED BY:

24         MARK R. DAHLBERG                **DISK**

25         CSR No. 8487                    **ENCLOSED**

                                                    1

1                    If I ask a question that you don't

2       understand, tell me and I'll rephrase it.

3                    Have you reviewed any documents in

4       preparation for the deposition today?

5            A.    Yes.

6            Q.    Okay.  Would you tell me which

7       documents you've reviewed?

8            A.    I've reviewed the mentoring.

9            Q.    Okay.  The mentoring notes?

10           A.    Yes.

11           Q.    Okay.

12           A.    And the investigation conducted

13      during the training class.

14           Q.    May I safely assume, Counsel, that

15      the documents she's referred to are amongst those

16      which you have produced?

17                    MS. BERNERT:  You may.

18      BY MR. LOKER:

19           Q.    Thank you.  What is your present

20      position?

21           A.    Customer service director.

22           Q.    Okay.  And how long have you been in

23      that position?

24           A.    I've been there five years.  Since

25      April of '94.

                                                    5

1          Q.    And how is it you fix that date as

2     six weeks after the training class began?

3          A.    Because I'm aware of when Jennifer

4     Adair left that class and Queen Scales took over.

5          Q.    Okay.  When did Jennifer Adair leave

6     the class and Queen Scales take over?

7          A.    The specific date?

8          Q.    Yes.

9          A.    I would need to refer to a document.

10         Q.    Okay.  What document would you have

11    to refer to?  Strike the question, let's go on.

12              MS. BERNERT:  Counsel, would you like

13    me to go get a calendar?

14              MR. LOKER:  No, I've got a

15    chronology.  I just want to test what she recalls

16    or may recall.

17              MS. BERNERT:  Okay.

18    BY MR. LOKER:

19         Q.    I'm trying to decide how you affix

20    these dates.  Dates are rarely important, but I

21    want to make sure we get the sequence of events.

22              Approximately March 9, 1998, as I

23    understand, the evidence in this case suggests

24    that Jennifer Adair was replaced by Queen

25    Scales.

                                                    13

              MARK R. DAHLBERG   (619) 296-4530

1          Is that consistent with your memory?

2     A.   Is that on a Monday?

3     Q.   That we made need a calendar.  Was

4  that a Monday?  If you tell me it was a Monday,

5  that will probably fix it close enough.

6     A.   Yes.

7     Q.   Do you know why Jennifer Adair was

8  replaced as a supervisor?

9     A.   She was a trainer, not a supervisor.

10    Q.   Thank you.

11    A.   She went to another training class to

12 begin a training class.

13    Q.   Was she replaced by Queen Scales

14 during the middle of a training cycle?

15    A.   Towards the end.  It was still in a

16 training class.

17    Q.   Was there any reason why she was

18 replaced within the training cycle?

19    A.   No, there was no reason except for

20 she had to start another class.

21    Q.   Did it have anything to do with any

22 complaints of either her or Charles Bates?

23    A.   No.

24    Q.   Okay.  Let's go back, if we may.

25         I'm trying to bracket in time.  Once

14

MARK R. DAHLBERG  (619) 296-4530

1    again indulge me here.

2              When did you first become aware of

3    any complaints of Charles Bates' behavior?

4         A.    To the best of my recollection it

5    would have been March 9th or 10th.

6         Q.    How did you become aware?

7         A.    April Gomez and Andrea Dickens

8    approached me.

9         Q.    Where were you when they approached

10   you?

11        A.    Either in their office or my office.

12        Q.    Did you keep any notes of that

13   conversation?

14        A.    Of the conversation I had with them

15   at that moment, no.

16        Q.    Okay.  No?

17        A.    No.

18        Q.    Tell me as well as you can recall --

19   by the way, was that before, immediately before

20   Queen Scales assumed the class or after?

21        A.    After.

22        Q.    But as nearly as you can recall,

23   right after?

24        A.    Either the first or second day that

25   she assumed the class.

                                                    15

```
1          Q.     Okay.  Can you tell me what Andrea

2     Dickens and April Gomez said to you on that

3     occasion?

4          A.     They said that they were going to

5     conduct an investigation.  That Queen came to

6     them with some concerns about the class.

7          Q.     Did they ask you for any guidance or

8     authority?

9          A.     Yes.

10         Q.     What did they ask you?

11         A.     We discussed the fact that if there

12    was some concerns about what was going on in the

13    training class, that they needed to conduct a

14    full investigation and speak with members of the

15    class that had a concern.

16         Q.     Did you -- by the way, at this point

17    then, were you by your position in charge of the

18    investigation?

19         A.     I was authorized to allow the

20    investigation because of my position.

21         Q.     Who at that time would you say was in

22    charge of the investigation?

23              MS. BERNERT:  I'm going to object, it

24    calls for speculation and lacks foundation.  If

25    you know.
```

16

1   BY THE WITNESS:

2          A.    Me.  I would report -- me.

3   BY MR. LOKER:

4          Q.    Okay.  And between -- were both

5   Dickens and Gomez, in your mind at that time,

6   going to do the investigation?

7          A.    Yes.

8          Q.    Did you suggest or direct them to

9   take written statements of the people they were

10  questioning?

11         A.    Yes, it would be part of that

12  process.

13         Q.    Do you know whether written

14  statements were taken?

15              MS. BERNERT:  I'm going to object,

16  vague and ambiguous as to "written statements".

17  BY MR. LOKER:

18         Q.    Do you still -- counsel and I from

19  time to time may object.  We're just doing it for

20  the record.  Unless she tells you not to answer

21  -- we're just doing it for the record in the

22  event it goes to trial, the judge might strike it

23  because of what she's objected to, but you still

24  need to answer the question.  Do you want him to

25  read the question back?

                                              17

MARK R. DAHLBERG  (619) 296-4530

1    workplace behavior?

2         A.    No.

3         Q.    At the time that Ms. Dickens and Ms.

4    Gomez came to you, had they gone or asked the

5    advice, if you know, of human resources?

6         A.    To the best of my recollection,

7    Andrea or April met with human resources at one

8    point during the investigation.

9         Q.    Okay.  But not prior to this March

10   9th or 10th conversation?

11        A.    I don't know.

12        Q.    Okay.  After -- okay.  Strike that

13   question.

14             I was asking you when you gave them

15   instructions -- by the way, I presume you did not

16   ever give written instructions to anybody on how

17   to conduct this investigation or what to do?

18        A.    No.

19        Q.    When you say you told them, you said

20   detail, what does that mean?

21             MS. BERNERT:  I'm going to object, it

22   misstates her testimony, but...

23   BY MR. LOKER:

24        Q.    Okay.  Perhaps it does.  I asked you

25   -- I'm sorry, there was sort of a transition

21

MARK R. DAHLBERG  (619) 296-4530

1   there.  I asked you about what instructions, if

2   any, you gave Dickens and Gomez and you said I

3   told them -- you said detail, I think you said

4   detail and then the second question, as many

5   people as possible.

6            What did you mean when you said

7   detail?

8        A.   I didn't say question as many

9   people.  I said question the people that had a

10  concern.

11       Q.   Okay.

12       A.   And in detail, to review with each

13  that had a concern in detail what their feelings

14  were about the situation and what had transpired.

15       Q.   Is there a time by which you asked

16  them to complete their investigation?

17       A.   It was to be done very quickly and it

18  was completed in two days, if not one.

19       Q.   And was it you that advised they

20  should do it quickly?

21       A.   Yes.

22       Q.   And why was that?

23       A.   I think it was important to get --

24  find out what the situation was.

25       Q.   Did you as a result of this

                                          22

```
1    investigation make any recommendation as to what
2    should be done?
3         A.    Yes.
4         Q.    Did you make such recommendations in
5    writing?
6         A.    I made recommendations in writing to
7    the person it affected.
8         Q.    Okay.  I'm sorry, I'm not sure what
9    that means.  You made recommendations in writing
10   to what?  To who?
11        A.    To the person, to Jennifer Adair,
12   which is the person affected.
13        Q.    And why was Jennifer Adair the person
14   affected?
15        A.    Because she was the trainer of the
16   class prior to Queen entering the training class.
17        Q.    What did you recommend her -- that
18   she do in regard to the complaints of Charles
19   Bates' behavior?
20        A.    I recommended that Jennifer be
21   demoted and return to the phone as counselor.
22        Q.    And would you give me the short
23   version of why you felt that?
24        A.    I felt that the class was behind, so
25   I felt like she had not controlled the class and
```

23

MARK R. DAHLBERG   (619) 296-4530

1    kept them on track and I felt that she had failed

2    to bring to me in a timely manner concerns that

3    had come up in the class, as I checked with her

4    frequently on the progress of the class.

5         Q.    And nonetheless, I guess what you're

6    saying is, she didn't tell you about any

7    complaints of Bates' behavior?

8         A.    That's correct.

9         Q.    What did you recommend in regard to

10   Mr. Bates, if anything?

11        A.    We warned him.

12        Q.    Okay.  I realize there were certain

13   things that were done, but what I'm -- what I'm

14   getting at, there may be absolutely no

15   distinction, but what did you recommend be done

16   to him as opposed to what actually happened to

17   him?

18             MS. BERNERT:  If there was any

19   difference, Counsel?

20   BY MR. LOKER:

21        Q.    Yeah, there may not have been.  First

22   off, I want to know if there was.  You seem to

23   answer that this is what happened.  Did what

24   happen what you recommend to be happened?

25        A.    Yes, absolutely.

                                                  24

         MARK R. DAHLBERG  (619) 296-4530

1              Was it your recommendation that all

2    four of them be failed, if that's the right word?

3         A.    Yes.

4         Q.    Was it your recommendation that any

5    others of the nine be failed?

6         A.    No.

7         Q.    So it was your recommendation that

8    the five, if my math is correct, be passed?

9         A.    Correct.

10        Q.    Anywhere up the chain of command

11   before it got to you, had anyone recommended that

12   any of those four not be failed?

13        A.    I don't recall.

14        Q.    Can you recall if anyone, through the

15   decision-making process, disagreed, not who, but

16   if anyone disagreed with the recommendation that

17   either of the four be failed?

18        A.    No.

19        Q.    Did you review the decision to warn

20   Mr. Bates with anyone else up the chain of

21   command?

22        A.    Yes.

23        Q.    Who?

24        A.    Don Lyons.

25        Q.    Okay.  Human resources, as I recall,

                                                      30

                MARK R. DAHLBERG   (619) 296-4530

1          A.      Sometimes.

2          Q.      Okay.  A little transition.  Why was

3    Ms. Hanson sent back to retraining, as best you

4    can recall?

5          A.      She was struggling with a particular

6    portion of the training, the rating portion.

7          Q.      Was that rating?

8          A.      Rating.

9          Q.      "R A T I N G"?

10         A.      Correct.

11         Q.      And would you tell me what that

12   means?

13         A.      That means taking factors,

14   information from customers, and applying those

15   factors properly to get the correct rate for the

16   customer.

17         Q.      Okay.  Rating meaning a premium?

18         A.      Yes, that was one area.

19         Q.      Okay.

20         A.      The other area was she was not able

21   to maneuver through the computer.

22         Q.      Okay.  What does it mean, again,

23   assume you're talking to somebody who doesn't

24   understand.  Maneuver through the computer, does

25   that mean switch between programs?

                                                        46

```
 1          A.     That means the first day of training

 2   you learn how to sign-in to the system and access

 3   information in the system.  And Alayne was not

 4   able to do that after 8 weeks -- 10 weeks.

 5          Q.     In what sense was she not able to do

 6   that?  Can you tell me what the deficiency

 7   appeared to be?

 8          A.     She would not be able to reference

 9   the right applications in the right system and

10   she was -- she needed to refer to notes to

11   sign-in to that system to do it, and she still

12   wasn't able do it correctly.

13          Q.     Is there any policy against referring

14   to written notes to do that?

15          A.     There's not a policy, but that's

16   elementary information that should be learned

17   after the second day.

18          Q.     Do you know whether the program which

19   she was -- for which programs on which she was

20   apparently having difficulty were different from

21   the programs which she used in her prior

22   employment?

23          A.     I do not know.

24          Q.     Okay.  You were aware by the time

25   that retraining was recommended, were you aware
```

47

1   of Ms. Hanson's professional background and

2   experience?  In other words, let me rephrase that

3   and make it easier.

4           Were you aware that she had been

5   employed as a customer counselor in the insurance

6   industry in the past?

7       A.    I was aware she had an insurance

8   background.

9       Q.    Were you surprised that she was

10  having difficulty on an elementary thing, such as

11  computer program switches?

12      A.    I was surprised at the level of her

13  problems.

14      Q.    Other than the two areas you've

15  identified, were there any other deficients --

16  any other reasons why Ms. Hanson was sent back to

17  retraining?

18      A.    Her retention skills were poor.  Yes,

19  there are other areas.  Her retention skills were

20  poor in general, which meant that she was unable

21  to give information that was accurate to

22  customers and she made mistakes, such as putting

23  someone else's car on someone else's policy, or

24  giving out erroneous information about -- about

25  rates or coverages, what coverages apply in what

48

1   situations.   What deductibles are appropriate.

2   And she made entries on other people's policy

3   logs that were not there.

4          Q.      The wrong policy logs?

5          A.      Yes.   Another person's file she

6   updated instead of updating the customer's that

7   she was speaking with.

8          Q.      Okay.   Was Alayne the only student

9   who made such mistakes?

10          A.      Alayne was the only student that made

11   those mistakes that frequently.

12          Q.      Tell me again, indulge me here, I'm

13   sorry if I asked you.

14               But with whom did you discuss, once

15   again, the decision for Ms. Hanson to go back to

16   retraining?

17          A.      I recommended it to Queen and April

18   Gomez -- I'm sorry, Queen Scales, April Gomez and

19   Andrea Dickens.

20          Q.      It's fine to use first names, just as

21   long as you use the last ones, too, then we can

22   do word search.   It makes it easier for us.

23               According to my client, when she went

24   back to retraining, Queen Scales was there.   Do

25   you know how Queen Scales was assigned to do the

49

MARK R. DAHLBERG   (619) 296-4530

1       Q.    Yeah.

2       A.    Yes.

3       Q.    Okay.  Presumably the mentors did, is

4   that correct?

5       A.    I had feedback from -- I had direct

6   feedback from mentors, the trainer and the

7   administrative supervisors.

8       Q.    Okay.  And which mentors, if you can

9   recall, did you talk to?  It may be that you

10  can't recall, as you sit here today.

11      A.    Danna Stewart Friend.  I don't

12  recall.  It would take more time than you ever

13  have.

14      Q.    Okay.  That's fine.  To name all the

15  mentors you spoke to?

16      A.    No, to recall which ones that -- I

17  distinctly recall a conversation with Danna.

18      Q.    Okay.  In addition did you review

19  mentor notes regarding Ms. Hanson?

20      A.    Yes.

21      Q.    Okay.  And in addition to the

22  mentors, who did you speak to?  Again, which

23  administrative supervisors did you speak to?

24      A.    I would have spoken to both of them

25  and to Queen Scales.

MARK R. DAHLBERG   (619) 296-4530

1      Q.    Queen Scales.

2      A.    Mm-hmm.

3      Q.    Where we left, I still wasn't quite

4  sure of the answer you gave me, so let's

5  transition back.

6           I'm trying to get at how Queen Scales

7  became Ms. Hanson's retraining instructor, and I

8  think you said -- I'm not sure what you said.

9  I'm sure it's my fault.

10          I think you said Ms. Hanson went

11  three weeks into a cycle -- or went into a class

12  that was three weeks in progress.

13          What did you mean by that?

14      A.    Another basic training class had

15  started similar to the one Alayne started on

16  February 2nd.  Queen was the instructor of that

17  class.

18      Q.    Okay.

19      A.    Queen and another person.  And she

20  attended that class at, I believe, the third

21  week.

22      Q.    Okay.  She was sent back to an

23  earlier class?

24      A.    Correct.

25      Q.    Ms. Funderbank was the other

1    instructor?

2          A.    Nancy Funderburke.

3          Q.    Funderburke.  By that time then, of

4    course, the investigation of Mr. Bates'

5    complaints were complete, is that correct?

6          A.    "By that time" being...?

7          Q.    By the time that Ms. Hanson was sent

8    back for retraining.

9          A.    By the time Alayne entered -- yes.

10         Q.    Had you ever discussed with Ms.

11   Scales any of Ms. Hanson's complaints regarding

12   Ms. Bates -- Mr. Bates?

13              MS. BERNERT:  I'm going to object.

14   It assumes facts not in evidence that Ms. Hanson

15   had made any complaints regarding Mr. Bates.

16              MR. LOKER:  I'm sorry.  What was the

17   objection?

18              MS. BERNERT:  Assumes facts not in

19   evidence, that Ms. Hanson made complaints

20   regarding Mr. Bates.

21              MR. LOKER:  Well, I guess indeed it

22   does.

23   BY MR. LOKER:

24         Q.    Are you aware, to belabor the obvious

25   -- perhaps -- maybe you aren't.  Are you aware

                                                    55

MARK R. DAHLBERG   (619) 296-4530

1   of my client, Ms. Hanson, ever complaining of Mr.

2   Bates' behavior?

3        A.   No.   The only complaint I'm aware of

4   is when Andrea or April interviewed her regarding

5   the details of the class.

6        Q.   Okay.   Did you ever discuss with Ms.

7   Scales whether my client was among those who

8   complained of Mr. Bates' behavior?

9        A.   No.

10       Q.   Do you believe, if you know, that as

11  of the time my client went to retraining, whether

12  Ms. Scales was aware of my client's behavior --

13  complaints of Mr. Bates' behavior?

14            MS. BERNERT:   Objection, lacks

15  foundation.

16            MR. LOKER:   Do you understand the

17  question?

18  BY THE WITNESS:

19       A.   Yeah, I can't tell you what Queen

20  thought.

21  BY MR. LOKER:

22       Q.   I understand that.   I just want to

23  know if you were aware of...

24            Did you ever have any discussion with

25  Ms. Scales about Ms. Hanson's complaints of Mr.

MARK R. DAHLBERG   (619) 296-4530

1    made a complaint earlier than the time she gave

2    the statement?

3          A.    Do I have any reason to believe.  No.

4          Q.    Okay.  That was it.  With whom did

5    you discuss -- strike that.

6                How many discussions did you have

7    with Queen Scales regarding Ms. Hanson's

8    performance in retraining?

9          A.    To the best of my recollection, one

10   to two.

11         Q.    Okay.  Did you keep notes or

12   memorandum from either of that or those meetings?

13         A.    No.

14         Q.    Can you tell me what, as long is you

15   can recall, Queen Scales said regarding Ms.

16   Hanson's performance in retraining?

17         A.    That compared to the rest of the

18   class, she was performing -- she was now the

19   farthest behind, compared to the people that had

20   just begun the class three weeks ago or four

21   weeks ago.

22         Q.    Okay.  That's a little vague to me.

23                She was furthest behind.  What do you

24   mean by that, I'm sorry?

25         A.    In her ability to comprehend the

                                                    60

MARK R. DAHLBERG   (619) 296-4530

1    material, her ability to keep up with the pace of

2    the class in tests that were given, as far as

3    time.

4         Q.    So was she further behind than that

5    very class was at that point in time, even though

6    she had been in the class before?

7         A.    That is my recollection, yes.

8         Q.    Did you say she was the -- Queen

9    Scales had said she was the furthest behind?  I'm

10   sorry.  I don't want to put words in your mouth.

11   I thought that's what you said.

12        A.    That's my word that I used.  I don't

13   recall Queen's exact words.

14        Q.    Was it your impression that she was

15   the behind-ist (sic)?

16        A.    Yes.

17        Q.    Prior to the time that -- well, at

18   some point I believe we've established Queen

19   Scales recommended that Ms. Hanson is incapable

20   of completing training at some point?  Did Ms.

21   Scales -- strike that.

22             Did Ms. Scales ever recommend my

23   client be terminated or asked to resign?

24        A.    Ms. Scales, no.

25        Q.    Did anyone?

MARK R. DAHLBERG   (619) 296-4530

1          A.    Andrea or April.  Andrea Dickens or

2    April Gomez.

3          Q.    Andrea Dickens or April Gomez.

4    Okay.

5                And can you tell me what date, if you

6    recall, that you made the decision that my client

7    -- that you made that decision on the

8    recommendation of Gomez or Durkin?

9                MS. BERNERT:  Dickens?

10               MR. LOKER:  I mean Dickens.

11   BY THE WITNESS:

12         A.    I can if I look at a calendar.

13   April... I don't...

14   BY MR. LOKER:

15         Q.    I understand.  Did anyone ever come

16   to you and complain about Ms. Scales' behavior in

17   the classroom?

18         A.    No.

19         Q.    Did you ever have a conversation with

20   Ms. Bartlett while Ms. Bartlett was employed at

21   GEICO?

22         A.    Yes.

23         Q.    How many such conversations did you

24   have?

25         A.    I recall two conversations.

                                                      62

MARK R. DAHLBERG  (619) 296-4530

1    lines as opposed to green lines -- blue lines,

2    I'm sorry, as opposed to red lines on the

3    screens?

4           A.    No.

5           Q.    Do you know whether in the case of

6    Ms. Hanson, a job description was ever given to

7    her?

8           A.    I don't know.

9           Q.    At any time after the -- after you --

10   this is a transition, I'm sorry.

11          At any time -- my mind works in odd

12   ways.

13          At any time after you counseled Mr.

14   Bates, did anyone complain to you of Mr. Bates'

15   behavior at GEICO?

16          A.    No.

17          Q.    To your knowledge, at any time after

18   you counseled Mr. Bates, did anyone complain to

19   anyone of Mr. Bates' behavior?

20          A.    Did anyone complain of Mr. Bates'

21   behavior?

22          Q.    First question was did they complain

23   to you, and the second one, have you heard of

24   anyone complaining to anyone else about Mr.

25   Bates' behavior after your counseling?

                                                    70

1          A.     From a peer level or from a customer

2    level?

3          Q.     Both.  Let's start with peer.

4          A.     No.  In fact, it was very clear --

5    made very clear to me that he was extremely

6    quiet.

7          Q.     Okay.  And how was that made clear to

8    you?

9          A.     From the times I asked the trainer.

10         Q.     Okay.

11         A.     I would check with the trainer

12   frequently.

13         Q.     Okay.  Did -- do you know whether Mr.

14   Bates was paired in any way with Ms. Bartlett

15   during the mentoring, if you recall?

16         A.     I don't know.

17         Q.     I guess it follows then -- strike

18   that.  Strike the question.

19                Did anyone, during Ms. Hanson's

20   employment to the present, ever complain that

21   they felt they were being treated unfairly

22   because they had complained of Bates' behavior?

23         A.     Can you say that again, please.

24         Q.     Sure.  Absolutely.  In fact, I'll

25   break it down a little bit.

MARK R. DAHLBERG  (619) 296-4530

1          Were there complaints from customers

2    regarding Bates' behavior?

3          A.    Not that I'm aware of.

4          Q.    Somehow maybe I got lost here.  You

5    seemed to divide an answer into peers or

6    customers.

7          A.    Well, at the moment you asked that

8    question to me, I wanted to make sure I was clear

9    on what you were asking and when I think in terms

10   of complaints, it's -- I work in the customer

11   service business.

12         Q.    Are you aware of -- strike that.

13   Were you ever told or you ever became aware that

14   Mr. Bates actually attempted to visit a customer

15   personally or did?

16         A.    I am aware of that, yes.

17         Q.    And at what point in the, we'll call

18   it training, mentoring -- strike that.  Why don't

19   we just make a brief record here.

20               What are the components that, at the

21   time of Ms. Hanson's employment, did one go

22   through in the process?  I think we've

23   established there's classroom training.  We'll

24   start there, is that correct?

25         A.    Initiation with human resources,

                                                    73

                MARK R. DAHLBERG   (619) 296-4530

```
1    classroom training.

2           Q.     And the classroom training lasts

3    about...?

4           A.     Anywhere from 7 to 8 weeks depending.

5           Q.     And then what happens next?

6           A.     The mentoring.

7           Q.     And that lasted about...?

8           A.     2 to 3 weeks, if not longer.

9           Q.     Okay.

10          A.     And after that?

11          A.     You would be taking inbound phone

12   calls from customers.

13          Q.     You'd actually be working?

14          A.     Well, you're working during

15   mentoring, too.  You're taking inbound calls from

16   customers.

17          Q.     I see.  During mentoring one actually

18   fields live calls from customers?

19          A.     Sometimes, yes.

20          Q.     Okay.  And after mentoring, does one

21   field only live calls from customers?

22          A.     Normally, yes.

23          Q.     I mean I just want to -- for those of

24   us who don't understand the process, after

25   mentoring, is one out of training or does one
```

MARK R. DAHLBERG   (619) 296-4530

1    continue in some sort of supervised capacity

2    while you -- while one takes calls?

3         A.    The out of -- out of mentoring on the

4    floor, as a new trainee on certification, you are

5    closely supervised.

6         Q.    Okay.  How does one know when one

7    completes the mentoring process?  Are you given a

8    piece of paper?

9         A.    You would, at that moment -- no, I'm

10   sorry.  No, you're not.

11        Q.    How does one know?

12        A.    You would be in a section, placed

13   with an assigned supervisor.

14        Q.    Okay.  When you say in a section,

15   what does that -- at the time Ms. Hanson was

16   there, what were the sections?

17        A.    What were the sections?

18        Q.    Well, how were they identified or

19   organized?

20        A.    A supervisor over each section.

21        Q.    Okay.  And those are the people who

22   are performing the line function, if you will, of

23   customer work?

24        A.    The supervisor supervises customer

25   reps, insurance counselors; that's how the job is

                                              75

1    documents that would say your certification

2    period is completed?

3         A.    Yes.

4         Q.    Okay.  Now, you mentioned six

5    months.  Is it always six months or are you

6    saying it could be up to six months that one goes

7    through the certification process?

8         A.    Okay.  The certification process is

9    up to six months.

10        Q.    Okay.

11        A.    Okay.

12            MS. BERNERT:  Up to or at least?

13   BY THE WITNESS:

14        A.    Well, you don't -- if you're not

15   performing appropriately, your certification

16   doesn't have to last six months.

17   BY MR. LOKER:

18        Q.    I understand that.  You can get

19   fired.

20        A.    Well, I know, but I want to make sure

21   you understand that.  And then after six months,

22   it is possible to have an extension, it can

23   happen that you have an extension of your

24   certification.

25        Q.    Can one go through the certification

                                                    87

MARK R. DAHLBERG   (619) 296-4530

1  period and -- in less than six months?

2      A.   One could.

3      Q.   Okay.  Has that, in fact, happened in

4  the history of GEICO training?

5      A.   Yes.  Rarely.

6      Q.   Rarely?

7      A.   Rarely.

8      Q.   How does one go through the

9  certification in less than six months?

10     A.   By becoming proficient in the job as

11  -- prior to six months.

12     Q.   And how is that proficiency measured?

13     A.   By the supervisor's view of their

14  performance.

15     Q.   Okay.  Is it up to the supervisor

16  solely whether the person has completed

17  certification?

18     A.   In terms of completing it before six

19  months?

20     Q.   Yeah.  Or -- well, no.  Let's just

21  say completing it.

22     A.   The supervisor recommends the

23  counselor be removed from certification.

24     Q.   Okay.  And is that a recommendation

25  you review?

88

MARK R. DAHLBERG   (619) 296-4530

1    might be handled by him?  Any specifics?

2         A.    That he would engage in conversation

3    and rehash; I said, he said, she said, we said.

4         Q.    In your conversations with Mr. Bates,

5    did he admit having made remarks of a sexual

6    connotation in class as well as out of class?

7    Regardless of the statement itself, I just want

8    to know of any conversations you had with Mr.

9    Bates.

10        A.    I believe he admitted to making them

11   outside the class.

12        Q.    Did he ever admit to making them in

13   class?

14        A.    I don't recall if he did.

15        Q.    Do you recall in your conversations

16   with Ms. Adair, whether she ever admitted that he

17   made inappropriate remarks in class?

18        A.    She said he did not make

19   inappropriate comments in her class.

20        Q.    Did she say that he made

21   inappropriate comments out of class?

22        A.    She remembered in a -- a comment

23   outside of class on lunch.

24        Q.    Okay.  One such comment?

25        A.    That's what I recall her saying.

                                                    91

```
 1        Q.    Can you give me the gist of that
 2   comment?
 3        A.    No, I just know there was one.
 4        Q.    Did you ask her why -- well, strike
 5   the question.  Did Mr. Bates tell you that he had
 6   once tried to tell a joke and that Ms. Hanson
 7   told him to stop?
 8        A.    I remember Lynn -- I remember that
 9   being apparent, but I don't remember who told me.
10        Q.    Can you recall if more than one
11   person told you?
12        A.    What I recall sitting here, is that
13   when I read the documentation from the interview,
14   that maybe one or two people had told him to
15   stop.
16        Q.    Can you recall any of the offensive
17   remarks that, according to anyone, any source,
18   that Mr. Bates made?
19        A.    Yes.
20        Q.    Give me an example or the examples
21   that you can recall.  I know it's embarrassing
22   sometimes, but we have to do it.
23        A.    One comment was that the person's
24   pants were up the crack of their rear-end and one
25   comment was regarding a joke that he told about
```

                                                    92

1          A.        When you say suggest to me, I think

2     in terms of prior to the investigation.   It's

3     clear in the investigation what transpired, that

4     was perceived as transpired.

5          Q.        Okay.

6          A.        And I read what this says and I

7     understand that that's what it says.

8          Q.        All right.   Did you ever talk to Mr.

9     Adair about Mr. Bates remarks?

10         A.        Ms. Adair?

11         Q.        Yes.

12         A.        About Mr. Bates' remarks?

13         Q.        About Mr. Bates' remarks.

14         A.        I did have a conversation with

15    Jennifer Adair.

16         Q.        Was that more than one conversation

17    regarding Mr. Bates' remarks?

18         A.        I don't recall.   I know of one for

19    sure.

20         Q.        Did you ever ask her if he had made

21    offensive remarks with sexual connotations during

22    the class?

23         A.        Yes.

24         Q.        And what did she say?

25         A.        No.

                                                    94

1   behavior?

2          A.    No, I don't recall her being the

3   person I spoke with or one of the people I spoke

4   with about Charles Bates.

5          Q.    Was it ever your belief that the --

6   that the conduct of Mr. Bates in class set back

7   or retarded the progress of the class?

8          A.    It was unclear to me whether he did

9   or whether Jennifer failed to keep the class on

10  track.

11         Q.    Okay.  It was unclear -- well, let me

12  think about that for a moment.

13               Okay.  So at least as you sit there

14  today, you're not certain, in your own mind, you

15  have no opinion as to whether his behavior

16  retarded the progress of the class?

17         A.    I have an opinion that he could have

18  been disruptive.

19         Q.    Okay.

20         A.    Because he monopolized conversations.

21         Q.    And was it -- is it your opinion that

22  that retarded the progress of the class?

23         A.    It is my opinion that it may have.

24  That Jennifer is the one I hold responsible for

25  the...

                                           96

MARK R. DAHLBERG  (619) 296-4530

1        Q.     It may have.  I see.  Is that a

2   belief that you held during Ms. Hanson's

3   employment, that it may have retarded the

4   progress of the class?

5        A.     Yeah.  Yes.

6        Q.     And what did you do, if any, to

7   ameliorate that effect?  Was any portion of the

8   training or classroom extended?

9        A.     Yes, it was extended for one week.

10       Q.     Okay.  And who made that decision?

11       A.     I did.

12       Q.     And can you tell me approximately or

13  at least in the sequence of events, when you made

14  that decision?

15       A.     When Queen entered the class and made

16  the assessment that the class seemed behind, that

17  they should have been further along and she said

18  she needed more time.

19       Q.     So is it safe to say that it was

20  probably within the week after she took over the

21  class that y'all made the decision to extend it a

22  week?

23            MS. BERNERT:  Objection, I interpret

24  that as a Southerner's plural and Ms. Furnas has

25  testified that she made that decision.

                                              97

MARK R. DAHLBERG   (619) 296-4530

1    BY MR. LOKER:

2         Q.    That is true.  And that was a

3    decision that was recommended by Ms. Scales as

4    well, to you?

5         A.    She brought forward the problem.  I

6    don't recall if she made a recommendation.  She

7    definitely brought forward the problem.

8         Q.    Okay.  Did y'all -- did you ever

9    consider transferring Mr. Bates to another class?

10        A.    No.

11        Q.    Did you ever discuss that

12   possibility?  Strike the question.  Did you ever

13   consider that possibility with Ms. Scales?

14        A.    No.

15        Q.    Did you ever discuss that possibility

16   with anyone?

17        A.    No.

18        Q.    Is it your belief that after you

19   counseled Mr. Bates, that he ceased being

20   disruptive in the classroom?

21        A.    Yes, absolutely.

22        Q.    And on what do you base that belief?

23        A.    My questioning to the trainer.

24        Q.    Okay.  And the trainer was Ms.

25   Scales?

1         A.      Correct.

2         Q.      Did anyone -- strike the question.

3                 What did she tell you about Mr.

4    Bates' behavior post counseling, we'll say?

5         A.      That he had tremendous fear for his

6    job.

7         Q.      Okay.

8         A.      And that he was quiet as a mouse, in

9    my terms.  I don't know if she said quiet as a

10   mouse, but it was clear he was quiet and had shut

11   up.

12        Q.      Okay.  One moment, please.  Try to

13   cut back on time.  If you'll bear with me a

14   moment, maybe I can cut this a little shorter

15   yet.

16        A.      Sure.

17        Q.      Do you know whether, prior to the

18   investigation, anyone such as a trainer, had

19   counseled Mr. Bates regarding his behavior?

20        A.      No.

21        Q.      Is it your -- is it that you don't

22   know or you believe they did not?

23        A.      I believe they did not.

24        Q.      And how do you -- what makes you

25   believe that?

                                                    99

1          A.     Because I asked Jennifer Adair that

2    question.

3          Q.     Okay.  Did you ask her why no one had

4    counseled him?

5          A.     I asked her if she had.

6          Q.     Okay.

7          A.     And I'm sure I asked why of her.

8          Q.     And do you recall what, if anything,

9    she said in response?

10          A.     No, I don't recall her answer to

11    that.

12          Q.     Do you recall the gist of her answer

13    to that?

14          A.     Just my dissatisfaction.  You know, I

15    don't recall the actual...

16          Q.     Other than the extension of the class

17    by a week, did you -- were there any other

18    adjustments made to the training of Ms. Hanson's

19    class to assist them in catching up?

20          A.     Yes.

21          Q.     What were those?

22          A.     People were allowed after the week

23    extension, some of the mentoring was extended and

24    the people were allowed to go back into a second

25    training class, as we discussed.

                                                100

1          Q.     Right.  And Ms. Hanson was allowed to

2     go into the second training class?

3          A.     That's correct.

4          Q.     What accommodations, if any, were

5     made for Ms. Stewart, if you recall?

6          A.     Ms. Stewart went back in the same

7     training class, too.

8          Q.     Was that also your decision?

9          A.     Yes.

10         Q.     And Ms. Bartlett, were there any

11    accommodations made for her?

12         A.     Ms. Bartlett had multiple mentors.

13         Q.     What does that mean?  That that was

14    sort of additional assistance?

15         A.     That means that when she complained

16    of one mentor's personality, she was given

17    another and finally another.  Normally they have

18    one mentor or can have one mentor.

19         Q.     Why in her case did you -- was that

20    done?

21         A.     Because she complained of a

22    personality conflict with the first mentor.

23         Q.     But she went through three.

24         A.     She complained of a second

25    personality conflict with the second mentor.

                                                    101

# Mark R. Dahlberg

COURT REPORTER
CSR#8487

1

2    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

3              FOR THE COUNTY OF SAN DIEGO

4

5    _____

6    ALAYNE A. HANSON,

7                     Plaintiff,        Case No. 730276

8         vs.

9    GEICO CORPORATION; GEICO

10   DIRECT; BERKSHIRE HATHAWAY        Pages 1 - 140

11   CORP., and DOES 1 through 25,

12   inclusive,                        **CERTIFIED COPY**

13                     Defendants.

14   _____

15

16

17   DEPOSITION OF:

18              JENNIFER ADAIR

19              JULY 22, 1999

20              10:00 A.M.

21                   .

22   REPORTED BY:  TERRY S. DANIELS,

23              CRR-RDR, CSR NO. 4950        **DISK**

24                                          **ENCLOSED**

25

1

1   first, but we need last as well.  So April Gomez and

2   Martha Furnas?

3        A.    Yes.

4        Q.    Was it ever -- strike that question.

11:15:00   5        At the time you left the class on March

6   9 of which Ms. Hanson was a part, did you have in

7   your mind an opinion as to whether she had passed

8   the classroom portion to that point?

9        A.    Yeah, I had an opinion.

10        Q.    And what was that opinion?

11        A.    I didn't have a lot of confidence in the

12   abilities that she had at that time.

13        Q.    And I would like to talk about that, but

14   the question was, has she passed as opposed to being

15   washed out in your mind to that point?

11:15:30   16        A.    I don't recall thinking along those

17   lines because that wasn't my decision.

18        Q.    By the time you left the class on the

19   9th, had anyone asked you whether Ms. Hanson

20   should -- strike the question.  Sort of an unfair

21   question.  I'm just trying to get through this as

22   quickly as possible.

11:16:00   23        Looking in Exhibit 5, and with the

24   exception of the repetitive documents that begin on

25   165, can you point to anything in Exhibit 5 that

DAHLBERG & ASSOCIATES

1    reflects the concerns you've just testified to about

2    Ms. Hanson's performance?

3         A.      The test scores were low.   That was a

4    concern.

11:16:30  5         Q.      Any other concerns?

6                 MS. BERNERT:   Reflected in this

7    exhibit?   Is that the question, Counsel?

8                 MR. LOKER:   Correct.

9                 THE WITNESS:   No.

10   BY MR. LOKER:

11        Q.      What concerns did you have?   Whether or

12   not they're reflected in this exhibit, what other

13   concerns did you have?

14        A.      I felt Ms. Hanson had a retention

15   problem.   She would ask the same question over and

11:17:00  16   over again.   I didn't have a problem answering it,

17   but it seemed like she wasn't grasping basic

18   concepts of things that we use on a daily basis in

19   our job.

20        Q.      How would that manifest itself, she

21   would ask you the same things again and again?

22        A.      Not necessarily even asking me the same

23   questions, but not know the same thing -- the

24   answers when I would ask questions.

25        Q.      Is there anything that particularly

                                                      62

DAHLBERG & ASSOCIATES

11:17:30

1    sticks out in your mind such as an ability to

2    navigate between program or database?

3          A.      We called them speed drills.  Almost on

4    a daily basis, and there was -- it was just

5    basically we would give them a policy number and

6    say, does this person qualify for a five-year good

7    driver or are they getting a good driver discount or

8    are they getting seat belt discount, where is their

9    social security number, and they would have to jump

10   back and forth through different screens to find the

11   information.

11:18:00

12              I would give them some pretty intensive

13   cheat sheets, and Ms. Hanson made additional notes

14   on hers.  It seemed like she couldn't find the

15   information without going through the cheat sheets

16   each time.

17         Q.      Is that a concern you raised with

18   Ms. Hanson?

19         A.      I don't recall if I spoke to her

20   directly about that.

21         Q.      In addition to her problems -- strike

22   that.

11:18:30

23              Any other ways this lack of retention

24   manifest itself that you haven't told me about?

25         A.      There was one test, I don't recall

63

DAHLBERG & ASSOCIATES

1    exactly which one it was, that prompted me to have a

2    discussion with Ms. Hanson.  I was concerned about

3    the low test scores.

4              I asked her what I could do to help her

5    to become more familiar with the screens, and at

6    that time, she -- let me back up for just a moment.

11:19:00   7              Ms. Hanson was absent from class.  She

8    was moving and she needed to take off some time, and

9    that was the first time that she had missed a couple

10   hours, and she had asked if she could make up the

11   time, and I said that wouldn't be a problem, that

12   she could come in early or stay through her lunch.

13              After she had taken this test where I

14   had voiced my concern over her low test score, I

11:19:30   15   offered to come in early with her, and there was a

16   couple other students that were struggling, and we

17   agreed to come in and try to go over the information

18   so it would become more familiar to her.

19         Q.    And did she, in fact, come in extra time

20   early or late?

21         A.    Yes, she did.

22         Q.    Who were the others, if you recall, who

23   came in early or late?

24         A.    Lynn Bartlett and Debbie Steward.

11:20:00   25         Q.    Did they all come to you, as did my

64

DAHLBERG & ASSOCIATES

1    corrected answers.

2         Q.    I see that.  Do you know why you may not

3    recall?

4         A.    I don't recall.

5         Q.    Let's go on to 145, Geico 145 as part of

11:26:00   6    Exhibit 5.  Can you identify that document for me?

7         A.    It appears to be a paper that describes

8    if you had three drivers and what their driving

9    records would be, which vehicle they would be

10    assigned to.

11         Q.    Does any of that appear in your hand?

12         A.    No.

13         Q.    Let me invite your attention to 146,

11:26:30   14    Geico 146.  Can you tell me now if you recall

15    whether it was the GDP/GG test that gave you concern

16    about Ms. Hanson's performance initially?

17         A.    That's kind of a two-part question in my

18    mind.  It wasn't the only thing that gave me concern

19    but certainly the low test score did concern me.

20         Q.    I understand that.  I'm not trying to

21    trick you.  I'm trying to isolate reasons, if you

22    know, the first test -- I think you said there was

11:27:00   23    particularly a test you may not recall today, but my

24    question to you, is it the GDP test which is the

25    first test that gave you concern, if you recall?

DAHLBERG & ASSOCIATES

1      A.     I don't recall.

2      Q.     Is there something about this GDP test

3  that gave you concern?  I'm talking about the GDP

4  makeup test.

5      A.     58 percent is just a little low for

6  half of the information.  I wouldn't consider that

7  passing.

11:27:30    8      Q.     Would you consider it failing?

9      A.     Yes.

10     Q.     Tell me again what the GDP, is that Good

11  Driver Plan?

12     A.     Yes.

13     Q.     Can you tell me as you sit there today

14  whether anyone else failed the GDP makeup test in

15  the class?

16     A.     I believe there were some other students

17  that failed it.

18     Q.     I don't particularly care who they were,

11:28:00    19  but out of, as I understand it, there were nine

20  people in Ms. Alayne's class; is that correct?

21     A.     That is correct.

22     Q.     And do you know how many of the nine

23  failed the GDP makeup test?

24     A.     I don't recall.

25     Q.     Do you mean how many of the 9 -- strike

1   as an instructor or trainer.

2              Between the 2nd of February and the 9th

3   of March, did anyone complain to you of the behavior

4   of Charles Bates?

5        A.    Yes.

6        Q.    Tell me if you can recall who first

7   complained to you.

8        A.    Lynn Bartlett.

11:45:00   9        Q.    When she came to you -- I'm sorry, did

10   she tell you in a face-to-face meeting?

11        A.    Yes.

12        Q.    Did you take any notes of that meeting?

13        A.    No.

14        Q.    Can you tell me about when the first

15   complaint was?

16        A.    I don't recall exactly when it was.  I

17   believe it was about three weeks after the class had

18   started.

19        Q.    Is there something in your mind that

11:45:30   20   affixes approximately three weeks or is that just

21   your best guess?

22        A.    It's just a best guess.

23        Q.    What did Lynn Bartlett complain of when

24   she first discussed Bates with you?

25        A.    She stated that he made sexual comments.

1 A. No, I didn't.

2 Q. Why not?

11:47:00 3 A. Well, part of the reason I didn't talk

4 to him hindsight being 20/20, I know I should have

5 talked to both of them.

6   A few days after she had come to me

7 complaining about his remarks, we were sitting in

8 class, and something was said, I don't recall who

9 said it, but she turned to Charles and made a sexual

11:47:30 10 innuendo to him, and asked for his response, and it

11 was my feeling that kind of like well, when somebody

12 invites something that, you know, I never heard him

13 say anything so why should I say anything to him

14 when she's goading him on.

15 Q. You described this as a few days later.

16 A few can be two or six.  How many days later after

17 the complaint did this classroom incident occur?

18 A. I believe it was two or three days

19 afterwards.

20 Q. Do you recall -- I think you began that

11:48:00 21 sequence by saying a comment was made, and then she

22 made a sexually-suggestive retort.  Tell me what you

23 recall actually having been said.

24 A. I don't recall the actual conversation.

25 I just remember thinking that she's goading him.

1    She's trying to get him to say things.

2         Q.    Did he say something first?

3         A.    No.  He was actually about 10 feet down

4    on the other end of the -- we didn't have a training

5    class.  It was just like in a section of the

11:48:30  6    building, and he was actually talking to somebody

7    else, and she interrupted their conversation to make

8    her remark, hoping for a response and he didn't give

9    one.

10         Q.    Can you tell me anything of what her

11   remark was?

12         A.    I don't recall it.

13         Q.    Did you say you thought it was sexually

14   suggestive, however?

15         A.    Yes, it was.

16         Q.    But you can't recall a single word of it?

11:49:00  17         A.    The only thing I can recall for sure is

18   she said, "What do you think about that, Charles?"

19         Q.    Did you make any notes about that

20   incident?

21         A.    No.

22         Q.    Did you after that -- strike the

23   question.

24               Did you in any way admonish Ms. Bartlett

25   for having said that in class that what you thought

84

11:49:30   1   was --

           2          A.      No, I didn't.

           3          Q.      Did Ms. Bartlett come to you again

           4   complaining of Mr. Bates?

           5          A.      I believe she did one more time, yes.

           6          Q.      Can you tell me approximately when the

           7   second time she came to you regarding Mr. Bates?

           8          A.      I don't recall exactly.  A week and a

           9   half after the first time maybe.

11:50:00  10          Q.      This would have been in February -- I

          11   mean in March by this time?

          12          A.      End of February, beginning of March, I'm

          13   assuming.

          14          Q.      By the way, at the first meeting, was --

          15   at the first conversation you had with Ms. Bartlett,

          16   was there anyone else present?

          17          A.      No.

          18          Q.      The second conversation, was there

          19   anyone else present?

          20          A.      Yes.

          21          Q.      Who was that?

          22          A.      Alayne Hanson and Debbie Steward.

          23          Q.      Do you recall where this conversation

          24   took place?

          25          A.      It was in the section where we were

1   retort in class that maybe made you think that she

2   wasn't offended, had she done anything else to

3   indicate to you -- that such as a sexual remark

4   herself in class to indicate she may not have been

5   offended by Bates?

6        A.   I don't recall anything else.

7        Q.   Still in this meeting with Steward and

11:54:30   8   Bartlett present, Ms. Steward, I believe,

9   Ms. Bartlett, I'm sorry spoke up first; is that what

10  you said?

11       A.   Yes.

12       Q.   Give me in the shortest version possible

13  the narrative of the rest of the conversation

14  regarding Bates.

15       A.   There wasn't any.

16       Q.   Did Ms. Steward say anything about

17  Bates' behavior?

18       A.   No.

19       Q.   Is it that she said nothing or you don't

20  recall whether she said something or not?

11:55:00   21       A.   She didn't say anything.  She was a very

22  quiet person.  She didn't say anything.

23       Q.   I'm sorry, I didn't mean to cut you

24  off.  Were you finished?

25       A.   Yeah.

1      Q.    Did she at all during the course of your

2   employment at Geico complain of anything regarding

3   Mr. Bates' behavior; that is, Ms. Steward?

4      A.    No.

5      Q.    Did anyone ever tell you prior to the

6   time you became aware of this litigation that

7   Ms. Steward was offended by anything Mr. Bates had

8   done?

9      A.    No.

11:55:30   10      Q.    During this meeting, did Ms. Hanson say

11   anything?

12      A.    No.

13      Q.    Did they do anything by gestures, sense,

14   grunts, groans to suggest to you that they had

15   agreed or disagreed with you with Ms. Bartlett?

16      A.    Ms. Hanson did like shake her head to

17   acknowledge type of thing.  That was it.

18      Q.    And as far as you can recall, not in the

19   case of Ms. Steward?

20      A.    I don't recall if Ms. Steward did or

21   not.

11:56:00   22      Q.    Did she say anything to suggest in that

23   meeting that she disagreed with Ms. Bartlett?

24      A.    No.  I don't recall her saying anything.

25      Q.    Did you ever speak to Ms. Bartlett again

1   about Mr. Bates?

2        A.      Other than she would roll her eyes at

3   him if he would talk in class or ask questions, and

4   she would say, "There he goes again," but other than

5   that, no, I don't recall anything specific.

11:56:30   6        Q.      Prior to the meeting you just described

7   with these three, had Ms. Hanson ever complained to

8   you about Mr. Bates' behavior?

9        A.      No.

10        Q.      To your knowledge had she complained to

11   anybody about Mr. Bates' behavior?

12        A.      I had no knowledge of it.

13        Q.      Have you told me all you can recall

14   about Ms. Bartlett's complaints to you about

15   Mr. Bates' behavior?

16        A.      Yes.

17        Q.      Prior to that meeting in which these

11:57:00   18   three were present, had anyone else complained of

19   Mr. Bates' behavior other than Ms. Bartlett the

20   first time?

21        A.      No.

22        Q.      After this meeting -- one moment,

23   please.

24              After this meeting, did anyone complain

25   of Mr. Bates' behavior?

DAHLBERG & ASSOCIATES

1           MS. BERNERT:  I'm going to object, it's

2    been asked and answered at least with respect to

3    Ms. Bartlett.  Anybody else?

11:57:30   4           THE WITNESS:  Not in reference to sexual

5    comments.  One I did hear of an incident after I was

6    no longer training that class that he and one of the

7    other trainers, Michelle Davis, got into a little

8    tiff in class, and I heard that from Michelle Davis.

9    BY MR. LOKER:

10           Q.   So is it fair to say we've discussed all

11   those instances in which students in that class

11:58:00   12   complained of Mr. Bates' behavior that you can

13   recall?

14           A.   Yes.

15           Q.   After this second meeting, did you

16   recommend to either of these three ladies what they

17   should do in regard to their complaints about Bates?

18           A.   No, I didn't.

19           Q.   Did you tell them what you might do in

20   regard to their complaints about Bates?

21           A.   No, I didn't.

22           Q.   Did they ask you what you were going to

23   do?

24           A.   No.

25           Q.   What did you do?

92

DAHLBERG & ASSOCIATES

```
         1          A.     I didn't do anything.
11:58:30 2          Q.     Can you tell me -- I mean nobody is
         3  perfect.  We all make mistakes.  Why didn't you?
         4          A.     I don't know.  I made a mistake.
         5          Q.     I understand.  It's the hardest thing in
         6  the world to admit.  I made one once, too.
         7                 In the classroom scenario itself, did
11:59:00 8  you ever observe Mr. Bates say anything that you
         9  thought was offensive in a sexual way?
         10         A.     No.
         11         Q.     Outside of the classroom scenario, did
         12 you ever hear Mr. Bates say anything that you felt
         13 was offensive in a sexual way?
         14         A.     No.  I did -- after the first time
         15 Ms. Bartlett had complained, I did go down and have
11:59:30 16 lunch with the class so I could observe kind of what
         17 went on there, and he made a joke that I thought was
         18 stupid but it wasn't terribly offensive.
         19         Q.     What was that?
         20         A.     He was talking about how some people are
         21 folders and some people are crumplers in reference
         22 to toilet paper.  He also made a joke at some time
         23 that had something to do with dog poop, but other
         24 than that --
         25         Q.     Do you remember what it was?
```

1        A.      I don't recall.

12:00:00   2        Q.      Were there any other complaints about

3    Mr. Bates' classroom behavior that you haven't

4    described that weren't sexual in nature?

5        A.      I don't recall anything specific.   I

6    know that Ms. Bartlett had made the comment several

7    times that he would ramble on and on or ask too many

12:00:30   8    questions or try to monopolize the conversation.

9        Q.      Did you feel that that was an accurate

10   representation of what was happening?

11       A.      I don't want to say that it was entirely

12   accurate.   Mr. Bates was learning in a different way

13   than some other people.   Everybody learns their own

14   way.

15               Some people are visual and some people

16   have to express themselves.   He would ask questions.

12:01:00   17   I felt it was for him to absorb the information.

18   That was one of the concerns that I had with one of

19   the other students was she wouldn't ask questions

20   and, you know, at least he would ask the questions.

21       Q.      Did you ever feel that he was being

22   disruptive?

23       A.      There were a few instances where I would

24   tell him to be quiet.

25       Q.      Do you ever recall the context what he

1    progress of the class?

2         A.    I don't believe it did.

12:22:00    3         Q.    How long did the meeting last?

4         A.    I don't recall exactly, half an hour, 40

5    minutes maybe.

6         Q.    She also discussed Mr. Bates and your

7    response to those complaints.  Tell me what you can

8    recall her having said in regard to Mr. Bates'

9    behavior.

12:22:30   10         A.    She basically instructed me that

11   regardless of whether there was any foundation, that

12   was important to bring this type of behavior to the

13   attention of somebody in management, that basically

14   that that's what I should have done.  I should have

15   said something.

16              I should have -- you know, the first

17   time that Lynn Bartlett said anything to me, that I

18   should have come to either Ms. Furnas, Ms. Gomez, or

19   Ms. Dickens and brought it to their attention.

12:23:00   20         Q.    Did she ask you at this meeting what, if

21   anything, Mr. Bates had said in class that was

22   sexually offensive?

23         A.    I don't believe she asked me that

24   because I had said to her that I never heard him say

25   anything that was offensive.

DAHLBERG & ASSOCIATES

# Mark R. Dahlberg

1
COURT REPORTER
CSR#8487

2

3    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

4            FOR THE COUNTY OF SAN DIEGO

5

6    ALAYNE A. HANSON,

7              Plaintiff, ) Case No. 730276

8        vs.                )

9    GEICO CORPORATION; GEICO

10   DIRECT; BERKSHIRE HATHAWAY

11   CORP., and DOES 1 through

12   25, inclusive,

13            Defendants.) Pages 1 - 65

14   ---------------------------

15            CERTIFIED COPY

16

17   DEPOSITION OF:

18            QUEEN E. SCALES

19            JULY 16, 1999

20            9:00 A.M.

21

22

23   REPORTED BY:

24       MARK R. DAHLBERG

25       CSR No. 8487

1

1    Huoang.

2           Q.     What spell that for the record?

3           A.     Loan, L-O-A-N, Hoang, H-O-A-N-G.

4           Q.     Is that L-O-N?

5           A.     L-O-A-N.

6           Q.     Thank you.

7                  MS. BERNERT:  For the record, I think

8    it's H-U-A-O-N-G.  No?

9    BY THE WITNESS:

10          A.     I don't know.  I thought it was H-O.

11   Something similar to that.

12   BY MR. LOKER:

13          Q.     That's close enough.  You had nothing

14   to do -- strike that.  Is it fair to assume that

15   you had nothing to do with the hiring or

16   interviewing of Ms. Hanson?

17          A.     Yes.

18          Q.     Transition.  Let's go forward to just

19   your interaction with Lynn Bartlett.

20                 At any time while Ms. Hanson was

21   employed, did Lynn Bartlett complain to you about

22   what she thought to be offensive classroom

23   behavior?

24          A.     Yes.

25          Q.     Can you tell me when you first spoke

                                                      19

                    MARK R. DAHLBERG  (619) 296-4530

1   to Ms. Bartlett about that?

2        A.    As I recall, it was the -- I believe

3   it was the first or second day of class.

4        Q.    Okay.  Would that have been on or

5   about March 10th?

6           MS. BERNERT:  Do you have the time

7   frame in your mind?

8   BY THE WITNESS:

9        A.    I don't recall the date.

10   BY MR. LOKER:

11        Q.    That's fine.  You can just tell me

12   you don't recall.  That's fair enough.  I just

13   want to know what you do recall.

14           MS. BERNERT:  Counsel, I will state

15   if we have a calendar here and you want to ask

16   about dates, that might help refresh

17   recollection.

18   BY MR. LOKER:

19        Q.    Okay.  Let's go on.  Let me show you

20   a copy for everybody.  Counsel, I'll represent to

21   you I'm going to offer into evidence your

22   document G 27.  I do have a copy for everyone

23   here.  We can mark this one for evidence here.

24              (The document referred to

25              was marked as Deposition

20

1    with her previous instructor?

2        A.    Yes.

3        Q.    And she told you that, yes, "but he

4    never got any better" or words to that effect?

5        A.    Correct.

6        Q.    Have you at any time, from that point

7    to today, discussed with Jennifer Adair any

8    allegations made regarding Bates' behavior?

9        A.    No.

10        Q.    Approximately how long did this

11    conversation with Ms. Bates last?  I'm sorry,

12    with Ms. Bartlett last?

13        A.    I don't recall.

14        Q.    Was it less than a half an hour?

15        A.    As I recall, I would say, yes, it was

16    during the lunch break.

17        Q.    And was it entirely on the lunch

18    break?  It didn't bleed over into working hours?

19        A.    As I recall, my discussion with her

20    was during the lunch break.  She did speak to

21    Lisa Van Zuyen after the lunch break.

22        Q.    At that time Lisa Van Zuyen was

23    training coordinator?

24        A.    She was my supervisor.

25        Q.    What was her job title?

25

1      A.     Service supervisor.

2      Q.     She was service supervisor.  It notes

3  here, "After talking with Ms. Bartlett, I felt I

4  should bring this to the attention of a

5  supervisor and discussed it with Lisa Van Zuyen",

6  Z-U-Y-E-N.  Did you bring it to her attention

7  because she was your supervisor?

8      A.     Yes.

9      Q.     Was there any other reason you

10  thought you should bring it to her attention?

11      A.     Yes.

12      Q.     Why is that?

13      A.     I hadn't dealt with a situation such

14  as this.

15      Q.     In addition, you did ultimately

16  discuss it with Lisa Van Zuyen, did you not?

17      A.     As far as...?

18      Q.     Well, it says here -- I'll withdraw

19  the question.  Let's go on.

20           In addition to Lisa Van Zuyen, did

21  you discuss these allegations with anyone else?

22      A.     Yes.

23      Q.     Who?

24      A.     Management.

25      Q.     Okay.  Can you identify those with

26

MARK R. DAHLBERG  (619) 296-4530

1    whom you discussed it?

2         A.    Martha Furnas.

3         Q.    Was that also on or about March 12th,

4    if you recall?  Was it about the same time, I'm

5    sorry, that this complaint by Bartlett arose?

6         A.    Correct.

7         Q.    Okay.  And who else have you

8    discussed it with?

9         A.    These particular -- this particular

10   incident?

11        Q.    Or any allegations regarding Bates'

12   behavior, yes.

13        A.    Actually, no one in addition to that.

14        Q.    All right.  One moment, please.  Did

15   you discuss Bates' allegation -- I'm sorry.  Did

16   you discuss the allegations regarding Bates at

17   any time with Andrea Dickens?

18        A.    Yes.

19        Q.    And who is that -- or I'm sorry, with

20   Andrea Dickens you did?

21        A.    Yes.

22        Q.    I know who she is.  (Pause.)

23              Pause of more than ten seconds and I

24   forget my question.

25              Okay.  Did you discuss with -- any of

                                              27

              MARK R. DAHLBERG  (619) 296-4530

1          Q.     Can you tell me who, if anyone,

2     signed the statements which you've reviewed?

3          A.     Andrea Dickens.

4          Q.     And did that include statements given

5     by or regarding interviews with Alayne Hanson?

6          A.     Yes.

7          Q.     During the course of your classroom

8     instruction from the time you picked up the class

9     in early March and thereafter, did you ever say

10    to the group "I know about your complaints or

11    issues"?

12         A.     As I recall, I don't remember saying

13    anything to that nature.  I don't know if I said

14    "complaining", I'm sorry.

15         Q.     That's fine.  Did Ms. Bartlett ever

16    say to you in the course of the instruction,

17    whether actually in the classroom or elsewhere,

18    such as the lunch room, on the premises, did she

19    ever say to you, words to the effect "Is anything

20    going to change?"

21         A.     I don't recall.

22         Q.     Can you recall whether she said

23    anything to you to the effect of "Does this mean

24    nothing is going to change?"

25         A.     I don't recall.

```
 1          Q.    Did you in any way during the course

 2   of your classroom instruction, ever say that

 3   those of you who are complainers -- strike the

 4   question.

 5                Did you ever say during the course of

 6   your classroom instruction, "Those of you who are

 7   complainers had better get back to work", or

 8   words to that effect?

 9          A.    I don't recall a statement of that

10   nature.

11          Q.    Okay.  Did you ever say what you

12   would consider to be -- strike the question.

13                Did you remain as a trainer with this

14   class through the end of this class?

15          A.    Yes.

16          Q.    And according to documents and

17   information in the case, the final test, what is

18   considered the final test, was taken on or about

19   March 27, 1998.

20                Does that sound right?  Was it late

21   March, 1998, when the class ended?

22          A.    Yes.

23          Q.    Okay.  Immediately following the

24   cessation of the class, what was your next

25   assignment?
```

48

MARK R. DAHLBERG   (619) 296-4530

1   course of Ms. Hanson's employment, that people

2   had complained about Ms. Adair's classroom?

3          MS. BERNERT:  Objection, vague and

4   ambiguous as to "bother".  You can answer the

5   question.

6   BY THE WITNESS:

7          A.    I'm sorry, can you repeat the

8   question.

9   BY MR. LOKER:

10          Q.    Would you read it back?

11                I'll restate it.

12                Did it bother you that people had

13   complained -- strike the question.  That's not a

14   very good question, you're right, Counsel.

15                During the course of your employment

16   with GEICO, have you ever expressed hostility to

17   those who complained of workplace behavior?

18          A.    No.

19          Q.    During the course of retraining, did

20   you ever make a statement about "those of you who

21   complain", in the context of anything?

22          A.    I don't recall a statement of that

23   nature.

24          Q.    Now, this is very picky, but that

25   could mean two things.  That could mean you don't

                                                    50

1    recall, or you believe you did not?

2          A.    I believe I did not.

3          Q.    I'm going to take a moment.  Let's go

4    off the record.

5                  (Discussion held off the record.)

6    BY MR. LOKER:

7          Q.    When my client went back to

8    retraining, at the time she joined your class

9    were you aware of how she had done in the

10   classroom portion of her training, first

11   classroom portion?

12         A.    Yes.

13         Q.    Okay.  And how did you become aware

14   of her performance?  Did you discuss it with

15   Jennifer Adair, for example?

16         A.    I'm sorry, I thought you were

17   referring to the portion that I actually taught.

18   I would consider that the first portion.

19         Q.    I'm sorry.

20                MS. BERNERT:  You asked about

21   retraining.

22   BY MR. LOKER:

23         Q.    Okay.  Let me rephrase.  Strike the

24   question.

25                At the conclusion of the classroom

                                                    51

MARK R. DAHLBERG   (619) 296-4530

1    the class in which Ms. Hanson was sent to

2    retraining.

3              Did she complete that class?

4        A.    No.

5        Q.    Could you describe her performance in

6    that class?

7        A.    As I recall, during the time that she

8    spent in that class her performance was poor.

9        Q.    Okay.  And can you tell me on what

10   you base that recollection?  I mean is it purely

11   your memory, for example, or have you reviewed

12   documents that --

13       A.    It's purely memory.

14       Q.    Okay.  Could you tell me what, if you

15   know, her mean score was at the time she left the

16   class?

17       A.    I'm sorry, I don't know.

18       Q.    Okay.  Can you tell me whether the

19   score was a failing score?

20       A.    I don't know that.

21       Q.    Can you tell me why she left the

22   class?

23       A.    She was terminated.

24       Q.    Okay.  Did you have any role in the

25   decision to terminate her during the class?

53

1      Q.    I want to go back just a moment, I

2  kind of skipped over something, so we'll

3  transition back.

4            You've described my client's

5  performance in the retraining class as -- as well

6  as you can recall, as poor, I believe.

7      A.    Correct.

8      Q.    Can you tell me how, if you recall,

9  that her performance was poor?

10     A.    As I recall, she was -- she struggled

11  significantly with things that were commonplace,

12  such as quoting.

13     Q.    Quoting?

14     A.    Mm-hmm.

15     Q.    Quoting a rate?

16     A.    Quoting a rate.

17     Q.    Okay.  What other things?

18     A.    Rating.

19     Q.    Okay.  Is that different from quoting

20  a rate?

21     A.    Yes.

22     Q.    What else?

23     A.    That's approximately the time that

24  she entered the class.

25     Q.    Any other ways you can recall having

                                              59

MARK R. DAHLBERG  (619) 296-4530

1    felt that her performance was poor?

2         A.    She was unable or last to finish the

3    morning quizzes.

4         Q.    Can you recall whether she failed any

5    quiz -- strike that.

6              Was there a mark below which one

7    failed written tests during retraining?  I'm

8    sorry, during the training classes?

9         A.    You were required to maintain an

10   average score of, I believe it was 80 percent.

11        Q.    Can you recall whether she failed any

12   classes during her tenure in this training class,

13   the retraining we'll call it?

14             MS. BERNERT:  I'm going to object,

15   vague and ambiguous, whether she failed any

16   classes.  Do you mean tests?

17             MR. LOKER:  I'm sorry, tests.

18   BY THE WITNESS:

19        A.    I don't recall.

20   BY MR. LOKER:

21        Q.    Have you yourself functioned as a

22   mentor?

23        A.    Yes, I have.

24        Q.    Have you yourself ever been -- strike

25   the question.

                                                  60

             MARK R. DAHLBERG   (619) 296-4530

# Mark R. Dahlberg

COURT REPORTER
CSR#8487

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

ALAYNE A. HANSON,

Plaintiff, ) Case No. 730276

vs.                    )

GEICO, CORPORATION; GEICO

DIRECT; BERKSHIRE HATHAWAY

CORP., and DOES 1 through

25, inclusive,

Defendants.) Pages 1 - 205

---------------------------

**CERTIFIED COPY**

DEPOSITION OF:

LYNN BARTLETT

JULY 8, 1999

9:00 A.M.

REPORTED BY:

MARK R. DAHLBERG

CSR No. 8487

DISK
ENCLOSED

1

MARK R. DAHLBERG   (619) 296-4530
2811 STATE STREET, SAN DIEGO, CALIFORNIA 92103  (619) 296-4530

1    out of the bunch of us that were there, I

2    wondered if any of us were -- any of us that had

3    complained were still there working.

4        Q.    Who did you consider those that had

5    complained?

6        A.    The people that had gone in behind

7    me.  I'm the one that spearheaded the complaint.

8    Then I went to Alayne and then I went to Debbie.

9        Q.    And is that the group that you

10   consider to be those who complained?

11       A.    Yes.

12       Q.    You don't consider anybody else in

13   the class to have complained?

14       A.    The only reason that they did was

15   because I asked them to go in there and talk and

16   management asked them to go in there and talk.

17   They wouldn't have voluntarily gone forward.

18       Q.    Okay.  And why do you have that

19   impression?

20       A.    Because it was the truth.  Because I

21   had gone to them and said we need to do something

22   about this and they all said, no, no, no, we'll

23   just -- it will go away.

24       Q.    Who had told you that they had

25   thought it would just go away?

                                               28

ng Student - Field

4/1

Can't find Screens. uses a cheat sheet to determine of the screen she needs is in p or cp.

She does not retain info I walked her through an old/new & she said she had never done one before, Andy did one with her the week before.

She writes info down before pulling up screen, did a L/H add, wrote down all info released call, then asked if she would endorse.

She has trouble with the keyboard. (suggest a typing refresher)

4/2 - Called me over to ask if she could give a quote for a 94 porsche w/o vin # asked her if she was giving a quote for a spin-off because she was quoting from a blank trust screen. She said no so I told her she needed to pull it up by the policy #. She then stated that she did not have a policy. I asked her why she was giving a quote and she said

GEICO/Hanson  00131

"I don't know, she needs a quote" I told her to trans the call to sales.

Pol 448 7761 - plcg very confusing. she did not verify R/O + did not know she needed to ask. She was adding ERS to a liab only veh and did not know to change the veh cov to 9 + we went over the info for the same scenario the day befor.

Took another L/H call, took all the info on paper + released the call, then asked if she should add.

4/3

Trans call to m. Campillo on help line - see his letter.

was helping her do some mlqns from the day before. She then asked me to help her with a VRLU - on L/H pulled up plcg, and the previous day she had plogged that she sent it. I asked her why she plogged that she sent it

GEICO/Hanson  00132

when she hadnt & she said so she wouldnt forget.

Put a call on hold then asked me if the person on hold does not have a policy and wants a quote does she trans to sales. I asked her if they preo' ad a policy w/ us & she said no·

I gave her an error on policy # 448774 She waited til the end of the day to fix. She got back on the phone to take more phone calls & plogged two different unrelated calls on this policy. I will ck to see if she eld the ins back because the day before she stated she did not verify R/O and I told her not to plog info not verified.

GEICO/Hanson  00133

Notes by Loan Hoang
Alayne Hanson - Week 1

**4/1: New business call with C/R vehicle**

Alayne did not know how to look up new policy info. She had attended PHAP training just the day before, but could not retain any of the info. When I asked her to sign on to PHAP, she was very confused as which screen it is on (IP or CP)...tried to locate her PHAP training guide but could not remember where she had placed it. Because the customer had already been on hold for a few minutes, I decided to walk her through PHAP. Alayne was still very confused as to what she was looking for or even why she was in PHAP. Alayne has a tendency to write everything down on her notebook such as policy #s, vehicle info, VIN, usage etc. This has been a concern from the beginning and observed by a many mentors. She has extreme difficulties remembering where her screens are (IDIQ, PLOGI, ENDR, KUST etc...)

The call lasted about an hour and was not resolved. I advised her to take down the customer's phone # and call her back. I asked Alayne to call the "help line" to get additional help but before she did that...I went over the call with her and explained why she should call for help. When she reached Silvana (help line), she was again very confused as to what she was supposed to ask. I had to tell her word for word what to say. This was very frustrating to me because she was on the phone for a hour with the customer, yet did not even know what the problem was...and was given a brief explanation before calling the help line. I finally had to take over the call with Silvana so that she could know what was going on and what the request was. Silvana and I was able to resolve the problem and Alayne called the customer back. The only good thing that came out of this was an MBI sale.

**4/2: DCHA Payment**

Alayne handled a DCHA request and released the customer before verifying that the payment had posted in PLOGI. She had 2 days of taking nothing but payment calls before going on the floor. She was trained to always look in PLOGI to make sure the payment went through before letting the customer go. This DCHA transaction did not go through. The following Q&A took place:

Alayne: How did you know the payment didn't go through?
Me: If you look in plogi...nothing was documented. It automatically documents
     the U74#, amt and what type of payment was taken. No documentation
     means the request did not go through.
Alayne: Well I wonder why it didn't go through. Do you suppose she didn't have
     enough funds in her account and that it was due to insufficient funds?
Me: NO...it was because you probably hit the wrong key and it cleared out of DCHA.
Alayne: Oh - do you think I should call the customer back?
Me: Well, what do you think? YES

And of course, the phone we had listed for this customer was incorrect. The # belonged to a hotel and without even realizing that the customer had been with us for more that 5yrs...she proceeded to ask the hotel clerk to locate our customer and find out what room he was in. I made her disconnect the line and call the 411 to get a listing...no success. Dana helped her with the mailgram the next morning.

GEICO/Hanson 00134

Suggestions and Advice

I suggested that she put away her notebook. Explained to her that it takes double the work and time when she writes everything down. She states she does this because she was still not very familiar with the screens. I had her sign off the phone so I could do a drill with her on how well she works with the computer. The reason for this was to try and catch her up to speed and get her familiarized with the screens. I told her it is important to have the IDIQ and PLOGI ready to go because these are most common screens you will be dealing with first first when the customer calls. I advised her to input as much info as she can get from the customer and only write down little memos on buck slips...not her notebook. She was very receptive and agreed to put her notebook aside. I told her this was not our way of punishing her but a way of helping her be well prepared for when she gets out on the floor and into her section. I told her that her supervisor will take into consideration that she is a new trainee but will still expect that she knows the basics of this job. The following day, I noticed that she did put her notebook away and was using buck slips instead.

With regards to the DCHA situation...Alayne is aware how important it is to check plogi now. I told her from now on...when pulling up a customer's policy #...immediately check plogi before doing anything else.

GEICO/Hanson  00135

April 3, 1998

Today I was on the service desk and I received a call from a policyholder. After the policy holder explained that she got a quote from us a month ago, Alayne Hanson came on line with the policy holder and was explaining that she needed help to go over the quote with the policyholder. I explained to Alayne to look into the callers application and service the call. I immediately ran over to Alayne and asked her to put the person on hold. Alayne indexed the person and found that she had a policy with GEICO and she was calling for a re-issue. I explained to Alayne that she was calling the service help line, and whenever she is calling another department she should put the customer on hold prior to calling. Alayne appeared lost and did not understand what I was explaining.

*Marle Campbell*

## <u>ICBT MENTOR SUMMARY SHEET</u>

MENTOR: _Danna_

WEEK ENDING: _4-3-98_

TRAINEE: _Elaine Hansen_

**<u>PHONE/CUSTOMER HANDLING:</u>** Elaine is friendly with P/H. Does not always determine P/H needs before putting on hold, has trouble transfering calls. Sounds confident on phone, sometimes has trouble expressing what she is trying to say so p/h can understand.

**<u>ENDR PROCESSING:</u>** needs to endr on line, tends to write info down then process endr after call released. Does not know S/H codes.

**<u>AREAS OF CONCERN:</u>** needs to learn screens & where to find them, has trouble vectoring between screens & tends to lose her screens. Does not pull up plog to check on policy notes, ~~coverages~~ and has inadvertantly plogged in the wrong policy & asked questions w/an answer in plog.

**<u>SUGGESTIONS FOR IMPROVEMENT:</u>** - Pull up plog immediately when policy number given. needs to become more familiar with reference manuals & cheat sheets. Practice changing from screen to screen, learning how to read screens.

GEICO/Hanson  00129

Bill Zaney

4/3/98

AT THE END OF THE FIRST WEEK
OF MENTORING, IT IS VERY CLOSE
TO ME THAT ALAINE HAS A BIG
RETENTION PROBLEM. IT SEEMS
LIKE SHE DOESN'T REMEMBER
ANYTHING FROM TRAINING.
TODAY, AFTER 4 DAYS ON THE PHONE,
SHE SAYS, "OK... I HAVE A PH
ON MY LINE THAT WANTS TO ADD
A CAR TO HIS POLICY. SO I WANT TO
GO INTO MY ENDORSEMENT SCREEN
RIGHT?" THEN IT TOOK HER ABOUT
15 SECONDS TO FIND HER ENDORSEMENT
SCREEN. SHE THEN PROCEEDED TO
GET OUT HER REFERENCE MANUAL SO
SHE COULD LOOK UP WHICH "AC" & "SH"
CODES TO USE. I ASKED HER WHAT
DATE SHE WAS GOING TO USE TO
MAKE THE CHANGE EFFECTIVE, AND
LITERALLY TOOK HER 10 SECONDS TO
FIND THE EFFECTIVE DATE OF THE
POLICY ON IDIQ.

WHEN SHE PUTS PEOPLE ON HOLD SHE
SAYS " I'M GONNA PUT YOU ON HOLD
NOW".

GEICO/Hanson   00127

## Weekly Summary

Trainee: _Wayne Hanson_  Mentor: _Danna Friend_

Week ending: _4-3-98_  Date: _4-3-98_

Items to target: _Endorsement Categories & PHAP_
_Review of these endorsements:_
_- Cancel policies - Spin offs_
_- Reinstate policies - Move up - downs_
_- Add / New - Move-into's_
_- Issue dash 1-3 - DRVU M240s / 64's_
_Review PHAP / PHIN_

Strengths: _- Adding Lienholders_
_- Pay plan changes_
_- Payments_
_- Adding or chg/replace vehicle_
_- Name/address change_
_- Updating usage_
_- Coverage adjustments_

Weaknesses: _- Not fast enough finding info needed_
_- Not fast enough changing screens_

GEICO/Hanson  00130

4/6/98 by Danna Stewart-Friend

who giving quote had one pol#
in Idlg and one in ends, I asked
who was on the line & she said
p/h in Idlg. asked who's policy
she was ends & she did not know,
I checked on her ends log & it
was last ends she did, I asked
if when giving quote to new p/h if
she had ever made any changes &
she said "I don't think so," I asked
her, do you think you didn't or you
didn't, she was totaly confused.
got her out of ends and in Idlg.
she called Loan over & was ends
on wrong policy again to give quote

GEICO/Hanson  00125

4/6/98

1. Feels that the mentors answer
   her questions as if she has the
   understanding & knowledge of
   some one who has been here for a
   long time.

2. She feels that the mentors tend
   to stay with one person.

3. She stated that eddie does not
   really need a mentor so Tracy has
   Bill to herself and if she had a
   mentor to herself, she would be
   doing better.

4. Asked if she could stay late to get
   help. She feels she can't learn
   her screens on the phone. And
   that she was not given the
   chance in chaining to learn the
   screens.

GEICO/Hanson  00126

Sherry
4/6/98

Lienholder calls

Observation: I was helping Alayne with adding a lienholder to a policy, and noticed she still doesn't know what AC SH code to use without looking it up in her manual. She took a few more calls and came across another call to add a lienholder. What concerned me at that point was she had to once again look up the AC SH code and asked me the same questions as on the first call I helped her with.

Endorsement screens

Observation: When helping Alayne with any type of endorsement, whether it is adding a car or correcting/changing/adding lienholders, I find she is completely lost as to what to do. She let a policyholder go before asking pertinent questions as % of use.

GEICO/Hanson  00124

Darren
Freed

4/3/98

First thing in the morning I sat down with Alayne and asked her what it was she felt she needed help with. She said she didn't understand old/new & when to do one. The sch example we were using had eff date of 5-1-98. I asked her what the end date would be to add a car she did not know, I asked her what the 35 day rule was, she did not know. She stated she did not understand the 35 day rule and when to use it. I walked her through the 35 day rule & how to look it up, she stated that she knew how, but could not find it. She stated when we were through that she understood and was ready to take calls, one of her first calls was to del a veh and she did not know what date to use on what Mph circ since pol renl was 5-1-98.

After meeting with April I got some Idig worksheets from Katie and gave them to Alayne to work on,

GEICO/Hanson   00122

they were filled out w/ some
errors, took her an hour and a
half to complete

GEICO/Hanson  00123

4/9

When I was sitting with Alayne, processing due paper ends. She told me that she was out sick for 2 days and that was when the class was learning level ones. So when she came back the class was already on level twos and she was not trained on level ones.

Danna F.

GEICO/Hanson   00116

To the desk file of Alayne Hanson
4/8/98

I spoke to Alayne today and told her that we had concerns about her performance and that she is not progressing along as quickly as we expect. I told her that I know her mentors have talked to her about her performance and their concerns. I said our concern is that some of the things that she isn't performing well on are basic (see desk file notes).

I discussed this with Alayne and asked her what if any help did she need from us. She only said that she needs help in maneuvering between screens. She said she discussed this with Danna Friend, her mentor. I told Alayne that I will have Danna work with her on that and then I asked if there was anything else she felt she needed. She said that she felt she needed more practice doing endorsements. I said that Danna can give her endr exercises after helping her with the screens. Danna will do speed drills as well as help Alayne with flowing through an endr while sitting next to her and helping her as well as doing mock calls.

I explained to Alayne that we want her to succeed and that we are doing this as an effort to help her, but she does need to take responsibility and work hard and learn as much as possible. I told her that we will check her progress after a couple days. Alayne said at her previous job at a call center, she said she had similar training (8 weeks long) and that it took her about 3 months to feel comfortable and then around a year later, she was able to even help others. I told her that was good, but she does need to progress more quickly. I said that we need to see significant improvement in her performance. Alayne said that earlier today she's been on the phones for 2 hours and she said she was doing well. We will review how she is progressing and go from there.


I spoke to Danna after talking with Alayne and asked her if Alayne was on the phone for a couple hours. Danna said that she went through the screens with Alayne as well as things like the 35-day rule for about an hour. Even after going over the 35-day rule, Alayne still would ask Danna the same question about it. Danna still feels a little concerned about Alayne's performance. I gave Danna some guidelines on how to help Alayne:

1.    Go over the screens. Have Alayne sign-on and observe her.
2.    Do speed drills asking questions about what is the eff date, etc.
3.    Pull paper endr's and act like Danna is the policyholder and observe how
      Alayne handles the process. Don't act like the actual caller—go in a slower pace.
      Does she know where to go? Does she know what to do? Danna should not provide
      guidance until Alayne has given it a try first.
4.    Call Alayne and pretend to be the customer using paper endr's. Act like it is
      a regular call without giving her any guidance and then go over the call afterwards.


April Gomez
Service Administrator

GEICO/Hanson  00121

called
alayne pretending to
be P/H.

Deannie
friend

col 9H327990.                                    4/9.

add aveh. -
          Asked for policy # then had
open holds for 5 sec, 10 sec then she
asked me to hold 30 sec. Renewal hold
30 sec. She asked for veh info then
came back and asked again.
          She asked what coverages I wanted
on new veh - 100/300/25 - she then said.
oh. and um. I said "I think I rejected
that" Alayne "Oh. I need to send you
an opt form". me "I already signed
that form" Alayne "I need to send you
another one" me "No, I'm pretty sure
I don't need to sign another one"
Alayne "you need to sign one for each
veh" me, "Are you sure? I'm pretty sure
that I was told Rej. was for the whole
policy". Alayne. "Oh. Can you hold &
I'll check on that for you" She then
asked me. She had typed all veh
info over existing veh. had her
erase & start over. . . .

when she was setting up to start
over she put me on hold 3 times

GEICO/Hanson  00118

1:45, 6:20, 5:00

when she input veh info it did not pull up vehic/vin. She did not know why veh not found, And I had to show her how to look up veh in alt index. She had typed in Sub instead of Subaru, had to tell her to look up her cheat sheet for ven abbrivat. After she worked up quote I asked her to give me the next pmnt amount, she put me on hold when came back and told me $59 ~~dollars~~ I asked her how that was possible since my current bill is $110 and she said veh raised my premium, she put me back on hold & asked Leon for help.      She did not enctr on line.

Left bi on veh 1 at 15/30 & pd 10 even after I reminded her to raise it.

took over one hour on phone & another 1/2 hour to complete the endr.

GEICO/Hanson   00119

She was processing old new, did not add the veh in old, updated mis on existing

veh only, I had to ~~gave~~ tell her
to add the veh. in the old.

GEICO/Hanson  00120

grid with car. - Sitting next to her

4/9

gave pfy H worth sheet. 1 hr to complete.

Had her sign off and re-sign on the phone -

1st call b/um/Lower-
took awhile to pull up plag.
put me on hold- did not use term.
took awhile to figure out what reason
code.

2   del L/H - put on hold to pull up
plag & endr screen. - del veh - not L/H.
advsd to arose & start over - did not
know how delete a L/H-

3  del coverages - typed rej next to all cov
to be deleted - did not know why would
not go through - advised her that rej
is typed next to coverages that must be
rej in writing, and she said ok ??? so
I asked her is med mand, in to she said
she didn't know- looked it up in
pfy H- still did not know what to do,
advised her to clean the coverages out.

GEICO/Hanson  00117

Paper endr # 386 656 70.                    4/10/98

This was an endr that Tim helped Alayne with. They overlooked ~~adding~~ changing the ins'd last name to her new married name. gave back to Alayne as a correction to add mrs new name. she gave me back the "correction". she had nached name, endorsed policy? used Reason code 457 w/ her new married name. when I looked up reason code 457 it says "the name on your policy was..." the name was not updated in Oru and she plogged the correction on policy # 5631847

Lisa Thaxton                          Denmark

GEICO/Hanson  00108

Danna Friend
4/10/98

Took Calls plugged into Alayne

1st Call- transferred from payment counselor,
P/H wanted to del L/H. Alayne took call
and asked p/h which car she wanted
to del L/h from. Ins said "The only
one that has a L/H." Alayne said ok.
and thats the . 34 Chev... ? Ins
said yes. She had changed the und.
code from 3 to 0 but did not update
mia. when call finished I asked her
why she changed und code from 3 to 0
and she said "Because I'm supposed to"
So I asked her "what does the und code
3 mean?" and she said "underwriting
concern." So I explained that was
there to remind counselors that mia
needs to be updated & Since she did
not do it to change back to a 3.

2nd Call- p/n called to advise us that her ch..
bounced and wanted to know if we
would put the check through a second
time. Alayne looked at me very confused,
I told her that we generally do, but can't
guarantee it, that it's up to the bank if

GEICO/Hanson  00109

p/h should ch. w/ her bank. Alayne then told the p/h we will put it through twice but can't guarantee money will be there. P/H stated that money was there. I said again we can't guarantee that the ~~money will~~ bank will put it through ex it's up to the bank. She said "what" into the phone so p/h could hear $ the p/h asked her "do you just want me to speak to her?" Alayne said no. And p/h said I'll just call my bank.

Call 3  p/h called ~~the~~ "I got a bill ~~that~~ says I owe $69 on 5/9 $ I want to know why. Alayne looked up his info and said your ~~total~~ prem is $569 (or so) and you paid $308 so your next pmnt is due on 5/9 for 69 - p/h said I know I paid $308 so why do I have a bill. she said you have to mo prem of 569 paid 308 ?? balance is $___ so pmnt is $69 she did not understand the pmnt he had made $ was confusing p/h. I told her that if she doesn't understand the p/h bill schedule to put him on hold, that trying

GEICO/Hanson  00110

to explain it to herself w/ p/h on line is confusing to p/h.

\* Call \* - p/h called to go over coverages, she told him he had 100th med, I told her no he has 10th, she glanced at me, then went back to explain what med covers, I said again, he has 10th, she glanced at me again went back to phone call, said a 3rd time he has 10th med not 100th in med, she then said "you have 10th med" she told p/h he has 100/300 uim. He said what does that cover she explained that is 100/300 for any type of claim, p/h "any type of claim huh?" Alayne "yes "

\* when I went over Alayne's summary w/ her, she told me that in training they spent too much time going over coverages and not enough on endrs. And that was why she was having trouble w/ endrs. After this call I reminded her of what she told me and that she needs to review her coverages because she <u>can not</u> give p/h's wrong info regarding their coverages. On one occasion I overheard her telling

a p/h that RL will cover a rental car
in the event that car in shop for any
reason. She asked me a question about
something else & I told her RL covers
if veh in acc only. She said I'm not
asking about that, I told her that I
overheard what she said & she said
"Oh, that's OK, they didn't take it any
way". On another occasion Bill heard
her tell a p/h that ers gives a $50-
ded. ?

5 on call- add veh eff 4/15. Alayne asked me
what eff date to use & what Ac/sh
codes to use, I asked her what the
35 day rule was and she said she
didn't know. I asked if she wrote it
down on endr log like I told her to
& she said she wrote it on a batch slip
& left it at another desk. I had to
tell her Ac/sh and eff date. during
call Ins was adding a the veh liab
only she asked if had l/h - then asked
if "does it have air bags or seatbelts
or any thing like that?" p/h answered "it
has seatbelts" she asked about Abs & p/h

was totaly confused. I walked her
through the endoz ends due to
ph had been on phone for a long
time.


note: when Alayne was signing on the phone
all the red lights lit up, Alayne asked
"what is this business?" I told her
that she hadn't signed on, she tried
again - I tried for her and could not
sign on w/ the info she had written down.
she said phone must be broke, I then
signed on & off w/ my number & told her
phone was not broke, Asked her if was
trying to use correct #, she said she
had ~~rummaged through~~ written it down
~~wrong~~ in several places. rummaged
through her notes and found the correct
number.

GEICO/Hanson  00113

Call took 30 min

pol 438 7096.

Hold 1:00

asked L/H when I asked for Liab only,

Hold 1:40

asked veh info @ % of use on 87 only.

Hold 3:25, Renewed hold

Hold 5:54 Asked coverages again

ask % use on 79 chev.

asked next pmt ~~do~~

h~~▓▓▓▓▓▓▓▓~~ renewed ~~▓▓▓▓▓▓▓~~

gave new Rate, asked to have

mus name added to heading

~~▓▓▓▓▓▓▓▓▓▓▓▓▓~~

GEICO/Hanson  00107

call toon 40 min.

Neil Wilson on
plug.
Bext friendis.

4/10/98

acc # 793 3842.

hold - 1:00 at begining right after pulled
up Idig. - was adding veh- told
her I bought a veh, did not ask if
was replacing a veh on policy. took veh info

hold. 3:57. Renewed hold. 2:11 Renewed hold
because could not find veh. (I went into
trust and was able to locate a symbol in
Aut indx) 5:01 Renewed hold again 3:05
Renewed hold: (asked ann nua on '93 Ford): 32
came back to ask info on susub added
not on policy back on hold. 4:55
Renewed hold again 20:01 hold again 3:05
came back w/new cemorate. -asked
next pmnt was put back on hold 1:40

was calling Alayne pretending to be a
customer.

Danna F.

GEICO/Hanson  00106

4-10-98

TIM LORE
RE: ELAINE

— MENTORED ELAINE 4-9-98. WALKED HER
THROUGH 4 ENDRS, WHICH INCLUDED
ADJUSTING LIABILITY COVGS, ADDING A
SPOUSE WITH A VEHL.

— TRIED TO HELP HER FIND SHORT CUTS
TO MAKE ENDR SMOOTH AND EASY. HELP
HER TO HAVE LESS TO REMEMBER

— ELAINE SEEMS TO HAVE DIFFICULTY
ESTABLISHING A ROUTINE WHEN
ENDORSING. SEEMS TO FORGET QUICKLY.

GEICO/Hanson  00105

*c4/10/48*

Alayne Hanson
Policy no K5-61-49-0
Paper endorsement

This similated phone call was a simple adding a vehicle w/lienholder info and updating % of use on veh 1. I first start the call by telling her that I wanted to add a 1995 Dodge Caravan to my policy. She identified me as Mrs. Fox. She remembered to say " I'd be happy to help you w/that."...but the next thing she asked me was if I had the dodge inspected yet. (?) I asked her the reason for this and she said we need record of any pre-existing damages even if the car is just for liability only. I told her that the vehicle has a lienholder and must be added today. She told me that she cannot add the car but can add the coverages (????)...she then proceeded by asking, "Now, which vehicle will replace w/ which drivers?" This call took over an hour to process and she placed me on hold 12 times. When she wrapped up her call...she gave me a total 6 mos prem of $865 (my quote in kust showed $565). I told her that seems quite high and asked her to double check her work. She said maybe the premium was so high because she did not go over any discounts. She asked me if I belonged to any clubs dealing w/Geico (????) or if I belonged to any professional group clubs (????). She then closed her call by telling me that she had C/R the 84 chev w/95 dodge...I told her there is no 84 chev and that I had deleted that vehicle back in January. She said that we are still insuring the 84 Chev but I kept insisting that the vehicle had be deleted...she then realizes a code 92 means the vehicle is no longer there. So she places me on hold again to try to fix the endorsement. She summarizes the call by telling me that she has added the 95 dodge to the policy and that she fixed the premium. She tells me the new premium is $865 (which was the first premium she gave me...so she really didn't fix it).

Resolution: I asked Alayne how did she came up with that premium. She showed me her endorsement and what I immediately noticed was that the 95 chev was veh 1 and the 87 chev was veh 2 (supposed to be 87 chev veh 1...and 95 dodge veh 2 b/c we had just added it). She didn't quote the right deductibles for the 95 dodge. Alayne was very confused. She told me the reason the 95 dodge was veh 1...was because she had made a mistake w/the 84 chev so she thought it would be okay to type over veh 1 and re-add the 87 chev down as the 2nd car. I told her never to do that because it really messes up the system and will not give you the correct ratings. I had Alayne erase the entire endorsement and to do it all over again. I basically had to walk her through it from beginning to finish. She did not know where she went wrong. I told her she must have typed something wrong for the premium to be way off. Danna was nearby helping her and had also taken some notes as follow:

Asked her how she had new veh as veh 1 and old veh as veh 2 and she told me that she accidentally typed the new car over the old....so she put the old in the veh 2 field and was going to go back and correct when finished. I asked her how many drivers were on the policy and she said 2. I then asked her why driver #1 was rated on both vehs and she said "Mr Ph" was 80% on both...told her that she would need to rate spouse as occ on one veh. Loan told her mrs was 80% on 95 chev and mr was 80% on 87 chev. She didn't listen clearly.

GEICO/Hanson   00104

## ICBT MENTOR SUMMARY SHEET

**MENTOR:** _Danna_

**TRAINEE:** _Alayne_          **WEEK ENDING:** _4-10-98_

**PHONE/CUSTOMER HANDLING:** Still uses a cheat sheet to sign on to the phone. Is remembering to say "I'd be happy to help you with that" and "Thank you for calling Geico."

**ENDR PROCESSING:** Is still having trouble with Ac/Sh codes (when do use which.) She does not know when to apply the 35 day rule. Not processing on line.

**AREAS OF CONCERN:** Is putting calls on hold several times during the call (up to 10 or 12.) not watching hold times. She does not understand coverages, and has given mis-information to policy holders.

**SUGGESTIONS FOR IMPROVEMENT:** Review coverages. Use timer $ when it goes off, renew hold. Get more info before putting p/H on hold. Write 35 day on Endr log so it is always handy.

GEICO/Hanson  00114

April 12, 1998

To the file of : Alayne Hanson

Alayne called to ask a question on a call she was handling.  When I answered the phone, she told me that she needed a "Phap".  I proceeded to clarify the call and she still couldn't clearly ask what she needed.  Finally, Loan (her mentor) instructed her to tell me that she was being mentored.  Even after that, Alayne could not convey to me what she needed so Loan had to get on the phone with me and explain the situation.

Silvana Jackson

GEICO/Hanson  00103

policy #7465740                                    4/13/98

On 4/10/98 I sat with Alayne
while she processed a L/H endr.
She had changed und code from 3 to
0 but did not update mia. I advised
her to put the und code 3 back,
which she did at the time. On Friday
she did not give me her endr log to
QC, today when I QC'd her work,
she had gone back into the endr &
changed the 3 back to a 0.

GEICO/Hanson  00102