USDC SCAN INDEX SHEET



LLH   1/26/00   9:32

3:99-CV-01151   HANSON V. GEICO CORPORATION

*21*

*NTCF.*

1  Kathryn A. Bernert, State Bar No. 127418
   Julie A. Vogelzang, State Bar No. 174411
2  Luce, Forward, Hamilton & Scripps LLP
   600 West Broadway, Suite 2600
3  San Diego, California  92101-3391
   Telephone: (619) 236-1414
4  Facsimile: (619) 232-8311

5  Attorneys for Defendant
   Government Employees Insurance Company

6

7

**FILED**

JAN 2 5 2000

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

8              UNITED STATES DISTRICT COURT

9          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10

11  ALAYNE HANSON,                    ) Case No.: 99CV1151 TW (RBB)
                                      )
12          Plaintiff,                ) **DEFENDANT GOVERNMENT**
                                      ) **EMPLOYEES INSURANCE COMPANY'S**
13      v.                            ) **APPENDIX OF CALIFORNIA**
                                      ) **AUTHORITIES IN SUPPORT OF**
14  GEICO CORPORATION; GEICO DIRECT;  ) **MOTION FOR SUMMARY JUDGMENT**
    BERKSHIRE HATHAWAY CORP., and     ) **OR, IN THE ALTERNATIVE, PARTIAL**
15  DOES 1 through 25, inclusive,     ) **SUMMARY JUDGMENT**
                                      )
16          Defendants.               ) Date:  February 22, 2000
                                      ) Time:  10:30 a.m.
17  _____ ) Ctrm:  7

18

19  TO PLAINTIFF AND HER ATTORNEY OF RECORD:

20          Defendant Government Employees Insurance Company ("GEICO")submits the following

21  appendix of California authorities cited in its Memorandum of Points and Authorities in Support of

22  Defendant GEICO's  Motion for Summary Judgment or, in the Alternative, Partial Summary

23  Judgment:

24  **Exhibit**

25      1   Addy v. Bliss & Glennon, 44 Cal. App. 4th  205 (1996)

26      2   Burton v. Security Pacific Nat. Bank,  197 Cal. App. 3d 972 (1988)

27      3   Carrisales v. Department of Corrections, 21 Cal. 4th 1132 (1999)

28      4   Croeni v. Goldstein, 21 Cal. App. 4th 754 (1994)

                                              99CV11511 TW (RBB)

**Exhibit**

5 <u>Eisenberg v. Alameda Newspapers, Inc.</u>, 74 Cal. App. 4th 1359 (1999)

6 <u>Fisher v. San Petro Peninsula Hospital</u>, 214 Cal. App. 3d 590 (1989)

7 <u>Hersant v. California of Dept. of Social Services</u>, 57 Cal. App. 4th 997 (1997)

8 <u>Mixon v. Fair Employment and Housing Com.</u>,192 Cal. App. 3d 1306 (1987)

9 <u>Muller v. Automobile Club of Southern California</u>, 61 Cal. App. 4th 431 (1998)

10 <u>Sequoia Insurance Company v. Superior Court</u>, 13 Cal. App. 4th 1472 (1993)

11 <u>Tyco Industries, Inc. v. Superior Court</u>, 164 Cal. App. 3d 148 (1985)

12 California Government Code section 12940(H)(1)

13 California Labor Code section 970

Date: January 25 , 2000   LUCE, FORWARD, HAMILTON & SCRIPPS LLP

By: _Julie A Vogelzang_____
  Kathryn A. Bernert
  Julie A. Vogelzang
  Attorneys for Plaintiff
  Government Employees Insurance Company

99CV11511 TW (RBB)

14461954.1

CONCLUSION

(2c) The result urged by the Insurer and its supporters may be cost effective for the insurance industry. Nevertheless, we cannot judicially create out of thin air an administrative remedy not contemplated by the Legislature for bad faith conduct in breach of a workers' compensation insurance contract. Respondent and amici curiae must first convince the Legislature to enact a law creating an administrative remedy before we can require a plaintiff to pursue it.

DISPOSITION

The judgment (order of dismissal) is reversed. Appellant is entitled to recover its costs on appeal from respondent.

Fukuto, J., and Zebrowski, J., concurred.

A petition for a rehearing was denied April 25, 1996, and respondent's petition for review by the Supreme Court was denied July 24, 1996.

[No. H013602. Sixth Dist. Apr. 8, 1996.]

IULA ADDY, Plaintiff and Appellant, v.
BLISS & GLENNON et al., Defendants and Respondents.

SUMMARY

In an employment discrimination action against plaintiff's former employer, the trial court granted summary judgment in favor of defendant. (Superior Court of Santa Clara County, No. 732379, Jeremy D. Fogel, Judge.)

The Court of Appeal affirmed the judgment. The court held that the trial court properly granted summary judgment for defendant with regard to plaintiff's cause of action for discriminatory failure to promote her to a management trainee position. Defendant submitted admissible evidence demonstrating that plaintiff could not establish a prima facie case of failure to promote based on discrimination. Defendant showed that the position was not a promotion for plaintiff. Also, defendant submitted evidence that it sought a person with a four-year college degree and that plaintiff did not have such a degree, and that another individual had already been selected for the position when plaintiff's application was received. This evidence also demonstrated that defendant had legitimate, nondiscriminatory reasons for not offering plaintiff the position. The court also held that the trial court properly granted summary judgment for defendant with regard to plaintiff's cause of action for retaliatory reassignment of work and elimination of flextime after she had filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). Plaintiff showed she engaged in protected activity by filing a claim with the EEOC, and that she was subjected to adverse employment action when some of her work was transferred and her flextime was eliminated. However, she failed to show a causal link between the two, and she did not rebut defendant's evidence that there was no causal link. The court further held that the trial court properly granted summary judgment for defendant with regard to plaintiff's cause of action for retaliatory denial of training, demotion, and constructive discharge. Defendant submitted evidence that plaintiff received the same training as the other underwriting assistant in the office, with the exception of a single training session, which plaintiff failed to attend because she had a headache. As for demotion, defendant submitted substantial evidence that

plaintiff was not performing in a satisfactory manner. Since plaintiff predicated her constructive discharge claim on an alleged denial of training and on her demotion, the claim was rebutted by this evidence. Plaintiff also failed to present evidence demonstrating the existence of a triable material controversy as to whether defendant's stated reasons for its actions were either untrue or a pretext for discrimination. (Opinion by Cottle, P. J., with Bamattre-Manoukian and Mihara, JJ., concurring.)

## HEADNOTES

Classified to California Digest of Official Reports

(1) **Summary Judgment § 11—Affidavits—Sufficiency—Showing by Defendant.**—Code Civ. Proc., § 437c, subd. (o)(2), reiterates the requirement originally found in Code Civ. Proc., § 437c, former subd. (n)(2), that a defendant moving for summary judgment must show, by admissible evidence, that one or more elements of the cause of action cannot be established. Thus, the same rule—that a moving defendant must make an affirmative showing in support of his or her motion—should apply.

(2) **Summary Judgment § 26—Appellate Review—Scope of Review.**—Since summary judgment involves pure matters of law, the appellate court reviews a summary judgment ruling de novo to determine whether the moving and opposing papers show a triable issue of material fact.

(3) **Civil Rights § 3—Employment—Discrimination Lawsuits—Burden of Proof.**—Employment discrimination lawsuits that are analogous to federal claims under title VII (42 U.S.C. § 2000e) are evaluated under federal law interpreting title VII cases. The basic allocation of burdens and the order of presentation of proof in a title VII case alleging discriminatory treatment are as follows: First, the plaintiff has the burden of proving, by a preponderance of the evidence, a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove, by a preponderance of the evidence, that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

(4) **Civil Rights § 3—Employment—Discrimination Lawsuits—Unlawful Refusal to Promote—Burden of Proof—Summary Judgment**

**and Summary Issue Adjudication.**—During a trial, once a plaintiff in a case involving an unlawful refusal to promote establishes a prima facie case of discrimination, the burden shifts to the defendant to rebut that prima facie showing by producing evidence that the plaintiff was rejected for a legitimate, nondiscriminatory reason. The defendant's responsibility is to clearly set forth, through the introduction of admissible evidence, the reason for the plaintiff's rejection. The explanation of reasons for the refusal to promote must be clear and reasonably specific. Although the burden of proof in a title VII action claiming an unjustifiable refusal to promote ultimately rests with the plaintiff, in the case of a motion for summary judgment or summary issue adjudication the burden rests with the moving party to negate the plaintiff's right to prevail on a particular issue. In other words, the burden is reversed in the case of a summary issue adjudication or summary judgment motion.

(5) **Civil Rights § 3—Employment—Discrimination Lawsuits—Unlawful Refusal to Promote—Summary Judgment—Evidence.**—In an employment discrimination action, the trial court properly granted summary judgment for defendant employer with regard to the employee's cause of action for discriminatory failure to promote her to a management trainee position. The employer submitted admissible evidence demonstrating that plaintiff could not establish a prima facie case of failure to promote based on discrimination. It showed, first, that the position was not a promotion for plaintiff. The management trainee position had the same advancement potential as the job she currently occupied, and it paid less than she was earning. Also, for plaintiff to make a prima facie showing that she might have been hired for the position had it not been for unlawful discrimination, she would have had to show she was qualified for the position and that the position was still open when she applied for it. Yet the employer submitted evidence in the form of a declaration from its president that it sought a person with a four-year college degree and that plaintiff did not have such a degree, and that another individual had already been selected for the position when plaintiff's application was received. In addition to showing that plaintiff could not make a prima facie case of discriminatory failure to promote, the employer's evidence also demonstrated that it had legitimate, nondiscriminatory reasons for not offering plaintiff the position. Plaintiff, in turn, produced no evidence demonstrating that the employer's showing was untrue or pretextual.

(6) **Civil Rights § 3—Employment—Discrimination Lawsuits—Retaliatory Reassignment of Work and Elimination of "Flex-time"—Prima Facie Case—Summary Judgment—Evidence.**—In an employment discrimination action, the trial court properly granted

claim on an alleged denial of training and on her demotion, the claim was rebutted by the evidence. Demotions, even with reductions in pay, are not by themselves enough to constitute constructive discharge. Plaintiff failed to present evidence demonstrating the existence of a triable material controversy as to whether defendant's stated reasons for its actions were either untrue or a pretext for discrimination.

(8) **Employer and Employee § 9—Actions for Wrongful Discharge—Constructive Discharge—Working Conditions Supporting Claim.**—To prevail on a claim for constructive discharge, an employee must plead and prove, under the usual preponderance of the evidence standard, that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign. An employee cannot simply quit and sue, claiming he or she was constructively discharged. The conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer. The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee. An employee may not be unreasonably sensitive to his or her working environment. An employee is protected from unreasonably harsh conditions, in excess of those faced by his or her coworkers. He or she is not, however, guaranteed a working environment free of stress. In order to amount to a constructive discharge, adverse working conditions must be unusually aggravated or amount to a continuous pattern before the situation will be deemed intolerable. In general, single, trivial, or isolated acts of misconduct are insufficient to support a constructive discharge claim. Moreover, a poor performance rating or a demotion, even when accompanied by reduction in pay, does not by itself trigger a constructive discharge.

[See 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 184M et seq.]

**COUNSEL**

Gary B. Wesley for Plaintiff and Appellant.

Donfeld, Kelley & Rollman and Paul M. Kelley for Defendants and Respondents.

summary judgment for defendant employer with regard to the employee's cause of action for retaliatory reassignment of work and elimination of flextime after she had filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). To establish a prima facie case of retaliation, a plaintiff must show that he or she engaged in a protected activity, that he or she was thereafter subjected to adverse employment action by the employer, and that there was a causal link between the two. Plaintiff showed she engaged in protected activity by filing a claim with the EEOC, and that she was subjected to adverse employment action when some of her work was transferred and her flextime was eliminated. However, she failed to show a causal link between the two, and she did not rebut defendant's evidence that there was no causal link. Defendant presented evidence that it had legitimate, nondiscriminatory business reasons for its actions. In a declaration, plaintiff's supervisor stated that some of the work of both plaintiff and the office's other underwriting assistant was transferred to a new employee. As plaintiff was treated the same as her coworker, she could not establish a prima facie case of discrimination. The supervisor also explained that defendant needed office coverage in the late afternoon, and that to maintain parity among employees, flextime was eliminated. Plaintiff failed to demonstrate the existence of a triable material controversy as to whether defendant's stated reasons for eliminating her flextime were either untrue or a pretext for discrimination.

(7a, 7b) **Civil Rights § 3—Employment—Discrimination Lawsuits—Retaliatory Denial of Training, Demotion, and Constructive Discharge—Summary Judgment—Evidence.**—In an employment discrimination action, the trial court properly granted summary judgment for defendant employer with regard to the employee's cause of action for retaliatory denial of training, demotion, and constructive discharge after she filed discrimination claims with the Equal Employment Opportunity Commission. Defendant submitted evidence that plaintiff received the same training as the other underwriting assistant in the office, with the exception of a single training session, which plaintiff failed to attend because she had a headache. As for demotion, defendant submitted substantial evidence that plaintiff was not performing in a satisfactory manner. Although plaintiff asserted that it was not her supervisor who decided to demote her, but rather the president from the head office, her complaint alleged that her supervisor participated in each of the adverse employment determinations. A judicial admission in a pleading is not merely evidence of a fact; it is a conclusive concession of the truth of a matter, which has the effect of removing it from the issues. Since plaintiff predicated her constructive discharge

# OPINION

COTTLE, P. J.—Iula Addy appeals the summary judgment entered in favor of her former employer, Bliss & Glennon (B&G), in this employment discrimination action. Her primary contention on appeal is that the trial court applied the incorrect standard in granting summary judgment. She contends that B&G was required to "negate each of the theories of liability contained in the complaint" (capitalization omitted) before it would have been entitled to summary judgment. B&G, in contrast, argues that it "may show a cause of action has no merit [merely] by pointing out to the court the absence of essential evidence to support some element of plaintiff's case." Although we agree with Addy that a moving defendant may not shift the burden to the plaintiff to put on a prima facie case simply by pointing out to the court the absence of essential evidence to support plaintiff's case, and that a defendant must make an affirmative showing in support of his or her motion, we conclude that B&G has made a sufficient showing here to entitle it to summary judgment. Accordingly, we shall affirm the judgment.

## FACTS

Addy, an Asian, received an A.A. degree in computer-aided office management from Condie Junior College in 1985. From 1986 to 1988, she worked for Weber Insurance Service assisting employees in operating computer terminals. From 1988 until 1990 she worked at Wallis and Wallis insurance agency.

On July 17, 1990, Addy was hired as an "underwriting assistant" by B&G, a corporation engaged in underwriting wholesale insurance, and was assigned to its Morgan Hill branch office. She received a salary of $2,000 per month, plus overtime. Her primary job responsibility was to issue policies.

In late 1990, Addy received a generally favorable performance review, and her salary was increased to $2,050 per month plus overtime. She did not receive a performance review during 1991, as the company did not issue any that year. In February 1992, Addy went on maternity leave, returning in May. Upon her return, Addy's supervisor, Carol Marquez, permitted Addy to begin and work early to accommodate a child-care scheduling problem.

In June 1992, B&G advertised for a management trainee position. The salary for the management trainee position was $250 per month less than what Addy was earning at the time. Both Addy's position ("underwriting assistant") and the advertised position ("management trainee") offered the identical promotional opportunity—to "underwriter."

B&G's newspaper advertisements for the position read: "MANAGEMENT TRAINEE. College grad to learn surplus insurance field. Some office exper. helpful, but not nec. Office in Morgan Hill w/some training in L.A. req'd. Send resume to . . . ." As a result of this job search, B&G hired a college graduate named Jose Ochoa.

Addy mailed an application for the management trainee position to B&G's main branch on June 15, 1992. However, by the time the application was received, B&G had already hired Mr. Ochoa.

Just a few days before Addy mailed in her application for the management trainee position, the president of B&G, Robert Abramson, had called a telephonic meeting with the Morgan Hill supervisor, Carol Marquez, and the two underwriting assistants, Addy and Penny Robinson, to address tardiness in issuing policies and persistent mistakes in the policies once issued. Abramson stated that these problems, which had come to light because of customer complaints, needed to be corrected immediately and that policies needed to be issued correctly in the first place. Some of the problems involved Addy's work before she went on maternity leave.

On June 17, 1992, Addy called Abramson to ask whether he had received her resume for the management trainee position. He told her that the position was not a promotion for her, as it paid less than she was receiving, and that B&G had already hired Jose Ochoa, who met the job qualifications which included a four-year college degree.

The next day, Addy called in sick and went to the Equal Employment Opportunity Commission (EEOC) to file a charge of race and sex discrimination based on not having been selected for the position of management trainee.

When Jose Ochoa was hired, some of the work of the two underwriting assistants was transferred to him. According to Addy, this was very demoralizing. She made errors in issuing policies which were documented in the regular course of business in memoranda dated July 14, 1992, July 16, 1992, July 17, 1992, July 27, 1992, and February 11, 1993. Even after additional training, Addy did not appear to her supervisor to grasp the essentials of proper policy issuance. In addition, she repeatedly failed to issue policies within 30 days of a request for coverage, renewal or amendment, as is B&G's policy. Finally, numerous customers complained to B&G about Addy's telephone manner and her failure to follow up on calls and to issue policies.

In July 1992, Penny Robinson, the other underwriting assistant, and Jose Ochoa, the newly hired management trainee, asked if they too could work

flextime like Addy. In response to their request, and to assure late afternoon coverage, Carol Marquez issued a memorandum on July 24, 1992, stating: "Due to the fact that we cannot discriminate by allowing some people to have flex time and some not, there will be no flex time permitted in the Morgan Hill office."

The following day, Addy failed to appear at a training session scheduled to address various policy issuance matters.

Based on the loss of her flextime, Addy filed a second charge with the EEOC. In the charge, she alleged B&G transferred some of her work to Ochoa and eliminated her flextime schedule "in retaliation for having filed my prior charge with EEOC."

On October 15, 1992, Addy received a "less than satisfactory" performance review and was put on three months' probation. In January 1993, Marquez discovered several policies on Addy's desk that had been pending for 30 days or more. In addition, Marquez received at least four complaints from customers regarding Addy's failure to issue policies or errors made in issued policies. At that point, Marquez and the other underwriting assistant issued all the overdue policies. Addy's work output at that time was half that of another employee performing the same job function.

On February 2, 1993, a B&G vice-president met with Addy and explained that the company could no longer tolerate Addy's "sub-par" performance. She was given three options: termination, demotion with pay cut, or resignation with severance pay to be determined by the board of directors. Addy asked for time to consider the options. The next day the vice-president informed Addy that the board had authorized $4,000 in severance pay. He stated the offer remained open through February 5 and that Addy could take the next three days off with pay to consider her decision. He also stated that if she returned to work on Monday February 8, 1993, she would be deemed to have accepted the demotion option.

On February 4, 1993, Addy filed a third charge with the EEOC, complaining she had been denied training and was being discriminated against because of filing her previous two charges.

On February 8, 1993, Addy reported for work and her job title became "Senior Clerk" with a salary of $17,200 per year. She worked through February 12, but did not report to work after that.

On May 27, 1993, Addy filed a fourth charge with the EEOC, alleging demotion and constructive discharge in retaliation for filing earlier charges.

## STANDARD OF REVIEW

A summary judgment may be granted where it is shown that the "action has no merit or that there is no defense" thereto. (Code Civ. Proc., § 437c, subd. (a).) To make this showing, the moving party must set forth admissible evidence establishing "that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)

In 1992, the Legislature amended Code of Civil Procedure section 437c to define what a moving party must prove in order to show that the responding party's cause of action has no merit: "A cause of action has no merit if o or more of the elements of the cause of action, even if not separated pleaded, cannot be established, or if there is a complete defense to the cause of action." (Code Civ. Proc., § 437c, [former] subd. (f), Stats. 1992, ch. 1348, § 1.) In addition, the Legislature set forth for the first time the moving party's substantive burden on a motion for summary judgment. Where the moving party is a defendant, that party "has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action." (Code Civ. Proc., § 437c, [former] subd. (n)(2), Stats. 1992, ch. 1348, § 1.)

In 1993, the Legislature added the following language at the end of Code of Civil Procedure section 437c, subdivision (n)(2), which was redesignated subdivision (o)(2): ". . . or a defense thereto. The plaintiff . . . may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific far showing that a triable issue of material fact exists as to that cause of action or a defense thereto." (Stats. 1993, ch. 276.) In addition, the Legislature redesignated the quoted portion of subdivision (f) as subdivision (n), with minor modifications.

As we noted in Hagen v. Hickenbottom (1995) 41 Cal.App.4th 168, 183-184 [48 Cal.Rptr.2d 197]. "[t]here was initial debate as to whether the new statutory requirement of a showing that an element "cannot be established" effected any significant change from the preexisting requirement that the defendant "conclusively negate" the element. [Citations.] There is evidence that the 1992 and 1993 amendments were in some respects influenced by the decision of the United States Supreme Court in Celotex Corp. v. Catrett (1986) 477 U.S. 317 [91 L.Ed.2d 265, 106 S.Ct. 2548], and those

who support the view that the amendments have substantially lessened a moving defendant's burden under the federal summary judgment rule, sometimes point to Celotex's statement that, the moving party may be discharged by 'showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.' [Citations.]

We went on to say, however, that we disagreed "with those [such as the court in Hunter v. Pacific Mechanical Corp. (1995) 37 Cal.App.4th 1282, 1287-1289 (44 Cal.Rptr.2d 335)] who may be understood to suggest that a moving defendant may shift the burden simply by suggesting the possibility that the plaintiff cannot prove its case. It is clear to us, from the requirement of the 1992 amendment that a defendant have 'shown that one or more elements of the cause of action . . . cannot be established' (Code Civ. Proc., § 437c, former subd. (n)(2), Stats. 1992, ch. 1348, § 1), that a defendant must make an affirmative showing in support of his or her motion. Such a showing connotes something significantly more than simply 'pointing out to the . . . court' that 'there is an absence of evidence': before the burden of producing even a prima facie case should be shifted to the plaintiff in advance of trial, a defendant who cannot negate an element of the plaintiff's case should be required to produce direct or circumstantial evidence that the plaintiff not only does not have but cannot reasonably expect to obtain a prima facie case. But where such a showing can be made we consider it both fair to the defendant and consistent with efficient administration of justice that the plaintiff be called upon, on risk of summary judgment, to make a prima facie case." (Hagen v. Hickenbottom, supra, 41 Cal.App.4th at p. 186.)

Although Hagen v. Hickenbottom, supra, dealt only with the 1992 amendments to the summary judgment statute, and not with the 1993 amendments, we believe the reasoning is equally sound with respect to the latter amendments. (1) Code of Civil Procedure section 437c, subdivision (o)(2) reiterates the requirement originally found in former subdivision (n)(2) that a moving defendant show, by admissible evidence, "that one or more elements of the 'cause of action . . . cannot be established.'" Thus, the same rule—that a moving defendant must make an affirmative showing in support of his or her motion—should apply.

(2) Since summary judgment involves pure matters of law, we review a summary judgment ruling de novo to determine whether the moving and opposing papers show a triable issue of material fact. (Parsons Manufacturing Corp. v. Superior Court (1984) 156 Cal.App.3d 1151, 1156 [203 Cal.Rptr. 419]; AARTS Productions, Inc. v. Crocker National Bank (1986) 179 Cal.App.3d 1061, 1064 [225 Cal.Rptr. 203].)

## Burden of Proof in Employment Discrimination Actions

(3) Because Addy's employment discrimination lawsuit is analogous to a federal Civil Rights Act title VII claim (42 U.S.C. § 2000e), it is evaluated under federal law interpreting title VII cases. (Mixon v. Fair Employment & Housing Com. (1987) 192 Cal.App.3d 1306, 1316 [237 Cal.Rptr. 884].) In McDonnell Douglas Corp. v. Green (1973) 411 U.S. 792 [36 L.Ed.2d 668, 93 S.Ct. 1817], the United States Supreme Court "set forth the basic allocation of burdens and order of presentation of proof in a title VII case alleging discriminatory treatment. First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' [Citation.] Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." (Texas Dept. of Community Affairs v. Burdine (1981) 450 U.S. 248, 252-253 [67 L.Ed.2d 207, 215, 101 S.Ct. 1089], fn. omitted; see also Martin v. Lockheed Missiles & Space Co. (1994) 29 Cal.App.4th 1718, 1735 [35 Cal.Rptr.2d 181] [to avoid summary judgment, plaintiff must produce "substantial, responsive evidence' that the employer's showing was untrue or pretextual"].)

## Discussion

The pleadings define the issues to which a summary judgment motion must be directed. (Hejmadi v. AMFAC, Inc. (1988) 202 Cal.App.3d 525, 536 [249 Cal.Rptr. 5].) Accordingly, we begin our analysis by examining the pleadings. Addy's four-page first amended complaint simply alleges "unlawful employment discrimination." (Capitalization omitted.) Nonetheless, we discern three potential causes of action: (1) discriminatory failure to promote to the management trainee position, (2) retaliatory reassignment of work and elimination of flextime, and (3) retaliatory denial of training, demotion, and constructive discharge. We shall address each of these causes of action separately.

### A. Failure to Promote

(4) "During a trial, once a plaintiff in a case involving an unlawful refusal to promote establishes a prima facie case of discrimination, the burden shifts to the defendant to rebut that prima facie case by producing evidence that the plaintiff was rejected . . . for a legitimate, nondiscriminatory reason." (Texas Dept. of Community Affairs v. Burdine, supra, 450 U.S. at p. 254 [67 L.Ed.2d at p. 216].) The responsibility of the defendant is to "clearly set forth, through the introduction of admissible evidence, the

reason for the plaintiff's rejection.' (*Id.* at p. 255 [67 L.Ed.2d at p. 216], fn. omitted.) The explanation of reasons for the refusal to promote 'must be clear and reasonably specific.' (*Id.* at p. 258 [67 L.Ed.2d at p. 218].)" (*University of Southern California v. Superior Court* (1990) 222 Cal.App.3d 1028, 1035-1036 [272 Cal.Rptr. 264].)

"Although the burden of proof in a title VII action claiming an unjustifiable refusal to promote ultimately rests with the plaintiff (450 U.S. at p. 253 [67 L.Ed.2d at p. 215]), in the case of a motion for summary judgment on summary issue adjudication, the burden rests with the moving party to negate the plaintiff's right to prevail on a particular issue. (*Barnes v. Blue Haven Pools* (1969) 1 Cal.App.3d 123, 127 [81 Cal.Rptr. 444].) In other words, the burden is reversed in the case of a summary issue adjudication or summary judgment motion. [Citations]" (*University of Southern California v. Superior Court, supra,* 222 Cal.App.3d at p. 1036.)

(5) In the instant case, B&G submitted admissible evidence demonstrating that Addy could not establish a prima facie case of failure to promote based on discrimination.' It showed, first, that the position was not a promotion for Addy. The management trainee position had the same advancement potential as the job she currently occupied, and it paid less than she was earning as an underwriting assistant. In addition, for Addy to make a prima facie showing that she might have been hired for the position had it not been for unlawful discrimination, she would have had to show she was qualified for the position and that the position was still open when she applied for it. Yet B&G submitted evidence in the form of the declaration of its president, Robert Abramson, (1) that it sought a person with a four-year college degree for the management trainee position and that Addy did not have such a degree, and (2) that Jose Ochoa had already been selected for the position when Addy's application was received.

In addition to showing that Addy could not make a prima facie case of discriminatory failure to promote, B&G also presented evidence that it had legitimate, nondiscriminatory reasons for not offering Addy the position: it sought a person with a four-year degree, it had already hired Jose Ochoa when Addy's application was received, and the position was not a promotion. Addy, in turn produced no evidence demonstrating that B&G's showing was untrue or pretextual. Under these circumstances, we conclude that summary judgment on Addy's failure to promote cause of action was properly granted.

'We note that B&G did not merely "point to" Addy's lack of evidence to support her claim but rather submitted evidence itself demonstrating that Addy could not support her claim. (See discussion of the distinction in "Standard of Review," *ante*.)

B. *Reassignment of Work and Elimination of Flextime*

(6) Addy alleges some of her work was reassigned to the new management trainee, Jose Ochoa, and her flextime was eliminated in retaliation for her having filed a charge of discrimination with the EEOC.

"To establish a prima facie case of retaliation, a plaintiff must show that she engaged in a protected activity, that she was thereafter subjected to adverse employment action by her employer, and there was a *causal link* between the two. [Citation.]" (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 614 [262 Cal.Rptr. 842].)

In the instant case, Addy can show she engaged in protected activity (filing a charge of discrimination with the EEOC) and that she was thereafter subjected to adverse employment action (some of her work was transferred and her flextime was eliminated). However, in order to establish a prima facie case of retaliation, she must also show a *causal link* between the adverse employment actions and the filing of her charge of discrimination with the EEOC. Addy has not made that showing here; nor has she rebutted B&G's evidence that there was no causal link between the adverse employment actions and the filing of the EEOC charge. B&G presented evidence it had legitimate, nondiscriminatory business reasons for reassigning some of Addy's work and eliminating her flextime. In her declaration, Addy's supervisor, Carol Marquez, stated that after Ochoa was hired, some of the work of both underwriting assistants in the Morgan Hill office was transferred to him. As Addy was treated exactly the same as her coworker, Penny Robinson, she cannot establish a prima facie case of discrimination based on having filed the charge of discrimination with the EEOC. (Cf. *Acosta v. University of District of Columbia* (D.D.C. 1981) 528 F.Supp. 1215, 1224.)

With respect to the elimination of flextime, Marquez stated that both Robinson and Ochoa had asked if they too could have flextime. She explained that B&G needed office coverage in the late afternoon. To maintain parity among the employees, flextime was eliminated. When one pierces this claim, one sees that Addy's complaint is that she was treated the same as other employees rather than being given preferential treatment. Addy has failed to demonstrate the existence of a triable material controversy as to whether B&G's stated reasons for eliminating flextime were either untrue or a pretext for discrimination. Under these circumstances, Addy's second cause of action cannot stand.

C. *Denial of Training, Demotion and Constructive Discharge*

(7a) Addy alleges she was denied training, demoted, and later constructively discharged as a result of filing various charges of discrimination with

the EEOC. To rebut these charges, B&G submitted evidence that Addy received the same training as the other underwriting assistant in the office, Penny Robinson, *with the exception of a single training session* on July 25, 1994, at which Addy failed to appear. In her deposition, Addy stated that she failed to attend that training session because she woke up with a headache. Otherwise, her training was the same as Penny Robinson's.

With respect to the demotion, B&G submitted substantial evidence that Addy was not performing the job of underwriting assistant in a satisfactory manner. Marquez chronicled customer complaints, persistent mistakes in issuing policies, tardiness in issuing policies, unacceptably low work output, unsatisfactory telephone manner, and failure to accept responsibility for mistakes. In response to this evidence, Addy merely points out that it was not Marquez who decided to demote her (presumably Marquez had sufficient grounds to do so) but rather it was Robert Abramson who made the decision from the B&G head office in the Los Angeles area. However, in Addy's complaint she alleges that "defendant CAROL MARQUEZ participated in each of the adverse employment determinations . . . ." " 'A judicial admission in a pleading . . . is not merely evidence of a fact; it is a conclusive concession of the truth of a matter which has the effect of removing it from the issues. . . .' " (*Walker v. Dorn* (1966) 240 Cal.App.2d 118, 120 [49 Cal.Rptr. 362].) In summary, Addy has not presented any evidence that her demotion was for reasons other than a failure to satisfactorily perform in her position.

Finally, Addy alleges that she was constructively discharged as a result of not receiving training and her demotion. **(8)** To prevail on a claim for constructive discharge, "an employee must plead and prove, by the usual preponderance of the evidence standard, that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1251 [32 Cal.Rptr.2d 223, 876 P.2d 1022].)

Moreover, the Supreme Court explained, "[A]n employee cannot simply 'quit and sue,' claiming he or she was constructively discharged. The conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer. The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee. [¶] "An employee may not be unreasonably sensitive to his [or her]

working environment . . . Every job has its frustrations, challenges, and disappointments; these inhere in the nature of work. An employee is protected from . . . unreasonably harsh conditions, in excess of those faced by his [or her] co-workers. He [or she] is not, however, guaranteed a working environment free of stress.' " [Citation.] [¶] In order to amount to a constructive discharge, adverse working conditions must be unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable. [Fn. omitted.] In general, '[s]ingle, trivial, or isolated acts of [misconduct] are insufficient' to support a constructive discharge claim. [Citation.] Moreover, a poor performance rating or a demotion, even when accompanied by reduction in pay, does not by itself trigger a constructive discharge." (*Turner v. Anheuser Busch, Inc., supra,* 7 Cal.4th at pp. 1244-1247.)

**(7b)** In the instant case, Addy predicates her constructive discharge claim on an alleged denial of training and on her demotion. However, as as the other underwriting assistant, except for one training session which she missed, and her demotion was due to her inability to successfully satisfy the job requirements for the underwriting assistant position. Demotions, even with reductions in pay, are not by themselves enough to constitute constructive discharge. (*Turner v. Anheuser Busch, Inc., supra,* 7 Cal.4th at p. 1247.) Addy has failed to present evidence demonstrating the existence of a triable material controversy as to whether B&G's stated reasons for its actions were either untrue or a pretext for discrimination. It was incumbent upon Addy to present some evidence creating a material factual issue, and she did not do so. Accordingly, the summary judgment was properly granted.

## DISPOSITION

The judgment is affirmed.

Bamattre-Manoukian, J., and Mihara, J., concurred.

A petition for a rehearing was denied May 2, 1996.

Opinions (Home Ins. Co. v. Landmark Ins. Co.; People v. Green; In re Brian P.) on pages 954-971 omitted.

[No. B023677. Second Dist., Div. Five. Jan. 19, 1988.]

DONALD BURTON, Plaintiff and Appellant, v. SECURITY PACIFIC NATIONAL BANK, Defendant and Respondent.

## SUMMARY

The trial court granted a bank's motion for summary judgment in an action by a former employee for wrongful discharge. The employee, who had an oral employment contract and thus was terminable at will, had been discharged for reading a confidential personnel book that was kept in a restricted area. Previously, he had been given a written reprimand for excessive absenteeism, but he alleged that he had not been given oral warnings prior to the written reprimand, as required by bank policy. (Superior Court of Los Angeles County, No. NCC 24547. Thomas C. Murphy, Judge.)

The Court of Appeal affirmed. It held the employee failed to allege material facts indicating that he was deprived of rights under the bank's personnel policies, and thus he had no cause of action for breach of his employment contract. It held that he failed to show a connection between the presence/absence of oral warnings and his termination; thus, the dispute as to whether oral warnings had been given did not raise a material factual issue that could avoid summary judgment for the bank. It further held that the trial court properly granted the bank's motion for summary judgment with regard to the allegation that the bank breached the implied covenant of good faith and fair dealing. Although the employee alleged the reason for his termination was untrue and used as a pretext for some other, impermissible reason, he failed to set forth any material facts to support this theory. Also, the claim that he was not in fact in the restricted area reading confidential materials raised no issue of bad faith on the part of the bank, since undisputed facts showed the bank investigated the charge against the employee and thus the bank did not lack probable cause for such charge.

Rehearing granted See 205 Cal.App.3d 188 for subsequent opinion

· Deleted on direction of Supreme Court by orders dated January 28, 1988, and March 31, 1988.

(Opinion by Ashby, Acting P. J., with Boren, J., and Hastings, J.,* concurring.)

## HEADNOTES

Classified to California Digest of Official Reports, 3d Series.

(1) **Summary Judgment § 1—Purpose—Disputed Facts—Materiality.**—Summary judgments look behind the pleadings to determine if the claims or defenses of a party are a sham or without any evidence to support the claim. In order to prevent the imposition of a summary judgment, the disputed facts must be material, that is, relate to a claim or defense in issue which could make a difference in the outcome. Summary judgment procedures are drastic. However, the purpose of a summary judgment is to expedite litigation by avoiding needless trials. If there are no triable issues, summary judgment is appropriate.

(2) **Employer and Employee § 9—Contracts of Employment—Actions for Wrongful Discharge—At-will Employee—Limitations on Employer's Absolute Right to Terminate.**—An employer states a cause of action for breach of contract if he is terminated in contravention of an employment contract. An employee hired for an indefinite period of time, however, is terminable at will (Lab. Code, § 2922). Nevertheless, an employer's absolute right to terminate an at-will employee is limited. An employer is prohibited from breaching an implied covenant to terminate only for good cause, and an employer is prohibited from breaching an implied-in-fact covenant of good faith and fair dealing contained in contracts, including employment contracts. Also, an employee may state a cause of action for wrongful discharge when the employer acts in violation of a public policy. The employee has the burden of proving that one of these legal exceptions to the at-will contract applies.

[See Cal.Jur.3d, Employer and Employee, § 62 et seq.; Am.Jur.2d, Master and Servant, § 43 et seq.]

(3a, 3b) **Employer and Employee § 9.2—Contracts of Employment—Actions for Wrongful Discharge—Pleading—Breach of Oral Employment Contract—Violation of Employer's Personnel Policies.**—In an action by a bank employee who was terminated for reading a confidential personnel book that was kept in a restricted area, the

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council



tion both require a false statement relied upon by another. In addition, fraud requires the statement to be made knowingly, that is, with scienter. In the wrongful discharge context, these concepts are applied when an employee relies upon false promises as an inducement to accept employment. Thus, a terminated employee does not state a cause of action for either misrepresentation or negligent misrepresentation where the employee fails to set forth facts to show reliance upon any representations made by the employer.

COUNSEL.

Lowell John Dosch for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, Kenneth W. Anderson, Stephen J. Burns and Robert C. Leventhal for Defendant and Respondent.

OPINION

ASHBY, Acting P. J.—

STATEMENT OF CASE

Plaintiff and appellant Donald Burton (appellant) filed a complaint against defendant and respondent Security Pacific National Bank (respondent), a California banking corporation, alleging that respondent wrongfully discharged him from employment. Appellant alleged breach of oral contract, wrongful discharge, fraud, and negligent misrepresentation.[1] Respondent answered and thereafter the parties engaged in discovery. Respondent brought a motion for summary judgment or in the alternative a motion for summary adjudication of issues. The court granted respondent's motion and entered summary judgment in favor of respondent finding that appellant had not raised triable issues of material fact. On appeal, appellant maintains that he raised triable issues of material fact. We affirm the trial court's ruling.

STATEMENT OF FACTS

Appellant was hired by respondent for an indefinite period of time pursuant to an oral agreement as an account reconcilement clerk. He began working on May 9, 1981. Approximately 22 months later, he was given a written reprimand for excessive absenteeism. Appellant alleged that

[1] Appellant's cause of action for libel and slander was dismissed by mutual agreement of the parties.

---

employee had no cause of action for breach of his oral employment contract. Previously, he had been given a written reprimand for excessive absenteeism, but allegedly had not been given oral warnings prior to the written reprimand, as required by bank policy. Nevertheless, he was not deprived of rights under the bank's personnel policies, since he was not terminated for excessive absenteeism and he failed to show a connection between the presence/absence of oral warnings and his termination. Thus, the dispute as to whether oral warnings had been given did not raise a material factual issue that could avoid summary judgment for the bank.

(4) Employer and Employee § 9—Contracts of Employment—Actions for Wrongful Discharge—Personnel Policies.—Personnel policies can become part of the contractual guaranty of employment if the employer and the employee mutually intend to create a contract that such rules are to be followed.

(5a, 5b) Employer and Employee § 9.2—Contracts of Employment—Actions for Wrongful Discharge—Pleading—Breach of Implied Covenant of Good Faith and Fair Dealing.—In a wrongful discharge action by a bank employee who was terminated for reading a confidential personnel book that was kept in a restricted area, the trial court properly granted the bank's motion for summary judgment, since the employee raised no triable issues of fact of breach of the implied covenant of good faith and fair dealing as to his at-will employment contract. Although he alleged the reason for his termination was untrue and used as a pretext for some other, impermissible reason, he failed to set forth any material facts to support this theory. Also, the claim that he was not in the restricted area reading confidential materials raised no issue of bad faith on the part of the bank, since undisputed facts showed the bank investigated the charge against the employee and thus did not lack probable cause for the charge. That the bank rejected the employee's denial of the charge and believed other witnesses raised no inference of bad faith.

(6) Employer and Employee § 9—Contracts of Employment—Actions for Wrongful Discharge—Implied Covenant of Good Faith and Fair Dealing—Requisite Showing.—An implied covenant of good faith and fair dealing requires only that the employer act fairly and in good faith. To be entitled to a trial for breach of the implied covenant of good faith and fair dealing, a terminated employee must bring forth facts to show that the employer acted in bad faith and without probable cause with regard to the termination of the employment contract.

(7) Employer and Employee § 9—Contracts of Employment—Actions for Wrongful Discharge—Fraud and negligent misrepresenta-



respondent failed to give him oral warnings prior to the written reprimand as required by bank policy.

Chris Riggio, appellant's supervisor, stated that two days after the reprimand, Riggio observed appellant reading a confidential personnel book, containing sensitive materials about many employees, such as their salary and discipline history. This book was kept in a file cabinet in a restricted area. Riggio reported the incident to his supervisor, Paula Armendariz, who then informed Gerald Stephens, the unit manager. Later that afternoon, Riggio, Stephens, and Patricia McKinniss, assistant vice president-personnel officer, had a meeting to discuss the incident. McKinnis then accompanied Riggio to the area in question and examined the book and the file cabinet. That same evening, McKinnis and Stephens determined that appellant should be discharged. The next working day, Stephens told appellant that he was being discharged for his unauthorized entry into a restricted area and for reading confidential materials. Appellant then discussed the matter with an employee in respondent's personnel office. Appellant asserted that he was reading a nonconfidential time record book in a nonconfidential area. After discussing the matter, appellant was told that he could appeal the discharge decision to Lily Fong, respondent's vice-president of corporate employee relations. Ms. Fong listened to appellant's story, discussed the matter with other personnel from the bank, and denied appellant's appeal.

In appellant's complaint, he asserted that respondent concocted the story that appellant was in a restricted area reading confidential material as a pretext for firing him. He asserted that respondent thought appellant was going to file a grievance alleging that no oral warnings were given about his excessive absenteeism, and thereafter respondent created a false reason for his termination.

## SUMMARY JUDGMENT

(1) Summary judgments look behind the pleadings to determine if the claims or defenses of a party are sham or without any evidence to support the claim. "The motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . ." (Code Civ. Proc., § 437c, subd. (c).) In order to prevent the imposition of a summary judgment, the disputed facts must be "material," i.e., relate to a claim or defense in issue which could make a difference in the outcome. (*Pettus v. Standard Cabinet Works* (1967) 249 Cal.App.2d 64, 69 [57 Cal.Rptr. 207].) We recognize that summary judgment procedures are viewed as "drastic" (*Stationers Corp. v. Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785]; *Sprecher v. Adamson*

*Companies* (1981) 30 Cal.3d 358, 372 [178 Cal.Rptr. 783, 636 P.2d 1121]); however, the purpose of a summary judgment "is to expedite litigation by avoiding needless trials". (*Barry v. Rodgers* (1956) 141 Cal.App.2d 340, 342 [296 P.2d 898]). If there are no triable issues, summary judgment is appropriate. We find that the court was correct in finding that appellant did not raise any material factual issues.

## BREACH OF CONTRACT/WRONGFUL DISCHARGE

(2) An employee states a cause of action for breach of contract if the employee is terminated in contravention of an employment contract. Historically, an employee hired for an indefinite period of time, however, was terminable "at will" and had no legal recourse. Recognizing present day economic realities and the reasonable expectations of the parties, recent courts developed legal theories which limit the employer's absolute right to terminate an "at-will employee." These theories include: (1) prohibiting an employer from breaching an implied covenant to terminate only for good cause (*Pugh v. See's Candies, Inc.* (1981) 116 Cal.App.3d 311 [171 Cal.Rptr. 917]; *Shapiro v. Wells Fargo Realty Advisors* (1984) 152 Cal.App.3d 467 [199 Cal.Rptr. 613]); and (2) prohibiting an employer from breaching an implied in fact covenant of good faith and fair dealing contained in contracts, including employment contracts (*Cleary v. American Airlines, Inc.* (1980) 111 Cal.App.3d 443 [168 Cal.Rptr. 722].)[1] The employee has the burden of proving that one of these legal exceptions to the "at-will" contract applies. (*Pugh v. See's Candies, Inc., supra,* 116 Cal.App.3d 311; *Swofield v. Universal Exxco Corp.* (1969) 271 Cal.App.2d 147 [76 Cal.Rptr. 680].)

The court in *Pugh v. See's Candies, Inc., supra,* 116 Cal.App.3d 311, held that the totality of circumstances should be examined to determine if a cause of action for breach of implied covenant to terminate only for good cause exists. One factor to be considered in this determination is personnel polices or practices of the employer. (*Id.* at p. 329.) (3a) While appellant does not argue that there was an implied covenant to terminate only for good cause, he contends that if an employer violates a personnel policy there is a breach of contract. Appellant bases this argument on the assertion

[1] This traditional common law approach is codified in Labor Code section 2922 which states in relevant part: "An employment, having no specified term, may be terminated at the will of either party on notice to the other."

[2] The courts also allow an employee to state a cause of action for wrongful discharge when the employer acts in violation of a public policy (*Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [610 P.2d 1330, 9 A.L.R.4th 314].) This theory is not applicable to the instant matter. Appellant alleges that respondent breached its obligation by not following its own personnel policies. Such a violation does not fall under the "public policy" exception. (*Gray v. Superior Court* (1986) 181 Cal.App.3d 813 [226 Cal.Rptr. 570]. See also *Hobbs v. Cordis Implantware Management Services* (1987) 188 Cal.App.3d 1437 [234 Cal.Rptr. 129].)

that respondent's personnel policy became part of his oral contract for employment. **(4)** Personnel policies can become part of the contractual guarantee if the parties mutually intended to create a contract that such rules are to be followed. [*Walker v. Northern San Diego County Hospital Dist.* (1982) 135 Cal.App.3d 896 [185 Cal.Rptr. 617]; *Rulon-Miller v. International Business Machines Corp.* (1984) 162 Cal.App.3d 241 [208 Cal.Rptr. 524].] **(3b)** For purposes of discussion, we assume that respondent's personnel policies became part of appellant's oral contract.

Appellant asserts that prior to respondent's giving him a written reprimand for excessive absenteeism, respondent's personnel policy required an oral reprimand and that when respondent failed to give an oral reprimand, respondent breached the employment contract. However, contrary to appellant's assertion, he has no cause of action for breach of contract because appellant was not deprived of his rights under the policies. Appellant was not terminated for excessive absenteeism and he has not shown a connection between the presence/absence of oral warnings as required by respondent's policies, and appellant's termination. Thus, even though the parties disagree as to whether the oral warnings were given, this factual dispute is not material to a cause of action for breach of contract.

**(5a)** Appellant also contends that he has a cause of action for "wrongful discharge," i.e., that respondent breached the implied covenant of good faith and fair dealing as discussed in *Cleary v. American Airlines, Inc.* *supra,* 111 Cal.App.3d 443. The thrust of appellant's argument is that the claim that he was in a confidential area, reading confidential materials, was untrue and used as a pretext to legitimate his termination. (See, e.g., *Khanna v. Microdata Corp.* (1985) 170 Cal.App.3d 250 [215 Cal.Rptr. 860].) He asserts that this factual dispute raised a material factual issue.

Appellant has not brought forth one fact to support his theory that respondent contrived a reason for his discharge. (*Clutterham v. Coachmen Industries, Inc.* (1985) 169 Cal.App.3d 1223, 1227 [215 Cal.Rptr. 795].) Appellant's assertion is based solely on conjecture and speculation. His only factual claim is that he told his supervisor and another employee named Delores that he was going to file a grievance because no oral reprimands for absenteeism were given. He offers no factual evidence, circumstantial or otherwise, that respondent or any supervisor fired appellant for this reason. Summary judgment was proper since there was no factual foundation for appellant's claim that the stated reason for discharge, being in the confidential area reading confidential materials, was a mere pretext for some other, impermissible reason. (*Crosier v. United Parcel Service, Inc.* (1983) 150 Cal.App.3d 1132, 1139 [198 Cal.Rptr. 361].)

Appellant's claim that he was not in fact in the confidential area reading confidential materials raises no issue of bad faith on the part of

respondent. **(6)** An implied covenant of good faith and fair dealing requires only that the employer act fairly and in good faith. (*Koehrer v. Superior Court* (1986) 181 Cal.App.3d 1155, 1169 [226 Cal.Rptr. 820].) To be entitled to a trial for breach of the implied covenant of good faith and fair dealing, appellant must bring forth facts to show that respondent acted in "bad faith" and without "probable cause." (*Seaman's Direct Buying Service, Inc. v. Standard Oil Co.* (1984) 36 Cal.3d 752, 769 [206 Cal.Rptr. 354, 686 P.2d 1158]; *Rulon-Miller v. International Business Machines Corp.* (1984) 162 Cal.App.3d 241, 253 [208 Cal.Rptr. 524].) **(5b)** Undisputed facts show that respondent investigated the charge that appellant was in the confidential area reading confidential materials. Appellant discussed the incident with at least two of respondent's employees, including the vice president of corporate employee relations. The assistant vice president personnel officer examined the area and documents in question; and there were at least three conversations among management personnel to discuss the allegations. Appellant presented no contrary evidence that respondent lacked probable cause to believe that appellant was in a confidential area reading confidential materials or that respondent lacked a good faith belief the charge was true.

Appellant denied the charge, and respondent chose to believe other witnesses and to reject appellant's version. This raises no inference of bad faith on respondent's part. This type of situation is very common; an employee charged with misconduct denies committing the misconduct. If the employer makes a determination in good faith that the misconduct occurred, there is no breach of the implied covenant of good faith and fair dealing, even if the employee could subsequently prove that the factual finding of misconduct was a mistake.

If the law were otherwise, no employment contract could be "at will" as codified in Labor Code section 2922. If the employee were entitled to jury trial for breach of the implied covenant of good faith and fair dealing merely by asserting that the charged misconduct was not true, the decision to terminate would be at the discretion of a jury, not the employer. The law of employment contracts would be turned on its head.

The trial court properly granted summary judgment, since appellant raised no triable issues of fact of breach of the implied covenant of good faith and fair dealing.[4]

[4] Because we affirm the summary judgment, we need not address of punitive damages would have been appropriate on appeal. We also need not address of the statute of frauds precludes an employee from suing on an oral employment contract, an issue presently before the California Supreme Court in *Santa Monica Hospital v. Superior Court* (1985) 192 Cal.App.3d 188 [218 Cal.Rptr. 543], review granted January 16, 1986 (L.A. 32143), and in

## MISREPRESENTATION/NEGLIGENT MISREPRESENTATION

(7) Appellant, citing no authority, contends that the alleged facts stated a cause of action for fraud and for negligent misrepresentation. He argues that the "concoction of a false story which was used as a basis for an employment termination amounts to straight deceit or fraud ... or at a minimum negligence." Appellant misconstrues these legal concepts. Fraud and negligent misrepresentation both require a false statement relied upon by another. In addition, fraud requires the statement to be made knowingly, i.e., with scienter. (4 Witkin, Summary of Cal. Law (8th ed. 1974) § 446, p.2711.) In the wrongful discharge context, these concepts are applied when an employee relies upon false promises as inducement to accept employment. (See, e.g., *Bondi v. Jewels by Edwar Ltd.* (1968) 267 Cal.App.2d 672 [73 Cal.Rptr. 494]; *Munoz v. Kaiser Steel Corp.* (1984) 156 Cal.App.3d 965 [203 Cal.Rptr. 345].) Appellant has not brought forth any facts to show that appellant relied upon any representations made by respondent. Thus he has not stated a cause of action for either misrepresentation or negligent misrepresentation. (See, e.g., *Shapiro v. Wells Fargo Realty Advisors, supra,* 152 Cal.App.3d 467, 479.)

The judgment is affirmed.

Boren, J., and Hastings, J.,* concurred.

*Foley's Interactive Data Corp.* (1985) 193 Cal.App.3d 28 [219 Cal.Rptr. 866], review granted January 31, 1986 (LA 32148)

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

[No. B024375. Second Dist., Div. Six. Dec. 21, 1987.]

THE PEOPLE, Plaintiff and Respondent, v. DAVID JAMES HOLDING, Defendant and Appellant.

### SUMMARY

After defendant was convicted on guilty pleas to unrelated charges of possession of cocaine (Health & Saf. Code, § 11350) and felony petit theft (Pen. Code, §§ 484, subd. (a), 666), the two cases were consolidated for sentencing. The trial court sentenced defendant to a midterm prison sentence for the cocaine conviction and enhanced this for service of a prior prison term (Pen. Code, § 667.5, subd. (b)). The trial court also sentenced defendant to a midterm prison sentence on the petit theft conviction and ordered him to serve one-third of the term consecutive to the term on the drug conviction. Defendant had served a prior prison term for both discharging a firearm at an occupied vehicle and burglary, for which he received concurrent prison sentences. Defendant was also imprisoned in a penal institution as a condition of probation for burglary. (Superior Court of Ventura County, Nos. CR21597 and 21455, Charles R. McGrath, Judge.)

The Court of Appeal affirmed, holding that the enhancement for service of a prior prison term under § 667.5, subd. (b) was proper. It held that the two cases were not related factually and were not one course of conduct so that the proscription of Pen. Code, § 654, against multiple punishment was inapplicable. The court also held that the jail term served by defendant as a condition of probation satisfied the confinement element of Pen. Code, § 666 (punishment for petit theft after prior conviction), and the prior prison term served for discharging a firearm at an occupied vehicle satisfied the requirements of § 667.5, subd. (b). The court also held that defendant's status as a burglary recidivist within § 666 was established by the prison term for the prior burglary without regard to the concurrent prison term for discharging a firearm. (Opinion by Gilbert, J., with Stone, P. J., and Abbe, J., concurring.)

## OPINION

CHIN, J.—The California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.)[1] declares certain kinds of discrimination and harassment in the workplace to be "unlawful employment practice[s]." (§ 12940.) We must decide whether an employee may be personally liable to a coworker for sexual harassment under the FEHA. We conclude that the FEHA *does not apply to actions between coworkers not involving a supervisorial relationship.*

### I. PROCEDURAL HISTORY

Plaintiff Maryann Carrisales, an employee of the Department of Corrections (Department) sued the Department, two of her supervisors, and a coworker, Dave Selkirk, for sexual harassment in violation of the FEHA. She alleged that Selkirk repeatedly sexually harassed her, and that the defendant supervisors knew of the sexual harassment but failed to take immediate and appropriate corrective action.

*The trial court granted summary judgment in favor of each defendant. Plaintiff appealed. In an opinion authored by Justice Richli, the Court of Appeal reversed the grant of summary judgment as to the Department, finding a triable issue of fact regarding whether the Department and plaintiff's supervisors took immediate and appropriate corrective action. It affirmed the grant of summary judgment as to the supervisors, holding that they could not be held personally liable under the FEHA for sexual harassment that they neither assisted, encouraged, nor participated in themselves. These rulings are not before us on review, and we do not consider them.*

The Court of Appeal also affirmed the grant of summary judgment in favor of Selkirk, holding that "a nonsupervisory coworker cannot be held liable for sexual harassment under FEHA." The court stressed that its ruling *did not mean* that sexual harassment is acceptable either legally or morally. The victim of harassment may have injunctive or tort remedies against the harasser depending on the precise facts of the case. It meant only that "the victim's legal remedy [against a coworker harasser] does not lie under FEHA."

### II. DISCUSSION

We granted plaintiff's petition for review, which raised only the issue of the liability of a coworker for harassment under the FEHA.

**(1a)** The sole issue before us is whether the FEHA makes a nonsupervisory employee personally liable to a coworker for sexual harassment.

[1] All further statutory references are to the Government Code unless otherwise indicated.

Resolution of the issue requires us to interpret section 12940, subdivision (h)(1) (section 12940(h)(1)), which states as relevant: "It shall be an unlawful employment practice . . . : [¶] . . . [¶] For an employer . . . or any other person, because of . . . sex, . . . to harass an employee or *applicant.* Harassment of an employee or applicant by an employee other than an agent or supervisor shall be *unlawful* if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action. An entity shall take all reasonable steps to prevent harassment from occurring."[2]

In urging that a coworker is personally liable for harassment under the FEHA, plaintiff relies primarily on the statutory reference to "any other person." This language is broad and certainly includes Selkirk; indeed, it includes everyone in the world. The FEHA defines a "person," as including "one or more individuals . . . ." (§ 12925, subd. (d); see *Reno v. Baird* (1998) 18 Cal.4th 640, 644 [76 Cal.Rptr.2d 499, 957 P.2d 1333].) Plaintiff argues that, because the statute prohibits *any person* from committing harassment, it makes a coworker like Selkirk *personally liable for harassing her.* We disagree.

**(2)** We must not view isolated language out of context, but instead interpret the statute as a whole, so as to make sense of the entire statutory scheme. (*People v. McCart* (1982) 32 Cal.3d 338, 342-343 [185 Cal.Rptr. 284, 649 P.2d 926].) **(1b)** Section 12940 defines what is "an unlawful *employment practice*." (Italics added.) If there is no proscribed "employment practice," the FEHA does not apply. The second sentence of section 12940(h)(1) makes clear what is an unlawful employment practice in this context: "Harassment of an employee or applicant by an employee *other than* an agent or supervisor [i.e., by someone like Selkirk] shall be *unlawful* if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action."

[2] Section 12940(h)(1) provides in its entirety: "It shall be an unlawful employment practice, *unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California:*

"(h)(1) For an employer, labor organization, employment agency, apprenticeship training program or any training program leading to employment, or any other person, because of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, or age, to harass an employee or applicant. Harassment of an employee or applicant by an employee other than an agent or supervisor shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action. An entity shall take all reasonable steps to prevent harassment from occurring. Loss of tangible job benefits shall not be necessary in order to establish harassment."

(Italics added.) If an employee other than an agent or supervisor commits the harassment, and the employer takes immediate and appropriate corrective action when it becomes or reasonably should become aware of the conduct—for example, when the victim or someone else informs the employer—there simply is no "unlawful employment practice" that the FEHA governs. Additionally, like the Court of Appeal, "we do not believe the Legislature intended the harassing coworker's liability to turn on the employer's knowledge and failure to take action." If the employer takes appropriate action, no unlawful employment practice has occurred. If the employer fails to take such action, there may be an unlawful employment practice, but *it is by the employer, not the coworker.*

Plaintiff makes a number of arguments in favor of imposing individual liability under the FEHA on coworkers, none persuasive. She notes that the "Legislature has declared that the purpose of the FEHA is to provide effective remedies which will eliminate discriminatory practices," which include harassment. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323], citing § 12920.) "In order to eliminate discrimination, it is necessary to provide effective remedies that will both prevent and deter *unlawful employment practices* and redress the adverse effects of *those practices* on aggrieved persons." (§ 12920.5, italics added.) This legislatively declared purpose of providing effective remedies would be defeated, plaintiff argues, if she had no recourse against the harasser personally. We certainly do not "dispute that the prevention of sexual harassment in the workplace is of utmost importance." (*Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1015 [47 Cal.Rptr.2d 478, 906 P.2d 440].) But the FEHA proscribes and provides remedies for unlawful employment *practices.* Under that law, harassment by a nonsupervisor is not an unlawful employment practice if the employer takes immediate and appropriate corrective action when reasonably made aware of the conduct.

Moreover, as the Court of Appeal noted, our conclusion does not necessarily prevent a harasser from being personally liable to the victim under some other statute or theory of tort. All we hold is that the *FEHA* does not cover harassment short of an unlawful employment practice. The FEHA's noncoverage does not immunize anyone, *including a coworker,* from the consequences of conduct that is otherwise tortious. It is true that under our holding a victim of harassment might not receive monetary damages for all acts of harassment. Section 12940(h)(1) makes the employer strictly liable for harassment by an agent or supervisor, but liable for harassment by others only if the employer fails to take immediate and appropriate corrective

action when reasonably made aware of the conduct. (See generally, *Fiol v. Doellstedt* (1996) 50 Cal.App.4th 1318, 1328 [58 Cal.Rptr.2d 308], and cases cited.) Thus, circumstances could exist in which a *plaintiff would not* receive a monetary recovery. If a person who is neither a supervisor nor an agent commits acts of harassment not amounting to a tort outside of the FEHA, and the employer takes immediate and appropriate corrective action when it is or should be aware of the conduct (for example, when the victim or someone else informs the employer), the victim would have *no recourse* beyond the employer's corrective action. These circumstances leading to no monetary recovery are very narrow. We see no suggestion in the FEHA of an intent to involve the courts in coworker harassment cases when the employer does act immediately and appropriately.

"When the workplace is permeated with discriminatory intimidation, ridicule and insult that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,"' the law is violated." (*Kelly-Zurian v. Wohl Shoe Co.* (1994) 22 Cal.App.4th 397, 409 [27 Cal.Rptr.2d 457], quoting *Harris v. Forklift Systems, Inc.* (1993) 510 U.S. 17, 21 [114 S.Ct. 367, 370, 126 L.Ed.2d 295].) If the harasser is a nonsupervisor, and the employer takes immediate and appropriate corrective action when informed of the conduct, this standard is not met.

Contrary to plaintiff's argument, *Reno v. Baird, supra,* 18 Cal.4th 640, does not compel a contrary conclusion. That case involved solely the question of individual liability for *discrimination.* We expressed no opinion "regarding individuals' liability for *harassment.*" (*Id.* at p. 645, fn. 2.) To support our conclusion that only the employer is liable for discrimination, we noted the difference in the statutory treatment of discrimination and harassment. (*Id.* at pp. 644-645.) Section 12940 does indeed treat the two differently, and for a reason. "Whatever similarities there may be between [discrimination and harassment], the *employer* ultimately does the former; coworkers and supervisors do the latter." (*Reno v. Baird, supra,* 18 Cal.4th at p. 657, original italics.) This differing statutory language means that our conclusion regarding discrimination does not compel a similar conclusion regarding harassment. It does not, however, compel a contrary conclusion either. It merely means that each question must be decided separately, considering the discrimination language to decide the discrimination issue, as we did in *Reno v. Baird,* and independently considering the harassment language to decide the harassment issue, as we do here.

Plaintiff notes that another provision of the FEHA that prohibits improper retaliation also extends the prohibition to any "person." (§ 12940, subd. (f).)

4

Some cases contain dicta suggesting that this language imposes personal liability on coworkers for retaliation. (*Page v. Superior Court* (1985) 31 Cal.App.4th 1206, 1213 [37 Cal.Rptr.2d 529]; *Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 615-616 [262 Cal.Rptr. 842].) Plaintiff argues that the same rule should apply to harassment because of section 12940(h)(1)'s assertedly similar language. However, whatever rule might apply to retaliation (we express no opinion), the statutory language regarding retaliation contains no additional language comparable to the second sentence of section 12940(h)(1). We must construe section 12940(h)(1) in its entire context, not by reference to the quite different overall language of section 12940, subdivision (f).

Plaintiff and amicus curiae Fair Employment and Housing Commission (FEHC) on her behalf cite the FEHC's administrative decisions as supporting imposition of personal liability on coworkers. Indeed, the FEHC cites over 20 of its decisions. Most of these decisions, however, involve harassment by a supervisor and thus have no bearing on this question. Only two precedential decisions—one rendered during the pendency of this appeal—impose personal liability for harassment on a nonsupervisorial coworker. (*Dept. Fair Empl. & Hous. v. Lake County Dept. of Health Services* (1998) No. 98-11, FEHC Precedential Decs. 1998-1999, CEB 1 (*Lake County*); *Dept. Fair Empl. & Hous. v. Madera County* (1990) No. 90-03, FEHC Precedential Decs. 1990-1991, CEB 1, pp. 27-28 (*Madera County*).) These decisions rely solely on section 12940(h)(1)'s "any other person" language. Only *Lake County* specifically considered whether to impose personal liability on a coworker as well as a supervisor. It cited cases holding supervisors liable, then stated, "While these cases decided individual liability only in the context of supervisor harassment, their logic—i.e., the use of the word 'person' in Government Code section 12940, subdivision (h)—applies equally to co-worker liability." (*Lake County, supra*, at p. 28.)

We find these FEHC decisions unconvincing. The first, *Madera County*, simply found the individual personally liable because he was a "person," without distinguishing between his roles as supervisor and as coworker. (*Madera County, supra*, No. 90-03, FEHC Precedential Decs. 1990-1991, CEB 1 at pp. 27-28.) The second, *Lake County*, at least mentions this issue, but it contains little analysis. (*Lake County, supra*, No. 98-11, FEHC Precedential Decs. 1998-1999, CEB 1 at p. 28.) It considered only the "any

¹ We express no opinion regarding the liability of a supervisor for harassment or any issue other than the one before us.

other person" language rather than the statute as a whole in imposing liability on coworkers as well as supervisors. Moreover, although a *contemporaneous* interpretation an administrative agency gives to the statutes under which it operates is entitled to great weight, *Lake County* was decided many years after the enactment of the statutory language it interprets. (See *Dyna-Med, Inc. v. Fair Employment & Housing Com., supra*, 43 Cal.3d at pp. 1388-1389.) "[U]ltimately[,] statutory interpretation is a question of law the courts must resolve." (*Reno v. Baird, supra*, 18 Cal.4th at p. 660.) We do so by considering all the relevant statutory language, not a single phrase in isolation.

Both parties invoke the legislative history of Assembly Bill No. 1985, 1981-1982 Regular Session, the bill that codified the substance of current section 12940(h)(1), as supporting their respective positions. We have reviewed that legislative history and find it inconclusive. It provides little guidance beyond the language of the statute itself. Indeed, the most striking feature about the materials the parties have provided is the absence of any clearly stated legislative intent to impose personal liability on nonemployer individuals in addition to defining prohibited conduct for which such employers may be liable. If anything, this circumstance supports Selkirk's position. But, on balance, we find the legislative history of little assistance either way.

Plaintiff argues that imposing personal liability on coworkers is necessary to deter harassment effectively. In *Reno v. Baird, supra*, 18 Cal.4th 640, we noted that because the employer would be liable for discrimination, employees are protected even if nonemployer individuals are not personally liable. "[E]mployers will not condone discriminatory acts by their supervisory employees, because the employers must ultimately pay. Furthermore, supervisors will not escape punishment. . . . Supervisors guilty of engag-ing in unlawful discrimination, and thus causing their employers to incur monetary liability, will often suffer demotion or unemployment." (*Id.*, at p. 662.) Plaintiff argues that this reasoning has no application to harassment because an employer is not and always liable for harassment by nonsupervisors. However, the Legislature has obligated the employer to take immediate and appropriate action when it is or should be aware of the harassment, for example, when the victim informs the employer. This obligation forces employers to control and, as necessary, discipline their employees. The statute deters coworker harassment with or without personal liability. Moreover, the statute also compels employers to "take all reasonable steps to prevent harassment from occurring." (§ 12940(h)(1).) In light of these duties, employers should take a very dim view of all forms of harassment, whether by supervisors or others.

4

### III. CONCLUSION

We affirm the judgment of the Court of Appeal.

George, C. J., Mosk, J., Kennard, J., Baxter, J., Werdegar, J., and Brown, J., concurred.

Relying heavily on law review articles, plaintiff argues that this court "cannot rely upon employers to provide effective deterrence at the coworker level." This argument is best directed to the Legislature, which can study the various policy and factual questions and decide what rules are best for society. Our role here is to interpret the statute, not to establish policy. The latter role is for the Legislature. Under the current statutory language, it appears the Legislature relies primarily on the employer to take appropriate action and wants courts to become involved only if the harassment is by a supervisor or if the employer fails to fulfill its statutory duty. Whether such reliance on the employer is sufficiently effective is not for us to say. If the Legislature believes it necessary or desirable to impose individual liability on coworkers, it can do so. But we believe that had it already intended to do so, it would have used clearer language than that found in section 12940(h)(1).

We note also that federal law does not impose personal liability on individuals. As the Court of Appeal stated, "The federal appellate courts have unanimously held an individual employee—whether supervisory or nonsupervisory—cannot be personally liable for hostile work environment sexual harassment under title VII [of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.)]." (E.g., *Miller v. Maxwell's Intern. Inc.* (9th Cir. 1993) 991 F.2d 583, 587-588; see generally, *Reno v. Baird, supra,* 18 Cal.4th at pp. 647-650; *Page v. Superior Court, supra,* 31 Cal.App.4th at pp. 1215-1216.) The Court of Appeal also noted that these federal cases do not control our interpretation of the different statutory language of the FEHA: "For example, title VII imposes liability for sexual harassment on an 'employer' (42 U.S.C. § 2000e-2(a)) . . . . Thus, title VII lacks the 'any other person' language on which Carrisales relies." However, the failure of title VII (42 U.S.C. § 2000e et seq.), which generally has a similar intent and purpose as the FEHA (*Reno v. Baird, supra,* 18 Cal.4th at p. 659), to impose personal liability on individuals undercuts plaintiff's policy arguments.

We thus conclude that, although section 12940(h)(1) prohibits any "person" from harassing an employee, it imposes on the *employer* the duty to take all reasonable steps to prevent this harassment from occurring in the first place and to take immediate and appropriate action when it is or should be aware of the conduct. Consistent with the FEHA's primary concern with unlawful employment *practices,* it does not also impose personal liability for harassment on nonsupervisory coworkers.

[No. A058727. First Dist., Div. Five. Jan. 5, 1994.]

DAVID CROENI et al., Plaintiffs and Appellants, v.
JEFFREY S. GOLDSTEIN, Defendant and Respondent.

## SUMMARY

The sellers of a label printing business brought an action against the corporate buyers and the officer of one of the buyers, who represented the buyer during negotiations. The causes of action included one for breach of contract against the corporate buyers, and one for promissory fraud in the sale of the business against all three defendants. The trial court granted judgment on the pleadings for the officer as to plaintiffs' fraud cause of action on the ground that, given the court's summary adjudication that plaintiffs were not entitled to recover damages in the fraud action for the profits or other benefits they would have earned had they not sold their business, and their own admissions that they were not seeking basic out-of-pocket damages in the fraud action, there were no cognizable compensatory damages for fraud that they were entitled to recover. The court then ordered the entire action against the officer dismissed with prejudice. (Superior Court of San Mateo County, No. 342-683, James L. Browning, Jr., Judge.)

The Court of Appeal reversed. It held that, since plaintiffs sought to enforce the sale and obtain the sale price to which they agreed, they could not recover from the corporate buyers profits they would have earned had they kept the business, as this would amount to a double recovery. However, since the officer was not a party to the sale agreement, he could not be sued for its breach or for rescission, but remained liable under any other legal or equitable remedies to which plaintiffs might be entitled (Civ. Code, § 3343, subd. (b)). The court held that plaintiffs were entitled to proceed against the officer for lost profits as though they were rescinding, in which case the officer was entitled to credit for any amount plaintiffs collected against the corporate buyers. (Opinion by Haning, J., with Peterson, P. J., and King, J., concurring.)

## HEADNOTES

Classified to California Digest of Official Reports

(1a-1c)  **Fraud and Deceit § 32—Actions—Fraud in Sale of Business—Damages Recoverable Against Officer of Purchasing Corporation.**

---

CROENI v. GOLDSTEIN
21 Cal.App.4th 754; 26 Cal.Rptr.2d 412 [Jan. 1994.]

755

—In an action by the sellers of a label printing business against the corporate buyers and the officer of one of the buyers, who represented the buyer during negotiations, the trial court erred in granting judgment on the pleadings for the officer as to plaintiffs' fraud cause of action on the ground that, given the court's summary adjudication that plaintiffs were not entitled to recover damages in the fraud action for the profits or other benefits they would have earned had they not sold their business, and their own admissions that they were not seeking basic out-of-pocket damages in the fraud action, there were no cognizable compensatory damages for fraud that they were entitled to recover. Since plaintiffs sought to enforce the sale and obtain the sale price to which they agreed, they could not recover from the corporate buyers profits they would have earned had they kept the business, as this would amount to a double recovery. However, although the officer was not a party to the sale agreement and thus could not be sued for its breach or for rescission, he remained liable under any other legal or equitable remedies to which plaintiffs might be entitled (Civ. Code, § 3343, subd. (b)). Plaintiffs were entitled to proceed against the officer for lost profits as though they were rescinding, in which case the officer was entitled to credit for any amount plaintiffs collected against the corporate buyers.

(2)  **Judgments § 8—On the Pleadings—Appellate Review.**—Review of a judgment on the pleadings is governed by the same standard applicable to review of a judgment of dismissal based on an order sustaining a general demurrer. The appellate court examines the face of the pleadings, together with matters subject to judicial notice, to determine whether the facts are sufficient to constitute a cause of action.

(3)  **Fraud and Deceit § 33—Actions—Damages—Measure of Damages—Property Transactions—Statutory Rules.**—In the absence of a fiduciary relationship, Civ. Code, § 3343, governs the measure of damages in fraudulent property transactions. Civ. Code, § 3343, subd. (a)(3) (party induced by fraud to part with property may recover compensation for profits that might reasonably have been earned by use of property had it been retained), added in 1971, retained and amended the preexisting "out-of-pocket" rule; pursuant to Civ. Code, § 3343, subd. (b) (defrauded person may not recover any amount measured by difference between value of property as represented and actual value thereof), the "benefit-of-the-bargain" measure was rejected. Prior to the 1971 amendment, a defrauded party could not receive anticipated profits in an action for damages. The 1971 amendment permitted lost profits as an element of damages in appropriate cases to correct certain

## Page 756

logical inconsistencies that existed between the judicial application of Civ. Code, former § 3343, and that of other enactments dealing with the measure of damages for fraud. However, the amendment did not repeal, amend, or affect the doctrine of election of remedies, nor did it provide for a double recovery by defrauded parties.

[See 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1446.]

### COUNSEL

Nick T. Reckas and Frederick E. Watson for Plaintiffs and Appellants.

Sheppard, Mullin, Richter & Hampton, David A. Pursley, Gary J. Nevolo and Katherine C. Potter for Defendant and Respondent.

### OPINION

HANING, J.—Plaintiffs/appellants David Croen et al.,[1] appeal a judgment on the pleadings against them in their fraud action against defendant/respondent Jeffrey S. Goldstein. Appellants contend the court erroneously ruled they were not entitled to recover lost profits under Civil Code section 3343[2] against respondent, whose fraudulent misrepresentations induced them to sell their business to others. We reverse.

### FACTS AND PROCEDURAL HISTORY

Pursuant to a written agreement executed October 26, 1987, appellants sold their label printing business to Alford Industries, Incorporated (Alford) and its parent corporation, Kane Industries, Incorporated (Kane). Respondent was an officer of Alford and represented it during the sale negotiations. As part of the sales price Alford agreed to pay appellants a specified amount for "machinery and equipment," plus additional sums if the cumulative net sales to the "clientele accounts" exceeded a specified amount between November 1, 1987, and October 31, 1989. It also agreed to pay appellants a specified percentage of the net sales price "of all orders invoiced and collected from the 'clientele accounts'..." during the five-year period commencing November 1, 1987, in exchange for appellants' covenants not to compete with Alford "for the placement of orders desireable [sic] to Alford from [the] 'clientele accounts'...." "'Clientele accounts'" were defined as the business entities for which appellants had printed labels during the two

[1] Additional appellants include Anett Croen, Thomas L. Hall and Billie Ann Hall.

[2] Unless otherwise indicated, all further statutory references are to the Civil Code.

## Page 757

years previous to October 26, 1987. The agreement states that "... Alford believes it will be capable of servicing the 'clientele accounts'..." in excellent fashion[.]"

Two years later appellants brought the action from which this appeal derives. One cause of action was against Alford and Kane for breach of contract, alleging generally that as a result of Alford's mishandling of the clientele accounts, sales had been reduced by 87 percent, with a concurrent reduction in the payments due appellants under the sales agreement.

The other cause of action was against Alford, Kane and respondent for promissory fraud in the sale of the business. It alleged generally that appellants agreed to sell the business and enter the covenant not to compete because they relied on the promises made by respondent, Alford and Kane that they were capable of "servicing the 'clientele accounts'... in excellent fashion[,]" that they would preserve and promote the good will of the business, and that they would keep appellants apprised of orders generated from the clientele accounts. It further alleged that respondent, Alford and Kane never intended to comply with their promises. As a result of these intentional misrepresentations, appellants alleged they "sustained damages of the difference between the actual value of their business and the amounts received by them under the terms of the sale agreements together with lost profits and other benefits which would have accrued to [them] had their business not been sold and transferred to [respondent,]" and sought damages in accordance with section 3343.[3]

The trial court summarily adjudicated that appellants were not entitled to recover damages in their fraud action for the profits or other benefits they would have earned had they not sold their business.

During trial the court granted respondent's motion for judgment on the pleadings on appellants' fraud action on the grounds that, given the summary adjudication and appellants' own admissions that they were not seeking basic out-of-pocket damages in their fraud action, there were no cognizable

[3] Section 3343 provides, in pertinent part: "(a) One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction, including any of the following: ... [¶] (4) Where the defrauded party has been induced by reason of the fraud to sell or otherwise part with the property in question, an amount which will compensate him for profits or other gains which might reasonably have been earned by use of the property had he retained it."

compensatory damages for fraud which appellants were entitled to recover.[3] It then ordered the entire action against respondent dismissed with prejudice.

## DISCUSSION

(1a) The primary issue in this appeal is whether the trial court correctly granted judgment on the pleadings. (2) Review of a judgment on the pleadings is governed by the same standard applicable to review of a judgment of dismissal based on an order sustaining a general demurrer. The appellate court examines the face of the pleadings, together with matters subject to judicial notice, to determine whether the facts are sufficient to constitute a cause of action. (*O'Neil v. General Security Corp.* (1992) 4 Cal.App.4th 587, 594, fn. 1 [5 Cal.Rptr.2d 712].) The plaintiff's allegations are accepted as true. (*Buillargeon v. Department of Water & Power* (1977) 69 Cal.App.3d 670, 676 [138 Cal.Rptr. 338].)

(1b) The trial court based its ruling on the fact of appellants' concession in response to an interrogatory that they were not seeking "the difference between the actual value of [their] business and the amounts [they] received . . . under the terms of the sale agreements, as alleged [in their complaint]." This does not preclude them from pursuing their fraud action against respondent: it simply states that they are not seeking damages under the particular standard framed by the interrogatory. It does not prevent them from seeking damages against respondent under some other standard or measure.

Since respondent was not a party to the sales contract between appellants and Alford, he could not be sued for its breach or for rescission. However, as the person who allegedly made the false representations on behalf of Alford to induce appellants to sell their business, he could be liable in tort for fraud or deceit. To plead a cause of action for fraud the plaintiff must allege (1) a knowingly false representation by the defendant, (2) an intent to defraud or to induce reliance, (3) justifiable reliance, and (4) resulting damages. (Civ. Code, § 1709; see 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 676, p. 778.) Appellants' complaint contains all the requisite elements of a cause of action for fraud, and respondent does not contend otherwise.

Respondent obtained judgment on the pleadings based on appellants' stated position that the only damages they were seeking from him consisted of lost profits, which the parties regarded as profits appellants would have earned from the business had they not sold it. Appellants concede they are

[3] On appeal appellants are only arguing that the ruling regarding their ability to seek lost profits was wrong. They are not contesting the ruling that they are precluded by their admissions from seeking out-of-pocket damages from respondent.

not seeking basic out-of-pocket damages against respondent, but contend that as sellers they are entitled to enforce the contract, recover the sales price, and also recover lost profits they would have received had they not sold the business. For this contention they rely on section 3343, which provides, in relevant part: "(a) One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damages arising from the particular transaction, including any of the following: [¶] . . . [¶] (3) Where otherwise part with the property in question, an amount which will comp sate him for profits or other gains which might reasonably have been earn... by use of the property had he retained it.""

(3) In the absence of a fiduciary relationship, section 3343 governs the measure of damages in fraudulent property transactions. (*Stout v. Turney* (1978) 22 Cal.3d 718, 725-726 [150 Cal.Rptr. 637, 586 P.2d 1228].) Subdivision (a)(3) of section 3343 was added by amendment in 1971. It retained the preexisting "benefit-of-the-bargain" measure by providing in subdivision (b): "Nothing in this section shall . . . : [¶] (1) Permit the defrauded person to recover any amount measured by the difference between the value of property as represented and the actual value thereof." (*Stout v. Turney, supra,* at pp. 724-727.) Prior to the 1971 amendment, a defrauded party could not receive anticipated profits in an action for damages. (See, e.g., *Burkhouse v. Phillips* (1971) 18 Cal.App.3d 661, 665 [96 Cal.Rptr. 197].) The 1971 amendment permitted lost profits as an element of damages in appropriate cases to correct "certain logical inconsistencies [that] existed between the judicial application of [former section 3343] and that of other enactments dealing with the measure of damages for fraud." (*Stout v. Turney, supra,* at p. 724.) For example, in fraud cases *not* involving the purchase, sale or exchange of property, lost profits were available under the general tort recovery statute, section 3333, or under section 3300 in breach of contract cases, and full "benefit-of-the-bargain" damages were recoverable under California Uniform Commercial Code section 2721. (*Stout v. Turney, supra,* at p. 726.)

However, the 1971 amendment did not repeal, amend or affect the doctrine of election of remedies, nor did it provide for a double recovery by defrauded parties. (See, e.g., *Channell v. Anthony* (1976) 58 Cal.App.3d 290, 314 [129 Cal.Rptr. 704].) (1c) Thus, since appellants sought to enforce the sale and obtain the sale price to which they agreed, they cannot recover from Alford and Kane profits they would have earned had they kept the business, since this would amount to a double recovery. In other words, the

amount of profit earned by the business is one of the factors taken into account in establishing its value, and reflected in the sale price. If appellants were seeking rescission against Alford and Kane, lost profits would be recoverable from them. (*Channell v. Anthony, supra,* 58 Cal.App.3d at p. 315.)

As part of their agreement to sell their business appellants also agreed not to compete, in exchange for a percentage of net profits from sales to existing customers for a specified period of time. To the extent this payment does not necessarily reflect the value of the business per se, it might reflect a compensable loss under section 3343, since it represents income or profits appellants might have earned had they not been fraudulently induced to refrain from engaging in that type of business. However, in the record before us, appellants did not argue this to the trial court or tender evidence in support thereof, but confined their damage argument to profits they would have earned from the business had they not sold it.[5] Likewise, appellants were entitled to pursue a judgment against respondent for the damages they recovered from Alford and Kane, but they presumably declined to do so.

Nevertheless, section 3343 also states in subdivision (b): "Nothing in this section shall . . . [¶] . . . [¶] (2) Deny to any person having a cause of action for fraud or deceit any legal or equitable remedies to which such person may be entitled." As we previously stated, since respondent was not a party to the agreement he could not be sued for its breach or for rescission, but it remains liable under any other "legal or equitable remedies to which [appellants] may be entitled." Consistent with section 3343, appellants are entitled to proceed against respondent for lost profits as though they were rescinding, in which case respondent is entitled to credit for any amount appellants collect against Alford and Kane, as appellants concede.

The judgment is reversed.

Peterson, P. J., and King, J., concurred.

A petition for a rehearing was denied January 28, 1994, and respondent's petition for review by the Supreme Court was denied April 20, 1994.

[5] Appellants initially sought declaratory relief from the noncompetition clause, but dismissed that cause of action at some point prior to judgment.

[No. B069504. Second Dist., Div. Four. Jan. 5, 1994.]

THE PEOPLE, Plaintiff and Respondent, v. GERSHON HEPNER et al., Defendants and Appellants.

[No. B079058. Second Dist., Div. Four. Jan. 5, 1994.]

In re GERSHON HEPNER on Habeas Corpus.

### SUMMARY

After the denial of their motions to suppress evidence, defendants pled guilty and were convicted of felonies arising from widespread insurance fraud carried on in a medical practice. A search warrant had permitted the seizure of all patient files. The affidavit in support of the warrant was submitted by a criminal investigator for the California Department of Insurance, who testified that he was led to believe that there was a continuing course of insurance fraud amounting to approximately 90 percent of defendant physician's business. The trial court found the warrant overbroad but denied the motion to suppress on the basis that the investigator acted in good faith. The court also denied a motion to traverse the affidavit with regard to good faith, on the ground that the investigator's belief that probable cause supported the scope of the seizure was reasonable. (Superior Court of Los Angeles County, No. BA 026582, Stanley M. Weisberg, Judge.)

The Court of Appeal, while modifying the judgment as to one defendant with respect to conduct credit, affirmed the judgments in all other respects, and denied a habeas corpus petition. The court held that the 90 percent estimates clearly established a fair probability that any particular file would contain evidence of fraud, absent some basis for severability. Circumstantial evidence justified inclusion in the warrant of files originating in satellite offices and those from specific years or certain patients, even absent direct evidence of fraud as to such files, because they indicated an intent to defraud and also corroborated the witnesses. The court also held that patients' privacy interests were plainly outweighed by the state's need to investigate and prosecute. (Opinion by Rappe, J.,* with Vogel (C. S.), Acting P. J., and Hastings, J., concurring.)

*Judge of the Los Angeles Superior Court sitting under assignment by the Chairperson of the Judicial Council.

IN RE CLAY W.
74 Cal.App.4th 1142; 88 Cal.Rptr.2d 629 [Aug. 1999]

injuries, especially when nonaccidental, present a serious threat to a child. However, we are not applying a "strict liability" standard. A parent's rights cannot be supplanted by the Department's jurisdiction merely on a finding that a child was injured. Children can be injured through no fault of the parents. In this case, there is no substantial evidence to support a determination that Mother was responsible by either act or omission. Hence the child should have been left in the care of the parent. There was no basis, on this limited evidence, for the Department to be given jurisdiction over the child.

### DISPOSITION

The order appealed from is reversed as to Mother.

Boren, P. J., and Nott, J., concurred.

---

EISENBERG v. ALAMEDA NEWSPAPERS, INC.
74 Cal.App.4th 1359; 88 Cal.Rptr.2d 802 [Sept. 1999]

[No. A076289. First Dist., Div. Three. Sept. 20, 1999.]

IRA EISENBERG, Plaintiff and Appellant, v. ALAMEDA NEWSPAPERS, INC., et al., Defendants and Respondents.

### SUMMARY

The trial court granted summary judgment to a newspaper and its editors in an action for defamation, false light, wrongful termination, breach of employment contract, breach of the covenant of good faith and fair dealing, and fraud, brought against defendants by a writer who was fired after the newspaper published a retraction of an article he had written. The article contained misleading and inaccurate statements concerning a luxury housing development and alleged that an individual involved with the project was corrupt. The reporter who wrote the article had been employed by the newspaper for less than a month. He had signed forms indicating that he was hired as an at-will employee and his knowledge of company policy that imposed a 90-day probationary period for new employees. (Superior Court of Alameda County, No. H-179513-2, John Frederick Kraetzer, Judge.)

The Court of Appeal affirmed. The court held that the newspaper's retraction was not privileged under Civ. Code, § 47, subd. (b) (litigation privilege), since the retraction was not a part of an official proceeding and there was no evidence to indicate the individual who demanded the retraction or defendants seriously contemplated litigation to resolve their dispute. The court also held that statements in defendants' retraction and a follow-up article were not defamatory as a matter of law, since those statements were either not provably false or nonactionable opinion. The court also held that the trial court did not err in granting defendants summary judgment on plaintiff's causes of action for wrongful discharge, breach of the implied covenant of good faith and fair dealing, and fraud, since undisputed evidence showed that plaintiff's employment contract was terminable at will, and plaintiff failed to produce any admissible evidence of a contract, either express or implied, that he could only be terminated for cause. The court also held that the trial court properly granted defendants summary judgment on plaintiff's cause of action for wrongful termination in violation of public policy, since plaintiff's termination did not violate his rights under U.S. Const., 1st Amend., or Lab. Code, § 970 (prohibits employer from inducing employee to relocate with false representations). (Opinion by McGuiness, P. J., with Corrigan and Walker, JJ., concurring.)

## HEADNOTES

Classified to California Digest of Official Reports

(1) **Summary Judgment § 6—Motion—Burden of Proof—Issue of Material Fact.**—When a defendant is the party moving for summary judgment, he or she may meet the burden of showing that a cause of action has no merit by proving either that (1) one or more elements of the cause of action cannot be established, or (2) there is a complete defense to that cause of action. Once that burden is met, the burden shifts to the plaintiff to show the existence of a triable issue of one or more material facts with respect to that cause of action or defense. A defendant moving for summary judgment may establish that an essential element of the plaintiff's cause of action is absent by reliance on the pleadings, competent declarations, binding judicial admissions, contained in the allegations of the plaintiff's complaint, responses or failures to respond to discovery, and the testimony of witnesses at noticed depositions. The plaintiff may not rely on his or her pleadings alone, but must file opposition to the motion, with affidavits setting forth specific facts demonstrating that a triable issue of material fact exists as to the cause of action or defense. An issue of material fact is one which, in the context and circumstances of the case, warrants the time and cost of fact-finding by trial.

(2) **Summary Judgment § 26—Appellate Review—Scope of Review.**—The appellate court reviews the trial court's decision to grant or deny a summary judgment motion de novo, on the basis of an examination of the evidence before the trial court and an independent determination of its effect as a matter of law. The appellate court also independently reviews the trial court's determination of questions of law. The reviewing court is not bound by the trial court's stated reasons or rationale, but reviews the summary judgment without deference to the trial court's determination.

[See 6 Witkin, Cal. Procedure (4th ed. 1997) Proceedings Without Trial, § 217.]

(3a-3d) **Libel and Slander § 18—Privileged Communications—Litigation Privilege—Applied to Newspaper Retraction.**—In an action for defamation and false light brought against a newspaper and its editors by a writer who was fired after the newspaper published a retraction of an article he had written, the trial court erred in finding that the newspaper's retraction was privileged under Civ. Code, § 47, subd. (b) (litigation privilege), as made in response to a demand under Civ.

Code, § 48a (demand for retraction as condition precedent to recovering general and exemplary damages in projected defamation action). The retraction was not a part of an official proceeding. Further, a newspaper retraction is not privileged under Civ. Code, § 47, subd. (b), unless made in advance of litigation that was not a mere possibility, but actually proposed, seriously and in good faith, as a means of resolving the dispute. Since there was no evidence to indicate the individual who demanded the retraction or defendants actually contemplated imminent resort to the judicial system to resolve their dispute, and the retraction was published to avoid litigation, the privilege did not apply.

[See 5 Witkin, Summary of Cal. Law (9th ed. 1997) Torts, § 504 et seq.]

(4a, 4b) **Libel and Slander § 18—Privileged Communications—Litigation Privilege—Scope.**—The privilege codified in Civ. Code, § 47, subd. (b)(3) (litigation privilege), applies only to statements made in the context of official proceedings; that is, proceedings involving the government, an agency or official thereof; or quasi-judicial proceedings otherwise reviewable by writ of mandate. The usual formulation of this privilege is that it applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action. These requirements for invoking the privilege are based upon the purpose of Civ. Code, § 47, subd. (b), which is to afford litigants and witnesses the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions.

(5a, 5b) **Libel and Slander § 18—Privileged Communications—Litigation Privilege—Applied to Communications Prior to Litigation—Scope.**—Although the express language of Civ. Code, § 47, subd. (b) (litigation privilege), applies only to communications made in a judicial or other official proceeding, courts have applied the privilege to some communications made in advance of anticipated litigation. This prelitigation privilege applies only when the communication has some relation to a proceeding that is contemplated in good faith and under serious consideration. The bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered. This prelitigation privilege only attaches when imminent access to the courts is seriously proposed and actually contemplated, in good faith, as a means of resolving a dispute and not simply a tactical ploy to induce a settlement.

whether a reasonable factfinder could conclude the published statements imply a provably false assertion of fact.

[See 5 Witkin, Summary of Cal. Law (9th ed. 1997) Torts, § 548.]

(9) **Libel and Slander § 1—False Light Claim.**—When a false light claim is coupled with a defamation claim, the false light claim is essentially superfluous, and stands or falls on whether it meets the same requirements as the defamation cause of action.

(10a, 10b) **Employer and Employee § 9.4—Actions for Wrongful Discharge—Evidence—Presumption of At-will Employment—Failure to Produce Evidence of Contract.**—In an action for wrongful termination brought against a newspaper and its editors by a writer who had been employed for one month and who was fired after the newspaper published a retraction of an article he had written, the trial court did not err in granting defendants summary judgment, since undisputed evidence showed that plaintiff's employment contract was terminable at contract, either express or implied, that he could only be terminated for cause. The employment application, which plaintiff signed, explicitly stated his understanding and acknowledgment that he was being hired as an at-will employee. In addition, the employee handbook plaintiff acknowledged receiving set out a 90-day probationary period as company policy for new employees. Plaintiff's conclusory allegations or unspecified representations or understandings about his job tenure failed to provide the factual evidence necessary to overcome the presumption of at-will employment, and thus were insufficient as a matter of law either to controvert that presumption, or to support a cause of action for breach of an implied-in-fact contract.

(11) **Employer and Employee § 9.4—Actions for Wrongful Discharge—Evidence—Presumption of At-will Employment—Rebuttal Evidence.**—Under Lab. Code, § 2922, an employee's term of employment, when not otherwise specified in an employment contract, written document, or oral agreement, is considered a term that may be terminated at will by either party. This presumption of at-will employment may be rebutted only by evidence of an express or implied agreement between the parties that the employment would be terminated only for cause. The existence of an implied promise to discharge an employee only for good cause is generally, but not always, a question of fact for the jury; the issue may appropriately be resolved as a matter of law given undisputed facts. To raise a triable issue of

(6a-6c) **Libel and Slander § 27—Privileged Communications—Newspapers—Action by Reporter—Statements in Published Retraction—Facts Not Provably False—Opinion.**—In an action for defamation and false light brought against a newspaper and its editors by a writer who was fired after the newspaper published a retraction of an article he had written, the trial court properly granted summary judgment for defendants, since statements in the retraction and a followup article were not defamatory as a matter of law. Defendants' statements that plaintiff's reporting had been inaccurate were not provably false, since there was no factual basis for plaintiff's statements that an individual involved with a housing development had been corrupt or hired a disreputable geologist, or that a grand jury investigation of the matter was pending. Further, defendants' statements that plaintiff's article should have made it clear that it was plaintiff himself who had approached the district attorney with information for the grand jury was a nonactionable statement of opinion.

(7) **Constitutional Law § 57—First Amendment and Other Fundamental Rights—Freedom of the Press: Libel and Slander § 27—Privileged Communications—Newspapers.**—In defamation actions generally, factual truth is a defense which it is the defendant's burden to prove. In a defamation action against a newspaper by a private person suing over statements of public concern, however, U.S. Const., 1st Amend., places the burden of proving falsity on the plaintiff. As a matter of constitutional law, therefore, media statements on matters of public interest, including statements of opinion which reasonably imply a knowledge of facts, must be provable as false before there can be liability under state defamation law. Whether a statement contains provably false factual assertions is a question of law for the trial court to decide.

(8) **Libel and Slander § 9—Actionable Words—Intent and Understanding—Opinion.**—It is an essential element of defamation that the publication be of a false statement of fact rather than opinion. The issue whether a communication was a statement of fact or of opinion is a question of law to be decided by the court. In making the distinction between provably false factual assertions and nonactionable opinion, the courts have defined as opinion any broad, unfocused, and wholly subjective comment. Under the common law privilege of fair comment, an honest expression of opinion on matters of public interest is privileged. On the other hand, if a statement of opinion implies a knowledge of facts which may lead to a defamatory conclusion, the implied facts must themselves be true. In such a case, the dispositive question is

material fact and defeat an employer's motion for summary judgment based on the presumption of at-will employment, a plaintiff must produce competent evidence of an agreement that he or she could not be discharged without good cause. In determining the existence of such a promise, a court looks to the entire relationship of the parties, including the terms of any relevant application for employment, employee handbook, or manual; the personnel policies and practices of the employer; the employee's longevity of service; actions or communications by the employer constituting assurances of continued employment; and the practices of the industry. A contract requiring termination only for cause will not be implied if there is an express writing providing to the contrary.

(12) **Employer and Employee § 9—Actions for Wrongful Discharge—Breach of Implied Covenant of Good Faith and Fair Dealing.**—In an action for breach of the implied covenant of good faith and fair dealing brought against a newspaper and its editors by a writer who was fired after the newspaper published a retraction of an article he had written, the trial court did not err in granting defendants summary judgment, given that undisputed evidence showed that plaintiff's employment contract was terminable at will, since plaintiff failed to show that a contractual covenant or promise was violated. The covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purposes. An at-will employee cannot use the implied covenant to create a for cause employment contract where none exists.

(13) **Employer and Employee § 9—Actions for Wrongful Discharge—In Violation of Public Policy—First Amendment.**—In an action for wrongful termination in violation of public policy brought against a newspaper and its editors by a writer who was fired after the newspaper published a retraction of an article he had written, the trial court did not err in granting defendants summary judgment, since plaintiff's termination did not violate his rights under U.S. Const., 1st Amend., or Lab. Code, § 970 (prohibits employer from inducing employee to relocate with false representations). The right to control the content of a privately published newspaper rests entirely with the newspaper's publisher; the First Amendment grants a newspaper a virtually unfettered right to choose what to print and what not to. Although a news reporter obviously has First Amendment rights, as well, those rights do not guarantee employment. Although plaintiff had a First Amendment right to express his own views, he did not have a

right to publish them in defendant newspaper against its wishes. As to Lab. Code, § 970, there was no evidence of any misrepresentation by defendants or that defendants induced plaintiff to relocate.

(14) **Employer and Employee § 9—Actions for Wrongful Discharge—At-will Employee: Fraud and Deceit § 28—Promises Made Without Intent to Perform.**—In an action for fraud brought against a newspaper and its editors by a writer who was fired after the newspaper published a retraction of an article he had written, the trial court did not err in granting defendants summary judgment, since plaintiff failed to offer evidence sufficient to establish a triable issue of material fact as to whether defendants made any promises about the duration of his employment or promised that he could be fired only for cause. There was no substance to plaintiff's allegations, since he failed to demonstrate that defendants promised to employ him on anything other than an at-will basis, or made any misrepresentations to him whatsoever.

**COUNSEL.**

Charles O. Morgan, Jr., and Andrew M. Rosner for Plaintiff and Appellant.

Crosby, Heafey, Roach & May, John E. Carne, Kathy M. Banke and Steven J. Boranian for Defendants and Respondents.

**OPINION**

McGUINESS, P. J.—Ira Eisenberg was hired by respondent Alameda Newspapers, Inc. (the Newspaper) as an investigative reporter, to write exposé-style articles for the Tri-Valley Herald (the Herald), a local Alameda County newspaper that served the Pleasanton-Livermore Valley area. In May 1994, the Herald published two articles written by Eisenberg, containing allegations of "corruption," "favoritism and influence-peddling" involving Ted Fairfield, an individual hired by local developers to obtain approval from the Pleasanton city government for a controversial luxury housing development. After Fairfield made a demand for a correction in accordance with Civil Code section 48a,[1] the Newspaper published a prominent retraction in the Herald, apologizing for its previous publication of "inaccurate and misleading information" concerning Fairfield, and stating that "[t]here is no evidence" he "was involved in improper, corrupt or illegal activities" relating to the development. Shortly thereafter, the Newspaper terminated Eisenberg's employment.

[1] Unless otherwise indicated, all further statutory references are to the Civil Code.

Eisenberg filed suit against the Newspaper, its managing editor (respondent Tim Graham) and editor (respondent Tim Hunt), alleging defamation, false light, wrongful termination, breach of employment contract, breach of the covenant of good faith and fair dealing, and fraud. This appeal arises from the trial court's grant of respondents' motion for summary judgment on all the causes of action of Eisenberg's complaint. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In order to understand the issues in this case, it is necessary to review the background of the dispute, which concerns Golden Eagle Estates, a 260-acre, 80-lot luxury home development located on Pleasanton Ridge in the City of Pleasanton (the City). From the preliminary stages of planning the development project (the Project) in 1984 through its approval by the City in 1988, the exact physical proximity of the development site (the Site) to the Calaveras fault was a topic of considerable controversy.

Developers Bill Currin and Mike Timm hired civil engineer Ted Fairfield to evaluate the Site and guide them through the planning process. The initial report of geologist Marc Seeley to the City in 1984 could find no evidence of the Calaveras fault, but recommended further study and "deep borings" to determine the overall stability of the Site. City Planning Director Brian Swift signed a planning staff report recommending against approval of the Project. Over the complaints of Fairfield and the developers, Swift required the preparation of an environmental impact report on the proposed development, focusing on visual, aesthetic and traffic issues.

Meanwhile, the developers retained a second geologist, Murray Levish. Levish examined the Site, found no evidence of the Calaveras fault, and concluded that it was not there. Levish's conclusions generated considerable controversy. Roy Shelmon, a soils dating expert who consulted with Levish on the Site, termed Levish's conclusions "startling." Consequently, the City hired a third geologist, Dave Carpenter, to review Levish's work. Carpenter's evaluation was sharply critical of Levish's conclusions. The City ordered further seismic study. It retained a Earl Hart, a geologist from the California State Division of Mines and Geology who had previously studied the Calaveras fault, as a consultant.

A fifth geologist, Dave Rogers, was hired by the City to review a soils report performed for the developers by Levish's company. In his report, Rogers severely criticized the Levish study as contrary to all previous geological studies of the Pleasanton Ridge, and suggested that Levish was biased in favor of the developers who had hired him. Rogers stated that

further soils work should not proceed until all the seismic and geological questions were resolved. He recommended that the City obtain an in-depth study to determine whether the Calaveras fault actually ran through the Site. At the time of making this recommendation, Rogers was not licensed to perform a state-mandated earthquake fault study. The City notified Rogers that his services were no longer required.

In early October 1988, Swift and Fairfield met with geologists Levish, Carpenter and Hart to discuss the seismic site studies. As a result of this meeting, additional trenches were dug at the Site, which all three geologists examined. The results were inconclusive, and did not reveal whether or not the Calaveras fault crossed the Site of the proposed development. Around the same time, geologist Seeley wrote the City a letter disavowing Levish's conclusions. Seeley continued to believe the deep borings he had originally recommended on the basis of his initial report should be performed. Carpenter disagreed, opining on the basis of similar studies in the Livermore area that such deep borings would be inconclusive. Seeley also disputed the conclusion of soils expert Shelmon that the Site was seismically stable.

In May 1989, the city planning department recommended that the City approve the Project, but conditioned its approval on the retention of yet another geologist to study the Site as grading, excavation and utility trenching took place. The City ultimately approved the Project, with the recommended conditions in force. Building code requirements applicable to the Project were upgraded to require single-family homes in the development to have foundation piers extending twelve feet into the ground, rather than the five to six feet found in older homes elsewhere in Pleasanton. A sixth geologist was retained by the City to monitor the development as it proceeded. Still, no trace of the Calaveras fault was found on the Site.

Nearly six years after the Project was approved and completed, the issue of its seismic safety was reopened when charges of incompetence and professional negligence were brought by the California State Licensing Board against the developers' geologist, Levish, prompting him to surrender his license. Planning Director Swift was asked to review the City's files on the development amid concerns that the Project had been approved too hastily and without sufficient study.

At this point, Eisenberg entered the controversy. He interviewed Rogers, who had been the geologist most critical of the geotechnical and seismic studies of the Project Site. Rogers criticized the City's subdivision approval process, which he considered insufficiently "open." However, Rogers did not believe the City, the developer, or Fairfield had done anything illegal in

obtaining approval for the Project, and he expressly told Eisenberg that Rogers also resisted Eisenberg's repeated attempts to get him to endorse a reopened investigation of the Project. Instead, he told Eisenberg that he had "looked at it from every angle" and concluded that "they did everything to the letter of the law," even though "[w]e may not like it" and "may think it was sleazy . . . ." Rogers referred Eisenberg to an attorney familiar with planning and subdivision law, and recommended that Eisenberg review an article Rogers had written entitled "Science versus Advocacy." Eisenberg did not read Rogers' article, contact the attorney, review the City's planning files, or research the city council meeting minutes on the Project.

On April 20, 1994, an article by Eisenberg was published in the Independent, a local Pleasanton-Livermore Valley newspaper. In the article, Eisenberg quoted Rogers as saying "Brian Swift was greasing the skids for Ted Fairfield," and reported that Rogers had accused Fairfield of having "used his considerable clout to blackball his firm, Rogers/Pacific, from doing any further consulting for the [C]ity." In fact, Rogers had not actually originated the phrase "greasing the skids"; rather, it was Eisenberg himself who suggested that expression in his telephone interview of Rogers.[2] Neither had Rogers made the accusation that Fairfield had "blackballed" him from doing further work for the City; in fact, Rogers had actually performed further consulting for the City in 1993. Having failed to review the City's files on the Project or the minutes of meetings of the city council, Eisenberg did not know or report that Swift had originally recommended against approving the Project, and was instrumental in obtaining the additional seismic studies that showed no evidence of the Calaveras fault running through the Site.

In the spring of 1994, Eisenberg contacted Tim Hunt, the new editor of the Herald, seeking employment at that newspaper. In discussions, Hunt and Eisenberg discussed salary and benefits, including retirement. They agreed that Eisenberg would be hired as a "senior writer," leaving open the possibility that he might later be redesignated a "columnist" upon the approval of the editor-in-chief. However, respondents did not make any other promises regarding the duration of Eisenberg's employment, and specifically did not suggest that he could only be terminated for good cause or would be hired as

2The Oxford English Dictionary defines the verb "to grease" as, among other things, "[t]o lubricate with grease," and, by extension, "[t]o make to run easily." When used figuratively, the verb "to grease" includes such definitions as "to make things run smoothly" or "[to] pay the expenses," as in the phrase "to grease the wheel"; "[t]o ply with money, to bribe . . . ; to enrich"; or "to give to those who do not lack." (6 Oxford English Dict. (2d ed. 1989) p. 794, italics in original.) The precise phrase "grease the skids" does not appear to be in the Oxford English Dictionary. However, it is not unreasonable to interpret the phrase, as it was used in this context, as at the very least suggesting favoritism and influence peddling, and possibly even graft, corruption and illegality.

anything other than an at-will employee. The Newspaper's standard practice, as reflected in its written personnel policies and employee handbook, had been to hire employees on a 90-day probationary basis, and treat employees hired for an unspecified term as terminable at will.

Eisenberg started work at the Herald on May 1, 1994. On May 3, he filled out and signed a form explicitly stating that his employment was "of an 'at will' nature." Eisenberg has acknowledged that no one ever told him anything that differed from this statement, and that it was consistent with his own understanding of the nature of his employment at the Herald.[3] Subsequently, on May 25, 1994, Eisenberg signed a form acknowledging both his receipt of the Newspaper's employee handbook, and his understanding that the contents of the handbook represented "the polices and procedures" of the Newspaper. Among other things, the employee handbook stated that all new employees were automatically placed on a "90-DAY INTRODUCTORY PERIOD" of probation, during which the employer could terminate their employment if they failed to meet the expectations of the job. Under a heading entitled "CAUSES FOR DISCHARGE," the handbook also restated the fact that, under the California Labor Code, "employment having no specified term is 'at will.' That means employment may be terminated by either the employer or the employee at any time, without cause, unless an agreement says otherwise."[4]

3Among other things, the "Applicant's Statement" signed by Eisenberg on May 3, 1994, stated: "I hereby understand and acknowledge that, unless otherwise defined by applicable law, any employment relationship with this organization is of an 'at will' nature, which means that the Employee may resign at any time and the Employer may discharge [the] Employee at any time with or without cause. It is further understood that this 'at will' employment relationship may not be changed by any written document or by conduct unless such change is specifically acknowledged in writing by an authorized executive of this organization."

4The section entitled "90-DAY INTRODUCTORY PERIOD" provides as follows: "All new full-time employees are placed on a three-month introductory period which is regarded as a time for the employer to review the employee's work performance to decide the employee's ability to perform the requirements of the assigned job. It is also a time for the new employee to evaluate the tasks required of the new job and the new company to determine if this is the job desired. [¶] If, during the first three months, the employer [or] the employee decides the employee or the employer fails to meet the expectations of the job, they can terminate the employment."

The following section, entitled "CAUSES OF DISCHARGE," provides as follows: "It is well for everyone to understand that there are certain types of conduct that can lead to discharge. The employer, however, will take no action without the [sic] sufficient evidence. And, the employer will give the employee an opportunity to state his/her case even when evidence is persuasive. [¶] [¶] The California Labor Code provides that employment having no specified term is 'at will.' This means employment may be terminated by either the employer or the employee at any time, without cause, unless the agreement says otherwise. [¶] In contrast, if the employee is hired for a specified period of time, the employer can fire the employee if the employee has willfully breached, habitually neglected, or demonstrated a continuing incapac-

Within a week of starting his job as a new "senior writer" at the Herald, Eisenberg contacted the Alameda County District Attorney's office and "asked to speak to the assistant DA in charge of the grand jury." He was referred to Assistant District Attorney Stacy Walthall. Eisenberg provided Walthall with copies of both his earlier Independent article and a letter from Rogers to Rebecca Demis, a member of the city council. At the time, the district attorney was not investigating the Project. Eisenberg had still not reviewed the City's records.

Thereafter, Eisenberg wrote an article on the Golden Eagle development controversy, entitled "GRAND JURY CONSIDERS PLANNING DEPARTMENT PROBE." The Herald published this headline conspicuously in a "banner" position at the top of the front page of its Sunday, May 8, 1994, edition. In the article, Eisenberg wrote that "[t]he stink of corruption that lately issued" from Golden Eagle Estates "still hangs heavy over Pleasanton City Hall"; "accusations of favoritism and influence-peddling" had been "lodged against the [C]ity by a consultant ([Rogers]) who says he was hired to review the Golden Eagle project, then fired for telling the truth about it"; these charges "will be forwarded to the [grand] jury next week"; and a "decision about whether to launch a full-scale investigation should be forthcoming shortly thereafter." Eisenberg quoted the assistant district attorney as saying . . . "This is something the grand jury will be glad to take a look at.'"[8] Eisenberg also reported that Planning Director Swift stood accused of having "greased the skids" for "politically influential developer's representative," Fairfield; and that Fairfield himself, not the developers, had "hired" the controversial geologist Levish. In a smaller adjoining article based on the allegations made in Eisenberg's article, an uncredited Herald staff writer reported that "[a] former geologist [Rogers] working for the [C]ity, who said in 1988 that the area was unsafe, has now gone to the district attorney alleging he was fired for questioning the plan," and "also claims the Planning Commission, specifically City Planning Director Brian Swift, instead hired another consultant to say the land was safe so that the project would be approved without difficulty."[9]

[8] . . . ity to perform, his or her duties." On May 25, 1994, Eisenberg acknowledged in writing receiving this employee handbook, and that its "contents are the policies and procedures" of the Newspaper.

[9] Eisenberg's May 8, 1994 article began as follows: "The stink of corruption that lately issued from posh Golden Eagle Estates up on Pleasanton Ridge still hangs heavy over Pleasanton City Hall, and now it's wrinkling the nose of the Alameda County District Attorney. [¶] 'This is something the grand jury will be glad to take a look at,' said assistant DA Stacy Walthall, the jury's liaison and legal adviser. [¶] The accusations of favoritism and influence-peddling lodged against the city by a consultant who says he was hired to review the Golden Eagle project, then fired for telling the truth about it, will be forwarded to the jury next week. A decision about whether a full-scale investigation should be forthcoming shortly thereafter."

These statements were inaccurate and misleading. It was simply false to suggest that Rogers had "lodged" criminal charges against the City with the district attorney, when it was Eisenberg himself who was the sole source of the district attorney's purported interest in the Golden Eagle controversy. In fact, as Eisenberg has admitted, neither Rogers *nor anyone else* (aside from Eisenberg himself) ever made *any* accusations of favoritism, influence-peddling, or illegality against Swift, the planning department, or the City government. Eisenberg failed to report that Seeley (the first geologist to study the Site) told him that Rogers "[m]ay have [an] axe to grind," and considered Fairfield a "professional" who "never leaned on him to bend the truth" or reach a particular conclusion. It was also inaccurate to report that the Alameda County District Attorney was forwarding Rogers's alleged "accusations" to the grand jury, or that "a full-scale investigation" was actively being considered. Finally, as Eisenberg knew, it was developer Currin, not Fairfield, who had hired Levish.

A week later, Eisenberg published a second article, entitled "PLANNING REPORT BACKS STAFF'S OK OF GOLDEN EAGLE." This time Eisenberg reported that Swift's "long-awaited" report on the Golden Eagle controversy did "not address" the failure to perform "deep earth boring . . . to try and identify the precise location of geological hazards before final approval was granted" of the Project, and did not "answer charges by geologist Dave Rogers that [Swift] or his staff 'greased the skids' for Golden Eagle and its influential "representative," Ted Fairfield." Thus, Eisenberg continued to represent that Rogers had accused Planning Director Swift and developers' representative Fairfield of collusion and corruption, when in fact Rogers had not made such accusations. The same day, editor Hunt himself published an article defending "our senior reporter Ira Eisenberg," in which Hunt represented that Eisenberg had simply "reported the allegations of geologist Dave Rogers."

On May 24, 1994, Fairfield's attorneys sent the Herald a letter demanding publication of a "correction of inaccurate and misleading information" contained in Eisenberg's article published on May 8, 1994. The letter specified eight items as to which demand was made that the Herald "publish a correction within three (3) weeks of receipt of this letter . . . in substantially as conspicuous a manner as the article by Ira Eisenberg containing the inaccuracies."[10] Although the letter twice stated that it was not written "out of a desire to litigate this matter," it repeatedly stressed the importance both of

[10] The eight items specified in the demand letter were: (1) the statement in the first sentence referring to "[t]he stink of corruption . . ." because it "implies that Ted Fairfield was involved in improper, corrupt and possibly illegal activities concerning Golden Eagle"; (2) the heading "'Grand jury considers Planning Department probe'" and the alleged quote from the

"presenting correct and accurate information" to the public, and of Fairfield's "[r]eputational interest," and "desire to restore his good name." In view of the content and tone of the letter, as well as its express demand for a published correction of eight specific alleged inaccuracies "within three (3) weeks . . . in substantial[ly] as conspicuous a manner" as the original Eisenberg article, it was clear to Hunt that the demand for correction was written pursuant to section 48a as a condition precedent to recovering general and exemplary damages in a projected defamation action against the Herald.[1]

In keeping with his established practice in responding to a demand for a correction, Hunt conducted his own investigation of Fairfield's claims and met separately with Fairfield and Eisenberg. Hunt learned that Rogers, Eisenberg's primary source, had accused Eisenberg of misquoting him, and had apologized to Fairfield for the accusations against Fairfield and the City without ever reviewing the City's planning files on the Project or any city council meeting minutes. In the course of reviewing the City's public

assistant district attorney that . . . "This is something the grand jury will be glad to take a look at . . . ." because they were misleading in not informing the public that it was Eisenberg himself who gave the information to the grand jury; (3) the statement that "Fairfield himself has declined to respond to repeated requests for an interview," because Fairfield had actually contacted editor Hunt prior to publication and offered to make himself available for an interview; (4) the statement that "complaints" had been made that City Planning Director Swift . . . "greased the skids for Ted Fairfield" . . . because "the obvious inference was . . . to imply improper, unethical and possibly illegal activities on the part of Ted Fairfield"; (5) the reference to . . . "accusations of favoritism and influence-peddling lodged against the [C]ity . . ." for the same reason; (6) the statement that developers Currin and Timm hired Fairfield "to convince the City it was safe to build homes on the [S]ite," and that Fairfield "in turn hired geologist Murray Levish," because the statements were both factually inaccurate and insinuated that Fairfield was hired for "improper and unethical" purposes; (7) the statement that Rogers had . . . "contended that Fairfield used his influence with Pleasanton's elected officials to banish Rogers' firm . . . from doing business" with the City because its "obvious intended inference is to imply improper, unethical and possibly illegal activities on the part of Ted Fairfield"; and (6) the alleged quotation that . . . "we all know how shady the development business can get . . ." because . . . the statement insinuated similar conduct.

[1] Civil Code section 48a provides in pertinent part as follows: "1. In any action for damages for the publication of a libel in a newspaper . . . plaintiff shall recover no more than special damages unless a correction be demanded and be not published . . . Plaintiff shall . . . serve upon the publisher, at the place of publication . . . a written notice specifying the statements claimed to be libelous and demanding that the same be corrected. Said notice and demand must be served within 20 days after knowledge of the publication . . . of the statements claimed to be libelous.

"2 If a correction be demanded within said period and be not published . . . in substantially as conspicuous a manner in said newspaper . . . as were the statements claimed to be libelous, in a regular issue thereof published . . . within three weeks after such service, plaintiff . . . in pleads and proves such notice, demand and failure to correct, and if his cause of action be maintained, may recover general, special and exemplary damages: provided that no exemplary damages may be recovered unless the plaintiff shall prove that defendant made the publication . . . with actual malice."

records himself, Hunt discovered that City Planning Director Swift had actually recommended against approval of the Project; the City's independent geologist, Carpenter, had criticized Levish's analysis and persuaded the City to undertake extensive further seismic studies; the City had procured review the seismic evaluation of the Site; and the City had thereafter required the developers to perform additional testing not required by state law but recommended by Hart and Carpenter. Hunt also learned that although Fairfield had recommended two geologists to developer Currin, one of whom was Levish, it was Currin, and not Fairfield, who had hired Levish.

Concerned with the quality and thoroughness of Eisenberg's investigation and the accuracy of his published articles, on May 27, 1994, Hunt and Graham asked Eisenberg if he had any evidence to support the allegations made in his articles about "the stink of corruption . . ." "favoritism and influence peddling," "complaints that [Swift] greased the skids for Ted Fairfield," or that Fairfield was hired in order "to convince the [C]ity it was safe to build homes" on the Site and had himself in turn hired Levish to fulfill that purpose. Eisenberg defended his articles as "good journalism," but did not provide any specific evidence to support his allegations. Graham and Hunt terminated Eisenberg's employment with the Herald later the same day, less than one month after he had been hired.

Under section 48a, a potential media defendant can avoid exposure to claims for general or exemplary damages by publishing a retraction in the manner specified by the statute. On June 7, 1994, therefore, the Herald published a retraction in compliance with section 48a. This "Correction and clarification" stated that (1) the May 8 and May 15 articles "contained inaccurate and misleading information" about the Golden Eagle development, Fairfield and the Alameda County Grand Jury; (2) "[t]here is no evidence that Fairfield was involved in improper, corrupt or illegal activities" in connection with the Project; (3) the editors of the Herald "regret any insinuation" that Fairfield or anyone connected with the Project was "engaged in any acts of collusion, illegal or otherwise"; (4) the May 8 article "should have made it clear that it was the reporter himself" who contacted the Alameda County District Attorney and presented information concerning the Project; (5) the developers themselves, not Fairfield, had hired geologist Levish; and (6) "[a]ny insinuation" Fairfield "engaged in improper and unethical behavior" concerning the Project "is incorrect, and we regret the errors in this regard." The retraction did not mention Eisenberg by name.

On June 19, 1994, after publishing the retraction, Hunt took the additional step of publishing his own article on the history of the Golden Eagle

controversy, entitled "City prudent with Golden Eagle." Among other things, the article made the following points: (1) "[R]eporting in this newspaper, which was inaccurate and unfair and lacked balance, helped spur the controversy"; (2) "[c]ontrary to claims, the [C]ity acted reasonably and prudently"; (3) "Planning Director Brian Swift made Golden Eagle Estates developers clear many more hurdles than was normal at the time"; (4) "[t]he Planning Department [twice recommended against plans for Golden Eagle"; (5) "[i]n earlier reporting, Swift was treated particularly unfairly with a number of inaccurate statements printed about his performance"; (6) "[i]n fact, [Swift] did his job professionally and went the extra steps to ensure that the [P]roject received the studies necessary so the department could recommend a decision"; (7) "[t]he dispute over the location of the Calaveras fault and whether it crosses the [Project] property is one that probably cannot be resolved" but instead is "the type of debate between professionals that reasonable people can disagree on"; and (8) "[t]here was no effort to hide the possible presence of the fault" on the Site. Once again, Hunt's article made no reference to Eisenberg by name.

Eisenberg subsequently submitted his own demand to the Herald for a retraction, claiming that the Herald's earlier retraction of the statements in Eisenberg's two articles and the Hunt article had defamed Eisenberg. Through its attorney, the Herald refused Eisenberg's demand on the grounds its own earlier retraction had been required by the lack of any evidence for "the very serious and inflammatory charges made by Mr. Eisenberg about Ted Fairfield, Brian Swift and the City of Pleasanton," as well as by Eisenberg's "breach" of journalistic standards in failing to disclose the fact it was he himself who approached the Alameda County District Attorney with the charges about which he was writing. The letter invited Eisenberg to submit any additional evidence in support of his charges of corruption "as soon as possible."

Thereafter, Eisenberg filed this lawsuit against respondents, alleging causes of action for defamation, false light, wrongful termination in violation of public policy, breach of implied-in-fact contract, breach of the implied covenant of good faith and fair dealing, and fraud. At the conclusion of discovery, respondents moved for summary judgment. The trial court granted the motion and entered judgment for respondents. This appeal followed.

STANDARD OF REVIEW

Code of Civil Procedure section 437c, subdivision (c), *requires* a trial court to grant summary judgment if all the papers and affidavits submitted,

together with "all inferences reasonably deducible from the evidence" and uncontradicted by other inferences or evidence, show that "there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c); 6 Witkin, Cal. Procedure (4th ed. 1997) Proceedings Without Trial, § 217, p. 629.) (1) Where the defendant is the moving party, he or she may meet the burden of showing that a cause of action has no merit by proving either that (1) one or more elements of the cause of action cannot be established, or (2) there is a complete defense to that cause of action. Once that burden is met, the burden *shifts* to the plaintiff to show the existence of a triable issue of one or more material facts with respect to that cause of action or defense. (Code Civ. Proc., § 437c, subd. (o)(2); *Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 161-163 [80 Cal.Rptr.2d 66] (*Sangster*).)

A defendant moving for summary judgment may establish that an essential element of the plaintiff's cause of action is absent by reliance on the pleadings, competent declarations, binding judicial admissions contained in the allegations of the plaintiff's complaint, responses or failures to respond to discovery, and the testimony of witnesses at noticed depositions. (Code Civ. Proc., § 437c, subd. (b); *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 20-21 [112 Cal.Rptr. 786, 520 P.2d 10]; *Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 579-593 [37 Cal.Rptr.2d 653] (*Union Bank*); *Uram* v. *Abex Corp.* (1990) 217 Cal.App.3d 1425, 1433 [266 Cal.Rptr. 695]; *Brown v. City of Fremont* (1977) 75 Cal.App.3d 141, 145-146 [142 Cal.Rptr. 46]; *Saporta v. Barbagelata* (1963) 220 Cal.App.2d 463, 468-469 [33 Cal.Rptr. 661] (*Saporta*).) The plaintiff may not rely on his or her pleadings alone, but must file opposition to the motion, with affidavits setting forth *specific facts* demonstrating that a triable issue of material fact exists as to the cause of action or defense. (Code Civ. Proc., § 437c, subd. (o); *Villa v. McFerren* (1995) 35 Cal.App.4th 733, 743-746 [41 Cal.Rptr.2d 719] (*Villa*); *Union Bank, supra,* 31 Cal.App.4th at pp. 590-593; *Saporta, supra,* 220 Cal.App.2d at pp. 468-469; 6 Witkin, Cal. Procedure, *supra,* Proceedings Without Trial, § 201, pp. 613-614.)

The purpose of the summary judgment procedure is to identify those cases in which "there is no triable issue as to any material fact." (Code Civ. Proc., § 437c, subd. (c).) For practical purposes, an issue of *material* fact is one which, in the context and circumstances of the case, "warrants the time and cost of factfinding by trial." (*Martin v. Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1735 [35 Cal.Rptr.2d 181] (*Martin*).) In other words, not every issue of fact is worth submission to a jury. The purpose of summary judgment is to separate those cases in which there are *material* issues of fact meriting a trial from those in which there are no such issues.

1376

Thus, where the parties have had sufficient opportunity adequately to develop their factual cases through discovery and the defendant has made a sufficient showing that the plaintiff's action has no merit, in order to avert summary judgment the plaintiff must produce *substantial* responsive evidence sufficient to establish the existence of a triable issue of material fact on the issues raised by the plaintiff's causes of action. (*Sangster, supra,* 68 Cal.App.4th at pp. 162-163; *Martin, supra,* 29 Cal.App.4th at pp. 1730-1735.)

(2) On appeal, we review the trial court's decision to grant or deny the summary judgment motion de novo, on the basis of an examination of the evidence before the trial court and our independent determination of its effect as a matter of law. (*Sangster, supra,* 68 Cal.App.4th at p. 163; *Villa, supra,* 35 Cal.App.4th at p. 741; *Union Bank, supra,* 31 Cal.App.4th at p. 579; *Jambazian v. Borden* (1994) 25 Cal.App.4th 836, 843-844 [30 Cal.Rptr.2d 768].; 6 Witkin, Cal. Procedure, *supra,* Proceedings Without Trial, § 217, p. 629.) We also independently review the trial court's determination of questions of law. To that end, we review the summary judgment without deference to the trial court's determination. (*Sangster, supra,* 68 Cal.App.4th at p. 163; *Transamerica Ins. Co. v. Superior Court* (1994) 29 Cal.App.4th 1705, 1713-1714 [35 Cal.Rptr.2d 259].)

## DEFAMATION

(3a) The trial court granted summary judgment in respondents' favor on Eisenberg's defamation and false light causes of action on the grounds that (1) respondents' published retraction was made in response to a statutory demand under section 48a and was absolutely privileged under section 47, subdivision (b),* and (2) the statements in Hunt's June 19, 1994, article were not actionable as a matter of law because they were either "substantially true" or were statements of opinion. Eisenberg contends these determinations of the trial court were erroneous. We agree with Eisenberg that the trial court erred in ruling that the retraction was privileged under section 47(b). However, we conclude the grant of summary judgment was nevertheless correct. As a matter of law, none of the statements at issue was defamatory.

## THE LITIGATION PRIVILEGE

In granting summary judgment on appellant's causes of action for defamation and false light, the trial court first found that the Herald's published June 7, 1994, retraction, entitled "Correction and clarification," "was a

*For convenience, we will refer to section 47, subdivision (b), as section 47(b).

1377

statement made in an official proceeding authorized by law, i.e. Civil Code Section 48a[,] and is therefore absolutely privileged under Civil Code Section 47(b).'" The trial court's finding is incorrect on its face in stating that the retraction was "a statement made in an official proceeding authorized by law." (4a) This category of the privilege, as codified in section 47(b)(3), applies only to statements made in the context of "official," i.e. governmental, proceedings; that is, proceedings involving the government, an agency or official thereof; or quasi-judicial proceedings otherwise reviewable by writ of mandate. (*Slaughter v. Friedman* (1982) 32 Cal.3d 149, 156 [185 Cal.Rptr. 244, 649 P.2d 886]; *Hackethal v. Weissbein* (1979) 24 Cal.3d 55, 59-61 [154 Cal.Rptr. 423, 592 P.2d 1175, 9 A.L.R.4th 791]; *Cuenca v. Safeway San Francisco Employees Fed. Credit Union* (1986) 180 Cal.App.3d 985, 993-994 [225 Cal.Rptr. 852].) (3b) The fact that the retraction in this case was published in response to a section 48a demand letter does not make it part of an "official" proceeding. Indisputably, no government agency, officer, body or proceeding was involved even peripherally in the publication of the retraction.

Nevertheless, as the parties have framed the issue, the question remains whether the retraction was absolutely privileged under the judicial privilege of section 47(b)(2). Respondents vigorously defend the trial court's decision on this ground. Because of the expansion by the courts of the judicial privilege to various communications made *in anticipation of litigation,* we must address the question whether the trial court was correct in applying this form of the privilege in this case.

(4b) The "usual formulation" of the privilege set out in section 47(b) is that it "applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action. [Citations.]" (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212 [266 Cal.Rptr. 638, 786 P.2d 365] (*Silberg*); *Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 29 [61 Cal.Rptr.2d 518] (*Edwards*).) These requirements for invoking the privilege are based upon section 47(b)'s purpose of affording litigants and witnesses "the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." (*Silberg, supra,* 50 Cal.3d at p. 213.) "In other words, the litigation privilege is intended to encourage parties to feel free to

In pertinent part, section 47 states: "A privileged publication or broadcast is one made: [¶]
[¶] (b) In any ... (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to Chapter 2 [commencing with Section 1084] of Title 1 of Part 3 of the Code of Civil Procedure ..."

exercise their fundamental right of resort to the courts for assistance in the resolution of their disputes, without being chilled from exercising this right by the fear that they may subsequently be sued in a derivative tort action arising out of something said or done in the context of the litigation. [Citation.]" (*Edwards, supra,* 53 Cal.App.4th at p. 29.)

(5a) Although the express language of section 47(b) applies only to communications made in a judicial or other "official" proceeding, courts have applied the privilege to some communications made *in advance* of anticipated litigation. (*Rubin v. Green* (1993) 4 Cal.4th 1187, 1193-1194 [17 Cal.Rptr.2d 828, 847 P.2d 1044]; *Edwards, supra,* 53 Cal.App.4th at pp. 30-32; *Lerette v. Dean Witter Organization, Inc.* (1976) 60 Cal.App.3d 573, 577-578 [131 Cal.Rptr. 592].) This expansion of the judicial privilege to statements made in a prelitigation context is explicitly reflected in the Restatement Second of Torts, under which attorneys, parties and witnesses are *absolutely privileged* "to publish defamatory matter concerning another in communications *preliminary* to a *proposed* judicial proceeding." (Rest.2d Torts, §§ 586-588, pp. 247-250, italics added; see also *Edwards, supra,* 53 Cal.App.4th at pp. 31-32.) Nonetheless, as the Restatement's comments make clear, this prelitigation privilege "applies only when the communication has some relation to a proceeding that is contemplated in good faith and under serious consideration. The bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered." (Rest.2d Torts, §§ 586, 587, com. c, pp. 248, 250; see also *Edwards, supra,* 53 Cal.App.4th at p. 32; *Laffer v. Levinson, Miller, Jacobs & Phillips* (1995) 34 Cal.App.4th 117, 122-125 [40 Cal.Rptr.2d 233].)

As this court has previously stated, "[t]he fact that California courts have extended the judicial privilege to prelitigation communications by way of the Restatement [Second of Torts] does not change the underlying rationale and justification for the privilege, which remains the same whether the communications at issue are made in the course of an actual judicial proceeding or in a prelitigation context. . . . [T]he privilege is based on a policy of encouraging *free access to the courts* for assistance in the resolution of disputes and the ascertainment of truth, without fear of incurring a derivative tort action." (*Edwards, supra,* 53 Cal.App.4th at p. 33, italics in original.) Because "[t]his rationale for the privilege cannot logically be extended to communications made *prior* to or *in anticipation* of litigation until the prospect of litigation has gone from being a mere possibility to becoming a contemplated *reality,*" we have therefore held that the litigation privilege only attaches when imminent access to the courts is seriously proposed and actually contemplated, seriously and in good faith, as a means of resolving a

---

dispute and not simply a tactical ploy to induce a settlement. (*Id.* at pp. 34-39, italics in original.)

(3c) Defending the applicability of the privilege in this case, respondents argue that the very purpose of a section 48a demand letter is to enable the party making the demand to obtain general and exemplary damages in subsequent defamation litigation, which itself is proposed for the purpose of resolving an underlying dispute as to the truth or accuracy of allegedly defamatory statements. Respondents urge that because the retraction or correction published in response to such a demand can avoid exposure to claims for general or punitive damages, both the demand for a correction and the published retraction itself are inextricably linked to threatened litigation. Arguably, a retraction by its very nature a "communication" that "has some relation to" and is "preliminary to a proposed judicial proceeding . . . that is contemplated in good faith and under serious consideration." (Rest.2d Torts, §§ 586, 587 & com. c, pp. 247-250; see *Edwards, supra,* 53 Cal.App.4th at pp. 31-37.) Thus, respondents argue, the contents of *any* retraction, clarification or correction published in response to a section 48a demand must be subject to the protection of the litigation privilege.

We disagree. No published decision has ever held a newspaper retraction is privileged under section 47(b). It was respondents' burden to establish the preliminary facts on which to base their affirmative defense of privilege. (*Edwards, supra,* 53 Cal.App.4th at p. 37; *Fuhrman v. California Satellite Systems* (1986) 179 Cal.App.3d 408, 421-423 [231 Cal.Rptr. 113], disapproved on other grounds in *Silberg, supra,* 50 Cal.3d at p. 212, 219.) In moving for summary judgment, they were therefore required to establish that at the time the retraction was published on June 7, 1994, ". . . litigation was not a mere possibility on the horizon, but was actually proposed, seriously and in good faith, as a means of resolving the dispute." (*Edwards, supra,* 53 Cal.App.4th at p. 37.)

On this record, we conclude respondents failed to make this necessary showing of preliminary fact. (5b) In the first place, as we stated in *Edwards,* the "mere possibility or subjective anticipation" of litigation is insufficient; it is necessary that there be proof of "some *actual verbalization* of the danger that a given controversy may turn into a lawsuit . . . ." (*Edwards, supra,* 53 Cal.App.4th at pp. 34-35, italics added.) Second, even though "[i]t is not necessary that a party make an actual 'threat' of litigation," there must be "a serious, good faith proposal." (*Id.* at p. 35.) Third, the contemplated litigation must be *imminent.* (*Ibid.*) Although "[t]he classic example of an instance in which the privilege would attach to prelitigation

communications is the attorney demand letter threatening to file a lawsuit if a claim is not settled," it is not the mere *threat* of litigation that brings the privilege into play, but rather the actual good faith contemplation of an imminent, impending resort to the judicial system for the purpose of resolving a dispute. (*Id.* at pp. 35-36 & fn. 10.) "[B]ecause the privilege does not attach prior to the actual filing of a lawsuit unless and until litigation is seriously proposed *in good faith* for the purpose of resolving the dispute, even a threat to commence litigation will be insufficient to trigger application of the privilege if it is actually made as a means of inducing settlement of a claim, and not in good faith contemplation of a lawsuit. This is a question of fact that must be determined before the privilege is applied. [Citations.]" (*Id.* at p. 35, fn. 10, italics in original.)

(3d) On its face, the May 24, 1994, letter from Fairfield's attorneys to the Herald does not expressly threaten to file a lawsuit if the Herald failed to publish a retraction. Although, in language closely tracking that of section 48a, Fairfield's attorneys "demand" the publication of a "correction within three (3) weeks of receipt of this letter . . . in substantially as conspicuous a manner" as Eisenberg's original articles, the letter twice repeats that it was not written "out of a desire to litigate this matter," but "in the interest of presenting correct and accurate information" and "to restore" Fairfield's "good name." There is no evidence to indicate either Fairfield or respondents themselves actually contemplated imminent resort to the courts or the judicial system to resolve their dispute, a fact acknowledged at oral argument by counsel for respondents. On this record, we cannot say whether the Fairfield demand letter was "merely a negotiating tactic," written as "a tactical ploy to negotiate a bargain" or induce the settlement of a claim, or a good faith suggestion, made "under the actual threat of impending litigation," that the controversy would imminently turn into a defamation lawsuit unless the demanded retraction was promptly published. (*Edwards, supra,* 53 Cal.App.4th at pp. 35-36.) The letter is in fact susceptible to interpretation as either of these possibilities.

Moreover, any application of the litigation privilege must satisfy the ultimate justification for the privilege, by encouraging the free exercise of the parties' fundamental right of resort to the courts for assistance in the ascertainment of truth and the resolution of their disputes. (*Silberg, supra,* 50 Cal.3d at pp. 212-214; *Edwards, supra,* 53 Cal.App.4th at pp. 29, 33, 35-36.) In this regard, it is important to bear in mind that the question presented here is not whether the privilege applies to the demand letter, but whether it covers the *retraction* published *in response to the* demand letter. The retraction was published not to obtain access to the courts, but to *avoid* litigation. Applying the privilege here would serve, not the purpose of encouraging free

access to the courts for assistance in resolving a dispute and ascertaining the truth, but instead the entirely separate goal of encouraging a settlement. As we pointed out in *Edwards,* this purpose, while entirely laudable, is totally unrelated to the rationale underlying the litigation privilege. Applying the privilege in such a context may actually serve to undermine or defeat the purposes of the privilege itself. (*Edwards, supra,* 53 Cal.App.4th at pp. 33-34, 36-37.)

To sum up: in order to take advantage of the litigation privilege, respondents must establish that either Fairfield or they themselves seriously and in good faith proposed imminent access to the courts as a means of resolving their dispute. (*Edwards, supra,* 53 Cal.App.4th at pp. 34-39; Rest.2d Torts, §§ 586-588, com. c, pp. 247-250.) Although respondents assert their retraction was published in response to a letter they perceived as a section 48a demand, the record contains no declaration confirming either that Fairfield seriously and in good faith intended to file a lawsuit, or that respondents themselves intended to protect themselves from *potential* damages and *avoid* litigation with Fairfield by publishing the retraction. Nowhere in the record is there evidence respondents contemplated anything more than the mere possibility that Fairfield might be considering a lawsuit. Respondents cannot gain the protection of the privilege to protect their own communications merely by establishing that they anticipated a potential for litigation. As we have held, "the privilege only arises at the point in time when litigation is no longer a mere possibility, but has instead ripened into a *proposed proceeding* that is actually contemplated in good faith and under serious consideration as a means of obtaining access to the courts for the purpose of resolving the dispute. [Citation.]" (*Edwards, supra,* 53 Cal.App.4th at p. 39, italics in original.)

It remains a triable issue of fact whether, at the time of the retraction, imminent litigation was seriously proposed and actually contemplated in good faith as a means of resolving the dispute between respondents and Fairfield. While we can imagine situations in which a given retraction might be protected by the litigation privilege, too many issues of fact surround the applicability of the privilege in this case to support the granting of summary judgment on that basis here. The trial court therefore erred in granting summary judgment on the basis of the privilege.'"

STATEMENTS OF OPINION OR FACTUAL TRUTH NOT DEFAMATORY

(6a) The trial court sustained respondents' motion for summary judgment with respect to the allegedly defamatory statements in Hunt's article

"Respondents apparently concede that Hunt's article published in the Herald on June 19, 1994, was unprotected by the litigation privilege of section 47b. The concession is well taken. At the very least, the same triable factual issues raised by the retraction exist with

published in the Herald on June 19, 1994, on the grounds these statements were either substantially true or else were nonactionable statements of opinion. Although we have concluded that triable issues of material fact bar summary judgment with respect to the applicability of the litigation privilege to the retraction, the question remains whether there is any triable issue of material fact as to whether any statements in the retraction could be considered defamatory in the first place. Because the trial court thought the retraction was privileged under section 47(b), it did not reach this issue. We conclude both that the trial court was correct in ruling that the statements in Hunt's June 19 article were not defamatory, and that the statements in the retraction were similarly not defamatory as a matter of law.

Eisenberg claims the following statement in the Hunt article of June 19 was defamatory: "Reporting in this newspaper, which was inaccurate and unfair and lacked balance, helped spur the [Golden Eagle] controversy."[7] The statement that certain reporting had been "inaccurate" is a verifiable statement of fact. In defamation actions generally, factual truth is a defense which it is the defendant's burden to prove. (7) In a defamation action against a newspaper by a private person suing over statements of public concern, however, the First Amendment places the burden of proving falsity on the plaintiff. (*Philadelphia Newspapers, Inc.* v. *Hepps* (1986) 475 U.S. 767, 768-769 [106 S.Ct. 1558, 1559-1560, 89 L.Ed.2d 783]; *Smith* v. *Maldonado* (1999) 72 Cal.App.4th 637, 646 & fn. 5 [73 Cal.App.4th 41]; 85 Cal.Rptr.2d 397].) As a matter of constitutional law, therefore, media statements on matters of public interest, *including* statements of opinion which reasonably imply a knowledge of facts, "must be provable as false before there can be liability under state defamation law." (*Milkovich* v. *Lorain Journal Co.* (1990) 497 U.S. 1, 18-20 [110 S.Ct. 2695, 2705-2707, 111 L.Ed.2d 1] (*Milkovich*).) Whether a statement contains provably false factual assertions is a question of law for the trial court to decide. (*Copp* v. *Paxton* (1996) 45 Cal.App.4th 829, 837 [52 Cal.Rptr.2d 831] (*Copp*); *Weller* v. *American Broadcasting Companies, Inc.* (1991) 232 Cal.App.3d 991, 999-1002 & fn. 9 [283 Cal.Rptr. 641].)

(6b) The statement in Hunt's published Herald article that previous reporting had been "inaccurate" was not provably false. Eisenberg admitted in deposition that although he had *intended* to convey the impression that certain "accusations created an atmosphere of doubt and suspicion" about

---

[7] ... respect to the question whether the statements made in the subsequent Hunt article could be considered privileged under section 47(b).

Nowhere in either the Hunt article or the retraction was Eisenberg identified by name. The Hunt article did not even identify the titles or dates of the articles in which the "inaccurate" and "unfair" reporting was published.

"favoritism," "influence-peddling," and the "integrity" of the City government, his *only* identified source for these alleged "accusations."—Rogers—never actually made them. Eisenberg also admitted that Fairfield himself did not hire Levish, contrary to what Eisenberg reported. Neither was there any factual basis for the statements in Eisenberg's article implying that it was Rogers who had "lodged" the "accusations of favoritism and influence-peddling" with the Alameda County District Attorney or grand jury, when in fact Rogers had repeatedly told Eisenberg that no one had done anything illegal and the only one who had made any accusations of illegality to the district attorney was Eisenberg himself. Clearly, and as a matter of law, Eisenberg cannot establish that the statement in Hunt's article that previous reporting had been "inaccurate" was provably false.

On its face, the statement that certain reporting had been "unfair and lacked balance" was one of opinion, not fact.[12] (8) It is an essential element of defamation that the publication be of a false statement of *fact* rather than opinion. (*Gregory* v. *McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 600 [131 Cal.Rptr. 641, 552 P.2d 425]; *Campanelli* v. *Regents of University of California* (1996) 44 Cal.App.4th 572, 578 [51 Cal.Rptr.2d 891]; *Jensen* v. *Hewlett-Packard Co.* (1993) 14 Cal.App.4th 958, 970 [18 Cal.Rptr.2d 83].) Once again, the issue whether a communication was a statement of fact or of opinion is a question of law to be decided by the court. (*Copp, supra,* 45 Cal.App.4th at p. 837; *Baker* v. *Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260 [228 Cal.Rptr. 206, 721 P.2d 87].)

In making the distinction between provably false factual assertions and nonactionable opinion, the courts have defined as opinion any "'broad, unfocused and wholly subjective comment.'" (*Copp, supra,* 45 Cal.App.4th at p. 837, quoting *Fletcher* v. *San Jose Mercury News* (1989) 216 Cal.App.3d 172, 191 [264 Cal.Rptr. 699].) Under the common law privilege of "fair comment," an honed expression of opinion on matters of public interest is privileged. (*Williams* v. *Daily Review, Inc.* (1965) 236 Cal.App.2d 405, 416 [46 Cal.Rptr. 135], disapproved on other grounds in *Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 732-733, fn. 18 [257 Cal.Rptr. 708, 771 P.2d 406].) 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 548, p. 644.) On the other hand, if a statement of opinion implies a knowledge of facts which may lead to a defamatory conclusion, the implied facts must themselves be true. In such a case, the dispositive question is whether a reasonable factfinder could conclude the published statements *imply* a provably false assertion of fact. (*Milkovich, supra,* 497 U.S. at pp. 18-20 [110 S.Ct. at pp. 2705-2707]; *Okun* v. *Superior Court* (1981) 29 Cal.3d 442,

---

[12] At the hearing on respondents' motion for summary judgment, counsel for Eisenberg conceded that the statement that previous reporting "lacked balance" was an opinion.

451-452 [175 Cal.Rptr. 157, 629 P.2d 1369]; *Copp, supra,* 45 Cal.App.4th at p. 837.)

(6c) Whether or not the statement in Hunt's June 19, 1994, article that previous reporting had been "unfair and lacked balance" *implied* knowledge of unstated facts, the statement was not actionable for the same reasons it was not actionable for Hunt to state that certain previous reporting in the *Herald* had been "inaccurate": any such factual implication was *not provably false.* Accordingly, the trial court was correct in granting summary judgment as to respondents' publication of Hunt's article.

With respect to the retraction, Eisenberg claims four statements therein were defamatory: (1) the articles "published May 8 and May 15 ... contained inaccurate and misleading information" about Golden Eagle, Fairfield and the Alameda County Grand Jury; (2) "[t]here is no evidence that Fairfield was involved in improper, corrupt or illegal activities related to" Golden Eagle, and the Newspaper "regret[s] any insinuation that Fairfield or anyone connected with" Golden Eagle was "engaged in any acts of collusion, illegal or otherwise"; (3) "[t]he May 8 article should have made it clear that it was the reporter himself who presented information concerning [Golden Eagle] to an assistant district attorney, who agreed to forward the information to the grand jury"; and (4) Levish was hired by Golden Eagle owners Currin and Timm, not by Fairfield, and "[a]ny insinuation from this passage that Fairfield engaged in improper and unethical behavior concerning [Golden Eagle] is incorrect, and we regret the errors in this regard." For the same reasons discussed with respect to Hunt's June 19, 1994, article, none of these statements in the retraction was defamatory.

The statement that the May 8 and May 15 articles "contained inaccurate and misleading information" about Golden Eagle, Fairfield and the Alameda County Grand Jury, like the parallel statement in the Hunt June 19 article, is not provably false. Eisenberg reported as *fact* that Rogers had made accusations of "favoritism," "influence-peddling," and the lack of "integrity" in the City government, and clearly implied *that Rogers had* "lodged" these accusations with the Alameda County Grand Jury. Because these reported "facts" were false, Eisenberg cannot as a matter of law prove that the retraction's characterization of them as "inaccurate" and "misleading" was itself false.

The retraction's statement that "[t]here is no evidence that Fairfield was involved in improper, corrupt or illegal activities related to" Golden Eagle is similarly a statement of fact that Eisenberg cannot prove false. To the contrary, the record shows that when asked to produce evidence to support his insinuations about the "stink of corruption," "accusations of favoritism"

and influence-peddling," and the grand jury's purported interest in these "accusations," Eisenberg was simply unable to do so. On its face, the Newspaper's statement *in the retraction that it "*regret[s] any insinuation that Fairfield or anyone connected with" Golden Eagle was "engaged in any acts of collusion, illegal or otherwise" is a statement of fact that Eisenberg cannot prove false. Indeed, the very publication of the retraction itself is ample evidence of the Newspaper's "regret."

The retraction's statement that the May 8 article "should have made it clear" that it was the reporter himself who presented information on *Golden* Eagle to an assistant district attorney, who then agreed to forward the information to the grand jury, is a nonactionable statement of opinion. Eisenberg does not dispute the *fact* that it was he, and not Rogers, who contacted the Alameda County District Attorney's office and tried to interest it *in initiating* a grand jury investigation of Golden Eagle. The Newspaper was clearly entitled to its opinion that Eisenberg *should have* revealed that fact rather than falsely insinuating that Rogers or someone else had "lodged" these accusations with the district attorney. That opinion is not actionable.

Finally, it is an undisputed *fact* that Levish was hired by Golden Eagle owners Currin and Timm, and not by Fairfield. Because it is demonstrably *true*, it cannot be defamatory. *The additional statement declaring "incorrect" "[a]ny insinuation" that Fairfield "engaged in improper and unethical behavior"* concerning Golden Eagle is, once again, not provably false. (9)See fn. 11. Because neither this statement nor any other statements in the retraction contained provably false factual assertions, the trial court was *required* to grant summary judgment to respondents on their motion for summary judgment.[11]

## EMPLOYMENT TERMINATION CLAIMS

The trial court also granted summary judgment on Eisenberg's various claims arising from the termination of his employment at the Herald. On appeal, he contends that material issues of fact exist as to (1) the existence of an implied-in-fact contract that his employment could only be terminated for

---

[11] "The trial court also granted summary judgment as to Eisenberg's second cause of action, alleging that respondents had placed him in a "false light" on the same grounds as it had granted summary judgment with regard to the defamation cause of action. When a false light claim is coupled with a defamation claim, the false light claim is essentially superfluous, and stands or falls on whether it meets the same requirements as the defamation cause of action. (*Kapellas v. Kofman* (1969) 1 Cal.3d 20, 35, fn. 16 [81 Cal.Rptr. 360, 459 P.2d 912]; *Selleck v. Globe International, Inc.* (1985) 166 Cal.App.3d 1123, 1136 [212 Cal.Rptr. 838].) The trial court was correct in granting summary judgment on Eisenberg's false light claim for the same reasons its grant of summary judgment on the first cause of action was correct."

1386

cause; (2) alleged breach of an implied covenant of good faith and fair dealing; and (3) alleged wrongful termination in violation of his rights under the First Amendment and the California labor law. These contentions are all meritless.

### BREACH OF IMPLIED-IN-FACT CONTRACT OF EMPLOYMENT

(10a) Eisenberg argues that his termination breached an implied-in-fact contract to terminate only "for cause," and the trial court erred in granting summary judgment on this cause of action. The trial court determined on the basis of undisputed evidence that Eisenberg's cause of action was terminable at will, and Eisenberg had failed to produce any admissible evidence of a contract, either express or implied, that could only be terminated for cause. The trial court did not err.

(11) Under Labor Code section 2922, "[a]n employment, having no specified term, may be terminated at the will of either party on notice to the other. Employment for a specified term means an employment for a period greater than one month." Under this statute, an employee's term of employment, when not otherwise specified in an employment contract, written document or oral agreement, is considered a term that may be terminated "at will" by either party. Thus, in the absence of any evidence of the duration or term of employment under a written or oral agreement, there is a statutory presumption that employment is terminable "at will," and a contract of employment may be ended at any time at the option of either party. (Haycock v. Hughes Aircraft Co. (1994) 22 Cal.App.4th 1473, 1488 [28 Cal.Rptr.2d 248] (Haycock); Hillsman v. Sutter Community Hospitals (1984) 153 Cal.App.3d 743, 749 [200 Cal.Rptr. 605]; Hoy v. Sears, Roebuck & Co. (N.D.Cal. 1994) 861 F.Supp. 881, 884-885 (Hoy).)

This presumption of at-will employment may be rebutted only by evidence of an express or implied agreement between the parties that the employment would be terminated only "for cause." The existence of an implied promise to discharge an employee only for good cause is generally, but not always, a question of fact for the jury. (Foley v. Interactive Data Corp. (1988) 47 Cal.3d 654, 668 [254 Cal.Rptr. 211, 765 P.2d 373] (Foley); Haycock, supra, 22 Cal.App.4th at p. 1488; Pugh v. See's Candies, Inc. (1981) 116 Cal.App.3d 311, 324-325 [171 Cal.Rptr. 917]; Hoy, supra, 861 F.Supp. at p. 885.) On the other hand, if the facts are undisputed and admit of only one conclusion, then summary judgment may be entered on issues that otherwise would be submitted to the jury. Thus, the issue of the existence of an implied-in-fact contract not to terminate except for good cause may appropriately be resolved as a matter of law given the undisputed

1387

facts of a particular case. (Davis v. Consolidated Freightways (1994) 29 Cal.App.4th 354, 366 [34 Cal.Rptr.2d 438] (Davis); Tollefson v. Roman Catholic Bishop (1990) 219 Cal.App.3d 843, 855-856 [268 Cal.Rptr. 550], disapproved on other grounds in Scott v. Pacific Gas & Electric Co. (1995) 11 Cal.4th 454, 474, fn. 5 [46 Cal.Rptr.2d 427, 904 P.2d 834]; Miller v. Pepsi-Cola Bottling Co. (1989) 210 Cal.App.3d 1554, 1558 [259 Cal.Rptr. 56] (Miller v. Pepsi-Cola; Hoy, supra, 861 F.Supp. at p. 885.)

To raise a triable issue of material fact and defeat an employer's motion for summary judgment based on the presumption of at-will employment, a plaintiff must produce competent evidence of an agreement that he or she could not be discharged without good cause. (Gould v. Maryland Sound Industries, Inc. (1995) 31 Cal.App.4th 1137, 1151-1153 [37 Cal.Rptr.2d 718] (Gould); Davis, supra, 29 Cal.App.4th at pp. 366-369.) In determining the existence of such a promise of termination only "for cause," we look to the entire relationship of the parties, including such factors as the terms of any relevant application for employment, employee handbook or manual; the personnel policies and practices of the employer; the employee's longevity of service; actions or communications by the employer constituting assurances of continued employment; and the practices of the industry in which the employee is engaged. (Foley, supra, 47 Cal.3d at pp. 677-680; Gould, supra, 31 Cal.App.4th at pp. 1151-1152; Haycock, supra, 22 Cal.App.4th at p. 1488; Miller v. Pepsi-Cola, supra, 210 Cal.App.3d at pp. 1557-1558; Hoy, supra, 861 F.Supp. at p. 885.) A contract requiring termination only "for cause" will not be implied if there is an express writing providing to the contrary. There cannot be a valid express contract and an implied contract, each embracing the same subject, but compelling different results. (Shapiro v. Wells Fargo Realty Advisors (1984) 152 Cal.App.3d 467, 482 [199 Cal.Rptr. 613] (Shapiro); Wal-Noon Corp. v. Hill (1975) 45 Cal.App.3d 605, 613 [119 Cal.Rptr. 646]; Hoy, supra, 861 F.Supp. at p. 885.)

(10b) In this case, there is overwhelming evidence in support of the presumption that Eisenberg's employment was at will. The employment application, which appellant signed on May 3, 1994, explicitly stated his understanding and acknowledgment that (a) "unless otherwise defined by applicable law, any employment relationship with this organization is of an 'at will' nature, which means that the Employee may resign at any time and and (b) "this 'at will' employment relationship may not be changed by any written document or by conduct unless such change is specifically acknowledged in writing by an authorized executive of this organization." In addition, the employee handbook Eisenberg acknowledged receiving on May 25, 1994, set out a 90-day probationary period during which the employer could

terminate an employee's employment if the latter "fails to meet the expectations of the job"; and restated the Newspaper's personnel policy and practice that unless an employee was hired for a specified period of time or "an agreement says otherwise," all employment was "at will," meaning it could be terminated "at any time, without cause . . . ."

Eisenberg signed his name to the employment application and to a form acknowledging his understanding that the employee handbook stated the Newspaper's employment "policies and procedures." In so doing, Eisenberg explicitly acknowledged that he understood his employment to be at will. In his deposition, Eisenberg conceded both that the statement on the employment application was consistent with his understanding of his employment with the Herald, and that neither he nor after signing it did anyone tell him anything that contradicted the "at-will" statement on the application. Eisenberg nevertheless points out that he signed both the employment application and the receipt form for the employee handbook after the Herald had already hired him; neither the application nor the handbook was supported by any independent consideration; neither document covered his position or his salary; and the application was on a standardized form that did not contain an integration clause. Citing these facts and relying on Seubert v. McKesson Corp. (1990) 223 Cal.App.3d 1514, 1519-1520 [273 Cal.Rptr. 296] (Seubert), Eisenberg argues that neither the employment application nor the employee handbook constituted an enforceable, integrated contract or was intended to represent the entire employment agreement between the parties; and his signatures on those documents did not bind him to at-will employment.

It is true that neither document was an integrated contract. Indeed, neither purported to be. However, this fact does not render these written documents stating the Herald's policy of at-will employment, and Eisenberg's signatures acknowledging that policy, any less significant to this case. To the contrary, these signed documents provide strong evidence in support of the statutory presumption that Eisenberg's employment, which admittedly had no specified term, was terminable at will. The fact that the application for employment and the employee handbook did not themselves constitute an integrated employment contract does not undermine their materiality as evidence of the nature of Eisenberg's employment, in the absence of countervailing factual evidence of an implied-in-fact contract not to discharge in the absence of good cause. (Davis, supra, 29 Cal.App.4th at pp. 366-369; Haycock, supra, 22 Cal.App.4th at pp. 1488-1491; Shapiro, supra, 152 Cal.App.3d at pp. 480-482; Hoy, supra, 861 F.Supp. at pp. 885-886; compare, Seubert, supra, 223 Cal.App.3d at pp. 1519-1520 [presumption of

at-will employment may be rebutted by evidence supporting the actual existence of an implied contract requiring cause for termination].)[4]

Here, instead of offering such factual evidence, Eisenberg merely makes general allegations in support of his assertion that he understood respondents to imply he would not be terminated without good cause. Specifically, Eisenberg alleges that: (a) he provided samples of his work to respondents to obtain assurance they were "comfortable" with his "hard-hitting, flamboyant style of journalism"; (b) respondents recognized and acknowledged Eisenberg's status as an experienced and established investigative journalist; (c) respondents assured him he would ultimately be named a "columnist," even though he was not hired as such; (d) respondents reassured Eisenberg about the financial stability of the Herald and its parent company; (e) respondents never told him he was hired at will or was subject to firing within a 90-day probationary period; (f) respondents told him what salary, vacation, health and pension benefits he would have if he came to work at the Herald; and (g) Eisenberg himself would not have left his previous employment at a different newspaper and gone to work at the Herald if he had not subjectively believed he would have more job security, increased opportunities for advancement, and better pension and retirement benefits at the Herald.

Significantly, in none of these allegations does Eisenberg offer any evidence of an actual promise that he would be employed for a specific term or as long as he was doing a good job, or that he could only be terminated for good cause. While Eisenberg and Hunt may have discussed salary and benefits and agreed that he would be a "senior writer," there is no evidence Hunt or anyone else ever told him he would have job security or could not be terminated without cause. To the contrary, Eisenberg admits neither Hunt

[4] "The case of Seubert, supra, 223 Cal.App.3d 1514, upon which Eisenberg relies, is factually distinguishable from this case for a number of reasons. In Seubert, the terminated employee-plaintiff had been employed by the defendant employer for four years at the time of his termination. During that period, the employer had implemented an express personnel policy governing termination of employees for failure to meet specific quotas. Finally, the employment application form on which the employer in Seubert relied in arguing that the employment was 'at-will' did not expressly state that employment could be terminated for any reason or without cause. The Seubert court specifically recognized that such language stating employment could be terminated 'for any reason' might preclude a separate collateral agreement requiring good cause for termination. (Id. at pp. 1519, 1520, citing Gerdlund v. Electronic Dispensers International (1987) 190 Cal.App.3d 263, 271 [235 Cal.Rptr. 279].)

In contrast, in this case Eisenberg had been employed at the Herald for less than one month at the time of his termination, well within the 90-day probationary period set out in the employee handbook. There was no evidence that either the Herald or the parent Newspaper had any personnel policy other than at-will employment of individuals employed for no specified term. To the contrary, both the employment application and the employee handbook expressly stated that employment for an unspecified duration could be terminated at any time 'without cause.'"

nor anyone else ever said *anything* about the duration of his employment. Neither has Eisenberg produced any evidence of any policy or practice, either in the newspaper industry in general or at the Herald in particular, of termination of employees only upon good cause.

Instead, Eisenberg's allegations of unspecified "representations" or "understandings" about his tenure are all "conclusory," in that they purport to establish an ultimate conclusion by inference without alleging the evidentiary *facts* necessary to demonstrate that conclusion. (3 Oxford English Dict., *supra*, at p. 667.) Because these conclusory assertions fail to provide the factual *evidence* necessary to overcome the presumption of at-will employment, they are insufficient as a matter of law either to controvert that presumption, or to support a cause of action for breach of implied-in-fact contract. (*Gould, supra*, 31 Cal.App.4th at pp. 1151–1153; *Davis, supra*, 29 Cal.App.4th at pp. 366-369; *Shapiro, supra*, 152 Cal.App.3d at p. 482; *Hentzel v. Singer Co.* (1982) 138 Cal.App.3d 290, 304 [188 Cal.Rptr. 159, 35 A.L.R.4th 1015].) In any event, Eisenberg could not reasonably have relied upon any allegedly implied promises by respondents which contradicted the *express* provisions of both the application for employment he signed and the employee handbook. (*Shapiro, supra*, 152 Cal.App.3d at p. 482.) Having been terminated after *less than one month* of employment, well within the 90-day probationary period set out in the employee handbook, Eisenberg certainly cannot rely on longevity of service as a factor in support of the existence of an implied contract of employment. (*Gould, supra*, 31 Cal.App.4th at pp. 1151–1152; *Davis, supra*, 29 Cal.App.4th at p. 368.)

In sum, respondents were entitled to rely on the presumption of at-will employment unless rebutted by actual evidence of an implied-in-fact contract of employment providing otherwise. They provided evidence strongly supporting their claim that Eisenberg's employment in fact was "at will." Eisenberg failed to negate either the presumption or respondents' actual practice of at-will employment. Thus, Eisenberg has failed to demonstrate there was any triable issue of material fact to support his claim of an implied-in-fact contract. Summary judgment on Eisenberg's fourth cause of action for breach of such a contract was therefore proper.

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

**(12)** Having failed to raise a triable issue of fact as to his at-will status, Eisenberg cannot raise a triable issue on his claim for breach of the implied covenant of good faith and fair dealing. "The covenant of good faith is read into contracts in order to protect the express covenants or promises of the

contract, not to protect some general public policy interest not directly tied to the contract's purposes." (*Foley, supra*, 47 Cal.3d at p. 690.) Thus, the implied covenant does no more than protect the right to enjoy the benefits of the contract. An "at-will" employee cannot use the implied covenant to create a "for cause" employment contract where none exists. (*Ibid.; Gould, supra*, 31 Cal.App.4th at pp. 1151–1152; *Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 480–481 [4 Cal.Rptr.2d 522].) Because Eisenberg cannot show that a contractual covenant or promise was violated, the trial court was correct in granting summary judgment on his fifth cause of action for breach of the implied covenant of good faith and fair dealing.

## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

**(13)** Eisenberg also contends the trial court erred in granting summary judgment as to his third cause of action alleging wrongful termination in violation of public policy. There are two prongs to Eisenberg's public policy contention. First, he argues his termination was a violation of his rights under the First Amendment. Second, he contends his termination was in violation of Labor Code section 970. There is no merit to either contention.

With regard to Eisenberg's First Amendment claim, he has not cited any federal or California state decisional authority under either the United States or California State Constitutions holding that a newspaper publisher cannot terminate the employment of a reporter, hired on an at-will basis, based on dissatisfaction with the content of or views expressed by the reporter's writing. To the contrary, the courts have long held that the right to control the content of a privately published newspaper rests entirely with the newspaper's publisher. The First Amendment protects the newspaper itself, and grants *it* a virtually unfettered right to choose what to print and what not to. Although a news reporter obviously has First Amendment rights as well, those rights do not guarantee employment. (*Miami Herald Publishing Co. v. Tornillo* (1974) 418 U.S. 241, 254–258 [94 S.Ct. 2831, 2837-2840, 41 L.Ed.2d 730]; *Columbia Broadcasting v. Democratic Comm.* (1973) 412 U.S. 94, 117 [93 S.Ct. 2080, 2093-2094, 36 L.Ed.2d 772]; *Collard v. Smith Newspapers, Inc.* (S.D.W.Va. 1996) 915 F.Supp. 805, 809-813; *Veino v. Fahs* (1989) 27 Mass.App. 442 [539 N.E.2d 548, 550]; *Venu v. Meredith* (1986) 357 Pa.Super. 85 [515 A.2d 571, 573-574, 581].)

Thus, it was the Herald's right to set and enforce its own standards for acceptable and responsible reporting. Eisenberg was fired because he did not meet those standards. Although Eisenberg has a First Amendment right to express his own views, he does not have a right to publish them in the Herald against its wishes. His termination was not a violation of his First Amendment rights.

EISENBERG v. ALAMEDA NEWSPAPERS, INC.
74 Cal.App.4th 1359; 88 Cal.Rptr.2d 802 [Sept. 1999]
1393

667].) The trial court properly granted summary judgment on this cause of action.

## DISPOSITION

The judgment is affirmed. Appellant Eisenberg shall pay respondents' costs on appeal.

Corrigan, J., and Walker, J., concurred.

---

1392
EISENBERG v. ALAMEDA NEWSPAPERS, INC.
74 Cal.App.4th 1359; 88 Cal.Rptr.2d 802 [Sept. 1999]

Eisenberg's claim under Labor Code section 970 is similarly meritless. That statute prohibits employers from inducing employees "to change from one place to another . . . for the purpose of working in any branch of labor, through or by means of knowingly false representations" concerning the nature, duration or conditions of employment.

The statute is inapplicable to this case. First, it requires the employee to demonstrate that his or her employer made "knowingly false representations" concerning the nature, duration or conditions or employment. As seen, there is no evidence of such misrepresentations in this case. Eisenberg admitted that no one at the Herald, including Hunt, ever said anything about the duration of his employment or told him anything in conflict with either the employment application or the employee handbook. Both of those documents indicated that Eisenberg was an at-will employee. Because there was no evidence of any misrepresentation about the duration of Eisenberg's employment, his Labor Code section 970 claim must fail. (Tyco Industries Inc. v. Superior Court (1985) 164 Cal.App.3d 148, 155 [211 Cal.Rptr. 540].)

Moreover, under the statute an employee must establish that the employer induced him or her to relocate or change residences. (Lazar v. Superior Court (1996) 12 Cal.4th 631, 637 [49 Cal.Rptr.2d 377, 909 P.2d 981]; Collins v. Rocha (1972) 7 Cal.3d 232, 239 [102 Cal.Rptr. 1, 497 P.2d 225]; Seubert, supra, 223 Cal.App.3d at pp. 1521-1523.) There was no such evidence in this case.

## OTHER CLAIMS

(14) Finally, Eisenberg contends that the trial court erred in granting summary judgment on his sixth cause of action for fraud because of the existence of alleged material issues of fact. Specifically, Eisenberg asserts he has offered evidence that during the negotiations on his employment, respondents impliedly promised not to terminate him except for good cause, while deliberately failing to disclose either the Newspaper's 90-day probationary period or the fact he was being hired on an at-will basis.

Once again, Eisenberg is wrong. As seen, Eisenberg has failed to offer evidence sufficient to establish a triable issue of material fact on the issue of whether respondents made any promises about the duration of Eisenberg's employment, or whether he could be fired only for cause. Having failed to demonstrate that respondents promised to employ him on anything other than an at-will basis, or made any misrepresentations to him whatsoever, there is no substance to his allegation of fraud. (Orient Handel v. United States Fid. & Guar. Co. (1987) 192 Cal.App.3d 684, 692-694 [237 Cal.Rptr.

Fisher v. San Pedro Peninsula Hospital
214 Cal.App.3d 590, 262 Cal.Rptr. 842 [Oct. 1989]

[No. B033017. Second Dist., Div. Seven. Oct. 2, 1989.]

JULIE FISHER et al., Plaintiffs and Appellants, v.
SAN PEDRO PENINSULA HOSPITAL et al., Defendants and
Respondents.

SUMMARY

A nurse and her husband, a physician, brought actions against the nurse's supervising physician, the hospital where they worked, and a third physician. The action stemmed from the supervising physician's sexual harassment of the nurse and other women, her complaint to the hospital against the supervising physician, and the retaliatory actions against both the nurse and the husband by the third physician and the hospital. The actions alleged environmental sexual harassment under the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.), a claim against the hospital for retaliation under FEHA, a claim against the physician for interference with business relations, a claim for emotional distress against both the hospital and the supervising physician, the husband's claim for retaliation under FEHA against the hospital and interference with business relations against the third physician, and the husband's claim for emotional distress against the hospital and the physician. The trial court sustained defendants' demurrers without leave to amend and issued an order dismissing all actions. (Superior Court of Los Angeles County, No. SOC86235, James M. Sutton, Jr., Judge.)

The Court of Appeal reversed and remanded with directions to dismiss the action against the third physician, but granting plaintiffs leave to amend their causes of action for environmental sexual harassment and for retaliatory actions by the hospital. It held that the nurse's allegations of specific acts of sexual harassment were not sufficiently pled to state a cause of action for environmental sexual harassment under FEHA, but it allowed her an opportunity to amend her complaint. It held that, if the nurse successfully pled an action for sexual harassment, then an action for emotional distress against the supervising physician and the hospital would be viable. It held that the husband failed to allege outrageous conduct against either

Fisher v. San Pedro Peninsula Hospital
214 Cal.App.3d 590, 262 Cal.Rptr. 842 [Oct. 1989]

defendant. It held that the husband could amend his action for retaliation against the hospital based on its cancellation of his office lease in retaliation for his involvement in his wife's complaint against the supervising physician. It also held that neither plaintiff pled a cause of action for interference with business relations, since there was no allegation of intent to interfere with any business relationship. (Opinion by Woods (Fred), J., with Lillie, P. J., concurring. Separate concurring and dissenting opinion by Johnson, J.)

HEADNOTES

Classified to California Digest of Official Reports, 3d Series

(1) **Appellate Review § 23—Decisions Appealable—Orders on Demurrer.**—An order sustaining a demurrer without leave to amend is not an appealable order. However, the appellate court may amend a judgment to include a dismissal of the action as to a defendant whose demurrer has been sustained without leave to amend.

(2) **Appellate Review § 128—Review—Scope and Extent—Rulings on Demurrers.**—A general demurrer admits the truth of all material factual allegations in the complaint, and the question of plaintiffs' ability to prove these allegations, or the possible difficulty in making such proof, does not concern the reviewing court. The plaintiffs need only plead facts showing that they may be entitled to some relief. The complaint should be liberally but reasonably construed. While a demurrer admits all material and issuable facts, it does not admit contentions, deductions, or conclusions of law. If the plaintiffs plead facts entitling them to relief, then the trial court errs in sustaining the defendants' demurrers and dismissing the defendants from the case.

(3) **Pleading § 17—Complaint—Claim Founded on Provisions of Statute.**—Where a plaintiff's claim is founded on the provisions of a statutory scheme that is not a codification of preexisting common law, facts in support of each of the requirements of a statute upon which the cause of action is based must be specifically pled.

(4) **Civil Rights § 3—Employment—Fair Employment and Housing Act—Interpretation—Federal Civil Rights Act Precedents.**—Although the wording of the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.), and title VII of the federal Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.), differs in some particulars, the antidiscriminatory objectives and the overriding public policy

purposes are identical, and California courts, interpreting FEHA, refer to federal decisions regarding title VII where appropriate.

(5) Statutes § 44—Construction—Aids—Contemporaneous Administrative Construction.—The administrative interpretation of a statute will be accorded great respect by the courts and will be followed if not clearly erroneous. However, the ultimate interpretation of a statute is an exercise of the judicial power.

(6) Labor § 3—Fair Employment Practices—Sexual Harassment.—There are two distinct categories of sexual harassment claims in the context of employment: quid pro quo and hostile work environment. Quid pro quo harassment occurs when submission to sexual conduct is made a condition of concrete employment benefits. A plaintiff may establish a violation of title VII of the federal Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) by proving that discrimination based on sex has created a hostile or abusive work environment, regardless of whether the plaintiff suffered tangible or economic losses.

[See Cal.Jur.3d, Labor Law, § 3 et seq.]

(7a, 7b) Civil Rights § 3—Employment—Environmental Sexual Harassment.—Pursuant to the Fair Employment and Housing Act (Gov. Code, § 12900 et seq.), under certain circumstances, the creation of an offensive or hostile work environment due to sexual harassment can violate the act irrespective of whether the complainant suffered tangible job detriment. The elements of the cause of action are: the plaintiff belongs to a protected group; the plaintiff was subject to unwelcome sexual harassment; the harassment complained of was based on sex; the harassment complained of was sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment; and respondeat superior. Whether the sexual conduct complained of is sufficiently pervasive to create a hostile or offensive work environment must be determined from the totality of the circumstances. The plaintiff must prove that the defendant's conduct would have interfered with a reasonable employee's work performance and would have seriously affected the psychological well-being of a reasonable employee and that she was actually offended. When evaluating a sexual harassment claim, a reasonable employee is one of the same sex as the complainant.

(8) Labor § 3—Fair Employment Practices—Respondeat Superior.—Under the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.), an employer is strictly liable for the harassing con-

duct of its agents and supervisors. The standard for coworker liability is that an employer is liable where it, its agents, or its supervisors know or should have known of the harassing conduct and fails to take immediate and appropriate corrective action. FEHA regulations state that an employee is any individual under the direction and control of an employer under any appointment or contract of hire or apprenticeship, express or implied, oral or written. An employee does not include an independent contractor as defined by Lab. Code, § 3353. (Cal. Code Regs., tit. 2, § 7286.5, subds. (b) & (b)(1)). Whether a person is an independent contractor or an employee is a question of fact if dependent upon the resolution of disputed evidence or inferences, and is a matter of law if the evidence is undisputed. (

(9) Labor § 3—Fair Employment Practices—Environmental Sexual Harassment—Totality of the Circumstances—Factors.—In assessing whether sexual conduct complained of is sufficiently pervasive to create a hostile or offensive work environment, the factors that can be considered in evaluating the totality of the circumstances are the nature of the unwelcome sexual acts or words (generally physical touching is more offensive than unwelcome verbal abuse); the frequency of the offensive encounters; the total number of days over which all of the offensive conduct occurred; and the context in which the sexually harassing conduct occurred. In determining what constitutes "sufficiently pervasive" harassment, acts of harassment cannot be occasional, isolated, sporadic, or trivial, rather the plaintiff must show a concerted pattern of harassment of a repeated, routine, or a generalized nature. While an employee need not prove tangible job detriment to establish a sexual harassment claim, the absence of such detriment requires a commensurately higher showing that the sexually harassing conduct was pervasive and destructive of the working environment.

(10) Labor § 3—Fair Employment Practices—Sexual Harassment in the Workplace—Harassment of Employees Other Than Claimant.—A claimant who was never herself the object of sexual harassment in the workplace might have a claim under title VII of the federal Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.), if she were forced to work in an atmosphere in which harassment was pervasive. Such a claim would require a higher showing than a claim by one who had been personally sexually harassed. It would be necessary to establish that the sexually harassing conduct permeated the plaintiff claimant's direct work environment. Evidence of the general work atmosphere, involving employees other than the plaintiff, is relevant to the issue of whether there existed an atmosphere of hostile work environment. Therefore, one who is personally subjected to offensive remarks and

touchings can establish a hostile work environment by showing that harassment existed in the place of employment. However, one who is not personally subjected to such remarks or touchings must establish that she personally witnessed the harassing conduct and that it was in her immediate work environment.

(11) **Labor § 3—Fair Employment Practices—Sexual Harassment—Hostile Work Environment—Sufficiency of Pleadings.**—In a nurse's action against her supervising physician and a hospital, alleging the physician created a hostile work environment for her by his sexual harassment of other women employees in her presence, the nurse did not properly plead a cause of action for environmental sexual harassment under the Fair Employment and Housing Act (Gov. Code, § 12900 et seq.). Although the complaint alleged instances of the physician's sexual conduct that, if proved, consisted of egregious, hostile, and unacceptable conduct, there were not sufficient facts to establish that the nurse's work environment was permeated by sexual harassment. In such a claim, a plaintiff is required to plead sufficient facts to establish a nexus between the alleged sexual harassment of others, her observation of that conduct, and the work context in which it occurred. The nurse's complaint failed to state the number of offensive acts, the exact nature of each act, and that she personally witnessed each act.

(12) **Labor § 3—Fair Employment Practices—Employer's Retaliatory Action.**—To establish a prima facie case of an employer's wrongful retaliatory conduct against an employee, the employee must show that she engaged in a protected activity, that she was thereafter subjected to adverse employment action by her employer, and there was a causal link between the two. The retaliatory motive is proved by showing that the employee engaged in protected activities, that the employer was aware of the protected activities, and that the adverse actions followed within a relatively short time thereafter. The causal link may be established by an inference derived from circumstantial evidence, such as the employer's knowledge that the employee engaged in protected activity and the proximity in time between the protected activity and allegedly retaliatory employment decision.

(13) **Labor § 3—Fair Employment Practices—Creation of Hostile Environment—Ostracism.**—Ostracism of an employee does not amount to a hostile work environment, and no cause of action for the creation of a hostile work environment can be pled on that basis alone.

(14a, 14b) **Civil Rights § 3—Employment—Retaliation.**—In an action under the Fair Housing and Employment Act (Gov. Code, § 12900 et

seq.), plaintiff physician did not successfully plead a cause of action for retaliation against defendant physician, where defendant was a co worker of plaintiff. At the time of the alleged occurrence, Gov. Code, § 12940, subd. (f), prohibited retaliation by an employer, and did not extend to other persons. Although the statute has since been amended to include "any person," there was no expression in the amendment that it be given retroactive effect, thus the amendment was not applicable.

(15) **Statutes § 5—Retroactivity.**—No statute is to be given retroactive effect unless the Legislature has expressly so declared.

(16) **Appellate Review § 32—Presenting and Preserving Questions in al Court—Raising Issue in Appellate Reply Brief.**—Points raised ... the first time in an appellate reply brief will not be considered by the appellate court unless good cause is shown for the failure to present them earlier.

(17) **Healing Arts and Institutions § 11—Hospitals, Mental Institutions, and Nursing Homes—Duties and Liabilities—One Doctor's Retaliatory Acts Against Another.**—In a physician's action, under the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.), against a hospital for retaliation against him for filing a complaint with the Department of Fair Employment and Housing, the physician did not state a cause of action by alleging that the hospital had a duty to protect him against retaliation from coworkers at the hospital. However, the physician did state a cause of action for retaliation against the hospital, based on its cancellation of the hospital's lease with the physician. Since the physician had occupied the office for many years, and since it was still vacant when the physician's second amended complaint was filed, it was reasonable to infer that the hospital refused to renew the lease due to the physician's earlier FF complaint. Failure to renew an office lease affects a condition of employment and is the type of conduct proscribed by Gov. Code, § 12940, subd. (f) (unlawful employment practices), as it existed at the time of the alleged occurrence.

(18) **Torts § 4—Infliction of Emotional Distress—Intentional—Elements of Action.**—The elements of a cause of action for intentional infliction of emotional distress are: outrageous conduct by the defendant, intention to cause or reckless disregard of the probability of causing emotional distress, severe emotional suffering, and actual and proximate causation of the emotional distress. Conduct is extreme and outrageous when it exceeds all bounds of decency usually tolerated by a decent society, and is of a nature that is especially calculated to

cause, and does cause, mental distress. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

[See Am.Jur.2d, Fright, Shock, and Mental Disturbance, § 1 et seq.]

(19a, 19b) Torts § 5—Infliction of Emotional Distress—Intentional—Sexual Harassment in the Workplace.—Without properly pleading a cause of action for sexual harassment under the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.), a nurse had not properly pled any outrageous conduct by either her supervising physician or the hospital where they worked. Under FEHA, a large measure of emotional injury from sexual harassment is inferred since sexual harassment is often inherently oppressive and malicious. Since the nurse's action was based on alleged sexual harassment that had not been properly pled, no action for intentional infliction of emotional distress was viable. Further, if the nurse could properly amend her complaint to plead an environmental sexual harassment cause of action, then she would have also pled sufficient facts to establish a claim against a hospital for intentional infliction of emotional distress.

(20) Employer and Employee § 26—Liability of Third Persons—Wilful Torts of Employees.—An employer is liable for the wilful and malicious torts of its employees committed in the scope of employment.

(21) Torts § 5—Infliction of Emotional Distress—Intentional—Retaliatory Cancellation of Lease.—In an action by a physician against a fellow physician and their employing hospital, alleging intentional infliction of emotional distress, plaintiff did not properly plead outrageous conduct sufficient to state a cause of action. Thus the trial court properly sustained defendants' demurrer. Plaintiff based his claim against the hospital on the fact that it cancelled his lease in retaliation for his filing of a Fair Employment and Housing Act (Gov. Code, § 12900 et seq.), and that the hospital denied plaintiff's request to prevent defendant physician from refusing to examine plaintiff's patients. Plaintiff's action against the other physician stemmed from the refusal to examine his patients. Such acts were mere indignities or threats and did not evidence behavior beyond the bounds of decency necessary to state a cause of action for intentional infliction of emotional distress.

(22) Interference § 6—Interference With Prospective Economic Advantage—Elements.—The elements of the tort of intentional interference with prospective economic advantage are: an economic relationship between the plaintiff and some third person containing the probability

of future economic benefit to the plaintiff; knowledge by the defendant of the existence of the relationship; intentional acts on the part of the defendant designed to disrupt the relationship; actual disruption of the relationship; and damages to the plaintiff proximately caused by the acts of the defendant. The actionable wrong lies in the inducement to break the contract or to sever the relationship. The defendant's motive is crucial. The plaintiff must not only plead and prove intentional acts, but also that such acts were designed to disrupt the formation of a prospective economic relationship. The interest expected is the interest in reasonable expectation of economic advantage.

(23) Interference § 6—Interference With Prospective Economic Advantage—Supervisor's Sexual Harassment of Employee Causing Resignation.—A nurse did not state a cause of action for intentional interference with prospective economic advantage against her supervising physician, where she alleged that the physician's sexual conduct with other female employees created a hostile environment, causing her to resign from the hospital for which they worked. Thus the trial court properly sustained the physician's demurrer. Even if the nurse could properly plead that the physician created a hostile work environment, there was no logical inference that the physician intended to disrupt the nurse's relationship with the hospital by his harassment of other employees.

(24) Interference § 6—Interference With Prospective Economic Advantage—One Physician's Refusal to Treat Another's Patients.—A physician failed to state a cause of action against another physician for intentional interference with prospective economic advantage, where the action was based on defendant's refusal to examine plaintiff's patients. Although plaintiff alleged that defendant actually disrupted the relationship by forcing plaintiff to seek out other physicians, there was no allegation that plaintiff lost patients. Having to seek other physicians or threats to patient welfare are not the kind of economic interest which this tort was designed to protect.

(25) Damages § 22.2—Exemplary or Punitive Damages—Availability—Action Under Fair Employment and Housing Act—Hospital's Retaliatory Refusal to Renew Physician's Lease.—Even though punitive damages are available in a civil action under the Fair Employment and Housing Act (Gov. Code, § 12900 et seq.), where the defendant is guilty of oppression, fraud, or malice, a physician's action for a retaliatory refusal to renew an office lease did not support punitive damages

Such a refusal to renew a lease does not amount to oppression or malice.

(26) **Civil Rights § 3—Employment—Actions Under Fair Employment and Housing Act for Sexual Harassment—Punitive Damages.**—A nurse's properly pled sexual harassment cause of action against her supervising physician would support a claim for punitive damages, since sexual harassment is the type of oppressive and malicious conduct contemplated in Civ. Code, § 3294 (exemplary damages). However, in order to successfully plead punitive damages against the hospital that employed the physician, based on the physician's acts, the nurse must plead facts to show that the hospital ratified those acts. (Civ. Code, § 3294, subd. (b).) Ratification may be established by any circumstantial or direct evidence demonstrating adoption or approval of the employee's actions by the corporate agent. Such ratification may be inferred from the fact that the employer, after being informed of the employee's actions, does not fully investigate and fails to repudiate the employee's conduct by redressing the harm done and punishing or discharging the employee.

(27) **Workers' Compensation § 7.2—Exclusivity of Remedy—Scope and Extent of Exclusivity; Dual Capacity Doctrine—Tort Action Against Employer Barred—Action Under Fair Employment and Housing Act.**—The trial court properly found that a nurse's action, alleging sexual harassment against her supervising physician and the hospital that employed them, was preempted by the Workers' Compensation Act (Lab. Code, § 3200 et seq.), where the nurse had failed to successfully plead a viable cause of action for environmental sexual harassment under the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.). Had the nurse successfully pled an action under FEHA, preemption would not be applicable.

**COUNSEL**

Patricia J. Barry for Plaintiffs and Appellants.

Christnam L. Klein and Chris Redburn as Amici Curiae on behalf of Plaintiffs and Appellants.

Rushfeldt, Shelley & Drake, Horvitz & Levy, David M. Axelrad, Julie Beyer Houpt, Baker, Silberberg & Keener, John C. Kelly, Robie & Matthai,

Pamela E. Dunn, James R. Robie, O'Flaherty & Belgum and John J. Weber for Defendants and Respondents.

**OPINION**

WOODS (Fred), J.— (1) (See fn. 1.) Plaintiffs appeal from an order dismissing their complaint after defendants' demurrers were sustained without leave to amend.[1] The crucial issue presented by this appeal is whether under the facts alleged in the second amended complaint, Ms. Fisher pled a valid claim for environmental sexual harassment. Although we conclude that she has not, we reverse and remand with directions to grant plaintiffs leave to amend certain causes of action since this case is one of first impression.

**FACTUAL AND PROCEDURAL BACKGROUND**

On January 29, 1987, plaintiffs, Julie and Cordell Fisher, commenced this action against San Pedro Peninsula Hospital (hereafter SPPH), Drs. Barry H. Tischler and Frank Brow, and approximately two dozen hospital officers, directors and board members. At the time of the filing of the second amended complaint, the operative pleading in this matter, only SPPH and Drs. Tischler and Brow remained as defendants.

The second amended complaint alleges six causes of action: sexual discrimination under the California Fair Employment and Housing Act (hereafter FEHA) (by Ms. Fisher against SPPH and Dr. Tischler) and retaliation in employment under FEHA (by Ms. Fisher against SPPH); retaliation in employment under FEHA (by Dr. Fisher against SPPH and Dr. Brow); third party interference with business relations (by Ms. Fisher against Tischler and by Dr. Fisher against Dr. Brow); and intentional infliction of emotional distress (by both plaintiffs against all defendants).

[1] Plaintiffs purport to appeal from an order of dismissal of the second amended complaint as to all defendants. However, the order appealed from only names SPPH. An order sustaining a demurrer without leave to amend is not an appealable order (*Beazell v. Schrader* (1963) 59 Cal.2d 577, 579 [30 Cal.Rptr. 534, 381 P.2d 390]), but we may amend a judgment to include a dismissal of the action as to a defendant whose demurrer has been sustained without leave to amend (See *Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 920-921 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518].)
Although in *Cohen v. Equitable Life Assurance Society* (1987) 196 Cal.App.3d 669, 671 [242 Cal.Rptr. 84], we indicated that we would not hear appeals from nonappealable orders, in the instant case, in the interests of judicial economy, we will make an exception in this case since the issues as to the two defendant doctors are interrelated to and intertwined with the issues as to SPPH. Accordingly, we amend the order of dismissal to include Drs. Tischler and Brow.

As alleged in the second amended complaint, the facts in this case are as follows.

Ms. Fisher was employed as a surgical nurse by SPPH. Ms. Fisher was hired by SPPH on August 3, 1981. Dr. Fisher, who is the husband of Ms. Fisher, has staff privileges as a pediatric dental surgeon at SPPH.

Dr. Tischler is a member of SPPH's medical staff specializing in gynecology and obstetrics. Dr. Tischler controlled Ms. Fisher's employment by giving her direct orders and making recommendations about her performance.

Dr. Brow is a member of SPPH's medical staff specializing in pediatrics.

From 1981 until November 1982, Dr. Tischler engaged in repeated acts of sexual harassment against Ms. Fisher, including verbal sexual insults and offensive touchings; on one occasion, he separated the cartilage in her ribs because he hugged her so tightly.

Ms. Fisher complained to SPPH about the sexual harassment. SPPH conducted an investigation. Afterwards, in December 1982, Dr. Tischler sent a letter of apology to Ms. Fisher. No disciplinary action was taken against Dr. Tischler. As a result of complaining, Ms. Fisher was ostracized by her associates and coworkers until approximately July 1983.

Dr. Tischler continued to engage in sexual harassment against other women employees in the presence of Ms. Fisher. These acts included: "[P]ulling nurses onto his lap, hugging and kissing them while wiggling, making offensive statements of a sexual nature, moving his hands in the direction of [a] woman's vaginal area, grabbing women from the back with his hands on their breasts or in the area of their breasts, picking up women and swinging them around, throwing a woman on a gurney, walking up closely behind a woman with movements of his pelvic area. Plaintiff JULIE FISHER saw him commit acts of sexual harassment against [three named] nurses. The acts were committed in hallways, the operating room, and the lunch room of Defendant HOSPITAL from 1982 to 1986. None of the women welcomed the advances and indicated to Defendant TISCHLER they were offensive by moving away from him, avoiding him whenever possible, or telling him to stop. Julie also was forced to hear Defendant TISCHLER make lewd remarks about the breasts of anesthetized female patients."

In June 1986, Ms. Fisher applied for workers' compensation, alleging that she suffered "headaches, stomach upset, diarrhea, tachycardia and

panic attacks" because Dr. Tischler's treatment of other women was so disconcerting.

In response to Ms. Fisher's workers' compensation claim, SPPH investigated Dr. Tischler a second time. "Defendant HOSPITAL officials were informed by two other employees besides [plaintiffs] that Defendant TISCHLER did engage in acts of sexual harassment, they did not like it, and wanted it to stop. Nonetheless, Defendant HOSPITAL took no disciplinary action against Defendant TISCHLER and furthermore covered up his action by falsely reporting to the California Department of Public Health Services through its attorney that its investigation showed he had not engaged in sexual harassment."

As a result of the second investigation, Ms. Fisher's supervisors, associates and coworkers left the room when she entered, refused to speak to her, and told her that she was causing trouble for fellow employees. The Fishers complained to SPPH about this ostracism, but no action was taken.

After SPPH refused to take corrective action when placed on notice of Ms. Fisher's ostracism, Ms. Fisher terminated her employment at SPPH on October 31, 1986, because of intolerable working conditions.

Ms. Fisher alleges that she and SPPH had an "economic relationship whereby she would be paid wages in exchange for which she would perform services as a surgical nurse . . . as a part of the relationship [she] had a duty . . . to act as the patient's advocate to insure the patient would receive competent medical care." Ms. Fisher further alleges that Dr. Tischler "embarked on a course of intentional conduct . . . designed to disrupt the relationship between Plaintiff and [SPPH] and to interfere with Plaintiff's duty to protect patient care."

In 1982, Dr. Brow, who receives many referrals from Dr. Tischler, stated openly that he "would no longer provide any medical services to patients even if they were his own when Dr. Fisher requested the services" because Dr. Fisher had harassed Dr. Tischler by reporting Tischler to SPPH. This practice continued to late 1986.

"Defendant BROW actually disrupted the relationship by forcing Dr. Fisher to seek out other physicians for examinations and histories and for medical care on numerous occasions from 1983 to October 1986, thereby threatening the welfare of Dr. Fisher's patients. On one occasion in March 1986, when Dr. Brow was the pediatrician on call, he threatened the life of a young patient of Dr. Fisher by refusing to examine the child."

When Dr. Fisher complained to SPPH about Dr. Brow's actions, it refused to take any corrective action. SPPH refused to renew Dr. Fisher's lease for the office he had rented for many years after he filed a complaint with the Department of Fair Employment and Housing. The office remained vacant at the time the second amended complaint was filed.

Dr. Fisher alleges that he has an economic relationship with SPPH "whereby he was granted staff privileges to perform dental surgery and [SPPH] would receive income from Dr. Fisher's patients. Part of Dr. Fisher's responsibilities was to insure his patients received competent medical care." Dr. Brow's intentional acts were designed "to disrupt the relationship [Dr. Fisher] had with [SPPH] and with his patients."

On July 14, 1987, in response to SPPH's motion for a protective order to prevent plaintiffs' attorney from communicating with SPPH's employees, the court ordered that: "the parties agree on a referee who will have full power to pass on whether the plaintiff will be able to contact a specific employee."

On September 10, 1987, the court stayed plaintiffs' taking depositions until after it had ruled on the defendants' demurrers.

At the September 17, 1987, hearing on the first amended complaint, the trial court notified Ms. Fisher that she had failed to allege that Dr. Tischler's misconduct toward other women was either "systematic" or "pervasive." Plaintiffs' counsel indicated that there were no additional facts which could be pled in support of the cause of action for sexual harassment. Plaintiffs' counsel indicated that she would like to test her complaint on appeal and stated that her "inclination right now is to elect to stand by my complaint, at least on Julie's cause of action [for environmental sexual harassment]." In response, the court stated that: "[I] want to see a lot of new stuff," and "I want the concerns that I have spent about an hour addressing . . . examined and I want them responded to."

The material facts alleged in the second amended complaint are not significantly different from the facts alleged in the first amended complaint. On December 29, 1987, the court sustained without leave to amend the demurrers of all three defendants to the second amended complaint. The court found that Ms. Fisher's claims were preempted by the Workers' Compensation Act and barred by the statute of limitations. The court noted that: "[Ms. Fisher] alleges essentially a vicarious disgust of Tischler but vicarious disgust is not actionable in the context of sexual harassment— there must be an 'harasser' [sic] and an [sic] 'harassee' . . . her vicarious

reaction to the travail of others is not sexual harassment directed to her for which she may have a cause of action."

The court ruled the same on Dr. Tischler's demurrer, noting that the world is full of "offensive jackasses but there is no tort for being offensive." The court found that Dr. Brow was not under a duty to make referrals to, or accept patient referrals from, Dr. Fisher.

Amicus curiae briefs were filed by the Fair Employment and Housing Commission (addressing the issues of whether or not a woman had to be the direct target of work environment harassment to bring a claim and whether the FEHA causes of action are preempted by the Workers' Compensa[1] Act—Lab. Code, § 3200 et seq.) and by the Employment Law Center[2] (addressing the issue of workers' compensation preemption).

## CONTENTIONS

1. Whether Ms. Fisher has a claim for environmental sexual harassment under the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.)[3] against SPPH and Dr. Tischler. (First cause of action.)

2. Whether Ms. Fisher has a claim for retaliation under the FEHA against SPPH. (First cause of action.)

3. Whether Ms. Fisher has a claim for interference with business relations against Dr. Tischler. (Second cause of action.)

4. Whether Ms. Fisher has a claim for emotional distress against SPPH and Dr. Tischler.[4] (Fifth cause of action.)

5. Whether Dr. Fisher has a claim for retaliation under the FE against SPPH and Dr. Brow. (Third cause of action.)

6. Whether Dr. Fisher has a claim for interference with business relations against Dr. Brow. (Fourth cause of action.)

7. Whether Dr. Fisher has a claim for emotional distress against SPPH and Dr. Brow. (See fn. 3, ante.) (Sixth cause of action.)

---

[1] Unless otherwise noted, all statutory references are to the Government Code.
[2] On appeal, Ms. Fisher abandoned her claim for emotional distress against Dr. Brow and Dr Fisher abandoned his claim for emotional distress against Dr. Tischler.



## DISCUSSION

### I. Standard of Review

(2) It is well settled that a general demurrer admits the truth of all material factual allegations in the complaint and that the question of plaintiffs' ability to prove these allegations, or the possible difficulty in making such proof, does not concern the reviewing court. (*Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496 [86 Cal.Rptr. 88, 468 P.2d 216].) The plaintiffs need only plead facts showing that they may be entitled to some relief. (*Ibid.*)

The complaint should be liberally, but reasonably construed. (*Dale v. City of Mountain View* (1976) 55 Cal.App.3d 101, 105 [127 Cal.Rptr. 520].) While a demurrer admits all material and issuable facts, it does not admit contentions, deductions or conclusions of law. (*Ibid.*) If the plaintiffs pled facts entitling them to relief, then the trial court erred in sustaining defendants' demurrers and dismissing defendants from the case.

(3) Plaintiffs' claims for harassment and retaliation are founded on the provisions of FEHA and are based exclusively on that statutory scheme since FEHA is not a codification of preexisting common law. (*Gay Law Students Assn. v. Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458, 490 [156 Cal.Rptr. 14, 595 P.2d 592].) Accordingly, we apply the general rule that facts in support of each of the requirements of a statute upon which a cause of action is based must be specifically pled. (*G.H.I.I. v. MTS, Inc.* (1983) 147 Cal.App.3d 256, 273 [195 Cal.Rptr. 211, 41 A.L.R.4th 653].)

Plaintiffs' counsel steadfastly refused to amend the complaint to contain the detail necessary to show that the harassment was "severe" and "pervasive" even after the court indicated to counsel at the hearing on the first amended complaint that it wanted those concerns addressed. Plaintiffs' counsel indicated that there were no additional facts which could be pled in support of the cause of action for sexual harassment and that she would stand by the complaint. The material facts alleged in the second amended complaint are not significantly different from the facts alleged in the first amended complaint. Normally, we would presume that plaintiffs have stated their case as strongly as it can be stated and would resolve all ambiguities and uncertainties against them. (*Shapiro v. Wells Fargo Realty Advisors* (1984) 152 Cal.App.3d 467, 474 [199 Cal.Rptr. 613] disapproved on another point in *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 688, 700, fn. 42 [254 Cal.Rptr. 211, 765 P.2d 373].)

However, not only is this case one of first impression, but the trial judge was without guidelines as to the specific details needed to be pled to

establish a cause of action for environmental sexual harassment. Furthermore, although the trial judge warned plaintiffs' counsel that the complaint was deficient in that it did not allege that Dr. Tischler's misconduct toward other women was either "systematic" or "pervasive," the court's ruling was based on the fact that the sexual harassment was not directed to Ms. Fisher. Therefore, we will order the trial court to grant plaintiffs leave to amend certain causes of action of their complaint.

### II. Environmental Sexual Harassment

The touchstone of this appeal is Ms. Fisher's contention that pursuant to FEHA, even though she was not the direct victim of sexual harassment, she pled a cause of action for environmental sexual harassment as recognized by the United States Supreme Court in *Meritor Savings Bank v. Vinson* (1986) 477 U.S. 57 [91 L.Ed.2d 49, 106 S.Ct. 2399]. As discussed in this opinion, we conclude that Ms. Fisher did not successfully plead a cause of action for environmental sexual harassment.

"The FEHA establishes a comprehensive scheme for combating employment discrimination. [Citations.] As a matter of public policy, the FEHA recognizes the need to protect and safeguard the right and opportunity of all persons to seek and hold employment free from discrimination (§ 12920.) [The Supreme Court] has declared that policy to be 'fundamental.' [Citation.]" (*Brown v. Superior Court* (1984) 37 Cal.3d 477, 485 [208 Cal.Rptr. 724, 691 P.2d 272].)

"Moreover, the opportunity to be free from discriminatory practices in seeking, obtaining, and holding employment is a 'civil right.' (§ 12921.) Employment discrimination 'foments domestic strife and unrest, deprives the state of the fullest utilization of its capacities for development and advance, and substantially and adversely affects the interest of employees, employers, and the public in general.' (§ 12920.) The express purpose of FEHA is to provide effective remedies which will eliminate such discriminatory practices.' (*Ibid.*) In addition, the Legislature has directed that the FEHA is to be construed 'liberally' so as to accomplish its purposes. (§ 12993.)" (37 Cal.3d at p. 486.)

FEHA prohibits a variety of unfair labor practices including discrimination "in terms, conditions or privileges of employment" on the basis of sex. (§ 12940, subd. (a).)[4] Furthermore, FEHA prohibits an employer from

[4] When we refer to section 12940, we are referring to former section 12940 (Stats. 1985, ch. 1151, § 2, p. 3891), the applicable statute in this matter. Effective January 1, 1988, section 12940 was amended with a minor wording change, the deletion of subdivision (h), and the re-

harassing an employee on the basis of sex, holds an employer liable for harassment of an employee by another employee if the employer knew or should have known of the harassment and failed to take immediate and appropriate corrective action, requires the employer to take all reasonable steps to prevent harassment from occurring, and prohibits retaliation against any person opposing any forbidden practice. (§ 12940, subds. (f), (h) and (j).)[1]

There are no California reported decisions addressing the issue of the requirements necessary to plead a cause of action for sexual harassment based on a hostile work environment. Accordingly, we look to both federal law and decisions of the California Fair Employment Housing Commission (hereafter FEHC) for guidance.

(4) "Although the wording of the Fair Employment Housing Act and title VII of the federal Civil Rights Act of 1964 (see 42 U.S.C. § 2000e et seq.) differs in some particulars, the antidiscriminatory objectives and the overriding public policy purposes are identical and we refer to those federal decisions where appropriate." (*County of Alameda v. Fair Employment & Housing Com.* (1984) 153 Cal.App.3d 499, 504 [200 Cal.Rptr. 381].)

(5) "[T]he administrative interpretation of a statute will be accorded great respect by the courts and will be followed if not clearly erroneous. . . . [However,] [t]he ultimate interpretation of a statute is an exercise of the judicial power." (*Bodinson Mfg. Co. v. California E. Com.* (1941) 17 Cal.2d 321, 325-326 [109 P.2d 935].)

FEHC has observed that where title VII precedent does not appear sound, or conflicts with the essential purposes of FEHA, FEHC does not rely on it. (*DFEH v. Church's Fried Chicken, Inc.* (1987) FEHC No. 87-18 at p. 12.) We note FEHC's unique procedural setting under the FEHA in which all but a very few of the cases prosecuted to the FEHC are heard by

---

designation of the remaining subdivisions (See Historical Note, 33 West's Ann. Gov. Code (1980 pocket supp.) § 12940, p. 80.)

In relevant part, these subdivisions provided that it was an unfair labor practice for an employer: (f) "to discharge, expel, or otherwise discriminate against any person because the person has filed a complaint, testified, or assisted in any proceeding under this part;"

(h) "or any other person, because of . . . sex . . . to harass an employee or applicant. Harassment of an employee or applicant by an employee other than an agent or supervisor shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action. An entity shall take all reasonable steps to prevent harassment from occurring. Loss of tangible job benefits shall not be necessary in order to establish harassment."

(j) "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring."

an administrative law judge sitting alone and come before FEHC only after a full evidentiary hearing. (*Id.*, at p. 13.) Accordingly, we will view these precedents with caution since the instant matter is before us at the pleading stage.

(6) Courts have generally recognized two distinct categories of sexual harassment claims: quid pro quo and hostile work environment. (*Hicks v. Gates Rubber Co.* (10th Cir. 1987) 833 F.2d 1406, 1413.) Quid pro quo harassment occurs when submission to sexual conduct is made a condition of concrete employment benefits. (*Ibid.*) There is no claim of quid pro quo harassment in the instant case.

The United States Supreme Court held that a plaintiff may establish a violation of title VII by proving that discrimination based on sex had created a hostile or abusive work environment regardless of whether the plaintiff suffered tangible or economic loss. (*Meritor Savings Bank v. Vinson, supra,* 477 U.S. 57, 58, 66 [91 L.Ed.2d 49, 54, 59].)

In determining that noneconomic injury was actionable, the United States Supreme Court looked to title VII and Equal Employment Opportunity Commission (hereafter EEOC) guidelines. Like section 12940, subdivision (a) of FEHA, title VII prohibits discrimination based on sex with respect to "compensation, terms, conditions, or privileges" of employment. (42 U.S.C. § 2000e-2(a)(1).) The United States Supreme Court noted that "Title VII is not limited to 'economic' or 'tangible' discrimination. The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent '". . to strike at the entire spectrum of disparate treatment of men and women in employment.'"" (477 U.S. at p. 64 [91 L.Ed.2d at p. 58].)

Under EEOC guidelines, sexual harassment includes: "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." 29 CFR § 1604.11(a) (1985) . . . such sexual misconduct constitutes prohibited 'sexual harassment,' . . . where 'such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.' § 1604.11(a)(3)." (477 U.S. at p. 65 [91 L.Ed.2d at pp. 58-59].) The general goal of the EEOC guidelines is prevention. (*Bundy v. Jackson* (D.C. Cir. 1981) 641 F.2d 934, 947 [205 App.D.C. 441].)

FEHC stated that: "As our regulations make clear, almost any type of conduct may constitute sexual harassment. The potential range includes, but is not limited to, conduct which is verbal, physical, or visual, where the focus is sex, as well as the proffering of unwanted sexual advances, and conditioning employment benefits on the victim's acquiescence. (Cal-

608



Admin. Code, tit. 2, § 7287.6, subd. (b)(1) and § 7291.1, subd. (f)(1).)" (DFEH v. Bee Hive Answering Service (1984) FEHC No. 84-16 at p. 18.)

FEHC recognizes a cause of action for work environment sexual harassment. (See cases collected in DFEH v. Bee Hive Answering Service, supra, FEHC No. 84-16 at p. 16.) The FEHC held that "conduct amounting to sexual harassment which deprives its victims of this substantial benefit [to a discrimination-free work environment pursuant to Cal. Admin. Code, tit. 2, § 7286.5, subd. (f)(3) and § 7287.6] is itself unlawful under [FEHA], whether or not the harassment also results in the loss of some more tangible employment benefit." (Id., at p. 17.) FEHA specifically provides that: "Loss of tangible job benefits shall not be necessary in order to establish harassment." (§ 12940, subd. (i).)

FEHC reasoned that: "Sexual harassment creates a hostile, offensive, oppressive, or intimidating work environment and deprives its victim of her statutory right to work in a place free of discrimination, when the sexually harassing conduct sufficiently offends, humiliates, distresses or intrudes upon its victim, so as to disrupt her emotional tranquility in the workplace, affect her ability to perform her job as usual, or otherwise interferes with and undermines her personal sense of well-being." (DFEH v. Bee Hive Answering Service, supra, FEHC No. 84-16 at pp. 18-19.)

(7a) We conclude that pursuant to FEHA, under certain circumstances, the creation of an offensive or hostile work environment due to sexual harassment can violate FEHA irrespective of whether the complainant suffers tangible job detriment.

We adopt the requirements for a prima facie claim of environmental sexual harassment set out in Priest v. Rotary (N.D.Cal. 1986) 634 F.Supp. 571, 582, and Henson v. City of Dundee (11th Cir. 1982) 682 F.2d 897, 903-905. (8) (See fn. 6.) The elements are: (1) plaintiff belongs to a protected group; (2) plaintiff was subject to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the harassment complained of was sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment; and (5) respondeat superior.[6]

[4] "Under FEHA, an employer is "strictly liable for the harassing conduct of its agents and supervisors." (DFEH v. Bee Hive Answering Service, supra, FEHC No. 84-16 at p. 23.) The standard for coworker liability is that an employer is liable where it, its agents or supervisors "'knows or should have known of this conduct and fails to take immediate and appropriate corrective action.'" (DFEH v. Madera County, supra, FEHC No. 88-11 at p. 22.)

[5] SPPH asserts that it is not liable for the misconduct of Dr. Tischler as it was neither an employer nor an agent of the hospital, but rather an independent contractor and such is excluded from the definition of employer under FEHA regulations. FEHC regulations state that an employee is: "Any individual under the direction and control of an employer under

609

### III. Plaintiffs' Claims

#### A. Ms. Fisher Has Not Pled a Cause of Action for Environmental Sexual Harassment or Retaliation

##### 1. Environmental sexual harassment

The critical question in the instant case is whether Ms. Fisher pled sufficient facts to establish that an atmosphere of pervasive or severe sexual harassment existed in her work environment at SPPH. "For [hostile work environment] sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment.'" (Meritor Savings Bank v. Vinson, supra, 477 U.S. 57, 67 [91 L.Ed.2d 49, 60].)

(7b) Whether the sexual conduct complained of is sufficiently pervasive to create a hostile or offensive work environment must be determined from the totality of the circumstances. (Henson v. City of Dundee, supra, 682 F.2d 897, 904.) The plaintiff must prove that the defendant's conduct would have interfered with a reasonable employee's work performance and would

any appointment or contract of hire or apprenticeship, express or implied, oral or written ... [¶] Employee does not include an independent contractor as defined in Labor Code Section 3353." (Cal.Code Regs., tit. 2, § 7286.5, subds. (b) and (b)(1).)

Labor Code section 3353 defines an independent contractor as "any person who renders service for a specified recompense for a specified result, under the control of his principal as to the result of his work only and not as to the means by which such result is accomplished." (Italics added.)

Whether Dr. Tischler is an independent contractor is an affirmative defense which must be asserted and proved by SPPH at the time of trial. (Cf. Germann v. Workers' Comp. Appeals Bd. (1981) 123 Cal.App.3d 776, 783 [176 Cal.Rptr. 868].) The determination of whether a person is an employee or an independent contractor is made based on a number of factors. (See discussion of determination of employment status in context of workers' compensation in S.G. Borello & Sons, Inc. v. Department of Industrial Relations (1989) 48 Cal.3d 341 360 [256 Cal.Rptr. 543, 769 P.2d 399].)

Whether a person is an independent contractor or an employee is a question of fact if dependent upon the resolution of disputed evidence or inferences. (48 Cal.3d at p. 349.) If the evidence is undisputed, the question becomes one of law. (Ibid.) Of course, in the instant case, the determination of whether Dr. Tischler is an employee will be made in the context of the purposes behind FEHA, not workers' compensation. (Id., at p. 354.)

The complaint alleges that SPPH's board of directors is composed of its agents and a doctor, that the board has the responsibility to insure that the members of the medical staff are of high ethical character and that there is an employee manual which prohibits sexual harassment of employees and promises disciplinary action against the perpetrator. If plaintiffs can prove these allegations, we express grave doubts as to SPPH's ability to prove that doctors are independent contractors so as to exempt SPPH from liability for sexual harassment of hospital employees by doctors.

Another district court noted that "the conduct complained of would have interfered with the work performance and would have seriously affected the psychological well-being of a



FISHER v. SAN PEDRO PENINSULA HOSPITAL
214 Cal.App.3d 590; 262 Cal.Rptr. 842 [Oct. 1989]

have seriously affected the psychological well-being of a reasonable employee and that she was actually offended. (*Ross v. Double Diamond, Inc.* (N.D.Tex. 1987) 672 F.Supp. 261, 270.)

(9) The factors that can be considered in evaluating the totality of the circumstances are: (1) the nature of the unwelcome sexual acts or works (generally, physical touching is more offensive than unwelcome verbal abuse); (2) the frequency of the offensive encounters; (3) the total number of days over which all of the offensive conduct occurs; and (4) the context in which the sexually harassing conduct occurred. (672 F.Supp. at pp. 270-271.)

In determining what constitutes "sufficiently pervasive" harassment, the courts have held that acts of harassment c'' "not be occasional, isolated, sporadic, or trivial, rather the plaintiff mus.    how a concerted pattern of harassment of a repeated, routine or a generalized nature. (*Downes v. F.A.A.* (D.C. Cir. 1985) 775 F.2d 288, 293 [243 App.D.C. 323].)

"[W]hile an employee need not prove tangible job detriment to establish a sexual harassment claim, the absence of such detriment requires a commensurately higher showing that the sexually harassing conduct was pervasive and destructive of the working environment." (*Jones v. Flagship Intern.* (5th Cir. 1986) 793 F.2d 714, 720.)

(10) There is dicta in *Vinson v. Taylor* (D.C. C. 1985) 753 F.2d 141, affirmed in part and reversed in part sub nom. *Meritor Savings Bank v. Vinson, supra,* 477 U.S. 57 that: "Even a woman who was never herself the object of harassment might have a Title VII claim if she were forced to work *in an atmosphere in which such harassment was pervasive*." (*Id.,* at p. 146.) Such a claim would require an even higher showing than a claim where there was no tangible job detriment by one who had been sexually harassed. It would be necessary to establish that the sexually harassing conduct permeated the plaintiff's direct work environment.

"Evidence of the general work atmosphere, involving employees other than the plaintiff, is relevant to the issue of whether there existed an atmosphere of hostile work environment. . . ." (*Broderick v. Ruder* (D.D.C. 1988) 685 F.Supp. 1269, 1277.) Therefore, one who is personally subjected

—————————

*reasonable female employee."* (Italics added.) (*Spencer v. General Elec. Co.* (E.D.Va. 1988) 697 F.Supp. 204, 218.)

We conclude that when evaluating a sexual harassment claim, a reasonable employee is one of the same sex as the plaintiff.

This is not intended to indicate that the direct victim of the sexually harassing conduct is somewhat misleading as an employee who is subjected to a hostile work environment is a victim of sexual harassment even though no offensive remarks or touchings are directed to or perpetrated upon that employee

FISHER v. SAN PEDRO PENINSULA HOSPITAL
214 Cal.App.3d 590; 262 Cal.Rptr. 842 [Oct. 1989]

to offensive remarks and touchings can establish a hostile work environment by showing that harassment existed in the place of employment. However, one who is not personally subjected to such remarks or touchings must establish that the harassing conduct and that it was in her immediate work environment.

For instance, *it is not enough* to allege that harassment occurred *in the hospital,* a plaintiff who is not a direct victim must also allege exactly what occurred in her presence or in her immediate work environment and describe that work environment. In other words, if Ms. Fisher knew that Dr. Tischler was harassing nurses when he was in the operating room, but she did not work with him in that operating room, she would not have been exposed to a hostile work environment.

Courts have concluded that a hostile work environment existed where there was a pattern of continuous, pervasive harassment. (See e.g., *Meritor Savings Bank v. Vinson, supra,* 477 U.S. 47, 60 [91 L.Ed.2d 49, 55] [The plaintiff had agreed to 40 or 50 acts of intercourse with her supervisor after repeated demands for sexual favors. The supervisor also "fondled her in front of other employees, followed her into the women's restroom when she went there alone, exposed himself to her, and even forcibly raped her on several occasions."]; *Hall v. Gus Const. Co., Inc.* (8th Cir. 1988) 842 F.2d 1010, 1012 [Constant verbal abuse, requests for sexual relations, unwanted touching directed to female traffic controllers at construction site and urinating in plaintiffs' water bottles and gas tanks.]; *Broderick v. Ruder, supra,* 685 F.Supp. 1269, 1277-78 [Plaintiff, who was sexually harassed by several male supervisors, showed pervasive nature of conduct by establishing that *employer afforded preferential treatment to female employees who submitted to sexual advances or other sexual conduct and such conduct was a matter of common knowledge.*]; *Yates v. Avco Corp.* (6th Cir. 1987) 819 F.2d 630, 632 [Supervisors' constant rude comments to and request or sexual favors from plaintiffs.]; *Katz v. Dole* (4th Cir. 1983) 709 F.2d 254 [Coworkers' systematic infliction of extremely vulgar and offensive sexual slurs and insults to a female air traffic controller.]; *Henson v. City of Dundee, supra,* 682 F.2d 897 [Police chief's numerous harangues and demeaning sexual inquiries as well as repeated requests that plaintiff have sexual relations with him.]; *Bundy v. Jackson, supra,* 641 F.2d 934, 940, 943 [Sexually stereotyped insults such as "any man in his right mind would want to rape you" and propositions directed to plaintiff by her supervisors over a two-year period amounted to the "standard operating procedure" of the agency.].)

On the other hand, courts have concluded that isolated instances of sexual harassment do not constitute a hostile work environment. (See, e.g.,



Case 3:99-cv-01151-W-RBB   Document 21   Filed 01/25/00   PageID.533   Page 60 of 122

*Jones v. Flagship Intern., supra,* 793 F.2d 714, 716 [supervisor's two suggestive remarks and a single proposition of plaintiff]; *Rabidue v. Osceola Refining Co.* (6th Cir. 1986) 805 F.2d 611, 615, 622 [Even though coworker was extremely vulgar and crude and in confrontation posture with plaintiff and nude photos were present, totality of the workplace was not affected.]; *Scott v. Sears, Roebuck & Co.* (7th Cir. 1986) 798 F.2d 210, 214 [isolated winks, suggestive remarks and a coworker's single request for a date with plaintiff]; *Downs v. F.A.A., supra,* 775 F.2d 288, 293 [Defendant engaged in mildly offensive verbal conduct on three occasions and twice touched plaintiff's hair].)

FEHC has likewise found environmental sexual harassment in cases where a pattern of continuous harassment existed. (See e.g., *DFEH v. Fresno Hilton Hotel* (1984) FEHC No. 84-03 [Complainant's supervisor harassed her virtually every day for nine months by making repeated demands for sexual favors and by fondling and kissing her.]; *DFEH v. Del Mar Avionics* (1985) FEHC No. 85-19 [Supervisor engaged in "regular stream" of sexual and racial comments including one particularly vulgar verbal attack.]; *DFEH v. Jack's Restaurant* (1984) FEHC No. 84-08 [restaurant owner's numerous sexually suggestive and explicit comments, fondling of and repeated requests for dates with complainant waitress over a period of approximately one year]; *DFEH v. Bee Hive Answering Service, supra,* FEHC No. 84-16 [incessant stream of sexual comments, unwanted touchings and propositions directed to plaintiff as well as outbursts of rage upon rejection]; *DFEH v. Hart and Starkey Inc.* (1984) FEHC No. 84-23 [Four complainants were constantly subjected to supervisor's sexual comments, unwanted touchings and explicit propositions]; *DFEH v. Rockwell International Corp.* (1987) FEHC No. 87-34 [supervisor's repeated sexual comments about and directed to complainant and repeated requests that complainant go out with him].)

(11) Ms. Fisher alleged that Dr. Tischler created a hostile work environment for her by his sexual harassment of other women employees in her presence. Ms. Fisher's entire factual basis for this claim is contained in one paragraph which alleges that Dr. Tischler's acts included: "[P]ulling nurses onto his lap, hugging and kissing them while wiggling, making offensive statements of a sexual nature, moving his hands in the direction of [a] woman's vaginal area, grabbing women from the back with his hands on their breasts or in the area of their breasts, picking up women and swinging them around, throwing a woman on a gurney, walking up closely behind a woman with movements of his pelvic area. [Ms. Fisher] saw him commit acts of sexual harassment against [three named] nurses. The acts were committed in hallways, the operating room, and the lunch room of [SPPH] from 1982 to 1986. None of the women welcomed the advances and

indicated to [Dr. Tischler] they were offensive by moving away from him, avoiding him whenever possible, or telling him to stop. Julie also was forced to hear [Dr. Tischler] make lewd remarks about the breasts of anesthetized female patients."

Even at the pleading stage, such allegations are simply not sufficient to establish a cause of action for environmental sexual harassment since none of the acts were directed at Ms. Fisher. We are cognizant that the trial court stayed discovery. However, in the instant case, the testimony of other employees about Dr. Tischler could only corroborate Ms. Fisher's observations. Ms. Fisher could not have suffered from working in a hostile environment unless she was personally exposed to it. It is not sufficient to plead a pattern of sexual harassment existed at SPPH. Ms. Fisher, being percipient, should have been able, and was properly required to plead, to allege sufficient facts to establish that *her work environment* was permeated by sexual harassment.

Given the case with which these claims can be made despite their serious nature, as a matter of fairness, a plaintiff should be required to plead sufficient facts to establish a nexus between the alleged sexual harassment of others, her observation of that conduct and the work context in which it occurred.

Although the complaint describes in general terms what acts occurred and where they occurred, it only alleges in a most conclusionary manner that Ms. Fisher saw Dr. Tischler commit sexual harassment against three named nurses. What acts she observed are not detailed and are left to the imagination. Even though it is reasonable to assume that she observed Dr. Tischler commit all the alleged acts, the complaint is deficient as there is no indication of the frequency or intensity with which these acts occurred.

Did each alleged act occur once in four years or did the acts occur on a daily or weekly basis? Which acts occurred with any frequency—the remarks or the offensive touchings? What acts occurred within the FEHA's one-year statute of limitations (§ 12960)? Although acts beyond the statute of limitations might be relevant to showing a pattern of continuous harassment (see *Spencer v. General Elec. Co., supra,* 697 F.Supp. 204, 218, fn. 17), if only a couple of acts occurred during the one year preceding the filing of the complaint, then Ms. Fisher cannot properly plead a claim for environmental sexual harassment.

Again, only a legal conclusion is pled regarding the alleged remarks. What lewd remarks did Tischler make about the breasts of anesthetized female patients; exactly what were the offensive statements of a sexual

The retaliatory motive is "proved by showing that plaintiff engaged in protected activities, that his employer was aware of the protected activities, and that the adverse action followed within a relatively short time thereafter." (*Jones v. Lyng* (D.D.C. 1986) 669 F.Supp. 1108, 1121.) "The causal link may be established by an inference derived from circumstantial evidence, 'such as the employer's knowledge that the [employee] engaged in protected activities and the proximity in time between the protected activities and allegedly retaliatory employment decision.'" (*Jordan v. Clark* (9th Cir. 1988) 847 F.2d 1368, 1376.)

Citing *Henson v. City of Dundee*: *supra*, 682 F.2d 897 and *Katz v. Dole*, *supra*, 709 F.2d 251, Ms. Fisher argues that an employer is liable supervisors or coworkers retaliate by creating a hostile work environment. These cases are inapposite as neither case deals with retaliation.

These cases stand in part for the proposition that when an employee seeks to hold an employer responsible for a hostile environment, the employee must show that the employer knew or should have known of the harassment in question; an employer's knowledge can be demonstrated by showing the pervasiveness of the harassment, which gives rise to an inference of knowledge or constructive knowledge. (*Henson v. City of Dundee, supra*, 682 F.2d 897, 905; *Katz v. Dole, supra*, 709 F.2d 251, 255.)

However, SPPH might be liable for retaliation amounting to a hostile work environment if Ms. Fisher can establish that the hostile work environment was created as retaliation for her complaints regarding sexual harassment. (See *Monge v. Superior Court* (1986) 176 Cal.App.3d 503, 507 [221 Cal.Rptr. 64].) (13) Ostracism, of course, does not amount to a hostile environment, and no cause of action can be pled on that basis alone.

B. Dr. Fisher Has Pled a Cause of Action for Retaliation Against SPPH, but Not Against Dr. Brow.

1. Dr. Brow

(14a) Section 12940, subdivision (f) prohibits retaliation by an employer against *any person* opposing any forbidden practice or filing an FEHA complaint. Dr. Brow was a coworker of Dr. Fisher's, not his employer. Accordingly, any retaliation he took was not actionable under FEHA.

Effective January 1, 1988, section 12940, subdivision (f) was amended so that it is now also an unfair labor practice for "any person" to retaliate against a person who opposes any forbidden practice. (15) "It is settled ... that no statute is to be given retroactive effect unless the Legislature

nature? Despite the fact that Dr. Tischler ceased his harassment of Ms. Fisher after she complained, she lodged no complaint about his harassment of others even though the acts took place over several years. Although Ms. Fisher alleges that the acts occurred in the hospital and a conclusion that Dr. Tischler controlled Ms. Fisher's employment by giving her orders and making recommendations about her performance, no facts are alleged about the size of the hospital or the size of its staff, how often Ms. Fisher was in Tischler's presence or what were the circumstances of the surroundings—did she observe these acts in passing or did they occur when she was required to work with Tischler? In *Spencer v. General Elec. Co., supra*, 697 F.Supp. 204, 218, footnote 17, rampant sexual horseplay in a confined trailer office was determined to be sufficient to establish a hostile environment. Hallways, and a lunch room do not connote a confined environment.

As alleged, the facts show aberrant behavior by one doctor over an extended period. We are swift to agree with Justice Johnson in his concurring opinion that the alleged conduct of Dr. Tischler is more than just sophomoric antics but if proved consists of egregious, hostile and unacceptable conduct. However, these facts, no matter how they are characterized, are more like isolated incidents and do not sufficiently plead that Ms. Fisher was subjected to a pattern of pervasive sexual harassment. Our concern is with the insufficiency of the pleading and the nexus between the alleged acts and Ms. Fisher's work environment.

If Ms. Fisher can properly plead a cause of action for environmental sexual harassment, then she will have pled the predicate behavior for constructive discharge (*Young v. Southwestern Savings and Loan Association* (5th Cir. 1975) 509 F.2d 140, 144 and *DFEH v. Jack's Restaurant, supra,* FEHC No. 84-08 at p. 9) and failure to take appropriate corrective action. (§ 12940, subds. (i) and (j).)[10]

2. Retaliation

(12) To establish a prima facie case of retaliation, a plaintiff must show that she engaged in a protected activity, that she was thereafter subjected to adverse employment action by her employer, and there was a causal link between the two. (*Wrighten v. Metropolitan Hospitals, Inc.* (9th Cir. 1984) 726 F.2d 1346, 1354.)

[9] Since FEHA has a one-year statute of limitations (§ 12960), the plaintiff's have no cause of action for Dr. Tischler's alleged harassment of Ms. Fisher in 1982 nor SPPH's alleged failure to take corrective action at that time

[10] Whether SPPH took immediate and appropriate corrective action and all the reasonable steps to prevent harassment from occurring are questions of fact to be decided at the time of trial, not at the pleading stage.

Case 3:99-cv-01151-W-RBB   Document 21   Filed 01/25/00   PageID.535   Page 62 of 122

has expressly so declared." (DiGenova v. State Board of Education (1962) 57 Cal.2d 167, 174 [18 Cal.Rptr. 369, 367 P.2d 865].) **(14b)** There is no such expression in the amendment to section 12940; therefore, it is not applicable to the matter before us.

For the first time in the reply brief, Dr. Fisher asserts that Dr. Brow is liable for retaliation against Dr. Fisher under section 12940, subdivision (g).[11] **(16)** The rule is that points raised in a reply brief for the first time will not be considered unless good cause is shown for the failure to present them before. (Balboa Ins. Co. v. Aguirre (1983) 149 Cal.App.3d 1002, 1009 [197 Cal.Rptr. 250].)

## 2. SPPH

**(17)** First of all, Dr. Fisher argues that SPPH retaliated against him for his complaints about Dr. Brow because it did not take action against Dr. Brow's retaliation in refusing to examine Dr. Fisher's patients. Dr. Fisher has no cause of action based on retaliation by another doctor.

Dr. Fisher's cases are inapposite. De Medina v. Reinhardt (D.D.C. 1978) 444 F.Supp. 573, proscribes employer retaliation against a third party for opposing forbidden practices. (Id., at p. 580.) As already noted Dr. Brow is not an employer. Dr. Fisher is not a third party against whom an employer retaliated, rather he is a party who allegedly suffered retaliation by a third party (Dr. Brow).

Dr. Fisher argues that under Elam v. College Park Hospital (1982) 132 Cal.App.3d 332 [183 Cal.Rptr. 156], SPPH has a duty to insure that staff doctors do not retaliate against fellow doctors who protest discriminatory employment practices. Elam holds that a hospital can be held liable to a patient for negligently screening the competency of its medical staff to insure the adequacy of medical care rendered to patients. (Id., at pp. 340-341.) Dr. Fisher is not a patient, and we would not extend this corporate hospital liability for negligent acts to a suit for retaliation by another staff physician.

Second, Dr. Fisher argues that SPPH retaliated against him by refusing to renew his lease for the office he had rented for many years after he filed a complaint with the Department of Fair Employment and Housing (hereafter DFEH). The office remained vacant at the time the second amended complaint was filed.

[11] Section 12940, subdivision (g) provides that it is an unfair labor practice "[f]or any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this part, or to attempt to do so."

We note that Dr. Fisher did not plead the date when the FEHA complaint was filed or the date the lease was cancelled, that the lease was cancelled because he filed an FEHA complaint, or that SPPH knew that he filed the FEHA complaint. However, reading the complaint liberally, it is reasonable to infer that the reason SPPH refused to renew the lease was because of the FEHA complaint, especially since Dr. Fisher had occupied the office for many years, and it was still vacant when the second amended complaint was filed.

DFEH notifies an employer within 45 days after a complaint is filed (§ 12962.) In order to bring a civil suit, a complainant must have a "right to sue" letter which is issued by DFEH if an accusation is not issued o[r] acts taken within 150 days after the filing of the FEHA complaint (§ 12965, subd. (b); Dyna-Med, Inc. v. Fair Employment & Housing Com. (1987) 43 Cal.3d 1379, 1384 [241 Cal.Rptr. 67, 743 P.2d 1323].) Since the civil suit may be brought within one year of the letter (§ 12965, subd. (b)) we assume that the lease was cancelled shortly after SPPH knew of Dr. Fisher's filing an FEHA complaint. Failure to renew an office lease affects a condition of employment and is the type of conduct proscribed by former section 12940, subdivision (f).

Although under the principle of a liberal reading of the complaint, Dr. Fisher has probably alleged a cause of action for retaliation against SPPH based on the cancellation of his office lease, if plaintiffs decide to amend their complaint, they would be well advised to clarify that the lease was cancelled because of Dr. Fisher's complaint to DFEH and that SPPH knew of that complaint and cancelled the lease shortly thereafter.

## C. Neither Ms. Fisher nor Dr. Fisher Has Pled a Cause of Action for Intentional Infliction of Emotional Distress

**(18)** "The elements of a cause of action for intentional infliction of emotional distress are (1) outrageous conduct by the defendant, (2) intention to cause or reckless disregard of the probability of causing emotional distress, (3) severe emotional suffering, and (4) actual and proximate causation of the emotional distress." (Molko v. Holy Spirit Assn. (1988) 46 Cal.3d 1092, 1120 [252 Cal.Rptr. 122, 762 P.2d 46].)

Conduct is extreme and outrageous when it exceeds all bounds of decency usually tolerated by a decent society, and is of a nature which is especially calculated to cause, and does cause, mental distress. (46 Cal.3d at p. 1122.) Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. (Ibid.) **(19a)** Without



properly pled cause of action for sexual harassment, Ms. Fisher has not pled any outrageous conduct by either Dr. Tischler or SPPH.

FEHC infers a large measure of emotional injury from sexual harassment since sexual harassment is often inherently oppressive and malicious. (*DFEH v. Jack's Restaurant, supra,* FEHC No. 85-08 at pp. 12-13.) Given an employee's fundamental, civil right to a discrimination free work environment (§§ 12920, 12921), by its very nature, sexual harassment in the work place is outrageous conduct as it exceeds all bounds of decency usually tolerated by a decent society.

Accordingly, if properly pled, sexual harassment will constitute the outrageous behavior element of a cause of action for intentional infliction of emotional distress against Dr. Tischler. (See *Monge v. Superior Court, supra.* 176 Cal.App.3d 503, 507, 511.)

(20) An employer is liable for the wilful and malicious torts of its employees committed in the scope of employment. (*John R. v. Oakland Unified School Dist.* (1989) 48 Cal.3d 438, 447 [256 Cal.Rptr. 766, 769 P.2d 948].) (19b) Thus, if Ms. Fisher properly pleads an environmental sexual harassment cause of action, then she will have also pled sufficient facts to establish a claim against SPPH for intentional infliction of emotional distress. However, we note that in order to hold SPPH liable for Dr. Tischler's tort of intentional infliction of emotional distress, plaintiffs will have to prove that Ms. Fisher was a victim of sexual harassment, that Dr. Tischler is an employee of SPPH and that Dr. Tischler was acting within the scope of his employment. (*Ibid.*)

(21) Dr. Fisher has likewise not pled any facts showing any extreme and outrageous conduct. Dr. Fisher based his claim on the fact that SPPH cancelled his lease in retaliation for his filing an FEHA complaint and refused to prevent Dr. Brow from refusing to examine Dr. Fisher's patient, that Dr. Brow refused to examine his patients, and that Dr. Brow endangered a child's life by refusing to examine the child. Such acts are mere indignities or threats and do not evidence behavior beyond the bounds of decency. Thus, Dr. Fisher has no cause of action against either Dr. Brow or SPPH.

### D. Neither Ms. Fisher nor Dr. Fisher Has Pled a Cause of Action for Interference With Business Relations

(22) This tort is also called interference with prospective economic advantage. "The elements of the tort of intentional interference with prospective economic advantage are: (1) an economic relationship between the

plaintiff and some third person containing the probability of future economic benefit to the plaintiff, (2) knowledge by the defendant of the existence of the relationship, (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) damages to the plaintiff proximately caused by the acts of the defendant." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 330 [216 Cal.Rptr. 718, 703 P.2d 58].)

The actionable wrong lies in the inducement to break the contract or to sever the relationship. (*Buckaloo v. Johnson* (1975) 14 Cal.3d 815, 822 [122 Cal.Rptr. 745, 537 P.2d 865].) "[T]he defendant's motive is crucial (*Hoffman Co. v. E. I. Du Pont de Nemours & Co.* (1988) 202 Cal.App.3d 390, 402 [248 Cal.Rptr. 384].) "The plaintiff must not only plead and prove intentional acts, but also that such acts were *designed* to disrupt the formation of a prospective economic relationship." (Original italics.) (*Ibid.*)

"The interest protected . . . is the interest in reasonable expectations of economic advantage." (*Worldwide Commerce, Inc. v. Fruehauf Corp.* (1978) 84 Cal.App.3d 803, 808 [149 Cal.Rptr. 42].) The expectancies are limited to two basic situations. "One is the situation where the tortfeasor induces or otherwise purposely causes a third party not to enter into a business relation with the plaintiff. . . . In the second situation the plaintiff and a third party are already in a business relationship which is terminable at the will of the third party and the torfeasor induces or otherwise purposely causes the third party to terminate the relationship . . . ." (*Ibid.*)

(23) Ms. Fisher alleged that Dr. Tischler "embarked on a course of intentional conduct . . . designed to disrupt the relationship between Plaintiff and [SPPH] and to interfere with Plaintiff's duty to protect patient care." Ms. Fisher has pled a legal conclusion, not facts.

Ms. Fisher argues that Dr. Tischler created a hostile work environment which was designed to disrupt her relationship with SPPH. As already discussed, Ms. Fisher failed to allege a hostile work environment. Furthermore, even if properly pled there is no logical inference that Dr. Tischler intended to disrupt Ms. Fisher's relationship with SPPH by his harassment of other employees.

(24) Dr. Fisher alleged that Dr. Brow's intentional acts were designed "to disrupt the relationship [Dr. Fisher] had with [SPPH] and with his patients." Dr. Brow's intentional acts consisted of stating that he would not examine Dr. Fisher's patients because Dr. Fisher had harassed Dr. Tischler by reporting Tischler to SPPH. Dr. Fisher argues that Dr. Brow had a duty to perform medical examinations for Dr. Fisher's patients and to examine the

all sick children when Dr. Brow was on call regardless of whose patients they were.

Although Dr. Fisher alleged that Dr. Brow "actually disrupted the relationship by forcing Dr. Fisher to seek out other physicians . . . thereby threatening the welfare of Dr. Fisher's patients," there is no allegation that Dr. Fisher lost patients. Having to seek other physicians or threats to patient welfare are not the kind of *economic interest* which this tort was designed to protect. (See *Worldwide Commerce v. Fruehauf Corp., supra*, 84 Cal.App.3d 803, 810.) Nor is this analogous to a situation where a doctor is denied his right to pursue a profession by other competing doctors who conspire to keep patients from the doctor.

### E. No Cause of Action Supports Punitive Damages

(25) As pled, the only possible viable cause of action is for retaliation based upon SPPH's refusal to renew Dr. Fisher's office lease. Even though punitive damages are available in a civil action under FEHA where the defendant was guilty of oppression, fraud or malice under Civil Code section 3294 (*Commodore Home Systems, Inc. v. Superior Court* (1982) 32 Cal.3d 211, 215, 221 [185 Cal.Rptr. 270, 649 P.2d 912]), the facts of this case do not support punitive damages.

Punitive damages based on retaliation are permitted in *Monge v. Superior Court, supra*, 176 Cal.App.3d 503, in which the Court of Appeal reversed an order striking punitive damages allegations. The alleged retaliation was that defendant officers "engaged upon a systematic course of retaliation by 'creat[ing] an intimidating, hostile and offensive working environment for each of the Plaintiffs' that 'changed Plaintiffs' working environment, hours, lunch and other privileges, and demoted the Plaintiffs to lesser positions, all in retaliation against the Plaintiffs for their complaints regarding sexual harassment.'" (*Id.*, at p. 507.)

No similar acts are alleged in the instant case. Such a refusal does not amount to oppression or malice and is not like sexual harassment which in itself pleads the evil motive necessary to support punitive damages or emotional distress. (176 Cal.App.3d at p. 511.) Retaliation by itself is not equivalent to the indignities inflicted by sexual harassment, but must be evaluated by the acts of retaliation.

Although in *Monge*, the court looked to the meanings of "oppression" and "malice" in former Civil Code section 3294 to determine the sufficiency of the punitive damages allegations, the court's reasoning is instructive. The court noted that: "'Malice' means a wrongful intent to vex or annoy.

'Oppression' means 'subjecting a person to cruel and unjust hardship in conscious disregard of his rights.'" (176 Cal.App.3d at p. 511.) The court concluded that: "a deliberate intent on the part of defendants to sexually harass and then to retaliate against plaintiffs, causing them to suffer significant mental anguish on the job without regard for their right to be free from such oppressive and hostile employment conditions. . . pleads defendants' actions as having an unequivocally evil and mischievous motive. (*Ibid.*)

The recently amended Civil Code section 3294 will apply to the instant case. (Civ. Code, § 3294, subd. (e).) This section now defines "malice" as "conduct which is intended by the defendant to cause injury to the pl[...] or despicable conduct which is carried on by the defendant with a w[...] and conscious disregard of the rights or safety of others" and "oppression" as "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (Civ. Code, § 3294, subd. (c)(1) and (2).) (26) We conclude that sexual harassment is subjecting a person to cruel and unjust hardship in conscious disregard of that person's rights and therefore supports punitive damage allegations. (Cf. *Krieger v. Pacific Gas & Electric Co.* (1981) 119 Cal.App.3d 137, 148 [173 Cal.Rptr. 751].)

Accordingly, once again, if Ms. Fisher properly pleads a sexual harassment cause of action, she will plead sufficient facts to support punitive damages allegations against Dr. Tischler. However, in order to successfully plead punitive damage allegations against SPPH based on Dr. Tischler's acts, Ms. Fisher will have to plead facts to show that SPPH ratified those acts pursuant to Civil Code section 3294, subdivision (b).[11]

"Ratification . . . may be established by any circumstantial or direct evidence demonstrating adoption or approval of the employee's actio[...] the corporate agent. [Citations.] Such ratification may be inferred from ...[...] fact that the employer, after being informed of the employee's actions, does[...] not fully investigate and fails to repudiate the employee's conduct by re-dressing the harm done and punishing or discharging the employee. [Citations.]" (*DFEH v. Hart and Starkey, Inc., supra*, FEHC No. 84-23 at p. 37. (See fn. 9, *ante.*)

[11]SPPH asserts that Civil Code section 3294 is unconstitutional on its face because there is no legislatively prescribed maximum limit and no fixed standards. This argument was rejected a long time ago (*Toole v. Richardson-Merrell, Inc.* (1967) 251 Cal.App.2d 689, 719 [60 Cal.Rptr. 398, 29 A.L.R.3d 988].) With Subdivision (b)... "An employer shall not be liable for damages ... based upon acts of an employee ... unless the employer ... ratified the wrongful conduct.... With respect to a corporate employer, the ... ratification ... must be on the part of an officer, director, or managing agent of the corporation."

F. Workers' Compensation Preemption

(27) The court's finding that Ms. Fisher's claims were preempted by the Workers' Compensation Act was a correct one since she did not successfully plead an FEHA cause of action. Had Ms. Fisher pled a viable cause of action under FEHA, then preemption would not be applicable under our holding in *Jones v. Los Angeles Community College Dist.* (1988) 198 Cal.App.3d 794, 807-809 [244 Cal.Rptr. 37] and *Watson v. Dept. of Rehabilitation* (1989) 212 Cal.App.3d 1271 [261 Cal.Rptr. 204].

CONCLUSION

Ms. Fisher is being provided with an opportunity to amend only the first cause of action of the second amended complaint to include the specific detail necessary to establish a cause of action for environmental sexual harassment. Of particular concern is that she establish that the sexual harassment was pervasive by pleading facts showing a nexus between the alleged sexual harassment of others, her observation of the sexual harassment and its occurrence in her direct work environment. As indicated previously this appears to be a case of first impression and the trial judge and counsel are now armed with an appellate holding on the applicable law. We deem it prudent to allow the plaintiffs to file a third amended complaint in accordance with the holding herein.

If Ms. Fisher successfully pleads a cause of action for sexual harassment, then the fifth cause of action for intentional infliction of emotional distress against Dr. Tischler and SPPH will in turn be legally viable.

No leave will be granted to amend the sixth cause of action for infliction of emotional distress by Dr. Brow and SPPH as he has not alleged any outrageous conduct by those defendants directed to him.

Dr. Fisher is given leave to replead his third cause of action for retaliation against SPPH for cancellation of his office lease commensurate with the comments herein contained. Leave to amend by Dr. Fisher to plead a cause of action for retaliation against Dr. Brow is not granted since we hold that such a cause of action cannot be maintained under the facts of this case.

No leave will be granted to amend the second and fourth causes of action for interference with business relations as neither plaintiff can plead such a cause of action under the facts of this case.

DISPOSITION

The order of dismissal is reversed and remanded with directions to enter a new and different order dismissing the action against Dr. Brow, but

granting plaintiffs leave to amend the first cause of action for sex discrimination and granting Dr. Fisher leave to amend his third cause of action for retaliation, against SPPH, based on SPPH's cancellation of Dr. Fisher's office lease. Appellants to recover costs on appeal from defendants and respondents San Pedro Peninsula Hospital and Barry Tischler. Defendant and respondent, Frank Brow, is to recover costs on appeal from the appellants.

Lillie, P. J., concurred.

JOHNSON, J., Concurring and Dissenting.—I concur with the majority's reversal of the judgment as to Ms. Fisher's cause of action for environmental sexual harassment and Mr. Fisher's cause of action for retaliation. However, I believe Ms. Fisher's allegations contained in the second amended complaint are sufficient to state a cause of action under the California Fair Employment and Housing Act (the Act) and, thus, no additional pleading is required.

Ms. Fisher alleges that from 1982 to 1986, Dr. Tischler committed various acts of sexual harassment including "pulling nurses onto his lap, hugging and kissing them while wiggling, making offensive statements of a sexual nature, moving his hands in the direction of woman's [sic] vaginal area, grabbing women from the back with his hands on their breasts or in the area of their breasts, picking up women and swinging them around, throwing a woman on a gurney, walking up closely behind a woman with movements of his pelvic area . . . . The acts were committed in hallways, the operating room and lunch room of Defendant Hospital . . . ."

By my count, these allegations indicate *at least* 12 separate instances of sexual harassment and misconduct which occurred throughout Ms. Fisher's work environment during a 4-year period.[1] I believe this number of "... instances is sufficient to establish a pervasive pattern of sexual harassment, which is actionable under the Act.

I also wish to take issue with both the trial court and respondents' characterization of this conduct. The trial court referred to Dr. Tischler's alleged conduct as "sophomoric antics," a theme perpetuated by respondents. Relegating this conduct to such a category is both demeaning and dishonest. Grabbing a woman's breasts, gesturing towards a woman's vaginal area or even making offensive sexual statements to another is far from being merely sophomoric. It is egregious, hostile conduct which should not be condoned or excused to immaturity. The Legislature has clearly man-

[1] I calculated this number by counting each separate act framed in the singular as one and those acts framed in the plural as two. Of course, Ms. Fisher may be referring to many more instances than two when she uses the plural.

[No. F011506. Fifth Dist. Oct. 2, 1989.]

SALWASSER MANUFACTURING CO., INC., Plaintiff and
Appellant, v.
OCCUPATIONAL SAFETY AND HEALTH APPEALS BOARD,
Defendant and Respondent;
DIVISION OF OCCUPATIONAL SAFETY AND HEALTH, Real
Party in Interest and Respondent.

## SUMMARY

The owner of a manufacturing plant who was issued citations alleging regulatory and serious safety order violations of the California Occupational Safety and Health Act (Lab. Code, § 6300-6711) sought a writ of mandate to suppress introduction or consideration of evidence obtained by virtue of an inspection warrant. The trial court denied the petition, finding the declaration's safety violation allegations supported the warrant and the scope of the search was not overly broad. (Superior Court of Fresno County, No. 374761-5, Eugene W. Krum, Judge.)

The Court of Appeal affirmed, rejecting plaintiff's contention that a criminal standard of probable cause was required before a valid inspection warrant could be issued based on an employee complaint. The court held the proper standard is administrative probable cause, which requires a showing of specific evidence to support a reasonable suspicion of a violation, an declaration submitted met that standard. The court further held that the evidence is presented that the deleterious conditions may be present throughout the facility, a warrant authorizing a full plant-wide inspection justified. (Opinion by Franson, P. J., with Ardaiz, J., and Pettitt, J.,[*] concurring.)

[*] Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.

dated hostile sexual work environments are no longer to be tolerated. We should not eviscerate this legislative mandate by disguising offensive conduct under a guise of horseplay or good-natured fun. It is neither.

In sum, I would conclude Ms. Fisher pled with sufficient particularity those facts necessary to maintain an action for environmental sexual harassment. Accordingly, I would reverse the judgment as to that cause of action without requiring any additional pleading.

Respondents' petition for review by the Supreme Court was denied January 18, 1990.

carry firearms), it is inconceivable the Legislature intended to enact a privilege whereby the licensee could refuse to identify a client or employer thereby potentially shielding the employer from any responsibility or liability. If the Legislature had intended such a radical result it would have done so by explicit language.

DISPOSITION

Let a peremptory writ issue vacating the trial court's order and entering a new order directing Bolling to answer the deposition questions regarding the identity of her client.

McDonald, J., and McIntyre, J., concurred.

[No. D026441. Fourth Dist., Div. One. Sept. 18, 1997.]

TOM HERSANT, Plaintiff and Appellant, v. DEPARTMENT OF SOCIAL SERVICES et al., Defendants and Respondents.

SUMMARY

In an action by a manager against his government employer for alleged age discrimination resulting in his demotion, the trial court granted summary judgment for defendant. (Superior Court of San Diego County, No. 688092, Judith McConnell, Judge.)

The Court of Appeal affirmed. The court held that the trial court properly granted summary judgment for defendant. Although plaintiff established a prima facie case of discrimination, he failed to offer substantial evidence that the nondiscriminatory reasons for demotion given by defendant were false, or to present evidence of a discriminatory animus or a combination of the two such that a reasonable trier of fact could conclude defendant engaged in intentional age discrimination. Plaintiff raised triable issues concerning whether the actions of defendant were reasonable and well considered, and a trier of fact could find either they were or they were not, but what a trier of fact could not reasonably conclude, the court held, was that defendant's stated reasons were implausible, inconsistent, or baseless, and it would not be reasonable to conclude they were pretextual and used merely to veil an act of age discrimination. (Opinion by Benke, Acting P. J., with Huffman and Nares, JJ., concurring.)

HEADNOTES

Classified to California Digest of Official Reports

(1) **Summary Judgment § 26—Appellate Review—Scope of Review.** —An appellate court reviews de novo the trial court's decision to grant summary judgment and it is not bound by the trial court's stated reasons or rationales. In reviewing a motion for summary judgment, the court accepts as undisputed fact only those portions of the moving party's evidence that are uncontradicted by the opposing party. In other

words, the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn therefrom are accepted as true.

(2a, 2b) **Civil Rights § 3—Employment—Age Discrimination—Burden of Proof.**—An employee alleging age discrimination must ultimately prove that the adverse employment action taken was based on his or her age. Courts use a system of shifting burdens as an aid to the presentation and evaluation of age discrimination cases, which requires that the employee first establish a prima facie case of age discrimination, usually by circumstantial evidence. If the employee does so, the employer is required to offer a legitimate non-age based reason for the adverse employment action. If the employee does not, then the employee prevails. When the employee has made this showing, the burden shifts to the employer to go forward with evidence that the adverse action was based on considerations other than age discrimination. When the employer offers evidence justifying the adverse action on a basis other than age, the burden shifts back to the employee to meet his or her ultimate obligation of proving that the reason for the adverse action was based on age discrimination. This ultimate issue is decided on all the evidence.

(3a, 3b) **Civil Rights § 3—Employment—Age Discrimination—Burden of Proof—Prima Facie Case.**—A prima facie case of age discrimination arises when the employee shows (1) at the time of the adverse action he or she was 40 years of age or older, 2) an adverse employment action was taken against the employee, (3) at the time of the adverse action the employee was satisfactorily performing his or her job, and (4) the employee was replaced in his or her position by a significantly younger person. Thus, in an action by a manager against his government employer for alleged age discrimination resulting in his demotion, in which there was no dispute plaintiff was over age 40 when demoted, plaintiff established a prima facie case. Through his own declaration and deposition testimony, through the declaration of another regional manager and through the declaration of others in a position to judge his performance as a manager, plaintiff made a sufficient showing that he was performing his job satisfactorily at the time of his demotion. Plaintiff also established he was replaced in his job by a man, who, while also over age 40, was 7 years younger than plaintiff—a differential that could reasonably be described as "significant."

(4) **Civil Rights § 3—Employment—Age Discrimination—Burden of Proof—Prima Facie Case—Summary Judgment for Employer.**—In

order to avoid summary judgment, an employee claiming age discrimination must offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination. It is not enough for the employee simply to raise triable issues of fact concerning whether the employer's reasons for taking the adverse action were sound. What the employee has brought is not an action for general unfairness but for age discrimination. The fact an employee is the member of a protected class and has demonstrated triable issues concerning the appropriateness of the adverse action taken does not so readily demonstrate discriminatory animus that it is alone sufficient to establish the fact of discrimination or alone sufficient to avoid summary judgment. The employee must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons.

(5) **Civil Rights § 3—Employment—Age Discrimination—Burden of Proof—Prima Facie Case—Rebuttal—Summary Judgment.**—In an action by a manager against his government employer for alleged age discrimination resulting in his demotion, in which plaintiff established a prima facie case of discrimination, plaintiff failed to offer substantial evidence that the nondiscriminatory reasons for demotion given by defendant were false, or present evidence of a discriminatory animus or a combination of the two such that a reasonable trier of fact could conclude defendant engaged in intentional age discrimination. Although plaintiff raised triable issues concerning whether the actions of defendant were reasonable and well considered, and a trier of fact could find either they were or they were not, what a trier of fact could reasonably conclude, however, was that defendant's stated reas were implausible, inconsistent, or baseless. Because it would not be reasonable to conclude they were pretextual and used merely to veil an act of age discrimination, the trial court properly granted summary judgment for defendant.

[See 8 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 761.]

COUNSEL

Alcala, Martinez-Senftner & Velez, Carlos M. Alcala, George P. Harris and Lawrence F. Salisbury for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Silvia Díaz and Jill P. Armour, Deputy Attorneys General, for Defendants and Respondents.

## OPINION

BENKE, Acting P. J.—Plaintiff and appellant Tom Hersant brought an action for age discrimination against his employer, defendant and respondent California Department of Social Services, and his supervisor, defendant and respondent Margaret Davis (jointly Department). Department sought, and the trial court granted, a motion for summary judgment. Hersant appeals, arguing the trial court erred in so finding.

### BACKGROUND

#### A. Complaint

On May 3, 1995, Hersant filed a form complaint against Department and his immediate supervisor, Davis, alleging he was demoted on the basis of his age in violation of the California Fair Employment and Housing Act. In an attachment to the complaint, Hersant alleged he was 52 years of age, had worked for the State of California since 1964 and had always received good work evaluations. He alleged he was demoted on June 28, 1994, one level from his staff service manager II position and was removed as the manager of Department's Carlsbad regional child day-care licensing and monitoring office.

#### B. Motion for Summary Judgment

After answering the complaint, Department filed a motion for summary judgment. It argued the basis for Hersant's demotion was not his age but rather his unsatisfactory job performance. Department alleged that he misused state property. More specifically, Department alleged Hersant was insubordinate, inefficient, neglectful of his duties, dishonest and resulted in a corruption of Department's policies at the Carlsbad regional office that had indicated his intention not to follow Department policies. Department alleged Hersant failed to notify his superiors of these policies. Further, Department alleged Hersant had indicated his intention not to follow Department policy concerning the termination of certain civil penalty proceeds and failed to follow the specific instructions of his superiors in conducting a promotional interview.

Department offered evidence that of the managers of the 21 regional licensing offices, the oldest of those managers was 66, the youngest 38. The

average age of such managers in Davis's region was 46.5 years. After his demotion, Hersant's position was filled by a manager with 21 years in state civil service and who was 45 years of age at the time of his appointment.

In opposition, Hersant alleged he followed applicable procedures in conducting the work of his office, had done nothing that would corrupt department mental data base, followed all Department policies known to him, never indicated an intention to ignore policy with regard to the termination of certain civil penalty proceedings and properly conducted the subject promotional interview. Hersant alleged Department's stated reason for his demotion was false and pretextual and that the true reason for his demotion was the bias of his supervisor, Davis, against older employees.

#### D. Decision

The trial court found Hersant had failed to present evidence that his demotion was based on age discrimination. The court specifically concluded all of Hersant's bases for believing he was discriminated against on the basis of age were speculations.

### DISCUSSION

Hersant argues since there were triable issues of fact concerning his claim of age discrimination, the trial court erred in granting Department's motion for summary judgment.

#### A. Law

Summary judgment is granted when there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law (Code Civ. Proc., § 437c, subd. (c).) (1) This court reviews de novo. the trial court's decision to grant summary judgment and we are not bound by the trial court's stated reasons or rationales. (Prilliman v. United Air Lines, Inc. (1997) 53 Cal.App.4th 935, 951 [62 Cal.Rptr.2d 142].)

In reviewing a motion for summary judgment, we accept as undisputed fact only those portions of the moving party's evidence that are uncontradicted by the opposing party. In other words, the facts alleged in the evidence that can be drawn therefrom are accepted as true. (Sada v. Robert F. Kennedy Medical Center (1997) 56 Cal.App.4th 138, 148 [65 Cal.Rptr. 112].)

Both federal and state law prohibits employers from discriminating against employees on the basis of age. (Gov. Code, § 12941, subd. (a); 42 U.S.C. § 2000e et seq.; 29 U.S.C. § 621 et seq.)[1]

(2a) An employee alleging age discrimination must ultimately prove that the adverse employment action taken was based on his or her age. Since direct evidence of such motivation is seldom available, the courts use a system of shifting burdens as an aid to the presentation and resolution of age discrimination cases. (See *St. Mary's Honor Center v. Hicks* (1993) 509 U.S. 502, 505-506 [113 S.Ct. 2742, 2746-2749, 125 L.Ed.2d 407]; *Texas Dept. of Community Affairs v. Burdine* (1981) 450 U.S. 248, 252-255 [101 S.Ct. 1089, 1093-1095, 67 L.Ed.2d 207]; *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 800-803 [93 S.Ct. 1817, 1823-1825, 36 L.Ed.2d 668]; *Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 195-199 [48 Cal.Rptr.2d 448].) That system necessarily establishes the basic framework for reviewing motions for summary judgment in such cases. (*Sada v. Robert F. Kennedy Medical Center, supra,* 56 Cal.App.4th at p. 148; *Addy v. Bliss & Glennon* (1996) 44 Cal.App.4th 205, 216 [51 Cal.Rptr.2d 642]; *Caldwell v. Paramount Unified School Dist., supra,* 41 Cal.App.4th at pp. 201-205.)

The burden-shifting system requires the employee first establish a prima facie case of age discrimination. If the employee does so, the employer is required to offer a legitimate non-age-based reason for the adverse employment action. If it does not, then the employee prevails. (See *St. Mary's Honor Center v. Hicks, supra,* 509 U.S. at pp. 505-507 [113 S.Ct. at pp. 2746-2747]; *Texas Dept. of Community Affairs v. Burdine, supra,* 450 U.S. at pp. 252-255 [101 S.Ct. at pp. 1093-1095]; *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at pp. 800-803 [93 S.Ct. at pp. 1823-1825]; *Sada v. Robert F. Kennedy Medical Center, supra,* 56 Cal.App.4th at pp. 148-151; *Caldwell v. Paramount Unified School Dist., supra,* 41 Cal.App.4th at pp. 195-199.)

Given the varying nature of the problem, it is impossible to make an exact, all-inclusive statement of the elements of a prima facie age discrimination case applicable in all situations. (*Ewing v. Gill Industries, Inc.* (1992) 3 Cal.App.4th 601, 610 [4 Cal.Rptr.2d 640]; 1 Lindemann & Grossman, Employment Discrimination Law (3d ed. 1996) ch. 16, pp. 586-587.) The general requirement is that the employee offer circumstantial evidence such that a reasonable inference of age discrimination arises. The requirement is

---

[1] While state and federal legislation concerning age discrimination differs in some respects, their objectives are identical, and courts of this state have looked to federal law to aid in the interpretation of analogous provisions of California statutes. (*Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 195 [48 Cal.Rptr.2d 448].)

not an onerous one. (*Heard v. Lockheed Missiles & Space Co.* (1996) 44 Cal.App.4th 1735, 1751 [52 Cal.Rptr.2d 620].)

(3a) In the context of the present case, a reasonable inference, that is, a prima facie case, of age discrimination arises when the employee shows (1) at the time of the adverse action he or she was 40 years of age or older,[2] (2) an adverse employment action was taken against the employee, (3) at the time of the adverse action the employee was satisfactorily performing his or her job and (4) the employee was replaced in his position by a significantly younger person.[3] (See *Caldwell v. Paramount Unified School Dist. supra,* 41 Cal.App.4th at pp. 195-200; *Nidds v. Schindler Elevator Corp.* (9th Cir. 1996) 103 F.3d 854, 858.)

(2b) When the employee has made this showing, the burden shifts to the employer to go forward with evidence that the adverse action was based on considerations other than age discrimination. When the employer offers evidence justifying the adverse action on a basis other than age, the burden shifts back to the employee to meet his ultimate obligation of proving that the reason for the adverse action was age discrimination. This ultimate issue is decided on all the evidence. (*Heard v. Lockheed Missiles & Space Co., supra,* 44 Cal.App.4th at p. 1752; *Barber v. Rancho Mortgage & Investment Corp.* (1994) 26 Cal.App.4th 1819, 1835 [32 Cal.Rptr.2d 906].)

The exact showing required by an employee to avoid summary judgment in the face of evidence by an employer of a non-age-based reason for an adverse action is a matter of disagreement. The disagreement stems from language in *St. Mary's Honor Center v. Hicks, supra,* 509 U.S. 502, the United States Supreme Court's most recent opinion concerning the burden-shifting procedure used in discrimination cases. (Lindemann & Grossman, 1 Employment Discrimination Law, supra, ch. 2, pp. 23-25.)

In part, the court in *Hicks* emphasized that liability could not arise merely from a showing that the employer's stated nondiscriminatory basis for adverse action was false. It stated the ultimate issue was not whether the employer offered an unbelievable explanation for the adverse action but whether the employer acted for a discriminatory reason. (*St. Mary's Honor Center v. Hicks, supra,* 509 U.S. at pp. 514-515 [113 S.Ct. at pp. 2751-2752]; *Green v. Rancho Santa Margarita Mortgage Co.* (1994) 28 Cal.App.4th 686, 694-696 [33 Cal.Rptr.2d 706].)

---

[2] Government Code section 12941, subdivision (a), makes it unlawful to take adverse employment actions against a person over the age of 40 on the ground of age.

[3] It is not entirely clear that this last element is a required part of the employee's prima facie case. (Cf. *O'Connor v. Consol. Coin Caterers* (1996) 517 U.S. 308, 309-313 [116 S.Ct. 1307, 1309-1310, 134 L.Ed.2d 433, 437-439] and *Heard v. Lockheed Missiles & Space Co., supra,* 44 Cal.App.4th at pp. 1747-1753.) Given the manner in which we resolve this matter, it is not necessary we resolve the issue.

On the other hand, the court stated: "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and . . . upon such rejection, '[n]o additional proof of discrimination is *required*.' [Citation.]" (*St. Mary's Honor Center v. Hicks, supra,* 509 U.S. at p. 511 [113 S.Ct. at p. 2749], fn. omitted; see also *post,* fn. 4.)

In the context of a motion for summary judgment, courts and commentators have considered the *Hicks* opinion and have come to varying conclusions concerning its meaning. Some have concluded an employee's prima facie case, even in the face of an employer's showing of a non-age-based reason for the adverse action, is alone sufficient to avoid summary judgment. Others have concluded *Hicks* requires the employee, once the employer has offered a nondiscriminatory reason, show both that the reason is false and that the true reason for the adverse action was a discriminatory animus. What has been described as the predominant view, however, is somewhere in between and requires the employee rebut the employer's stated nondiscriminatory reason with substantial evidence of its falsity or present other evidence suggesting a discriminatory basis, or some combination of the two such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination. (1 Lindemann & Grossman, Employment Discrimination Law, *supra,* ch. 2, pp. 23-27.)

Courts in California appear to have taken different positions on the question. *Barber v. Rancho Mortgage & Investment Corp., supra,* 26 Cal.App.4th at page 1835, appears to suggest that an employee's prima facie case of discrimination is alone sufficient to avoid summary judgment, and she/he need present no evidence to rebut the employer's claimed nondiscriminatory motivation.

In *Martin v. Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1735 [35 Cal.Rptr.2d 181], however, the court stated: "[T]o meet an employer's sufficient showing of a legitimate reason for discharge[,] the discharged employee, to avert summary judgment, must produce 'substantial responsive evidence' that the employer's showing was untrue or pretextual."[4]

(4) We agree with *Martin* and the predominant view that to avoid summary judgment, an employee claiming discrimination must offer

---

*Stewart v. Rutgers, The State University* (3d Cir. 1997) 120 F.3d 426.

substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination.

It is not enough for the employee simply to raise triable issues of fact concerning whether the employer's reasons for taking the adverse action were sound. What the employee has brought is not an action for general unfairness but for age discrimination. While, given the inherent difficulties in showing discrimination, the burden-shifting system established by the Supreme Court is a useful device to facilitate the adjudication of claim discrimination, it ultimately, however, does not change what the employee must prove. In our judgment the fact an employee is the member of a protected class and has demonstrated triable issues concerning the appropriateness of the adverse action taken does not so readily demonstrate a discriminatory animus that it is alone sufficient to establish the fact of discrimination or alone sufficient to avoid summary judgment.

As several federal courts have stated: "The [employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. [Citations.] Rather, the [employee] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' [citation], and hence infer 'that the employer did not act for the [the asserted] non-discriminatory reasons.' [Citations.]" (*Fuentes v. Perskie* (3d Cir. 1994) 32 F.3d 759, 765, fn. omitted; *Sheridan v. E.I. DuPont de Nemours and Co.* (3d Cir. 1996) [***] F.3d 1061, 1072; *Stewart v. Rutgers, The State University, supra,* 120 F. 426.)

With this background in mind, we review the grant of Department's motion for summary judgment.

B. *Discussion*

(3b) Hersant successfully complied with the nononerous requirement he present a prima facie case of age discrimination. There is no dispute Hersant was over age 40 when demoted. Through his own declaration and deposition testimony, through the declaration of another regional manager and through the declaration of others in a position to judge his performance as a manager,

Hersant made a sufficient showing that he was performing his job satisfactorily at the time of his demotion. Assuming it was necessary he do so, Hersant also established he was replaced in his job by a man, who, while also over age 40, was 7 years younger than Hersant—a differential that could reasonably be described as "significant."

Department responded with an adequate showing that Hersant was demoted for nondiscriminatory reasons. The core of Department's motion for summary judgment was the notice of adverse action that resulted in Hersant's demotion. In general, Department accused Hersant of inefficiency, insubordination, neglect of duty, dishonesty and misuse of state property. These general claims arose from three areas.

First, Department alleged that Hersant, without the knowledge of his superiors and in contravention of Department policy, acted to artificially inflate the caseload of his Carlsbad regional office. This he allegedly did by failing, beginning in June 1993, to close at least 468 cases that Department policy required because of the licensee's failure to pay fees or because the licensee indicated an intent to surrender its license or close its facility. Department alleged Hersant instructed his employees not to close such cases until near the time of events that would make continuing the case as open impossible. Department alleged Hersant instructed his staff that rather than submitting such cases for closure, they were to prepare forms that kept the file open and change the address of the subject facilities to that of the Carlsbad regional office.

It was alleged Hersant carried out this policy, in part, to support additional employment positions at the Carlsbad office and to ensure that a management position of his level would be required at that office.

Department alleged Hersant's policy resulted in the intentional falsification of information maintained in the files and computer data bases of Department and resulted in the dissemination to various governmental and nongovernmental entities of false information in violation of statutes and regulations. Department also alleged that maintaining those 468 files as open result in mailings to facilities and licensees that had no need for such communications, resulting in the needless expenditure of state funds.

Department alleged Hersant failed to inform his supervisors of these case closings and address-change policies after being instructed to keep such supervisors informed of all significant policy and procedure changes in his regional office.

Next, Department alleged that Hersant was informed by his supervisor that in any case in which a district attorney refused to prosecute unlicensed

care providers because of pending civil penalty proceeding, the civil proceeding was to be terminated. With knowledge of this policy, Hersant sent a memo to Department's supervising investigator, with copies to other regional managers but with no copy to Davis, stating his intention not to follow that policy. In another memo to the investigator, Hersant set out the legal opinion that both civil and criminal procedures could proceed simultaneously. Department alleged these memos showed Hersant's unwillingness to follow policy and his lack of understanding of his role as a regional manager.

Finally, Department alleged that in December 1993 Hersant conducted interviews to fill a supervisor position in the Carlsbad office. Thor<sup> '' </sup>-instructed to include a district office manager on the interview pal Hersant did not do so.

(5)   The question that remains is whether Hersant offered substantial evidence that the nondiscriminatory reasons for demotion given by Department were false, or presented evidence of a discriminatory animus or a combination of the two such that a reasonable trier of fact could conclude Department engaged in intentional age discrimination.

Hersant presented evidence showing there was no validity to any of the stated bases for his demotion. In his deposition and declaration, supported by the declarations of others in Department, Hersant stated, contrary to the assertion of the notice of adverse action, there was no Department policy requiring or authorizing the closing of cases when fees were not paid. Department policy only required files be closed when a licensed day-care facility was no longer in operation.

Hersant offered evidence that his was the only district office in the state that had in place a procedure for tracking, rebilling and forfeiting licenses when annual fees were not paid. This procedure was aggressive in collecti... fees and as a result of the policy, the office was identifying cases to closed much sooner than would otherwise have been identified. For various reasons, however, closures were not made immediately. This policy resulted in the Carlsbad office having a higher percentage of cases for closure than other offices.

As to other situations where policy required the closure of files, closures were made, although this was not given a high priority by staff and in some cases was delayed for valid reasons such as investigating if the licensed facility was in fact no longer in operation.

Hersant inquired concerning the closing of cases where fees had not been paid and was advised by Department's legal counsel that until regulations were formulated for such file closings, there was no authority to close them.



Concerning the changing of the mailing addresses[5] of licensees, Hersant stated, and the declaration of employees at the Carlsbad office confirmed, this was done based on a staff recommendation. Hersant stated he authorized changing the mailing address of licensees who had been sent notices of forfeiture to that of the Carlsbad office. This was done to identify which licensees had been issued forfeiture letters, as a way to identify licensees who had not paid their fees and a way to avoid the sending of mail to licensees whose mail was returned but whose files had not yet been closed. No one at the district office believed the policy improper. The resource and referral agencies were informed that any licensee with a mailing address listed as that of the district office was inactive for a failure to pay fees. The policy was not designed to corrupt Department statistics or recordkeeping. Hersant believed this policy was in accordance with a General Services directive to periodically correct mailing lists.

Hersant stated management above his level may not have been aware of this address-change policy, but he considered this a clerical matter which did not require notice to his superiors.

As to the claim he determined not to follow Department policy with regard to terminating civil penalty proceedings when, in light of such proceeding, a district attorney refused to prosecute criminally, Hersant stated that while he was aware such a policy had been discussed, he did not know it had been reduced to policy. Hersant stated since he was unaware it was policy to terminate such civil penalty proceedings, he believed there was nothing inappropriate in sending a memo to a Department investigator and other regional managers informing them of a legal opinion indicating it was unnecessary to suspend civil penalty proceedings before initiating criminal prosecution. Hersant did not believe there was any need at that point to send the memo to his superior.

Finally, with regard to the claim that in violation of instructions from his supervisor he conducted a promotional interview without the inclusion on the panel of another district manager, Hersant stated that shortly before Davis left on vacation she told him she believed Department personnel policy required such inclusion. Davis stated she would check. The supervisor, however, never informed Hersant of what she had determined. Nonetheless, Hersant attempted to get one of the other district managers in his region to sit on the panel. None was available on the day of the scheduled interview and rather than delay, Hersant went ahead.

Hersant states in his declaration that it was not until after Davis reviewed the application of the candidate who received the position, an application

[5] The mailings were sent from a central office and not from the regional office.

that indicated the candidate was 51 years old, did Davis complain about the manner in which the interview was conducted.

Hersant offered other evidence he believed more directly showed an age discriminatory animus. In a declaration, Fred Dumont, former manager of the Santa Ana district office, indicated he also had difficulty with regional manager Davis. Dumont believed Davis was harassing and a micromanager. Because of this harassment, Dumont, aged 59, decided to retire 3 years before he had planned. Dumont stated that after Hersant told him at an interview concerning the charges that resulted in Hersant's demotion and that Davis and a Department lawyer had inquired concerning Hersant's age and seniority, Hersant and Dumont concluded they were the victims of discrimination. Dumont also noted Davis appeared to have concerns about whether he was having trouble hearing and about his health in general.

Hersant offered evidence that the regional manager of the San Diego office, Mary Delmast, had engaged in management practices that resulted in serious deficiencies. Davis was aware of these facts and took no action against Delmast.[6]

We conclude Hersant failed to present "substantial responsive evidence" that Department's stated bases for demoting him were pretextual and motivated by a discriminatory animus. Hersant raised triable issues concerning whether the actions of Department were reasonable and well considered. A trier of fact could find either they were or they were not. What a trier of fact could not reasonably conclude, however, was that Department's stated reasons were implausible, or inconsistent or baseless; it would not be reasonable to conclude they were pretextual and used merely to veil an act of age discrimination.

Hersant's attempt to buttress his claim of age discrimination with more direct evidence is also unavailing. We agree with the trial court that to attribute Davis's claimed harassment and ill treatment of Dumont and Hersant and her inquiries concerning Dumont's hearing to age bias is simply speculation.

The trial court acted correctly in granting Department's motion for summary judgment.

[6] In the declaration of Department's deputy director in charge of Hersant's division, Mary Delmast was 51 years old at the time of Hersant's demotion.

HERSANT v. DEPARTMENT OF SOCIAL SERVICES
57 Cal.App.4th 997; 67 Cal.Rptr.2d 483 [Sept. 1997]

The judgment is affirmed.

Huffman, J., and Nares, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 14, 1998.

---

McGETTIGAN v. BAY AREA RAPID TRANSIT DIST.
57 Cal.App.4th 1011; 67 Cal.Rptr.2d 516 [Aug. 1997]

[No. A075737. First Dist., Div. Four. Aug. 22, 1997.]

JAMES R. McGETTIGAN, Plaintiff and Appellant, v.
BAY AREA RAPID TRANSIT DISTRICT, Defendant and Respondent.

SUMMARY

The trial court dismissed an individual's personal injury action at, sustaining, without leave to amend, defendant transit district's demurrer to the complaint. Plaintiff had been inebriated to the point of incapacity while a passenger on defendant's train, defendant was aware of his condition and ordered him off the train leaving him on the platform, and plaintiff was injured on the platform in a manner unknown to plaintiff. (Superior Court of Alameda County, No. 764761-1, Sandra Lynn Margulies, Judge.)

The Court of Appeal affirmed. It held that the trial court did not abuse its discretion in sustaining defendant's demurrer. Defendant did not have a special relationship with plaintiff, and thus defendant had no duty to assist him. Since it was the end of the line, plaintiff could not be left on the train, and he was ordered to leave. Once he had safely exited the train and was on the platform, the relationship of carrier and passenger terminated, since plaintiff was in a place of relative safety. The fact that plaintiff expressed the intention to board another train did not renew the relationship. Furthermore, defendant did not create a situation of peril. Plaintiff was merely directed onto the train platform; he was not placed in harm's way. Defendar" owed plaintiff no duty to assist him further. (Opinion by Hanlon, J., wi Anderson, P. J., concurring. Dissenting opinion by Poché, J.)

HEADNOTES

Classified to California Digest of Official Reports

(1) **Appellate Review § 128—Scope of Review—Rulings on Demurrers.**
—On appeal from the sustaining of a demurrer without leave to amend, the appellate court accepts the facts stated in the complaint as true, but it reviews the complaint de novo to determine whether the facts as

[No. H001787. Sixth Dist. June 24, 1987.]

ROBERT J. MIXON, Plaintiff and Appellant, v. FAIR EMPLOYMENT AND HOUSING COMMISSION, Defendant and Respondent.

## SUMMARY

The trial court denied a petition for writ of mandate to overturn a determination of the Fair Employment and Housing Commission that an employee of a union was not discharged for racially discriminatory reasons. The employee had been terminated after refusing to comply with the union's request that he relocate in order to reduce the expenses to the union resulting from his lengthy commute. (Superior Court of Santa Clara County, No. 572088, Jack Komar, Judge.)

The Court of Appeal affirmed, holding that the commission's findings supported its conclusion that the employee was not discharged for discriminatory reasons. While the employee had established a prima facie case of disparate-treatment racial discrimination, the court held, the union's desire to reduce its expenses resulting from his commute was a legitimate non-discriminatory reason for termination. The court held that it was the employee's burden to prove by a preponderance of the evidence that a discriminatory intent, and not this proffered reason, was behind the decision to terminate; however, he produced no direct evidence of racial animus, but knew at the outset that he might be required to relocate, and White employees who were allowed to commute great distances were in circumstances different from his. (Opinion by Brauer, J., with Agliano, P. J., and Capaccioli, J., concurring.)

## HEADNOTES

Classified to California Digest of Official Reports, 3d Series

(1a-1c) Administrative Law § 138—Judicial Review Subsequent Proceedings—Appellate Courts—Scope of Review.—On appeal of a trial court determination upholding the decision of the Fair Employment

and Housing Commission that a union employee was not discharged for racial reasons, review was not circumscribed by the substantial evidence rule but amounted to an inquiry of law, where in the trial court the only issue under Code Civ. Proc., § 1094.5 (administrative mandamus), was whether the commission's decision was supported by the findings. The issue before the trial court presented only legal questions, since the employee had not challenged the commission's factual findings. Further, the employee could not argue the substantiality of the evidence for the first time on appeal.

(2) Administrative Law § 69—Adjudication—Effect of Administratitl Law Judge's Findings Where Proposed Decision Is Rejected.—In a proceeding before the Fair Employment and Housing Commission by a union employee who was allegedly fired because of race, the commission did not have to accept the factual findings of the administrative law judge, who had issued a proposed decision in which he determined that the union had engaged in an unlawful employment practice by discharging the employee for racial reasons, which decision the commission determined not to adopt. Once an administrative law judge's proposed decision is rejected, it serves no identifiable function in the administrative adjudication process and is in no way binding on the commission.

(3) Administrative Law § 121—Judicial Review—Scope and Extent—Questions of Law—Where Sufficiency of Evidence Is Not Disputed.—On trial court review of an administrative determination, the posture of a case in which sufficiency of the evidence is not disputed is identical to that where the facts before the administrative agency are uncontradicted. In such a case, the only issue concerns the conclusion to be drawn from the pertinent facts; the trial court's determination . therefore a question of law.

(4) Civil Rights § 3—Employment—Disparate-treatment Theory.—To prevail under a disparate-treatment theory of employment discrimination, an employee must show that the employer harbored a discriminatory intent. First, the employee must establish a prima facie case of discrimination. Next, the employer may offer a legitimate reason for his actions. Finally, the employee must prove that any such reason was a pretext to mask an illegal motive.

[See Am.Jur.2d, Civil Rights, § 103.]

(5) Civil Rights § 3—Employment—Disparate-treatment Theory—Prima Facie Case.—To establish a prima facie case of disparate-treatment

employment discrimination, the complainant must show that he belongs to a racial minority; that he applied and was qualified for a job for which the employer was seeking applicants; that, despite his qualifications, he was rejected; and that, after his rejection, the position remained open and the employer continued to seek applicants from persons of the complainant's qualifications.

(6) **Civil Rights § 3—Employment—Disparate-treatment Theory—Prima Facie Case—Discriminatory Discharge.**—To state a prima facie case of discriminatory discharge, an employee proceeding under a disparate-treatment theory must show that he belongs to a protected class, that his job performance was satisfactory, that he was discharged, and that others not in the protected class were retained in similar jobs, and/or his job was filled by an individual of comparable qualifications not in the protected class.

(7) **Civil Rights § 3—Employment—Disparate-treatment Theory—Employer's Burden.**—Establishment of a prima facie case of disparate-treatment employment discrimination creates a rebuttable presumption that the employer unlawfully discriminated against the employee. The burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection. The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.

(8) **Civil Rights § 3—Employment—Disparate-treatment Theory—Plaintiff's Burden.**—In a disparate-treatment employment discrimination case, if the defendant carries its burden of producing evidence that it had a nondiscriminatory reason for rejecting the employee, the presumption raised by the employee's prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. The employee now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. He may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

(9) **Civil Rights § 3—Employment—Disparate-treatment Theory—Plaintiff's Burden—Causation.**—While a complainant in a disparate-treatment employment discrimination case need not prove that racial animus was the sole motivation behind the challenged action, he must

prove by a preponderance of the evidence that there was a "causal connection" between the employee's protected status and the adverse employment decision.

(10a, 10b) **Civil Rights § 3—Employment—Discharge of Union Employee for Failure to Relocate.**—In a proceeding before the Fair Employment and Housing Commission by a union employee who claimed he was discharged for racial reasons, the findings of the commission supported its conclusion that the employee's discharge was not motivated by racial discrimination but rather by his failure to relocate. The union's desire to reduce expenses by requiring him to relocate was a legitimate, nondiscriminatory reason for termination, and there was no direct evidence of racial animus on the part of any union official. The employee knew from the outset that he might have to relocate, and the circumstances of White employees who were allowed to commute great distances were different from his.

[See Cal.Jur.3d, Labor, § 5.]

(11) **Civil Rights § 3—Employment—Fair Employment and Housing Commission—Analysis of Discrimination Claim.**—In a proceeding before the Fair Employment and Housing Commission by a union employee claiming he was discharged for racial reasons, the commission's failure to go through the normal three-step disparate-treatment analysis before addressing the ultimate issue of discrimination and determining that the employee was not improperly discharged was not a fatal defect, where the commission's decision included 67 detailed factual findings followed by an exhaustive discussion, and where its decision presented a clear and explicit account of its findings and legal conclusions.

## COUNSEL

Louis D. Silver for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Andrea Sheridan Ordin, Chief Assistant Attorney General, Marian M. Johnston and Henry Torres, Jr., Deputy Attorneys General, for Defendant and Respondent.

## OPINION

BRAUER, J.—Robert Mixon appeals from an order denying his petition for a writ of administrative mandamus seeking to overturn a decision of the

Fair Employment and Housing Commission (the FEHC or the Commission) The Commission had found that Mixon's employer, the Hospital and Institutional Workers' Union, Local 250 (Local 250), had not discriminated against him on the basis of race when it terminated his employment. Mixon's petition challenged this decision on the ground that it was not supported by the Commission's findings. After reviewing this same question on appeal we have concluded that the findings support the decision. We therefore affirm the judgment.[1]

### The Standard of Review

(1a) There has been some confusion throughout these proceedings as to the appropriate standard of review both in the superior court and in this court. Mixon's writ petition was brought under Code of Civil Procedure section 1094.5 which provides three grounds for establishing that an agency has abused its discretion: the agency "has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (2) (See fn. 2), (1b) Only the second of these was at issue.[2] There was no claim that the evidence failed to support the findings; therefore, a review of the administrative record was entirely unnecessary in the trial court and is not called for here.

The trial judge misconceived the scope of his duties when he observed: "The question at issue and the only question is whether or not the Commission's decision is supported by substantial evidence and independent review of the record will support that decision." While the court's feeling was that petitioner had been "ill used," and "treated very poorly," the judge nonetheless indicated his intended decision to deny the petition, saying this: "... I think

[1] Since the trial court's order denying the writ petition represented a final judicial determination we treat it as an appealable judgment, despite the fact that no formal judgment was entered. (Cal. Civil Appellate Practice 2d (Cont.Ed.Bar 1985) Appealable Judgments and Orders, § 2.11, p. 29.)

[2] One additional ground stated in the petition, that the Commission was without power to make findings regarding the credibility of certain testimony, was not addressed in appellant's brief. Since it was, however, raised at oral argument before this court we will comment briefly here. Mixon takes the position that the Commission must accept the factual findings of the administrative law judge who originally heard the matter. We find no merit in this argument. Under Government Code section 11517, subdivision (c) the Commission may refuse to adopt the administrative law judge's proposed decision and may then decide the case itself "... It follows that once the administrative law judge's proposed decision is rejected, "it serves no identifiable function in the administrative adjudication process" (Compton v. Board of Trustees (1975) 49 Cal.App.3d 150, 158 [122 Cal.Rptr. 493]), and is in no way binding on the Commission. Mixon's cases (for example, Merrill Farms v. Agricultural Labor Relations Bd. (1980) 113 Cal.App.3d 176 [169 Cal.Rptr. 774] stand only for the general proposition that the credibility of a witness is a matter solely within the province of the finder of fact, and are inapposite here.

I am legally bound to affirm the—the findings of the Commission and to deny the petition for a writ." There followed a written order denying the writ petition on the basis that "the evidence in the administrative record supports the findings of fact and the determination of issues."

Taking his cue from these pronouncements, Mixon argues on appeal that the trial court erred in applying the substantial evidence test rather than the independent judgment test, and that in either case we must reverse because the court's decision is not supported by substantial evidence. The FEHC contends that the issue before the trial court presented only legal questions, since Mixon had not challenged the Commission's factual findings. The FEHC is correct. It is also correct in its assertion that Mixon cannot now argue the substantiality of the evidence for the first time on appeal.[3]

(3) The posture of a case in which the sufficiency of the evidence is not disputed is identical to that where the facts before the administrative agency are uncontradicted. In such a case the only issue concerns the conclusions to be drawn from the pertinent facts; the trial court's determination is therefore a question of law. (Aries Dev. Co. v. California Coastal Zone Conservation Com. (1975) 48 Cal.App.3d 534, 545 [122 Cal.Rptr. 315].) (1c) On appeal our review is not circumscribed by the substantial evidence rule, but amounts to an inquiry of law. In essence we treat the appeal as a renewed petition for a writ of mandate. (Swaby v. Unemployment Ins. Appeals Bd. (1978) 85 Cal.App.3d 264, 269 [149 Cal.Rptr. 336], disapproved on other grounds in Pacific Legal Foundation v. Unemployment Ins. Appeals Bd. (1981) 29 Cal.3d 101 [172 Cal.Rptr. 194, 624 P.2d 244].)

With this in mind, we proceed to the facts, taking our summary directly and in part verbatim, from the findings of the Commission.

### The Facts

In the summer of 1978 Mixon, a Black man, submitted an employment application to the San Francisco office of Local 250. In January of 1979 he was informed that there was a position for a business representative available in the Stockton office. Later that month Mixon met with Joan Allen Bryant, the regional director for the Stockton area. During this meeting Bryant asked him if he could relocate to Stockton. Mixon replied that he had just bought a house in San Jose, he was installing a swimming pool, and

[3] We note that our Supreme Court in the case of Fisher v. City of Berkeley (1984) 37 Cal.3d 644, 654, fn. 3 [209 Cal.Rptr. 682, 693 P.2d 261] has held that a party may advance a new theory on appeal when the issue posed is not a factual one and involves important questions of public policy. Our case does not fall within this exception.

his wife was a school teacher in San Jose, "but that there would be no problem relocating." Bryant told him that "if the commute from San Jose to Stockton interfered with his work, he would be required to relocate later."

Mixon began work for Local 250 as a business representative on February 12, 1979, servicing the Stockton, Manteca, Modesto and Tracy areas.

Bill Dougherty was the controller of Local 250. Since becoming controller in March of 1978 he had made an effort to reduce union expenses by scrutinizing the expense accounts of the business representatives. Dougherty had also instituted a policy of focusing on the finances of each of the union's four regions rather than the northern district as a whole. He was particularly concerned about Stockton because dues in that office were insufficient to cover operating expenses.

Mixon called Dougherty approximately a month after he started to work, to find out why he was not fully reimbursed for meal expenses. Dougherty informed him that the union had certain limits on meal expenses. In the course of the conversation Dougherty "asked [Mixon] when he was going to relocate because he [Dougherty] was concerned about the high commuting expenses. [Mixon] responded that his employment was not contingent upon his relocation to the Stockton area."

Shortly after this conversation Dougherty spoke with Timothy Twomey, the secretary-treasurer of Local 250, about Mixon's failure to relocate. Twomey then called Bryant, who as regional director was Mixon's immediate supervisor, to inquire when Mixon planned to relocate. "Bryant told Twomey that [Mixon's] wife was teaching school, but that [he] would be relocating during the summer . . . ."

Over the next few months Dougherty spoke with Mixon several times, complaining that his gas and mileage expenses were too high and asking when he was going to move. Mixon responded again that relocating had not been made a condition of his employment. He also asked Dougherty why he should move when other representatives who were not Black were allowed to commute. Dougherty told Mixon that was none of his business. Finally, Mixon told Dougherty "that Dougherty should talk to his supervisor, Joan Bryant, since he was not hired upon condition of relocation." Thereafter both Dougherty and Twomey channeled their communications to Mixon through Bryant.

Bryant's testimony in this regard was summarized by the Commission as follows: "Bryant testified that on at least three occasions she was told by the

Secretary-Treasurer and the Controller that complainant would have to relocate to the Stockton area because of the expense to the local. Bryant later contradicted herself and testified that the Controller only asked why complainant had not relocated. Later in her testimony, Bryant stated that she once received a call from the Controller and that she told complainant that she had been told to tell him to relocate. Bryant further testified that she would tell complainant when she had been called by the Controller or the Treasurer and tell him that they were giving her a "bad time" about complainant's failure to relocate. In response, complainant would ask why other business representatives were allowed to commute."          (

The distance between San Jose and Stockton is approximately 77 miles. Mixon lived in north San Jose. He testified that his driving distance was 57 miles each way and that it took him approximately an hour and 15 minutes.

Although Mixon's average monthly auto expenses of $245.16 were the highest of Local 250's 32 business representatives, other non-Black representatives had expenses nearly as high. Representatives Jones and Carnejo who commuted from San Jose to Oakland had expenses of $232 and $185 respectively. Dougherty testified that he had taken no action to cut expenses of Jones or Carnejo because they had been commuting before he became controller. Representative Bratt's expenses were $228. There was no evidence as to how long Bratt had been commuting or the length of his commute.

In addition to these three, the findings listed five other non-Blacks, including Dougherty himself, who commuted significant distances. With the exception of Jones, Carnejo and Dougherty, there was no evidence as to how long any of the eight had been commuting, or the exact length of thea commutes. None of these people was asked to relocate. Mixon was the only Black who commuted a significant distance from home to his job assignment.

Several White representatives who faced significant commutes had been given the option to relocate or resign. These included Zimmerman, Mead, and Crowley. Zimmerman chose to resign rather than move when he was transferred from Fresno to Stockton. Mead resigned rather than move from San Jose to Santa Rosa. Crowley relocated when transferred from Stockton to Fresno. There was no evidence as to how long these three had been employed by Local 250. Bryant was the regional director who had informed both Zimmerman and Crowley of the option to move or quit. In addition Bryant was instrumental in arranging for Charlene Masters to replace Mixon. Masters was transferred from the San Jose office to the Stockton office

and was told by Bryant that she would have to relocate as a condition of the job.

"Although Mixon was told by Bryant that Twomey and Dougherty wanted him to relocate, he was never directly ordered to relocate, nor was he advised that he would be terminated if he did not relocate."

Mixon had been told at the time of his employment interview that his probationary period would be approximately six months. After he had been working for Local 250 for approximately six months, informing him that although Mixon needed some assistance in the area of collective bargaining since he was new to the job, otherwise "he was doing the job quite well."

In the period following this letter, Bryant apparently complained to others in the union that "she was having difficulty with [Mixon]," that he would not take orders, and that Mixon "still refused to Stockton. She was 'after him,'" that he couldn't find a house in Stockton. She told Twomey "to move" but he Mixon "was not available to her secretary during this time that going in Crowley, and that he "kept coming up with excuses after excuses." She also complained that he Bryant told him on several occasions that there was no organizing plaintiff in terms of following directions and not relocating."

Sometime in the summer of 1979, Bryant had a conversation with Bob Gerstenlauer, regional director of the Santa Clara Valley area wherein she said that Mixon "simply refused to relocate, that he would not follow her instructions, that [he] did not get along with the employers or the member-ship, and that Bryant felt something had to be done." It was from Gersten-lauer's region that Bryant recruited Masters, in November or December of 1979, to take Mixon's place.

Twomey called Bryant approximately four to six weeks before Mixon's termination in December of 1979 to discuss his continued failure to relo-cate. During this conversation "Bryant told Twomey that she had talked to Secretary-Treasurer and the Controller about his relocating to Stockton."

Twomey testified that it was Bryant who finally decided to terminate Mixon. Bryant testified that Twomey called her to fire [Mixon] because of her on December 15 and had "had enough." Bryant told her to terminate Mixon and the resulting "expense to the union."

On December 17 Bryant told Mixon that he was terminated effective December 28 "because of his failure to relocate and unsatisfactory work performance." A memo of the same date recited, in addition to his failure to relocate, the following reasons for the termination: "(a) [complainant had not] grasped the job duties and management for the termination; "(b) His interaction with the membership and management; and (c) It was apparent that complainant had not caused him to be ineffective in carrying out his job duties; and (c) It was apparent that complainant had not furth by the executive officer."

In explanation of this memo, "Bryant testified that when told to termi-nate [Mixon] because of his failure to relocate, she did not feel that failure to relocate was a sufficient ground for [his] termination, she did not feel that failure non-black business representatives who were terminated or ordered to relocate. There was no evidence that Bryant communicated to her secretary during this time that there was no organizing relating to work performance cited in [Mixon's] written termination notice on her own initiative." Bryant added the two reasons

Prior to his termination Mixon had never been advised that he had an "interaction" problem. Bryant admitted that Mixon "was performing his job satisfactorily" and said she did not consider his job performance to be grounds for his termination.

On December 20, 1979, Mixon met with Dougherty and Bryant to dis-cuss his termination. Dougherty spoke to Mixon again regarding his failure to relocate and the cost involved in his commute. Nothing was resolved.

In January of 1980, after his termination, Mixon met with Twomey, complaining that he had been terminated without any notice that he had to relocate. During this probation period Twomey informed Mixon that he had the first notice of this extension, whereas two White representative trainees in the San Jose office were given written notice of similar extensions, including the reasons therefor.

On March 17, 1980, Mixon made a written request for arbitration regard-ing his discharge, as is provided for by letter from Twomey that "the could not avail himself of the arbitration procedure from Twomey that "the could not avail himself of the time of his termination." In fact the union's constitution does not distin-guish between a probationary and permanent employee at the tion. Twomey's letter advised Mixon that he could request arbitration from the executive board by appearance on April 30, 1980.

On April 14, 1980, Mixon made a written request to review his personnel file in order to prepare for the board meeting. This request was denied without explanation.

Mixon appeared before the board on April 30, 1980. The Board denied his request for arbitration. In response to Mixon's request for a written explanation, Twomey sent him a letter stating that his request for arbitration had been denied but stating no reasons for the denial.

On May 12, 1980, Mixon filed a verified complaint with the Department of Fair Employment and Housing (the DFEH or the Department) alleging that his discharge constituted discrimination in violation of the California Fair Employment and Housing Act. The Department investigated the matter and filed a formal accusation on July 9, 1982. The matter was heard before George Coan, administrative law judge. Judge Coan heard a proposed decision wherein he determined that Local 250 had engaged in an unlawful employment practice by discharging an employee because of his race, and ordered that Mixon be reinstated with back pay. Judge Coan awarded additional compensatory damages "for emotional distress, shame and humiliation," and found that the union's "deliberate, egregious, and inexcusable conduct" warranted punitive damages.

The Commission determined not to adopt the proposed decision of the administrative law judge but rather to decide the case itself upon the record and supplemental briefing. Its decision overturning Judge Coan was issued on December 7, 1984. Two members of the Commission's five member panel dissented and wrote separately, finding that the facts demonstrated unlawful discrimination. Mixon's unsuccessful petition to the superior court followed.

### Discussion

Under both state and federal antidiscrimination legislation,[1] it is unlawful for an employer to discharge a person on the basis of race, or otherwise "discriminate against the person in compensation or in terms, conditions or privileges of employment."[a] While the California act and title VII differ in some particulars, their objectives are identical, and California courts have relied upon federal law to interpret analogous provisions of the state statute.

---

[*] See footnote 2, ante.

[1] Here we refer to the California Fair Employment and Housing Act, Government Code section 12900 et seq, and title VII of the Federal Civil Rights Act, 42 United States Code section 2000e et seq.

[a] Government Code section 12940, subdivision (a). Section 2000e-2 of the Civil Rights Act contains the same language.

(*Price v. Civil Service Com.* (1980) 26 Cal.3d 257 [161 Cal.Rptr. 475, 604 P.2d 1365]; *County of Alameda v. Fair Employment & Housing Com.* (1984) 153 Cal.App.3d 499 [200 Cal.Rptr. 381].) Neither of the parties here disputes the applicability of the legal analysis developed by the federal cases. In addition we note that the precedential decisions of the FEHC (compiled and published by Cal Continuing Education of the Bar) rely upon these cases.

In *Teamsters v. United States* (1977) 431 U.S. 324 [52 L.Ed.2d 396, 97 S.Ct. 1843], the Supreme Court stated that conceptually the theory of "'[d]isparate treatment' . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin.'" (*Id.*, at pp. 335-336, fn. 15 [52 L.Ed.2d at p. 415].)

(4)  To prevail under the disparate treatment theory, an employee must show that the employer harbored a discriminatory intent. In most cases, the complainant will be unable to produce direct evidence of the employer's intent. Consequently certain rules regarding the allocation of burdens and order of presentation of proof have developed in order to achieve a fair determination of "the elusive factual question of intentional discrimination." (*Texas Dept. of Community Affairs v. Burdine* (1981) 450 U.S. 248, 255, fn. 8 [67 L.Ed.2d 207, 101 S.Ct. 1089].) A three-part analysis was mandated by the Supreme Court in the case of *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 [36 L.Ed.2d 668, 93 S.Ct. 1817]: (1) The complainant must establish a prima facie case of discrimination; (2) the employer must offer a legitimate reason for his actions; (3) the complainant must prove that this reason was a pretext to mask an illegal motive.

(5)  The *McDonnell Douglas* model for a prima facie case is as follow: The complainant must show "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." (*McDonnell Douglas v. Green, supra,* 411 U.S. 792, 802 [36 L.Ed.2d 668, 677].) As this test focused only on discriminatory hiring practices, the Supreme Court acknowledged in a footnote that the precise elements of a prima facie case would vary according to differing theories of discrimination and different factual situations. (*Id.*, at p. 802, fn. 13 [36 L.Ed.2d at pp. 677-678].)

The *McDonnell Douglas* prima facie case has since been adapted to and applied in a variety of contexts.[6] Where discharge from employment is the challenged action, the complainant must make an initial showing that he was discharged from a position for which he was qualified "under circumstances which give rise to an inference of unlawful discrimination." (*Texas Dept. of Comm. Affairs v. Burdine, supra,* 450 U.S. 248.) The circumstances generally fall into two categories: either he was replaced by a nonminority member no more qualified than he (see, e.g., *Chaline v. KCOH, Inc* (5th Cir. 1982) 693 F.2d 477; *Coleman v. Braniff Airways, Inc.* (5th Cir. 1982) 664 F.2d 1282), or he was fired when nonminority co-workers similarly situated were not fired. (*McDonald v. Santa Fe Trail Transp. Co.* (1976) 427 U.S. 273 [49 L.Ed.2d 493, 96 S.Ct. 2574]; *E.E.O.C. v. Brown & Root, Inc.* (5th Cir. 1982) 688 F.2d 338.) (6) The prima facie case for discriminatory discharge can therefore be stated thusly: (1) complainant belongs to a protected class; (2) his job performance was satisfactory; (3) he was discharged; and (4) others not in the protected class were retained in similar jobs, and/or his job was filled by an individual of comparable qualifications not in the protected class.

(7) Establishment of the prima facie case creates a rebuttable presumption that the employer unlawfully discriminated against the employee. (*Texas Dept. of Community Affairs v. Burdine, supra,* 450 U.S. 248, 254, fn. 7 [67 L.Ed.2d 207, 216].) The burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." (*McDonnell Douglas Corp. v. Green, supra,* 411 U.S. 792.)[7] The defendant need not persuade the court that it was actually motivated by the proffered reasons. [Citation.] It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" (*Texas Dept. of Community Affairs v. Burdine, supra,* 450 U.S. 248, 254 [67 L.Ed.2d 207, 216].)

(8) Finally, "[i]f the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity.... [Plaintiff] now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision." (*Id.* at pp. 255-256 [67 L.Ed.2d at pp. 216-217].) "[He] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indi-

[6]For example, *E.E.O.C. v. West Bros. Dept. Store,* (5th Cir. 1986) 805 F.2d 1171 (failure to promote); *Texas Dept. of Community Affairs v. Burdine, supra,* 450 U.S. 248 (failure to promote and termination of employment); *Uviedo v. Steve's Sash & Door Co.* (5th Cir. 1984) 738 F.2d 1425 (wage disparity); *Lynn v. Regents of the University of California* (9th Cir. 1981) 656 F.2d 1337 (denial of tenure); *Grant v. Bethlehem Steel Corp* (2d Cir. 1980) 622 F.2d 43 (retaliatory actions).

rectly by showing that the employer's proffered explanation is unworthy of credence." (*Id.,* at p. 256 [67 L.Ed.2d at p. 217].) "This burden now merges with [plaintiff's] ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." (*Id.,* at p. 256 [67 L.Ed.2d at p. 217].) At this stage, the *McDonnell/Burdine* presumption "drops from the case" and the factfinder must decide upon all of the evidence before it whether defendant intentionally discriminated against plaintiff. (*U.S. Postal Service Bd. of Govs. v. Aikens* (1983) 460 U.S. 711, 715 [75 L. Ed.2d 403, 103 S.Ct. 1478].) In short the trier of fact decides whether it believes the employer's explanation of its actions or the employee's.

(9) While a complainant need not prove that racial animus was \ sole motivation behind the challenged action, he must prove by a preponderance of the evidence that there was a "causal connection" between the employee's protected status and the adverse employment decision.

(10a) With these principles in mind, we now turn to the findings and the decision of the Commission. Initially, we note that the Commission's decision does not reveal that it engaged in the three-part analysis required by the Supreme Court. There is no reference to a prima facie showing and a resultant shifting of burdens. The Commission opened its discussion of issues by saying this: "[d]iscrimination on the basis of race is established if we determine that a preponderance of all the evidence demonstrates that a causal connection exists between complainant's race and his termination." Recognizing that the complainant bears the burden of persuasion, the Commission concluded, after lengthy analysis of the facts, that Mixon had not carried this burden: "we are persuaded that it was complainant's failure to relocate, not his race, that was the cause for his termination."

(11) Thus it appears that the Commission addressed only the ultimate issue of discrimination, thereby "collapsing" the three-step analysis into one step. (See, e.g., *Sumner v. San Diego Urban League Inc.,* (9th Cir. 1982) 681 F.2d 1140.) But we do not find this to be a fatal defect. In the *Sumner* case the reviewing court was presented with a single conclusory finding as the sole explanation of the lower court's decision. The circuit court held that the "findings" of the district court were "insufficient to enable us to understand the basis for its decision under [*McDonnell* and *Burdine*].... " (*Id.* at p. 1142.) In contrast, the Commission's decision here included 67 detailed factual findings followed by an exhaustive discussion. Courts have recognized that the order of proof of every discriminatory treatment case need not be rigidly compartmentalized. (*U. S. Postal Service Bd. of Governors v. Aikens, supra,* 460 U.S. 711; *Williams v. Southwestern Bell Telephone Co.* (5th Cir. 1983) 718 F.2d 715.) The Commission's deci-

sion here presents a clear and explicit account of its findings and legal conclusions. Under the circumstances, the lack of reference to *McDonnell Douglas* standards does not adversely affect our ability to review the case.[8]

(10b) It is evident that Mixon has demonstrated a prima facie case of discrimination. The findings establish that he is Black, his work performance was satisfactory, and l e was fired whereas White business representatives *who commuted* were *not* fired. Moreover, he was replaced by a White worker with no more experience than he had.

In response, the union asserted Mixon was fired out of business necessity: his expenses were the highest in the union, he served a union office which could ill afford to absorb the cost, and he was unwilling to relocate to reduce expenses. Since this is a legitimate nondiscriminatory reason for termination, the union has satisfied its burden of production and the inquiry rises to the third level.

At this stage, as *Burdine* has shown us, the complainant must prove by a preponderance of the evidence that a discriminatory intent was behind the decision to terminate.

The findings reveal no direct evidence of racial animus on the part of any union official. Moreover, Bryant herself was Black, as was one other of the *four regional directors of Local 250.* One of the vice presidents of Local 250 was also Black.

Mixon must then prove his case indirectly, by showing that *the employer's reasons for terminating him, namely high expenses and failure to relocate, are* "unworthy of credence." In this regard he argued 1) that the union hired him with the knowledge that he was not willing to relocate, and 2) that he was treated differently from White representatives who commuted similar distances and had high expenses.

In support of the first point, Mixon's employment application shows that in answer to the question "If necessary, are you willing to relocate?," he stated "No." The application, however, is dated April 23, 1979, more than two months after Mixon had been on the job. Mixon's original application, and a second one given to Bryant at the initial interview, had apparently both been lost. The findings establish only that before he was hired he was told that "he would be required to relocate" to Stockton "if the commute interfered with his work," and at that time he represented this "would not

[8] The extensive findings made in this case amount to a comprehensive evidentiary summary. As a consequence, although the probative value of the evidence is not at issue here, our discussion will at times resemble an evidentiary review.

be a problem." These findings support an understanding by both sides that a move might be required at a later date.

As to the second point, Mixon produced evidence of eight White business representatives who were allowed to commute significant distances without being obliged to relocate. Of these, five served the Oakland office of Local 250, two worked in San Francisco, and one commuted from Stockton to Sacramento. None serviced the Stockton area. The controller testified that dues from the Stockton members did not cover operating costs at that office. Whereas other offices could afford to pay the expenses of their commuting representatives, *the Stockton office apparently could not. Moreover* Dougherty testified that the policy of cracking down on commuting expenses was instituted by him after his installation as controller and that its application had not been extended to those who had been commuting before his time. These facts distinguish Mixon's situation from that of the others, supporting a conclusion that he was treated differently for the legitimate reasons offered by his employer.

Somewhat more troublesome is the finding that White business representatives whose travel expenses required that they relocate were given a specific option either to move or quit, whereas Mixon was not given such an option. Again, the central question is whether the persons sought to be compared are in fact in a comparable factual setting. The three cases in which employees were given an option involved employment decisions to transfer a representative from one office to a distant office, such that a lengthy commute presented itself. In one case the transferred employee would have faced a commute from San Jose to Santa Rosa. The other two would have involved commutes from Fresno to Stockton and vice versa. In each instance the option to relocate or resign was apparently coincide with the decision to transfer. This was so as well in the case of Masters, w. was transferred to Stockton from San Jose to replace Mixon. On the other hand, Mixon's circumstances were somewhat different since he was a new employee who had been hired with the proviso that he would be asked to move if the commute interfered with his work.

More importantly, it was not proven, as the formal accusation in this case had alleged, that Mixon was fired without being advised that he had to relocate to Stockton. The findings make clear that Mixon had ample notice that management wanted him to move. Dougherty expressed his concern directly to Mixon. On numerous occasions Bryant communicated to Mixon that Twomey and Dougherty were upset about his failure to move. On one occasion Bryant told Mixon that Dougherty had told her to tell him to relocate. In addition, Bryant expressed to others in the union her mounting

frustration that Mixon would not follow her orders and refused to relocate despite the fact that she was "after him" to move.

Thus while the union cannot show that Mixon was given the express option to move or quit, the findings establish the following: he knew from the outset he might be required to move; he was on notice from as early as the first month after starting work that his expenses were considered to be too high; management repeatedly told his supervisor throughout the year that he must move; and his supervisor communicated these demands to him. In our view such circumstances would leave no doubt *in the mind of a reasonable person* that his job was in jeopardy unless he made plans to relocate. In any event these findings do not reasonably support a conclusion that the union had an impermissible motive in firing Mixon.

Finally, Mixon argues that his treatment following termination demonstrates a *continued pattern of discrimination.* He was not informed that his probationary status had been extended, he was denied access to his personnel file, he was refused arbitration in violation of the union's constitution, *and he was given no written explanation of this refusal.* As to all but the first incident, there were no findings that Mixon was treated differently from other employees. We do not by any means endorse the union's actions; however, without evidence tending to establish a nexus to prohibited discrimination, these incidents by themselves are not actionable under the California statute.

In regard to the first point, the Commission found that two White employees were given written notices that their probationary periods had been extended, whereas Mixon received no such notice. The findings note that there was no evidence as to the names or circumstances of the two individuals who received such notices, except that they worked in the San Jose office. There was no further proof that written notice of this kind was standard policy at the union. On the other hand the union did not furnish an explanation why Mixon was not notified in writing, and others were.

It is important that this incidence of disparate treatment was not placed in issue by the allegations in either Mixon's complaint or the accusation filed by the Department; therefore the union's failure to produce specific rebuttal evidence does not compel a finding in favor of Mixon. The action at issue here was Mixon's discharge. The fact that he did not receive notice of his probationary status and two White employees did is evidence properly considered and weighed in determining the ultimate question of discrimination *vel non* in regard to the discharge. On balance, the Commission did not find it to be compelling and the responsibility to weigh evidence was the Commission's. We are not empowered to reweigh it.

In summary we are satisfied the findings of the Commission support its conclusion that Mixon's discharge was not motivated by racial discrimination.

The judgment denying the writ of mandamus is affirmed.

Agliano, P. J., and Capaccioli, J., concurred.

A petition for a rehearing was denied July 15, 1987.

.

CHEEKS v. CALIFORNIA FAIR PLAN ASSN.
61 Cal.App.4th 423; 71 Cal.Rptr.2d 568 [Feb. 1998]

DISPOSITION

The judgment is reversed and the matter remanded to the trial court with directions to vacate its order confirming the appraisal award and for further proceedings consistent with the Supreme Court's opinion in *Jefferson.* Appellant is awarded costs on appeal.

Woods, J., and Neal, J., concurred.

Respondent's petition for review by the Supreme Court was denied April 29, 1998. Baxter, J., and Brown, J., were of the opinion that the petition should be granted.

---

[No. D024497. Fourth Dist., Div. One. Feb. 9, 1998.]

ANNE MULLER, Plaintiff and Appellant, v. AUTOMOBILE CLUB OF SOUTHERN CALIFORNIA, Defendant and Respondent.

SUMMARY

In a wrongful termination action brought by an insurance claims adjuster, who sustained a work-related temporary anxiety disorder, against her former employer for harassment based on mental disability and medical condition in violation of Gov. Code, § 12940, subd. (h)(1), of the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.), breach of contract, breach of the implied covenant of good faith and fair dealing, and tortious discharge in violation of public policy, the trial court entered summary judgment in favor of defendant on the ground that the state workers' compensation scheme provided the sole remedy for all of plaintiff's claims, since they arose out of a work-related injury. (Superior Court of San Diego County, No. 685890, Wayne L. Peterson, Judge.)

The Court of Appeal affirmed the judgment. The court held that plaintiff's FEHA claim was without merit, since she did not have a "mental disability" or a "medical condition" within the meaning of Gov. Code, §§ 12926 and 12940. Even if plaintiff suffered from a mental disability or medical condition under the act, she failed to raise a triable issue of fact as to whether she was harassed by being subjected to a hostile work environment. The court further held that plaintiff's contractual claims were covered by Lab. Code § 132a, and thus were barred by the exclusive remedy provisions of the Workers' Compensation Act (Lab. Code, § 3200 et seq.), since they sought damages arising out of alleged discrimination based on a work-related injury under the FEHA. In any event, assuming that there was an implied contract between the parties that plaintiff could be terminated for good cause only, uncontroverted evidence established that defendant had good cause as a matter of law to terminate her employment. The court also held that there was no merit to plaintiff's tortious discharge claim. i.e., that she was discharged in retaliation for complaining of unsafe working conditions in violation of Lab. Code, § 6310. Plaintiff's declaration, in which she stated that she was frightened for her safety, conveyed her fear to management employees and requested that various measures be taken to accommodate her fear, failed to raise a triable issue of fact as to whether she was terminated

for complaining to defendant about unsafe working conditions under the statute. (Opinion by Haden, J.,* with Work, Acting P. J., and McDonald, J., concurring.)

## HEADNOTES

Classified to California Digest of Official Reports

(1) **Summary Judgment § 26—Appellate Review—Scope of Review.**—On appeal from a ruling on a motion for summary judgment, the appellate court conducts its own independent review of the moving and opposition papers and applies the same standard as the trial court in determining whether the motion was properly granted. The appellate court is not bound by the trial court's stated reasons for its ruling on the motion, since the appellate court reviews only the ruling and not its rationale.

(2a–2d) **Employer and Employee § 9.4—Contracts of Employment—Action for Wrongful Termination—Evidence—Harassment Based on Mental Disability and Medical Condition: Civil Rights § 3—Employment—Fair Employment and Housing Act.**—In a wrongful termination action brought by an insurance claims adjuster, who sustained a work-related temporary anxiety disorder, against her former employer for harassment based on mental disability and medical condition in violation of Gov. Code, § 12940, subd. (h)(1), of the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.), the trial court properly entered summary judgment in favor of defendant. Plaintiff's claim was without merit, since she did not have a "mental disability" or a "medical condition" within the meaning of Gov. Code, §§ 12926 and 12940. First, plaintiff failed to point to evidence suggesting the existence of any genuine issue of material fact about whether she had an actual disability under the act, i.e., a mental impairment that substantially limits a major life activity. Her evidence regarding her claimed mental disability failed to dispute defendant's evidence showing that plaintiff's psychological impairment was of limited duration and did not substantially limit a major life activity. Second, plaintiff's temporary stress disorder did not constitute a medical condition under the act. The definition of "medical condition" is limited to any health impairment related to or associated with a diagnosis of cancer, for which a person has been rehabilitated or cured.

---
*Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

based on competent medical evidence. Finally, even assuming that plaintiff suffered from a mental disability or medical condition under the act, she failed to raise a triable issue of fact as to whether she was harassed by being subjected to a hostile work environment. Although several teasing remarks made by management personnel, and an accusation of insubordination, may have been upsetting to plaintiff, they could not reasonably be viewed as a concerted pattern of harassment of a repeated, routine, or a generalized nature.

(3) **Statutes § 33—Construction—Language—Legislative Intent—Meaning Derived From Context.**—When interpreting a statute, the court must ascertain legislative intent so as to effectuate the purpose of a particular law. The first step in determining that intent is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning. When the words are clear and unambiguous, there is no need for statutory construction or resort to other indicia of legislative intent, such as legislative history. But language that appears unambiguous on its face may be shown to have a latent ambiguity; if so, a court may turn to customary rules of statutory construction or legislative history for guidance. Furthermore, the court must assume that the Legislature has in mind existing laws when it enacts a statute. The court must also interpret a statute in context, examining other legislation on the same or similar subjects, to ascertain the Legislature's probable intent. Therefore the court may attempt to gain insight into the intended meaning of a phrase or expression by examining use of the same or similar language in other statutes. Statutory language that seems clear when considered in isolation may in fact be ambiguous or uncertain when considered in context.

(4) **Statutes § 35—Construction—Language—"Includes".  Words, Phrases, and Maxims—"Includes."**—The word "includes" may be used to broaden a statute, or it may be used as a word of limitation.

(5) **Civil Rights § 3—Employment—Hostile Work Environment Sexual Harassment—Burden of Proof.**—For hostile work environment sexual harassment to be actionable under Gov. Code, § 12940, subd. (h)(1), of the Fair Employment and Housing Act (Gov. Code, § 12900 et seq.), it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. The acts of harassment cannot be occasional, isolated, sporadic, or trivial; rather the plaintiff must show a concerted pattern of harassment of a repeated, routine or a generalized nature.

(6) **Workers' Compensation § 7—Exclusivity of Remedy—Scope and Extent of Exclusivity—Breach of Contract—Claim Arising Out of**

**Alleged Work-related Discrimination: Employer and Employee § 9.4—Contracts of Employment—Action for Wrongful Termination—Evidence—Good Cause.**—In a wrongful termination action brought by an insurance claims adjuster, who sustained a work-related temporary anxiety disorder, against her former employer for breach of contract and breach of the implied covenant of good faith and fair dealing, the trial court properly entered summary judgment in favor of defendant. Plaintiff's claims were covered by Lab. Code, § 132a, and thus were barred by the exclusive remedy provisions of the Workers' Compensation Act (Lab. Code, § 3200 et seq.), since they sought damages arising out of alleged discrimination based on a work-related injury under the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.). In any event, assuming that there was an implied contract between the parties that plaintiff could be terminated for good cause only, uncontroverted evidence established that defendant had good cause as a matter of law to terminate her employment. Defendant did not terminate plaintiff's employment until after her treating psychiatrist concluded that she could not return to work at defendant business, she was retrained to work as a bookkeeper, and defendant received notice that she had secured a position in her new field.

[See 2 Witkin, Summary of Cal. Law (9th ed. 1987) Workers' Compensation, §§ 25, 26.]

(7) **Employer and Employee § 9.4—Actions for Wrongful Discharge—Evidence—Violation of Public Policy—Complaint About Unsafe Working Conditions—Employer Retaliation.**—In a wrongful termination action brought by an insurance claims adjuster, who sustained a work-related temporary anxiety disorder, against her former employer for tortious discharge in violation of public policy, the trial court properly entered summary judgment in favor of defendant. To support a claim of tortious discharge in violation of public policy, the policy allegedly violated must be delineated in a constitutional or statutory provision. There was no merit to plaintiff's claim that she was discharged in retaliation for complaining of unsafe working conditions in violation of Lab. Code, § 6310. To establish a prima facie case of retaliation, a plaintiff must show that he or she engaged in a protected activity, that he or she was thereafter subjected to adverse employment action by his or her employer, and that there was a causal link between the two. In this case, there was no evidence that plaintiff was subjected to unsafe working conditions in defendant's office. Plaintiff's declaration, in which she stated that she was frightened for her safety, conveyed her fear to management employees, and requested that various measures he taken to accommodate her fear, failed to raise a triable issue of fact as to whether she was terminated for complaining to defendant about unsafe working conditions under the statute. The voicing of a fear about one's safety in the workplace does not necessarily constitute a complaint about unsafe working conditions under Lab. Code, § 6310.

COUNSEL

Jon Y. Vanderpool for Plaintiff and Appellant.

Gray, Cary, Ware & Freidenrich and Cindy M. Cipriani for Defendant and Respondent.

O'Melveny & Myers, Stephen P. Pepe and Steven M. Cooper as Amici Curiae on behalf of Defendant and Respondent.

OPINION

HADEN, J.[*]—In this wrongful termination action plaintiff Anne Muller sued her former employer, Automobile Club of Southern California (Auto Club), for harassment based on a mental disability and medical condition in violation of the Fair Employment and Housing Act (FEHA) (Gov. Code,[1] § 12900 et seq.), breach of contract, breach of the implied covenant of good faith and fair dealing, and wrongful termination in violation of public policy. The court granted Auto Club's motion for summary judgment on the ground California's workers' compensation scheme provides the sole remedy for all of Muller's claims because they arose out of a work-related injury. We affirm on various other grounds.

FACTUAL AND PROCEDURAL BACKGROUND

Muller was employed by Auto Club from October 1977 through February 1994. On April 26, 1993, while working as a claims adjuster at Auto Club's Escondido district office, Muller informed an Auto Club insured that he would have to make two deductible payments on a claim for damage to his vehicle caused by more than one accident. The insured's son, Mr. Williams, Jr. (Williams), became incensed by Muller's interpretation of his father's

[*]Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1]All further statutory references are to the Government Code unless otherwise specified.

policy and made a series of angry and threatening calls to Muller in which he repeatedly berated and shouted obscenities at her. At some point during this series of calls, coworkers informed Muller that Williams was on his car telephone in the parking lot waiting for her to leave work. Consequently, a police officer escorted Muller to her car at the end of the workday. Fearing for her safety, Muller contacted the Auto Club employee assistance hotline that evening and requested the first available time for a counseling session.

After Williams threatened Muller, certain Auto Club employees made what Muller felt were insensitive, teasing remarks about the incident. Her supervisor Jack Lape asked her, "Anne, did you wear your target today?"

On May 3, 1993, Muller left work early in tears over a disagreement with her assistant supervisor, Evelyn Blake. On May 5, Lape, Blake, and Auto Club regional manager Frank Mieczkowski met with Muller and informed her that her altercation with Blake constituted insubordination. Muller told them she was experiencing fear and anxiety for her safety in the wake of the threats by Williams and requested that certain measures be taken to accommodate her fear.

On the afternoon of May 5, Muller saw Williams sitting at the employee's lunch table adjacent to Auto Club's parking lot. When Muller confronted Lape and Mieczkowski about Williams's presence on company property, they laughed and Lape told her he had informed Williams where she lived and what kind of car she drove.

On May 12, an Auto Club supervisor of travel services said to Muller, "I'm glad to see you're still alive."

On May 10 and 11, Muller saw Dr. Roshen Gutierrez for psychological counseling. Dr. Gutierrez diagnosed Muller as suffering from posttraumatic stress disorder[2] and prescribed various medications, including Klonopin and Paxil. Muller continued counseling sessions with Dr. Gutierrez and Dr. Martin Cary through May and June. The prescription medications she took during that period impaired her ability to perform her job duties. After several successive absences from work, Muller was told Auto Club's personnel policy required her to take a leave of absence. Muller began her leave of absence on June 15 and never returned to work.

In July Muller was referred to Dr. J. Brand Brickman for a psychiatric evaluation. Dr. Brickman diagnosed Muller as suffering from "Adjustment

---

[2] Dr. Gutierrez's diagnosis of posttraumatic stress disorder is shown through Muller's declaration in opposition to summary judgment and Auto Club's answer to Muller's complaint in the federal action. There is no direct evidence in the record that Dr. Gutierrez made such a diagnosis.

Disorder with Anxiety" and concluded she had a "Temporary Total Psychiatric Disability." From July through September, Dr. Brickman and two of his colleagues, Dr. Robert Zink and social worker Lucinda Nerhood, counseled Muller. Dr. Brickman took Muller off all the medications previously prescribed except the antidepressant Paxil. Muller's anxiety decreased and she became progressively more functional under the care of Dr. Brickman and his colleagues.

Through Nerhood, Muller communicated to Auto Club specific safety and security measures she wanted Auto Club to implement to accommodate her fear for her safety in the workplace. Nerhood also communicated Muller's request that Auto Club remove from her personnel file the May 5 counseling interview in which she was accused of insubordination.

On August 23, Muller telephoned district office manager Carolyn Tsuida and Auto Club personnel representative Kimberly Klink to determine what progress Auto Club had made in addressing her safety concerns. Tsuida did not call Muller back. According to Muller's declaration, Klink told her efforts were underway to update Auto Club's safety policies and procedures. Muller testified that she believed Auto Club would be providing her with an updated written safety program. However, Klink testified that she understood Muller sought only a copy of the existing safety manual and written confirmation that the insubordination matter had been removed from her file, and wanted Auto Club to conduct safety meetings with its employees.

Auto Club complied with most of Muller's requests. Klink informed Muller that Rod Middleswart was being reassigned to the Escondido district office as claims supervisor to further accommodate her safety concerns. Middleswart was chosen because of his prior involvement in a shooting incident in Auto Club's East San Diego office in which a female employee was killed. Middleswart sent Muller a letter notifying her that the May 5 counseling interview had been removed from her file. In October Muller received a copy of Auto Club's written safety policies and procedures. Muller noted that the policies and procedures had been updated on May 18, 1993, but the specific security procedures regarding threatening telephone calls had not been changed since February 1992.

Muller felt that Auto Club was not adequately addressing her safety concerns. In an agreed upon reevaluation of Muller's psychiatric condition dated September 15, 1993, Dr. Brickman noted a breakdown in negotiations between Muller and Auto Club. Dr. Brickman concluded that as a result of Muller's experiences with Auto Club following Williams's threats, it would be impossible for Muller to return to work for Auto Club, although she was

fully able to work elsewhere. Accordingly, Dr. Brickman deemed Muller to be a "Qualified Injured Worker."

Dr. Brickman's final report resulted in an agreement between Klink, workers' compensation claims adjuster Diane Klatt, and Muller's workers' compensation attorney Randy Mason that Auto Club would provide Muller vocational rehabilitation services. Muller expressed a desire to "get out of the claims industry altogether." In November 1993 Klink told Muller she would be terminated after she completed her vocational rehabilitation. Muller completed her retraining in February 1994 and began working for Tool Time Construction as a bookkeeper on March 1.

During a visit to Auto Club's Escondido office on March 4, Muller was given a final paycheck and told she had been "resigned" from her position with Auto Club.

In June 1994 Muller filed a claim for harassment based on mental disability and medical condition with the California Department of Fair Employment and Housing (DFEH). She also filed a federal disability discrimination claim with the Equal Employment Opportunity Commission (EEOC). The EEOC investigator assigned to her claim informed Muller she was not a qualified individual with a disability under the Americans with Disabilities Act (ADA) (42 U.S.C. § 12101 et seq.).

After obtaining right-to-sue letters from EEOC and DFEH, Muller filed an action in federal court on July 25, 1994, for discrimination based on harassment of a disabled individual, breach of contract, breach of implied covenant of good faith and fair dealing, and wrongful termination in violation of public policy. On February 27, 1995, Muller filed the instant action in superior court, alleging the same causes of action.

In April 1995 Auto Club moved for summary judgment in the federal action as to all of Muller's claims. The federal court granted summary judgment as to Muller's ADA cause of action on the ground she was not disabled under the ADA. The federal court declined to exercise its discretionary jurisdiction over Muller's state law causes of action and, accordingly, dismissed them without prejudice.

On May 2, 1995, Muller filed a first amended complaint dropping the ADA cause of action adjudicated by the federal district court. Auto Club then successfully moved for summary judgment.

## Discussion

(1) On appeal from a ruling on a motion for summary judgment, the appellate court conducts its own independent review of the moving and

opposition papers and applies the same standard as the trial court in determining whether the motion was properly granted. The appellate court is not bound by the trial court's stated reasons for its ruling on the motion, as the appellate court reviews only the ruling and not its rationale. (*California Aviation, Inc. v. Leeds* (1991) 233 Cal.App.3d 724, 730-731 [284 Cal.Rptr. 687].)

## I

### Claim for Disability Harassment Under FEHA

The FEHA provides in pertinent part: "It shall be an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California: [¶] (a) For an employer, because of the ... mental disability, [or] medical condition ... of any person, because of the ... sation or in terms, conditions or privileges of employment." (§ 12940.)

(2a) In her FEHA cause of action entitled "Employment Harassment," Muller alleged she was harassed by coworkers at Auto Club because of her post-traumatic stress disorder. The court granted summary judgment on the ground all of her claims, including the FEHA cause of action, "are precluded by the exclusive remedies set forth in the workers' compensation statutes." The briefing on Auto Club's motion for summary judgment and the cases cited by the court in its ruling make it clear the ruling was based on Labor Code section 132a, which provides a remedy against employers who retaliate against workers for filing workers' compensation claims. The cases cited in the court's ruling support the proposition that Labor Code section 132a provides the exclusive remedy for employee claims of discrimination based on a work-related injury. (E.g., *Angell v. Peterson Tractor, Inc.* (1994) 21 Cal.App.4th 981, 988 [26 Cal.Rptr.2d 541].)

We do not address the issue of whether the exclusivity of Labor Code section 132a bars a claim under FEHA for work-related disability discrimination.[4] Rather, we conclude Muller's FEHA cause of action is without merit because she did not have a "mental disability" within the meaning of FEHA.

[4] Section 12940, subdivision (h)(1), makes it unlawful to harass an employee because of mental disability or medical condition.

This issue is currently pending before the California Supreme Court, which granted review in two cases reaching contrary results as to whether a 1993 amendment to section 12940 eliminated Labor Code section 132a's preemption of FEHA claims for discrimination based on work-related injuries. (*Gommack v. GTE California Inc.* (1996) 48 Cal.App.4th 207 [55 Cal.Rptr.2d 837], review granted Nov. 26, 1996 (S056183); *City of Moorpark v. Superior*

Alternatively, we conclude, as a matter of law, that Muller was not the victim of harassment.

### A. Muller Was Not Disabled

Section 12926 defines the terms "physical disability" and "mental disability" as used in FEHA. Under that statute a physical malady does not qualify as a "physical disability" unless it "[l]imits an individual's ability to participate in major life activities." (§ 12926, subd. (k)(1)(B).) However, similar restrictive language does not appear in section 12926's definition of "mental disability." Section 12926, subdivision (i) merely states: "'Mental disability' includes any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities."

Auto Club and the Employers Group, in its amicus curiae brief filed in this matter, contend the Legislature clearly intended to bring California's disability discrimination law into conformity with the ADA, which defines "disability" with respect to an individual as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (¶) (B) a record of such impairment; or (¶) (C) being regarded as having such an impairment." (42 U.S.C. § 12102(2).) Auto Club and the Employers Group argue that to effectuate the legislative objective of conformity with the ADA, the term "mental disability" as used in FEHA must be construed as including only mental disorders that substantially limit one or more of a person's major life activities.

(3) "When interpreting a statute, we must ascertain legislative intent so as to effectuate the purpose of a particular law. Of course our first step in determining that intent is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning. [Citation.] When the words are clear and unambiguous, there is no need for statutory construction or resort to other indicia of legislative intent, such as legislative history. [Citation.] But language that appears unambiguous on its face may be shown to have a latent ambiguity; if so, a court may turn to customary rules of statutory construction or legislative history for guidance. [Citation.]

"Furthermore, we must assume that the Legislature has in mind existing laws when it enacts a statute. [Citation.] We must also interpret a statute in

---

Court (1996) 49 Cal.App.4th 973 [57 Cal.Rptr.2d 156], review granted Nov. 26, 1996 (S056721).)

[4] In addition to listing what the term "mental disability" *includes*, section 12926, subdivision (i) provides that the term *excludes* conditions excluded from the federal definition of "disability" in the ADA (e.g., kleptomania and pedophilia) as well as the unlawful use of controlled substances.

context, examining other legislation on the same or similar subjects, to ascertain the Legislature's probable intent. [Citation.] Therefore we may attempt to gain insight into the intended meaning of a phrase or expression by examining use of the same or similar language in other statutes. [Citation.] Statutory language which seems clear when considered in isolation may in fact be ambiguous or uncertain when considered in context. [Citation.]" (*Quarterman v. Kefauver* (1997) 55 Cal.App.4th 1366, 1371 [64 Cal.Rptr.2d 741].)

The definition of "mental disability" in section 12926 includes, without qualifying language, "emotional or mental illness." The terms "emotional illness" and "mental illness" can be broadly construed to include myriad temporary mental or psychological disorders that are not truly disabling because they do not impair any of the afflicted person's major life activities. Although section 12926, subdivision (i) may be unambiguous when read in isolation, viewed in the overall context of section 12926, it creates an ambiguity as to whether the Legislature intended to provide to employees with minor or temporary *mental* disorders protection that is denied to employees with minor or temporary *physical* disorders.

Further, section 12926, subdivision (i), is ambiguous when considered in the context of other legislation addressing disability discrimination. Section 12955.3, an FEHA statute concerning housing discrimination, defines "disability" as "[a] physical or mental impairment that substantially limits one or more of a person's major life activities." (§ 12955.3, subd. (a).) We can think of no good reason why the Legislature would define "mental disability" more broadly in the context of employment discrimination than in the context of housing discrimination.

In addition to section 12955.3, numerous other California statutes prohibiting disability discrimination, or otherwise protecting disabled persons, use the ADA definition of mental disability requiring substantial limitation of major life activity. (See, e.g., §§ 11135, subd. (c), 19231, subd. (a)(1); Bn. & Prof. Code, §§ 125.6, 17206.1, subd. (b)(2); Civ. Code, §§ 54, 1761, subd. (g); Ed. Code, §§ 44101, subd. (b), 44337; Ins. Code, § 10144; Rev. & Tax. Code, § 24383, subd. (t).) The Legislature's use of the ADA definition of "mental disability" in so many other antidiscrimination statutes strongly indicates it intended it to apply in the context of FEHA's employment discrimination statutes as well. Because of the ambiguity regarding the meaning of "mental disability" in the FEHA employment statutes, we look to legislative history for guidance. (*Quarterman v. Kefauver, supra,* 55 Cal.App.4th at p. 1371.)

The definition of "mental disability" was added to section 12926 by Assembly Bill No. 1077, 1991-1992 Regular Session (Assembly Bill 1077) (Stats. 1992, ch. 913, § 21.3, p. 4306). The legislative history of that

provision is revealed through companion bills to Assembly Bill 1077. The definition of "mental disability" in Assembly Bill 1077 is substantially the same as that set forth in Assembly Bill No. 3825. 1991-1992 Regular Session (Assembly Bill 3825), which the Governor vetoed solely because it would have empowered the Fair Housing and Employment Commission to award unlimited emotional distress damages to victims of employment discrimination. The Assembly Committee on Labor and Employment reported that Assembly Bill 3825 "[c]onforms state disability laws to the federal ADA in the area[] of employment. . . . Among its provisions, this bill specifically: [¶] Protects individuals with physical or mental disabilities from discrimination." (Assem. Com. on Labor and Employment, Analysis of Assem. Bill No. 3825 (1991-1992 Reg. Sess.) as amended Apr. 2, 1992, p. 5.) Noting California law provided less protection than the ADA against discrimination based on mental disability, the report stated: "Employers and providers of public accommodations or services will be required to comply with both the ADA and state laws and regulations. [¶] Without conformity, California businesses and employers will be required to comply with the varying standards in state law and ADA. Supporters argue that conformity with the ADA will benefit employers and businesses because they will have one set of standards with which they must comply." (Op. cit. supra, at p. 8; accord, Sen. Com. on Judiciary, Analysis of Assem. Bill No. 3825 (1991-1992 Reg. Sess.) as amended June 19, 1992.)

A number of California's antidiscrimination statutes, including section 12926 and Civil Code section 54, were amended by the enactment of Assembly Bill 1077. The Assembly Committee on Judiciary noted Assembly Bill 1077 would conform California law to the ADA by modifying "the language contained in state anti-discrimination laws to ensure that protections are given to individuals with *physical or mental disabilities*. . . . Further, it changes terms such as 'physical handicap' found through state anti-discrimination provisions to terms found in the ADA such as 'persons with disabilities'. Disability is defined to mean: (a) a physical or mental impairment that substantially limits a major life activity, (b) a record of such impairment; or (c) being regarded as having such an impairment." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1077 (1991-1992 Reg. Sess.) as amended Jan. 6, 1992, p. 2; see also Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1077 (1991-1992 Reg. Sess.) as amended June 1, 1992.)

(2b) From this legislative history and the various antidiscrimination statutes cited above, it is clear the Legislature intended to conform California's employment discrimination statutes to the ADA by extending protection to persons with mental disabilities, and intended, in accordance with the

ADA, to uniformly define "mental disability" as a mental impairment that substantially limits a major life activity."

The issue of whether Muller suffered a mental disability under that definition was adjudicated against Muller in her federal action. Therefore, Muller is collaterally estopped from relitigating that issue in the present case. (See *Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341 [272 Cal.Rptr. 767, 795 P.2d 1223, 2 A.L.R.5th 995].)

In ruling on Auto Club's motion for summary judgment in the federal action, the federal district court noted: "The regulations promulgated by the EEOC to implement the ADA define 'major life activities' as 'functi[ ]c such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.' [Citation]" (*Muller v. Automobile Club of Southern California* (S.D.Cal. 1995) 897 F.Supp. 1289, 1294.)[7] The federal district court carefully reviewed Muller's evidence regarding her claimed mental disability and concluded it "fails to dispute [Auto Club's] evidence showing that [Muller's] psychological impairment was of limited duration and did not substantially limit a major life activity. . . . That the Williams incident 'impacted' [Muller's] life is insufficient to show a disability under the ADA. [¶] [Muller] falls especially short in her efforts to show a substantial limitation on her ability to work. [Muller] has

---

[7] The Fifth District recently concluded the Legislature intended to omit the language requiring limitation of a major life activity from the definition of "mental disability" in section 12926. (*Pensinger v. Bowsmith, Inc.* (1998) 60 Cal.App.4th 709 [70 Cal.Rptr.2d 531].) The *Pensinger* court declined to look beyond the language of section 12926 to determine legislative intent, citing the rule that there is no need for construction when the language of a statute is clear and unambiguous. *Pensinger* viewed the Legislature's amendment of the definition of "disability" in other statutes (e.g., Civ. Code, § 54; Gov. Code, § 11135) to mirror the ADA definition, including the requirement that the physical or mental disability substantially limits a major life activity, as evidence of its intent *not* to adopt the ADA definition of "mental disability" in section 12926.

We disagree with *Pensinger's* conclusion there is no ambiguity regarding the definition of "mental disability" in section 12926 and that statutory construction is therefore unnecessary. Assuming no ambiguity is created by the language of section 12926 itself, an ambiguity is nevertheless created by the inconsistency between section 12926, subdivision (i) and the definition of mental disability in other statutes dealing with physical disability discrimination. "When a particular provision appears in one statute but is omitted from a related statute, the most obvious conclusion from the omission is that a different legislative intent existed.' [Citation.] *On the other hand, an examination of legislative history and the pertinent statutory scheme may suggest that the omission was an oversight.*" (*People v. Goodloe* (1995) 37 Cal.App.4th 485, 491 [44 Cal.Rptr.2d 15], italics added.) Based on our examination of the relevant legislative history and California's antidiscrimination legislation overall, we conclude the omission of the requirement of limitation of a major life activity from the definition of "mental disability" in section 12926, subdivision (i), was legislative oversight.

The same definition of "[major] life activities" is set forth in Civil Code section 1761, subdivision (g)(2) and Business and Professions Code section 17206.1, subdivision (b)(2)(B).

Indemnity Corp. v. Pacific Southwest Airlines (1982) 128 Cal.App.3d 898, 904 [180 Cal.Rptr. 685].) The governing consideration in resolving such an ambiguity is the intention of the Legislature. (Coast Oyster Co. v. Perluss (1963) 218 Cal.App.2d 492, 501 [32 Cal.Rptr. 740].)

The parties do not refer to any express indication of the Legislature's intention in specifying only a health impairment related to or associated with cancer in the definition of "medical condition" in section 12926, subdivision (h). However, we infer that the Legislature intended to use the word elsewhere in the statute. The Legislature clearly uses the word "includes" as a word of limitation in defining the following terms in section 12926: "affirmative relief" or "prospective relief" in subdivision (a); "employer" in subdivision (d) (see American National Ins. Co. v. Fair Employment & Housing Com. (1982) 32 Cal.3d 603, 611 [186 Cal.Rptr. 345, 651 P.2d 1151] (dis. opn. of Mosk, J.)); "employment agency" in subdivision (e); "labor organization" in subdivision (g); and "mental disability" in subdivision (i).

In defining "physical disability" in subdivision (k) and "sex" in subdivision (o) of section 12926, the Legislature makes clear its intent to use the word "includes" as a word of enlargement by adding the phrase "but is not limited to" after it. If the Legislature intended to extend FEHA protection to employees with medical conditions other than cancer, presumably it would have followed the word "includes" with the phrase "but is not limited to" in section 12926, subdivision (h). Not only is that phrase absent from the definition of "medical condition" in subdivision (h), but the Legislature specifically deleted it from the definition when it amended section 12926 in 1993. (Stats. 1993, ch. 1214, § 5.)[9]

(2c) Considering the Legislature's use of the word "includes" as a word of limitation throughout section 12926 except where it is followed by the phrase "but is not limited to," and the Legislature's specific deletion of the phrase from subdivision (h) in 1993, we conclude the Legislature intended to limit the definition of "medical condition" to "any health impairment related to or associated with a diagnosis of cancer, for which a person has been rehabilitated or cured, based on competent medical evidence." (§ 12926, subd. (h); see Gosvener v. Coastal Corp. (1996) 51 Cal.App.4th 805, 812-813 [59 Cal.Rptr.2d 339].) Accordingly, Muller's temporary stress disorder

[9]Prior to its amendment in 1992, section 12926, subdivision (f) stated: "'Medical condition' means any health impairment related to or associated with a diagnosis of cancer, for which a person has been rehabilitated or cured, based on competent medical evidence." (Stats. 1990, ch. 15, § 1, p. 88, italics added.) In 1992 the Legislature amended section 12926 by, among other things, substituting "includes, but is not limited to" for "means" in subdivision (h). (Stats. 1992, ch. 913, § 3, pp. 4232-4233; ch. 912, § 3, p. 4236; ch. 913, § 2, p. 4307.) In 1993 the Legislature deleted the phrase "but is not limited to" as noted above.

---

not pointed to any evidence showing that her psychological impairments prevented her from holding a job in the same class as the one she held at the Auto Club before her termination. That [Muller] did not want to return to the insurance industry does not demonstrate that her impairments met the standard for "disability" under the ADA. [Muller] has offered no information about the availability in her area of claims adjuster jobs or other jobs requiring similar skills, training, and ability. [¶] In short, [Muller] has failed to point to evidence suggesting the existence of a genuine issue of material fact about whether she had an actual disability under [the ADA]." (Muller v. Automobile Club of Southern California, supra, 897 F.Supp. at p. 1297.)[8]

### B. Muller Did Not Suffer From a "Medical Condition"

Section 12926, subdivision (h) states: "'Medical condition' includes any health impairment related to or associated with a diagnosis of cancer, for which a person has been rehabilitated or cured, based on competent medical evidence." Although the issue is not extensively argued, Muller contends section 12926 does not impose limits on the type of "medical conditions" contemplated by section 12940. Auto Club, on the other hand, contends "medical condition" in section 12926 covers only impairments related to successful recovery from cancer.

The word "includes" in section 12926, subdivision (h) creates an ambiguity. (4) As this court has noted, "'While the word "includes" may be used to broaden a specific term, it may also be used as a word of limitation.' [Citation.]" (State Compensation Ins. Fund v. Workers' Comp. Appeals Bd. (1977) 69 Cal.App.3d 884, 890 [138 Cal.Rptr. 509]; see also Associated

[8]Muller argued in federal court that even if she was not actually disabled, she was "disabled" under the ADA because Auto Club regarded her as having a disability (Muller v. Auto Club of Southern California, supra, 897 F.Supp. at p. 1297.) The court noted that a "proper test for a 'regarded as' claim is whether the impairment, as perceived, would affect the individual's ability to find work across the spectrum of same or similar jobs." [Citation.] (Id. at p. 1297-1298.) The court concluded: "[Muller] has failed to point to any evidence suggesting that [Auto Club] considered her disabled under the ADA. [Auto Club's] efforts to accommodate [Muller's] safety concerns and ultimately to help her find employment outside the Auto Club do not suggest that [Muller] has a valid "regarded as" claim. [Muller's] workers' compensation attorney and a representative of [Auto Club] agreed that [Muller] should receive vocational training after Dr. Brickman stated that [Muller] could not return to her job at the Auto Club. By its actions, [Auto Club] never conceded that [Muller] was unfit for work as a claims adjuster or that [her] impairment, as perceived by [Auto Club], would preclude her from obtaining employment consistent with her training and experience. Instead, all of the evidence before this Court shows that [Auto Club's] efforts at accommodation were responses to [Muller's] own concerns about her safety and her wishes to enter a new line of work. [¶] In short, [Muller] has failed to raise a genuine issue of material fact about whether [Auto Club] regarded her as disabled under the ADA." (Id. at p. 1298.)

does not constitute a "medical condition" within the meaning of sections 12926 and 12940.

### C. Muller Was Not Harassed

Assuming arguendo Muller suffered from a mental disability or medical condition within the meaning of section 12940, she fails to raise a triable issue of fact as to whether she was harassed.

There is no published California case addressing the requirements for a claim of harassment based on a mental disability or medical condition. Since Muller's theory is that she was subjected to a hostile work environment created by repeated harassing statements by management personnel, we look to cases addressing the requirements for a hostile environment claim of sexual harassment for guidance.

(5) ""For [hostile work environment] sexual harassment to be actionable, it must be sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment."'" [Citation.]' (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 609 [262 Cal.Rptr. 842], quoting *Meritor Savings Bank v. Vinson* (1986) 477 U.S. 57, 67 [106 S.Ct. 2399, 2405, 91 L.Ed.2d 49].) "In determining what constitutes 'sufficiently pervasive' harassment, the courts have held that acts of harassment cannot be occasional, isolated, sporadic, or trivial, rather the plaintiff must show a concerted pattern of harassment of a repeated, routine or a generalized nature. [Citation]" (*Fisher v. San Pedro Peninsula Hospital, supra,* 214 Cal.App.3d at p. 610.)

(2b) Muller's harassment claim is essentially based on two remarks made jokingly by her supervisor, Jack Lape, and a third remark made by a coworker. Lape asked Muller if she wore "her target" and, on another occasion, told her that he had informed Williams where she lived and what kind of car she drove. The only other relevant Muller points to as supporting her harassment claim is that of a female coworker, who said to her, "I'm glad to see you're still alive." These isolated remarks cannot reasonably be viewed as "a concerted pattern of harassment of a repeated, routine or a generalized nature." Rather, they fall into the category of "occasional, isolated, sporadic, or trivial" instances of inappropriate conduct. Moreover, they cannot constitute harassment on the basis of Muller's mental disability or medical condition because they were made before Muller's disorder was diagnosed.

In addition to the aforementioned teasing remarks and accusation of insubordination, Muller testified in her deposition that her disability harassment claim was based on the fact Lape twice knocked on the door of the

room in which she was secluded on May 5 and asked her to come out to talk to Williams's father. She also felt harassed by receiving contradictory and confusing instructions from 17 different people regarding her workers' compensation claim; by an alleged directive from management to employees to direct any calls from Muller to management and not discuss anything with her; and by the fact Auto Club employees learned she had retained [an attorney] in her workers' compensation case. While these events may have been upsetting to Muller, they cannot reasonably be viewed as a concerted pattern of harassment. The court properly adjudicated Muller's FEHA cause of action in Auto Club's favor.

### II

### Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing

(6) We have not addressed whether the exclusive remedy aspect of Labor Code section 132a[20] bars Muller from pursuing a remedy under FEHA for harassment or discrimination as result of a work-related injury because we have concluded Muller does not have a viable FEHA claim. However, we conclude the exclusivity of section 132a bars Muller's causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing.

Muller contends the exclusive remedy provisions of the Workers' Compensation Act (Lab. Code, § 3200 et seq.) do not bar her contractual claims because she seeks damages under those claims for economic injury independent of her mental injury, including prospective loss of earnings and medical benefits. Muller relies on *Pichon v. Pacific Gas & Electric Co.* (1989) 212 Cal.App.3d 488 [260 Cal.Rptr. 677], in which the plaintiff was suspended from work pending a psychological evaluation after he became emotional distraught as a result of harassment by his supervisor. The plaintiff returned to work and was ultimately discharged for insubordination because he insisted his proposal for a bridge design was superior to that submitted by one of his supervisors. He then sued his employer for breach of an agreement to terminate for good cause only, breach of the implied covenant of good faith and fair dealing and intentional and negligent infliction of emotional distress. (*Id.* at pp. 492-493.)

The Court of Appeal in *Pichon* held that the plaintiff's emotional distress claims were barred by the exclusivity of workers' compensation but his

[20]All further statutory references in this section of the opinion are to the Labor Code unless otherwise specified.

Workers' Compensation Act. Appellant cannot avoid the exclusive remedy provision by labeling this cause of action as breach of a contract. Unlike the plaintiff in *Pichon*, appellant can point to no damages that are not recoverable under section 132a. The contract cause of action is also barred by the Workers' Compensation Act." (*Usher v. American Airlines, Inc., supra,* 20 Cal.App.4th at p. 1528.)[2]

*Usher* is on point. Muller's contract claims are based on the same alleged discriminatory and harassing conduct as her disability harassment claim under FEHA. Whether that conduct was in response to Muller's anxiety disorder or her voicing of safety concerns as a result of the William incident, it arose from her alleged mental disability. The essence of the alleged harm in each of Muller's claims is the loss of wages and benefits as a result of her employer's harassment and discrimination on the basis of her work-related psychiatric injury. As *Usher* noted, these matters are governed by the Workers' Compensation Act.

Further, Labor Code section 132a provides an adequate remedy for the harm Muller claims under her contract causes of action. Muller seeks damages for loss of past and future earnings, job benefits, and expenses incurred in the search for comparable employment. Section 132a provides for a penalty of up to $10,000 in addition to reimbursement for lost wages and benefits. Section 132a also provides for reinstatement, which obviates the need for future earnings and job hunting expenses.

Muller cites *Bray v. Workers' Comp. Appeals Bd.* (1994) 26 Cal.App.4th 530 [31 Cal.Rptr.2d 580], for the proposition that workers' compensation exclusivity does not preclude her from seeking compensation for prospective lost earnings and benefits suffered after her termination. However, *Bray* merely held that the workers' compensation system does not provide compensation for *psychiatric* injuries arising after the termination as a result of the termination itself. (*Id.* at pp. 539-540.) *Bray* did not address Labor Code section 132a or whether workers' compensation exclusivity bars a civil action for breach of an employment contract that arises out of disability discrimination.

"[T]he Supreme Court has interpreted the broad policy language of section 132a to provide the increased workers' compensation remedies of section 132a for *any* discrimination against an employee based on a work-related

[2] "To *Usher's* analysis distinguishing *Pichon* we would add that *Pichon* addressed only the exclusive remedies of Labor Code sections 3600 and 3602 for work-related personal injury or death. *Pichon* did not address the exclusive remedy effect of Labor Code section 132a on a claim for breach of contract arising out of alleged disability discrimination.

---

contractual claims were not. *Pichon* concluded: "Economic or contractual damages incurred independent of any disability cannot logically be included in the concept of 'injury' in the sense of 'personal injury or death' [for which the Workers' Compensation Act provides the exclusive remedy]." (*Pichon v. Pacific Gas & Electric Co., supra,* 212 Cal.App.3d at p. 501.)

However, *Pichon* further stated: "Our decision should not be construed to hold that the exclusivity provisions of the Workers' Compensation Act can never preclude a wrongful termination claim because the injury sought to be redressed by such a claim is loss of employment, not a 'personal injury' or death. '[When] the essence of the wrong is personal physical injury or death, *the action is barred by the exclusiveness clause no matter what its name or technical form* . . . .' [Citation.] The crucial question is what is the nature of the actual underlying injury for which the former employee is trying to recover, not what cause of action is alleged." (*Pichon v. Pacific Gas & Electric Co., supra,* 212 Cal.App.3d at p. 501, italics in original.)

In *Usher v. American Airlines, Inc.* (1993) 20 Cal.App.4th 1520 [25 Cal.Rptr.2d 335], the plaintiff sued her employer for constructive termination and breach of contract based on the employer's alleged discrimination against her because she was temporarily disabled as the result of an industrial injury to her back and knee. (*Id.* at pp. 1522-1523.) Relying on *Pichon*, the plaintiff in *Usher* argued Labor Code section 132a does not provide for disability discrimination when the employer's conduct also breaches an implied employment contract. The *Usher* court stated it did "not read *Pichon* so broadly as to allow a separate action whenever an employee alleges that a work injury also resulted in a breach of contract." (20 Cal.App.4th at p. 1528.)[1]

The *Usher* court found *Pichon* distinguishable, stating: "The plaintiff in *Pichon* was fired for disagreeing with his supervisor, and injuries to his psyche followed. He was not terminated because of any physical or mental disability. Appellant claims that she was not allowed to work because of her industrially caused disability. This conduct was the basis for the 132a claim. Appellant has incurred no damages independent of the compensable workers' compensation claim. By her complaint and answers to interrogatories, she has admitted that the damages suffered were derived from discrimination based on an industrial injury and that she was disabled throughout the entire period of discrimination. The essence of this wrong is a personal injury sustained at work and lost wages because of the employer's discrimination against her due to her industrial injury. These matters are governed by the

[1] *Usher* and *Pichon* were decided by different panels of the First District Court of Appeal, Division One.

injury. [Citation.]" (*Angell v. Peterson Tractor, Inc., supra,* 21 Cal.App.4th at p. 988.) Muller's causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing are barred by the Workers' Compensation Act because they seek damages arising out of alleged discrimination based on a work-related injury.[13]

In any event, although, Muller alleges various ways in which Auto Club breached her employment contract and the implied covenant of good faith and fair dealing, the gravamen of those causes of action is that Auto Club terminated her without good cause. Assuming there was an implied contract between the parties that Muller could be terminated for good cause only, uncontroverted evidence establishes that Auto Club had good cause to terminate her employment. Auto Club did not terminate Muller's employment until after her treating psychiatrist, Dr. Brickman, concluded she could not return to work at Auto Club, she was retrained to work as a bookkeeper, and Auto Club received notice that she had secured a position in her new field. Under these circumstances, Auto Club's termination of Muller's employment was for good cause as a matter of law.

The court correctly granted summary judgment as to Muller's contractual causes of action.

### III

### Tortious Discharge in Violation of Public Policy

(7)  To support a claim of tortious discharge in violation of public policy, the policy allegedly violated must be delineated in a constitutional or statutory provision. (*Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1095 [4 Cal.Rptr.2d 874, 824 P.2d 680].) Muller contends her discharge violated the public policy against discrimination on the basis of disability delineated in Government Code section 12940 as well as the public policy promoting safety in the workplace and prohibiting employers from retaliating against employees who complain of unsafe working conditions, delineated in Labor Code sections 6402 and 6310, subdivision (b).[14]

Government Code section 12940 does not support Muller's tortious discharge claim, as we have concluded there is no merit to Muller's cause of

[13] We view harassment as a form of discrimination. (See Gov. Code, § 9572; *Meritor Savings Bank v. Vinson, supra,* 477 U.S. at p. 67 [106 S.Ct. at pp. 2405-2406]; *Reno v. Baird* (1997) 57 Cal.App.4th 1211, 1224-1227 [67 Cal.Rptr.2d 671] review granted December 17, 1997.) [SM654373.]

[14] Labor Code section 6402 provides: "No employer shall require, or permit any employee to go or be in any employment or place of employment which is not safe and healthful." Labor Code section 6310, subdivision (b), provides, in relevant part: "Any employee who is discharged, threatened with discharge, demoted, suspended, or in any other manner discriminated against in the terms and conditions of employment by his or her employer

action under that statute. Nor is there merit to Muller's claim that she was discharged in retaliation for complaining of unsafe working conditions in violation of Labor Code section 6310.

"To establish a prima facie case of retaliation, a plaintiff must show that she engaged in a protected activity, that she was thereafter subjected to adverse employment action by her employer, and there was a causal link between the two. [Citation.]" (*Fisher v. San Pedro Peninsula Hospital, supra,* 214 Cal.App.3d at p. 614.)

There is no evidence in the record that Muller was subjected to unsafe working conditions in the Auto Club office where she worked. In her separate statement of undisputed facts in opposition to Auto Club's motion for summary judgment, Muller merely states she was "terminated *subsequent to* expressing concerns for her workplace safety and security." (Italics added.) She does not assert she was terminated *because* she expressed safety concerns. Assuming she meant her termination was retaliatory, the only relevant evidence she cites in support of that contention is her declaration in which she states she was frightened for her safety, conveyed her fear to management employees and requested that various measures be taken to accommodate her fear, including removing her name tag from her desk cubicle, locking two of the three doors accessing her work area, and notifying her coworkers about the Williams incident. She also asked about the possibility of hiring a security guard for the building and having cameras installed outside the building.

Obviously, Muller's anxiety disorder did not overnight render her office an unsafe workplace. There is a certain risk of crime in any workplace to which the general public has access. However, unless crime in the workplace is highly foreseeable, employers cannot reasonably be expected to insure against it. As one court stated: "Sadly, in these days of increased urba, crimes of violence, such crimes can also occur in the workplace, just as they do in the street. However, there is no fundamental public policy requiring a retail employer to provide adequate store security; to the contrary, there is a 'well-established policy' against forcing landowners to insure public safety. [Citation.]" (*Arendell v. Auto Parts Club, Inc.* (1994) 29 Cal.App.4th 1261, 1265 [35 Cal.Rptr.2d 83].)

because the employee has made a bona fide oral or written complaint to . . . his or her employer . . . of unsafe working conditions, or work practices, in his or her employment or place of employment . . . Shall be entitled to reinstatement and reimbursement for lost wages and work benefits caused by the acts of the employer. Any employer who willfully refuses to rehire, promote, or otherwise restore an employee . . . who has been determined to be eligible for rehiring or promotion by a grievance procedure, arbitration, or hearing authorized by law, is guilty of a misdemeanor."



The voicing of a fear about one's safety in the workplace does not necessarily constitute a complaint about unsafe working conditions under Labor Code section 6310. Muller's declaration shows only that she became frightened for her safety as a result of her unfortunate experience with Williams and expressed her fear to Auto Club; it is not evidence that the Auto Club office where she worked was actually unsafe within the meaning of Labor Code sections 6310 and 6402. Hence, Muller's declaration fails to raise a triable issue of fact as to whether she was terminated for complaining to Auto Club about unsafe working conditions in violation of Labor Code section 6310.

The court properly adjudicated Muller's cause of action for tortious discharge in violation of public policy in favor of Auto Club.

DISPOSITION

The judgment is affirmed.

Work, Acting P. J., and McDonald, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 27, 1998.

[Deleted 453-471]

Opinions (*People v. Thompson** and *People v. Gonzalez*†) on pages 453-471 omitted.

*Reprinted as modified at 61 Cal.App.4th 1269
†Review granted. Reprinted without change in the Review Granted Opinions Pamphlet to permit tracking pending review and disposition by the Supreme Court.

insurance commissioner for the purpose of determining whether an insurer's financial condition warranted a rate increase, he failed to identify a specific statement in Prop. 103 or other statutes restricting the amount of an insurer's reserves. (Opinion by Premo, J., with Cottle, P. J., and Elia, J., concurring.)

## HEADNOTES

Classified to California Digest of Official Reports

**(1) Summary Judgment § 6—Motion—Notice of Motion—Summary Adjudication of Issues—Necessity of Specifying Issues.**—In an employee's action against his former employer for wrongful discharge in violation of public policy, age discrimination, and fraud and deceit, the trial court erred in finding that defendant's notice of motion for summary adjudication of each cause of action was deficient on the ground that it failed to specify the matters to be adjudicated, where the notice, in requesting an order adjudicating that there was no merit to the causes of action alleged by plaintiff, listed each disputed cause of action. The 1990 amendment to Code Civ. Proc., § 437c, subd. (f), applied to defendant's motion, and that amendment redefined the summary adjudication process, eliminating its use for facts or issues that do not completely dispose of a cause of action or defense. Thus, there is no longer any reason for a notice of motion to identify specific issues. Instead, it is sufficient to simply list the disputed causes of action in the notice.

**(2a-2c) Employer and Employee § 9—Contracts of Employment—Actions for Wrongful Discharge—In Violation of Public Policy—Necessity of Constitutional or Statutory Basis for Public Policy.**—An employee's wrongful discharge action against his former insurance company employer, the trial court erred in denying defendant's motion for summary adjudication of the cause of action for wrongful termination in violation of public policy, where plaintiff alleged he was terminated because he refused to artificially increase reserves in order to create an illusion of loss and reduce customer refunds due under Prop. 103 (reduction and control of insurance rates). To state a cause of action, plaintiff was required to allege conduct that violated a public policy delineated in a constitutional or statutory provision. It was insufficient for plaintiff to allege merely that the general purpose of Prop. 103 was to bar excessive rates by ensuring proper profit reporting to the insurance commissioner for the purpose of determining whether an insurer's financial condition warranted a rate increase. Plaintiff

Opinions (*People v. Banuelos*\*; *People v. Grace*\*; and *Naissar Internat. Transportation Corp. v. State Bd. of Equalization*\*) on pages 1428-1471] omitted.

[No. H010413. Sixth Dist. Mar. 2, 1993.]

SEQUOIA INSURANCE COMPANY et al. Petitioners, v. THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent; ROBERT A. NORDEN, Real Party in Interest.

## SUMMARY

A discharged employee brought an action against his former employer, an insurance company, for wrongful discharge in violation of public policy, age discrimination, and fraud and deceit. Plaintiff alleged he was terminated because he refused to artificially increase reserves on pending cases, which, he alleged, was ordered by the company president to create an illusion of loss and reduce customer refunds due under Prop. 103 (reduction and control of insurance rates). The trial court denied defendant's motion for summary judgment or, in the alternative, for summary adjudication of each cause of action, finding that defendant's notice of motion of summary adjudication was insufficient because it failed to specify the matters to be adjudicated, and that plaintiff adequately alleged causes of action for age discrimination and discharge in violation of public policy. (Superior Court of Santa Clara County, No. 711409, Peter G. Stone, Judge.)

The Court of Appeal ordered issuance of a writ of mandate directing the trial court to vacate its order denying the motion for summary adjudication of the cause of action for wrongful discharge in violation of public policy and to enter a new order granting the motion. The court held that the trial court erred in finding that defendant's notice of motion was deficient, since the notice listed each disputed cause of action, which was sufficient under the 1990 amendment to Code Civ. Proc., § 437c, subd. (f), which eliminated use of the summary adjudication process for facts or issues that do not completely dispose of a cause of action or defense, thus obviating the need for a notice of motion to identify specific issues. The court further held that the trial court erred in denying defendant's motion for summary adjudication of the cause of action for wrongful termination in violation of public policy. The court held that in order to state a cause of action, plaintiff was required to allege conduct that violated a public policy delineated in a constitutional or statutory provision. While plaintiff alleged that defendant's conduct had violated the general purpose of Prop. 103, which, according to plaintiff, was to bar excessive insurance rates by ensuring proper profit reporting to the

---

\*Deleted on direction of Supreme Court by orders dated June 10, 1993.

†Review granted. Reprinted without change in 18 Cal.App.4th 1085, to permit tracking pending review by the Supreme Court.

tailed to identify a specific statement in Prop. 103 or other statutes restricting the amount of an insurer's reserves.

[Liability for discharging at-will employee for refusing to participate in, or for disclosing, unlawful or unethical acts of employer or co-employees, note, 9 A.L.R.4th 329. See also 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 170A.]

(3a, 3b) **Summary Judgment § 6—Motion—Treating as Motion for Judgment on Pleadings.**—When a defendant's summary adjudication motion asserts that the complaint fails to state a cause of action, the motion is tantamount to a motion for a judgment on the pleadings. If, in fact, the complaint fails to state a cause of action, then the defendant is entitled to summary adjudication as a matter of law, and the court need not reach the question of whether the plaintiff's opposition to the motion raises a triable issue of fact.

(4) **Words, Phrases, and Maxims—Delineate.**—To "delineate" means to describe in detail, especially with sharpness or vividness, or to describe, portray, or set forth with accuracy or in detail.

(5) **Insurance Companies § 2—Regulation—Proposition 103—Purpose.**—In approving Prop. 103 (reduction and control of insurance rates), the voters intended to protect consumers from arbitrary insurance rates and practices, to encourage a competitive insurance marketplace, to provide for an accountable Insurance Commissioner, and to ensure that insurance is fair, available, and affordable for all Californians.

(6) **Pleading § 92—Motion for Judgment on Pleadings—Granting Leave to Amend.**—Where a judgment on the pleadings is appropriate, a court has discretion to grant the opposing party leave to amend.

COUNSEL.

Carlsmith, Ball, Wichman, Murray, Case, Mukai & Ichiki, Richard R. Pace and Donn Dimichele for Petitioners.

No appearance for Respondent.

McGuinn, Hillsman & Palefsky, John A. McGuinn and Keith A. Ehrman for Real Party in Interest.

OPINION

PREMO, J.—In this writ proceeding, we consider whether a cause of action is stated for wrongful termination in violation of public policy when the employer's conduct is not specifically prohibited by a statutory or constitutional provision. We conclude that such a provision is a foundational requirement to establish wrongful termination on public policy grounds. Accordingly, we hold that the superior court erred in denying defendant employer's motion for summary adjudication of the wrongful termination cause of action in this case. We grant a writ of mandate to obviate an expensive and complex trial of a legal issue which, as a matter of law, must be resolved in the employer's favor.

BACKGROUND

For purposes of this proceeding, we will summarize only the undisputed facts leading to the termination at issue. Plaintiff Robert Norden was hired as claims manager by Sequoia Insurance Company (hereafter, Sequoia) in 1976. In 1979, his title was changed to vice-president. In 1987, Sequoia was acquired by defendant QBE Insurance Limited, an Australian insurance and reinsurance group. In connection with the transfer of ownership, plaintiff acknowledged in writing that his employment was terminable at will. Defendant Michael Moody was named president of Sequoia in late February 1990).

In November 1988, the voters of California passed Proposition 103, adding article 10 to the Insurance Code (§ 1861 et seq.) for the express purpose of reducing and controlling insurance rates. After assuming the presidency of Sequoia, Moody observed that a number of large, late increases in case reserves were appearing in the claims department.[1] Moody told plaintiff that he believed the higher reserves on these cases should have been set earlier. Later, Moody expressed his opinion to plaintiff that a pattern of large, late reserves had developed at Sequoia. Plaintiff disagreed with this assessment, believing that "for the most part" adequate case reserves were being implemented on a timely basis. In June 1990, Moody sent plaintiff a memo expressing extreme concern about late reserve development. Although Moody never directly ordered plaintiff to increase the case reserves for all pending claims, he openly disagreed with the perceived overall practice by the claims department of establishing low case reserves, and ultimately spending millions of dollars on attorney fees disputing

[1] As described by plaintiff, "case reserves" are amounts of money set aside by the company as an estimate of the reasonable amount the company will ultimately be required to pay on a claim.

1476

SEQUOIA INS. CO. v. SUPERIOR COURT
13 Cal.App.4th 1472; 16 Cal.Rptr.2d 888 [Mar. 1993]

liability for claims. Nevertheless, plaintiff received favorable performance evaluations, rating him either "satisfactory" or "excellent" in 19 out of 20 categories, with an overall rating of "satisfactory."

In July 1990, Moody decided to activate a previously authorized position of "litigation specialist" and appoint plaintiff to the position. Plaintiff agreed that his abilities would best be utilized in the "legal-technical area" and accepted the transfer, which took effect September 4, 1990.

In August 1990, the company experienced an operating loss of over half a million dollars, its second major loss in three months. Moody concluded that the loss was due principally to excessive expenditures. Moody was also concerned that Sequoia's "A" rating with the Best's Insurance Group would decline as a result of these losses. In late September or early October 1990, Sequoia was notified that it had been placed on a "watch" list by Best's—a preliminary step in Moody's view, to lowering Sequoia's rating, and a reflection of Sequoia's deteriorating financial condition. On September 24, 1990, Moody called a meeting of a large group of managers and explained to them the severity of Sequoia's financial situation. The meeting produced a long list of recommended cost-cutting measures. Subsequently, 18 to 20 measures were implemented, including the closure of offices in 2 cities.

On October 13, 1990, about one month after plaintiff assumed the duties of litigation director, Moody informed him that Sequoia was eliminating this position and that plaintiff's employment was terminated. According to Moody, the termination of plaintiff and five other employees was one of the company's cost-cutting measures; plaintiff's position was, in his words, "a job that we could do without." Plaintiff found this explanation "not credible," however. In May 1991, he filed suit, alleging (1) *wrongful discharge in violation of public policy*, (2) age discrimination, and (3) fraud and deceit.

With respect to the first cause of action, plaintiff alleged that he was terminated "for his refusal to inflate claim reserves." According to plaintiff, Sequoia was engaged in a "scheme" to defeat the purposes of Proposition 103, by artificially inflating case reserves in order to reduce its apparent profitability. By "creat[ing] the illusion of loss," Sequoia would be able to reduce the amounts it would be required to refund to customers under Proposition 103 and increase its premiums. Plaintiff was "in the way" of this scheme; although he was "pressured" to inflate case reserves, he refused to do so. In the second and third causes of action, plaintiff alleged he was fraudulently induced by Moody's false promise to accept the position of litigation director, and thereafter was terminated as part of a plan to "get rid of Sequoia's older employees."

---

1477

SEQUOIA INS. CO. v. SUPERIOR COURT
13 Cal.App.4th 1472; 16 Cal.Rptr.2d 888 [Mar. 1993]

Defendants moved for summary judgment, or in the alternative, summary adjudication of each cause of action. With respect to the first cause of action, defendants argued that there was no factual or legal foundation for a *wrongful termination claim based on public policy, because there was no statutory expression of a policy against increasing case reserves.* Plaintiff responded that there were numerous material factual issues precluding summary judgment. He further disputed defendants' interpretation of *Gantt v. Sentry Insurance Co.* (1992) 1 Cal.4th 1083 [4 Cal.Rptr.2d 874, 824 P.2d 680], on which defendants had relied, arguing that a public policy need only be "*based on or derived from*" a statute to support a cause of action for wrongful termination. After hearing argument on the matter, the trial court denied both summary judgment and summary adjudication, ruling by min[ute] order that "defendant's [sic] notice fails to specify the matters to be adjudicated. Plaintiff adequately alleges Causes of Action for age discrimination and breach of public policy, although the proof is very thin."

### DISCUSSION

Defendants assert two errors in the trial court's ruling. First, they object to the court's perception of their summary adjudication motion as inadequate for failing to specify the matters to be adjudicated. Second, they challenge the court's legal determination that a cause of action is stated for wrongful termination on public policy grounds. Plaintiff responds that summary adjudication was not warranted because "*numerous*" material issues of fact existed with respect to the wrongful termination allegations. As for the legal adequacy of this cause of action, he maintains that his claim was sufficiently rooted in public policy concerns to withstand summary adjudication.

(1) We first consider the trial court's determination that defendants' statement of grounds for summary adjudication was deficient. The noted motion requested summary judgment in defendants' favor, or "[a]lternatively, if for any reason summary judgment cannot be had[,] for an order adjudicating that there is no merit to the following described causes of action contained in the complaint filed herein by Robert A. Norden; and that the *final judgment in this action shall, in addition to any matters determined at trial, award judgment as established by such adjudication as to the following described causes of action:* discharge in violation of public policy, unlawful age discrimination, fraud and deceit, and intentional infliction of emotional distress. Said motion will be made upon the ground that there is no triable issue of material fact as to the summary judgment or summary adjudication sought and therefore the moving party is entitled to such summary judgment or summary adjudication as a matter of law."

Defendants' motion was made in August 1992, more than 18 months after the 1990 amendment to Code of Civil Procedure section 437c[2] took effect. Subdivision (f.) of that statute redefines the summary adjudication process, eliminating its use for facts or issues "that do not completely dispose of a cause of action or a defense." (Stats. 1990, ch. 1561, § 1.) Accordingly, there is no longer any reason for a notice of motion to identify specific issues; a listing of the disputed causes of action, as was done here, is sufficient. The trial court's stated requirement that the "matters" at issue be more precisely identified would have been accurate under the prior system of summary adjudication (cf. *Homestead Savings v. Superior Court* (1986) 179 Cal.App.3d 494 [224 Cal.Rptr. 554]), but is unjustified under the present version of section 437c, subdivision (f.).[3]

**(2a)** We turn next to the trial court's ruling on the legal sufficiency of the wrongful termination cause of action. Defendants' position is that plaintiff cannot succeed on this theory because he was not directed to engage in any conduct specifically enjoined by a statutory or constitutional provision. Plaintiff suggests this issue need not be reached because there were disputed issues of fact that precluded summary adjudication of this cause of action. In any event, he argues, a specific prohibition such as defendants advocate would be "absurd"; all that is required for a public policy to be stated is that it be generally "based on or derived from" a statutory or constitutional law.

Preliminarily, we find it necessary to clarify some confusion evident in plaintiff's identification of the issues. Plaintiff appears to assume that if questions of fact exist, it is not necessary to address the merits of the controversy between the parties. Plaintiff's approach, however, is backward.[3a] In a case such as this, where the defendant asserts a failure of the complaint to state a cause of action, the summary adjudication motion is tantamount to a motion for judgment on the pleadings. (*C. L. Smith Co. v. Roger Ducharme, Inc.* (1977) 65 Cal.App.3d 735, 745 [135 Cal.Rptr. 483]; see also *Robinson v. Hewlett-Packard Corp.* (1986) 183 Cal.App.3d 1108, 1131 [228 Cal.Rptr. 591].) Defendants' motion is based on the argument that *even if* the allegations of the complaint are true, no ground for wrongful termination is stated therein. If defendants are correct, then adjudication in their favor must follow as a matter of law, and we need not reach the question whether plaintiff's opposition to the motion raises a triable issue of fact. (*C. L. Smith Co. v. Roger Ducharme, Inc., supra,* 65 Cal.App.3d at p. 750; *Hejmadi v. AMFAC, Inc.* (1988) 202 Cal.App.3d 525, 536 [249 Cal.Rptr. 51].)

---

[2] Further statutory references are to the Code of Civil Procedure unless otherwise indicated. Indeed, defendants' motion was, if anything, overly inclusive; it sought adjudication of whether plaintiff had suffered emotional distress, which had not been asserted as a separate cause of action.

---

**(2b)** Our first task, then, is to accept as true the material factual allegations of the complaint and determine whether, on these facts, plaintiff's allegation of wrongful termination in violation of public policy is legally sufficient. The answer to this question turns on the correct interpretation of our Supreme Court's most recent exposition on the subject of public policy, in the employment context in *Gantt v. Sentry Insurance, supra,* 1 Cal.4th 1083.

In *Gantt,* the plaintiff alleged he was terminated in retaliation for supporting a coworker's claim of sexual harassment and refusing to lie to investigators from the Department of Fair Employment and Housing. The Supreme Court reaffirmed the right of an employee to sue for wrongful termination "when he or she is discharged for performing an act that public policy would condemn, or for refusing to do something that public policy would condemn." (1 Cal.4th at p. 1090.)

The court also recognized, however, the difficulty of defining "public policy" clearly enough to distinguish truly public interests from mere private disputes between employer and employee and, at the same time, avoid "judicial policymaking" inherent in an overly broad construction of the term. Notwithstanding the division among the courts both of this state and across the country in their willingness to define this concept broadly, the *Gantt* court observed that "with few exceptions courts have, in practice, relied to some extent on statutory or constitutional expressions of public policy as a basis of the employee's claim." (*Gantt v. Sentry Insurance, supra,* 1 Cal.4th at p. 1094.) Even those decisions favoring a broad view, the court pointed out, have typically cautioned against declaring public policy "absent some prior legislative expression on the subject." (*Id.* at p. 1095.)

The *Gantt* court embraced a more restrictive approach, which, it reasoned, would best serve the interests of employer, employee, and the public: "These wise caveats against judicial policymaking are unnecessary if one recognizes that courts *in wrongful discharge actions* may not declare public policy without a basis in either constitutional or statutory provisions. A public policy exception carefully tethered to fundamental policies that are delineated in constitutional or statutory provisions strikes the proper balance among the interests of employers, employees and the public. The employer is bound, at a minimum, to know the fundamental public policies of the state and nation as expressed in their constitutions and statutes; so limited, the public policy exception presents no impediment to employers that operate within the bounds of law. Employees are protected against employer actions that contravene fundamental state policy. And society's interests are served through a more stable job market, in which its most important policies are safeguarded." (1 Cal.4th at p. 1095.)

This statement evinces an intent by the Supreme Court to narrow the scope of the public policy exception to at-will employment. Plaintiff's selected references to portions of the *Gantt* opinion that mention public policy being generally "derived from" or "based on" a statute are misleading; they are taken not from the court's holding, but from its review of precedent in the area, which was fraught with conflict and uncertainty.[4] Indeed, the court acknowledged that it had *not* previously taken a position on the issue of how broadly "public policy" should be defined. In *Gantt*, however, it did adopt such a position: the fundamental policies underlying the public policy exception must be *delineated in a constitutional or statutory provision*.

A requirement that a policy be "delineated" entails more specificity than merely being "derived from" or "based" on its source. **(4)** To "delineate" means "... to describe in detail, esp. with sharpness or vividness" (Webster's Third New Internat. Dict. (1981) p. 597); "... to describe, portray, or set forth with accuracy or in detail" (Webster's Ninth New Collegiate Dict. (1984) p. 336). **(2c)** Although one should *not* assume that the employer's *precise act* (e.g., discharging an employee for refusing to commit a crime) must be specifically prohibited for the public policy exception to apply,[5] a constitutional or statutory provision must sufficiently describe the type of prohibited conduct to enable an employer to know the fundamental public policies that are expressed in that law.

In this case, the employer is accused of violating public policy by attempting to persuade plaintiff to "inflate" case reserves. Unless plaintiff can point to a specific statement in Proposition 103 or another statute which restricts the amount of reserves an insurer may set aside for the anticipated cost of a pending claim, no public policy can be inferred.

Plaintiff cannot identify such a provision. Instead, he relies on the general purpose "to be *derived from*" Proposition 103 and related sections—in his words, "to bar insurers from charging excessive rates, by ensuring that proper and non-deceitful profitability data is [sic] given to the Insurance

[4] *Dabbs v. Cardiopulmonary Management Services* (1987) 188 Cal.App.3d 1437 [234 Cal.Rptr. 129], for example, was not cited by the *Gantt* court "with approval," as plaintiff says, on the contrary, any suggestion in *Dabbs* that public policy need not be rooted in a statute or constitution is inconsistent with the holding ultimately reached in *Gantt*. Plaintiff's other pre-*Gantt* citations likewise provide no support for his suggestion that "vague, general policies" are sufficient to protect an employee from retaliatory discharge.

[5] Our attention in this otherwise well-evident qualification only is illustrative from plaintiff's following suggestion that if, generally inferring public policy from a statute, is not sufficient, the alternative must be a hypothetical requirement that the statute proscribe the very act of which the employer is accused. Such resort to either set reasoning contributes nothing to a balanced analyses of the *Gantt* decision.

Commissioner, in order for the Commissioner to determine whether an insurer's financial condition is such that it should be allowed a rate increase." Consequently, he argues, this "conduct in refusing to participate in a scheme that aimed at *purposely misleading* the Insurance Commissioner as to Sequoia's profitability deserves to be *protected* and *encouraged*, since it upheld the clear purpose and policy of [Proposition] 103."

We must reject this reasoning. First, plaintiff's description of the purpose of Proposition 103 exaggerates the significance of the submission of data to the Insurance Commissioner. **(5)** In approving the initiative, the voters of California intended to "protect consumers from arbitrary insurance rates and practices, to encourage a competitive insurance marketplace, to provid[e] an accountable Insurance Commissioner, and to ensure that insurance is[ ] available, and affordable for all Californians." (See Historical and Statutory Notes, 42A West's Ann. Ins. Code, § 1861.01 (1993 pocket supp.) pp. 104-105.) That purpose should not be confused with the rate approval procedures, one of several mechanisms intended to further compliance with the goals of the initiative.

**(2d)** Even if we were to accept plaintiff's representation of the purpose of Proposition 103, we nonetheless can find no "direct statutory support" (*Gantt v. Sentry Insurance, supra,* 1 Cal.4th at p. 1096) for the argument that an insurer's adjustment or manipulation of case reserves is against public policy. An employer cannot be "bound to know" that a practice of increasing reserves at an early date in the claim process is against public policy where there is no expression of that policy anywhere in the codes under which the employer operates its business. The nexus between the public's general objective of controlling the rise of insurance rates and an insurer's disingenuous motive for an otherwise legitimate business practice is simply too tenuous to serve as a basis for finding a public policy exception to employment at will. Thus, whether the conflict between plaintiff and Moody's reflection of fundamental differences in "case-reserving philosophy," Moody explained it, or, as plaintiff characterizes it, a battle between a company president trying to distort its profitability figures and an employee who "refused" to "go along with" that "scheme," defendants' conduct provides no basis for recovery on a wrongful termination theory.

**(3b)** As noted earlier, where a complaint is insufficient to state a cause of action, a defendant's motion for summary judgment is in legal effect a motion for judgment on the pleadings, and factual controversies are essentially irrelevant. **(6)** Where judgment on the pleadings is appropriate, a court has discretion to grant the opposing party leave to amend. (*Hejmadi v. AMFAC, Inc., supra,* 202 Cal.App.3d at p. 536.) **(2e)** In this case, plaintiff will be able to amend his

complaint to state a cause of action for wrongful termination in violation of public policy. Accordingly, we must conclude that defendants were entitled to judgment on the pleadings— or, as they labeled the request, summary adjudication—of this count in plaintiff's complaint." (See generally, *Heredia v. Farmers Ins. Exchange* (1991) 228 Cal.App.3d 1345, 1358 [279 Cal.Rptr. 511] [court may grant motion for judgment on the pleadings as to some of asserted counts].)

## Disposition

Let a writ of mandate issue directing the superior court to vacate its order denying the motion for summary adjudication of plaintiff's first cause of action, and to enter a new order granting the motion. The stay issued by this court on November 12, 1992, is vacated.

Cottle, P. J., and Elia, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied May 20, 1993. Kennard, J., was of the opinion that the petition should be granted.

---

"Although technically this motion should have been denominated a motion for judgment on the pleadings, the ultimate result is the same: elimination of this cause of action from the controversy. For purposes of disposition, therefore, we will treat the motion as if it had properly been brought as a request for summary judgment.

[No. A057304. First Dist., Div. Three. Mar. 3, 1993.]

CHARLES LEE GRAHAM, Plaintiff and Appellant, v. ROBERT HOPKINS, Defendant and Respondent.

## Summary

The trial court, in an action by an employee injured by a molding machine, determined the machine was not a power press within the meaning of Lab. Code, § 4558 (action at law against employer for injury caused by absence of guard on power press not barred), and entered judgment in favor of defendant employer, finding that the action was barred. (Superior Court of Mendocino County, No. 61472, Eric Labowitz, Judge.*)

The Court of Appeal affirmed. The court held that for purposes of Lab. Code, § 4558, the molding machine, utilizing five cutting heads for cutting or planing boards fed into the machine, was not a power press. Lab. Code, § 4558, subd. (a)(4), defines "power press" as "any material-forming machine that utilizes a die which is designed for use in the manufacture of other products." One characteristic in common to all devices mentioned in the dictionary definition of a die is that in each case the shape of the "die" itself determines the shape of the product that is formed, which was not true in the case of the molding machine cutting heads. The trial court, therefore, properly determined that the molding machine was not a power press and the action against the employer was barred. (Opinion by White, P. J., with Merrill and Werdegar, JJ., concurring.)

## Headnotes

Classified to California Digest of Official Reports

(1a,1b) **Workers' Compensation § 7.2—Exclusivity of Remedy—Tort Action Against Employer Barred—Application of Statutory Exemption for Injuries Caused by Power Presses—What Constitutes.**

---

*Judge of the Justice Court for the Anderson Judicial District sitting under assignment by the Chairperson of the Judicial Council.

[No. B008825. Second Dist., Div. Three. Jan. 28, 1985.]

TYCO INDUSTRIES, INC., Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
ALAN RICHARDS, Real Party in Interest.

## SUMMARY

A manufacturer petitioned the Court of Appeal for a writ of mandate after the trial court overruled its demurrer to the causes of action pleaded by a former sales representative. The former sales representative's second amended complaint alleged a cause of action for violation of Lab. Code, § 970 (influencing worker to relocate by false representations) and wrongful discharge, based upon his discharge from employment after accepting the manufacturer's offer to relocate from Illinois and become the west coast regional manager in California. In overruling the demurrer, the trial court sustained the manufacturer's demurrer to causes of action charging breach of covenant of good faith and fair dealing and intentional infliction of emotional distress.

The Court of Appeal granted the petition and issued a writ of mandate directing the trial court to vacate the portion of its order overruling the manufacturer's demurrers and enter a new and different order sustaining them. The court held that the sales representative did not allege facts sufficient to state a cause of action under Lab. Code, § 970, due to a failure to sufficiently plead a knowing intent to misrepresent. The complaint failed to allege that the manufacturer intended not to perform under the sales representative's relocation agreement as it had promised. Moreover, the sales representative did not allege that he was promised a fixed period of employment. As to the cause of action for the common law tort of wrongful discharge, the sales representative merely alleged a public policy violation based upon the statutory violation of § 970, but there were no facts to support a cause of action for violation of § 970. Mere allegation of public policy violation of a statute does not suffice to state a cause of action. Thus, the demurrer should have been sustained without leave to amend. (Opinion by Klein, P. J., with Danielson and Arabian, JJ., concurring.)

### HEADNOTES

Classified to California Digest of Official Reports, 3d Series

(1) **Pleading § 21—Demurrer to Complaint—Function.**—The function of a demurrer is to test the sufficiency of a pleading by raising questions of law.

(2) **Pleading § 21—Demurrer to Complaint—Liberal Construction of Allegations—Right to Relief.**—The allegations in a complaint are to be liberally construed with a view to substantive justice between the parties. A complaint survives a demurrer if it states facts disclosing some right to relief.

(3) **Pleading § 30—Demurrer to Complaint—Hearing and Determination—Amendment After General Demurrer Sustained—Abuse of Discretion.**—It is an abuse of discretion to sustain a demurrer without leave to amend if there is a reasonable possibility that the defect can be cured by amendment. However, a demurrer may be sustained without leave to amend where it is probable *from the nature of the complaint and the previous unsuccessful attempt to plead that the plaintiff cannot state a cause of action.* To do so does not constitute an abuse of discretion. Where the nature of a plaintiff's claim is clear, but under substantive law no liability exists, leave to amend should be denied, for no amendment could change the result.

(4) **Mandamus and Prohibition § 15—Mandamus—Conditions Affecting Issuance—Existence and Adequacy of Other Remedy—Remedy by Appeal—Overruled Demurrer.**—Mandate is a proper remedy to reach an abuse of discretion by a trial court in overruling a demurrer. An order overruling a demurrer is nonappealable, and ordinarily is to be reviewed upon appeal from the judgment entered after trial. Generally, absent a showing that under the particular facts appeal is not a plain, speedy and adequate remedy, an appeal is presumed to be adequate. However, mandamus is an appropriate remedy to obtain relief from a nonappealable order, and the presumption of adequacy of remedy by appeal does not apply when a trial court's nonappealable order can only be reached by appeal from a subsequent judgment.

(5) **Mandamus and Prohibition § 7—Mandamus—Conditions Affecting Issuance—Discretion.**—For a writ of mandate to issue, Code Civ. Proc., § 1085, requires a clear and present duty for the performance of an act which the law specially enjoins, and a clear, present right in the petitioner to performance of that act. Although it is well established

that mandamus cannot be issued to control a court's discretion, in unusual circumstances the writ will lie where, under the facts, that discretion can reasonably be exercised in only one way.

**(6a-6c) Employer and Employee § 9—Contracts of Employment—Actions for Wrongful Discharge—Public Policy—Solicitation of Employees by Misrepresentation.**—In an action by a sales representative against a manufacturer, his former employer, for violation of Lab. Code, § 970 (influencing worker to relocate by false representations), and for wrongful discharge, the trial court abused its discretion in overruling the manufacturer's demurrer. The demurrer should have been sustained without leave to amend. Although the representative alleged that he was discharged from his position in California not long after he accepted the manufacturer's offer to leave Illinois and become west coast regional manager, the complaint failed to state a cause of action under § 970 since it did not allege that the manufacturer intended not to perform under the relocation agreement as it had promised. Thus, there was no allegation of a knowingly false representation. Also, there was no allegation of a fixed period of employment. As to the cause of action for the common law tort of wrongful discharge, the representative merely alleged a public policy violation based upon the statutory violation of § 970, but there were no facts to support a violation of § 970. Mere allegation of public policy violation of a statute does not suffice to state a cause of action.

**(7) Employer and Employee § 8—Contracts of Employment—Duration and Termination—Public Policy—Solicitation of Employees by Misrepresentation.**—The public policy codified by Lab. Code, § 970, whereby employers may not cause employees to move to, from, or within California by misrepresentation of the nature, length, or physical conditions of employment, provides an exception to the employment-at-will doctrine. This statute was enacted to protect migrant workers from the abuses heaped upon them by unscrupulous employers and potential employers, especially involving false promises made to induce migrant workers to move in the first instance.

**(8) Fraud and Deceit § 7—Actual Fraud—False Representations—Promises.**—A false promise is actionable on the theory that a promise implies the promisor's intention to perform, that intention to perform or not to perform is a state of mind, and that misrepresentation of a state of mind is a representation of fact.

**(9) Fraud and Deceit § 25—Actions—Pleading—Misrepresentation.**—To plead misrepresentation, the necessary averment is the general statement that the promise was made without any intention to perform it, or that the defendant did not intend to perform it. The absence of such a general allegation is ordinarily a fatal defect.

**(10) Employer and Employee § 9—Contracts of Employment—Actions for Wrongful Discharge.**—When an employer's discharge of an employee violates fundamental principles of public policy, the discharged employee may maintain a tort action.

[See Cal.Jur.3d, Employer and Employee, § 68 et seq.; Am.Jur.2d, Master and Servant, § 60 et seq.]

COUNSEL.

Finley, Kumble, Wagner, Heine, Underberg, Manley & Casey, Jeffrey A. Charlston and Peter C. Rosenbloom for Petitioner.

No appearance for Respondent.

Sylvia T. Whitmore for Real Party in Interest.

Joseph Posner as Amicus Curiae on behalf of Real Party in Interest.

OPINION

KLEIN, P. J.—Tyco Industries, Inc. (Tyco), a corporation, petitioned this court for a writ of mandate seeking relief from the trial court's overruling of Tyco's demurrer to the causes of action pleaded by real party in interest Alan Richards (Richards).

Because Richards failed to state a cause of action for either violation of Labor Code section 970 (section 970) or wrongful discharge, the trial court abused its discretion in overruling Tyco's demurrer; therefore, we grant the petition for peremptory writ of mandate.

PROCEDURAL AND FACTUAL BACKGROUND[1]

In December 1979, Richards was employed by Tyco, a toy manufacturer, as a sales representative for its Illinois territory based in Chicago.

In September 1980, Tyco proposed to Richards a relocation to California because Tyco was pleased with Richards' performance and was considering

[1] The facts are gleaned from the pleadings and the briefs supporting and opposing the petition.

him for advancement. Tyco told Richards of company plans to convert from an independent-sales-representation form of doing business to factory-employed personnel, and if Richards would consider relocation, a promotion might be forthcoming.

In October 1981, Richards accepted Tyco's offer to become west coast regional manager for the purpose of supervising current sales and later reorganization. The offer included a $12,000 per year raise, and a "$10,000" bonus to cover relocation expenses. Richards discussed with Tyco the "erratic history of sales" in California and questioned whether the move would be good for him. After receiving assurances that Tyco expected long-term development and that it considered him the only suitable person for the job, Richards accepted.

Richards sold his $85,000 home in Illinois and bought one in California for $120,000.

Within a month after Richards began performing his duties, his managerial function was usurped by a Chicago sales supervisor. In answer to his complaint in this regard, he was told to just concentrate on selling.

Richards continued to perform his sales duties for Tyco without incident or criticism until the date of his discharge on September 19, 1982. The reason given by Tyco was that the projected changeover had not turned out to be economically feasible.

On October 11, 1983, Richards filed a first amended complaint, alleging as causes of action, inter alia, violation of section 970 and wrongful discharge. Tyco demurred, claiming the complaint failed to state facts sufficient to constitute any cause of action. The trial court sustained the demurrer with leave to amend.

On March 8, 1984, Richards filed a second amended complaint to which Tyco again demurred to each and every cause of action.

The trial court sustained Tyco's demurrer to causes of action charging breach of covenant of good faith and fair dealing and intentional infliction of emotional distress. It overruled Tyco's demurrer to the causes of action for violation of section 970 and for wrongful discharge.

Tyco filed a petition for a writ of mandate in this court alleging it had no plain, speedy or adequate remedy at law because it would be put to the time and expense to defend an unnecessary trial when no cause of action existed. (See Conway v. Municipal Court (1980) 107 Cal.App.3d 1009, 1015-1016

[166 Cal.Rptr. 246].) An alternative writ was issued on September 13, 1984, directing the trial court to vacate its June 20, 1984, order, or to show cause why it should not do so. The trial court declined.

## DISCUSSION

### 1. When a demurrer should be sustained.

(1) The function of a demurrer is to test the sufficiency of a pleading by raising questions of law. (Johnson v. County of Los Angeles (1983) 143 Cal.App.3d 298, 306 [191 Cal.Rptr. 704].)

(2) The allegations in the complaint are to be liberally construed with a view to substantive justice between the parties. (King v. Central Bank (1977) 18 Cal.3d 840, 843 [135 Cal.Rptr. 771, 558 P.2d 857].) A complaint survives a demurrer if it states facts disclosing some right to relief. (Fox v. Greenbriar (1983) 141 Cal.App.3d 1, 13 [190 Cal.Rptr. 84].)

(3) It is an abuse of discretion to sustain a demurrer without leave to amend if there is a reasonable possibility that the defect can be cured by amendment. (Supra v. City of Bakersfield (1983) 145 Cal.App.3d 861, 871, fn. 7 [193 Cal.Rptr. 760].; 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, §§ 844, 845, pp. 2449-2450.)

However, a demurrer may be sustained without leave to amend where it is probable from the nature of the complaint and the previous unsuccessful attempt to plead that the plaintiff cannot state a cause of action. To do so does not constitute an abuse of discretion. (Kingsbury v. Tevco, Inc. (1978) 79 Cal.App.3d 314, 318-319 [144 Cal.Rptr. 773].) Where the nature of a plaintiff's claim is clear, but under substantive law no liability exists, leave to amend should be denied, for no amendment could change the result. (Berkeley Police Assn. v. City of Berkeley (1977) 76 Cal.App.3d 931, 942 [143 Cal.Rptr. 255].)

In the instant case, Richards' second amended complaint failed to state any cause of action, and therefore Tyco's demurrers should have been sustained without leave to amend.

### 2. (4) Mandate is a proper remedy to reach an abuse of discretion by the trial court in overruling a demurrer.

An order overruling a demurrer is nonappealable, and ordinarily is to be reviewed upon appeal from the judgment entered after trial. (County of Santa Barbara v. Superior Court (1971) 15 Cal.App.3d 751, 754 [93

Cal.Rptr. 406].) Generally, absent a showing that under the particular facts appeal is not a "plain, speedy and adequate remedy." (Code of Civ. Proc., § 1086), an appeal is presumed to be adequate. (*Attorney General v. Superior Court* (1953) 41 Cal.2d 249, 250 [259 P.2d 1].)

However, mandamus is an appropriate remedy to obtain relief from a nonappealable order (*Varra v. Superior Court* (1960) 181 Cal.App.2d 12, 14 [4 Cal.Rptr. 920]), and the presumption of adequacy of remedy by appeal does *not* apply when a trial court's nonappealable order can only be reached by appeal from a subsequent judgment. (*State Farm etc. Ins. Co. v. Superior Court* (1956) 47 Cal.2d 428 [304 P.2d 13]; *Conway v. Municipal Court, supra*, 107 Cal.App.3d at p. 1015.)

(5) For a writ of mandate to issue, Code of Civil Procedure section 1085 requires a clear and present duty for the performance of "an act which the law specially enjoins," and a clear, present right in the petitioner to performance of that act. (*Taylor v. Board of Trustees* (1984) 36 Cal.3d 500, 507 [204 Cal.Rptr. 711, 688 P.2d 710]; *People ex rel. Younger v. County of El Dorado* (1971) 5 Cal.3d 480, 491 [96 Cal.Rptr. 553, 487 P.2d 1193].)

"Although it is well established that mandamus cannot be issued to control a court's discretion, in unusual circumstances the writ will lie where, . . . that discretion can [reasonably] be exercised in only one way . . ." (*La Bue v. Superior Court* (1977) 75 Cal.App.3d 264, 268-269 [142 Cal.Rptr. 83].)

This is an appropriate case for a writ.

*3. Richards did not allege facts sufficient to state a cause of action under section 970.*

Richards' legal theory underlying his lawsuit is that Tyco's conduct as spelled out in his complaint constituted a violation of section 970, and the alleged statutory violation also constituted a violation of public policy which would therefore support the common law tort of wrongful discharge.

In its minute order overruling the demurrer to the first and second causes of action, the trial court concurred with Richards' theory stating: "The 1st cause of action for violation of Labor Code section 970 states enough facts as does the 2nd cause of action for wrongful discharge (based, somewhat redundantly on the public policy found in section 970)."

*a. Overview of California law.*

The general rule in employment of an unspecified term is that either an employer or an employee may terminate employment at will on notice to

the other. (Labor Code, § 2922.) Some exceptions to the employment-at-will rule have been carved out in recent years, including exceptions where employers violate public policy in the discharge of employees. (*Shapiro v. Wells Fargo Realty Advisers* (1984) 152 Cal.App.3d 467, 475-477 [199 Cal.Rptr. 613].)

The leading case exemplifying the "public policy theory" of wrongful discharge is *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330], wherein an employee terminated for refusal to participate in price-fixing was found to have been wrongfully discharged. Other public policy exceptions to Labor Code section 2922 have included dismissals for refusing to testify falsely (*Petermann v. International Brotherhood of Teamsters* (1959) 174 Cal.App.2d 184, 189 [344 P.2d 25]), for filing workers' compensation claims (*Portillo v. G. T. Price Products, Inc.* (1982) 131 Cal.App.3d 285 [182 Cal.Rptr. 291]), for protesting working conditions as unsafe (*Hentzel v. Singer Co.* (1982) 138 Cal.App.3d 290, 298 [188 Cal.Rptr. 159, 35 A.L.R.4th 1015]) and for associating in a union (e.g., *Wetherton v. Growers Farm Labor Assn.* (1969) 275 Cal.App.2d 168 [79 Cal.Rptr. 543]; *Glenn v. Clearman's Golden Cock Inn, Inc.* (1961) 192 Cal.App.2d 793 [13 Cal.Rptr. 769]).

(6a), (7) The trial court in this case, reasoned that the public policy pronouncement codified by section 970, whereby employers may not cause employees to move to, from, or within California by misrepresentation of the nature, length or physical conditions of employment, provides another exception to the employment-at-will doctrine, and would have allowed Richards' cause of action under this public policy theory.

The problem with the trial court's rationale is that section 970, although applied exceptionally to other employment situations (see *Munoz v. Kaiser Steel Corp.* (1984) 156 Cal.App.3d 965 [203 Cal.Rptr. 345]), was enacted to protect migrant workers from the abuses heaped upon them by unscrupulous employers and potential employers, especially involving false promises made *to induce migrant workers to move in the first instance.* (*Collins v. Rocha* (1972) 7 Cal.3d 232 [102 Cal.Rptr. 1]; *Rivera v. Amaya* (9th Cir. 1984) 726 F.2d 564.) In this fact situation, however, no such knowing misrepresentations were alleged to have been made at the time of negotiations between Richards and Tyco for the relocation.

In pertinent part, section 970 provides that "[n]o person . . . directly or indirectly, shall influence, persuade, or engage any person to change . . . from any place outside [California] to any place within the state . . . for the purpose of working in any branch of labor, *through or by means of knowingly false representations*, whether spoken [or] written . . . concerning

either: [¶] (a) The kind, character, or existence of such work; [¶] (b) The length of time such work will last. . . ." (Italics added.)

From the allegations of Richards' second amended complaint, granted, Tyco persuaded Richards to move to California to work, but nowhere does Richards allege facts from which it could even be inferred that Tyco made knowingly false representations.

b. Richards did not allege knowingly false representation.

In Bondi v. Jewels by Edwar, Ltd. (1968) 267 Cal.App.2d 672 [73 Cal.Rptr. 494], the owners of a jewelry store persuaded Bondi, a jewelsmith, to close his jewel business and to work at their store, "so long as [Bondi] should satisfactorily perform as manager of and jewelsmith for Jewels." (Id., at p. 674.) Bondi filed his complaint alleging, inter alia, that "at the time said promise [of employment] was made the defendants did not intend to perform it; such promise was made by defendants with the intent on their part to induce plaintiff to close his business and thereby remove him as a competitor of defendants and to induce plaintiff to enter into and remain in their employ until such time as they should, at their will, elect to terminate such employment." (Id., at p. 675, italics added.) Bondi alleged not to have known their secret intent, and that he would not have acted as he did had he known it.

The Bondi court reversed the lower court's dismissal, as Bondi's allegations regarding defendants' intent sufficed to state a cause of action, inter alia, for false misrepresentation.

(8) A false promise is actionable on the theory that a promise implies intention to perform, that intention to perform or not to perform is a state of mind, and that misrepresentation of a state of mind is a representation of fact. (3 Witkin, Cal. Procedure, supra, § 581, p. 2219.)

(9) To plead misrepresentation, the necessary averment is the general statement that the promise was made without any intention to perform it, or that the defendant did not intend to perform it. (Union F. M., Ltd. v. Southern Cal. F. M. (1938) 10 Cal.2d 671, 675 [76 P.2d 503].) The absence of such a general allegation is ordinarily a fatal defect. (Szabliki v. Western Loan & Bldg. Co. (1946) 72 Cal.App.2d 550, 558 [165 Cal.Rptr. 260]; Hills Trans. Co. v. Southwest Forest Industries, Inc. (1968) 266 Cal.App.2d 702, 707 [72 Cal.Rptr. 441].)

(6b) Unlike Bondi, the instant case does not present a complaint which sufficiently pleads intent to misrepresent. Tyco promised Richards a pay

increase, which he apparently received. Richards indicates that his responsibilities did not meet his expectations, but he alleges no facts pointing to Tyco's having induced him to come to California as manager, all the while intending to keep him at the same level of responsibility as in Chicago.

Neither did Richards allege that Tyco promised him a fixed period of employment. The general oral understanding of the transfer appeared long term at its inception. At the same time, Richards apparently knew the move involved uncertainty and risk, inasmuch as Tyco had had an "erratic history of sales in California."

Richards did not plead that he questioned Tyco's explanation for his discharge, i.e., that the projected change over had not turned out to be "economically feasible." He did not allege that Tyco had anticipated the failure of its California venture and had induced him to move here "through or by means of knowingly false representations . . . concerning . . . the length of time [his] work [would] last . . . ." (§ 970; italics added.)

Therefore, we must hold that although section 970 could apply to Richards (See Munoz v. Kaiser Steel Corp., supra, 156 Cal.App.3d 965), his complaint fails to allege that Tyco intended not to perform under his relocation agreement as it had promised. Thus, the trial court erred in overruling Tyco's demurrer to the section 970 cause of action.

4. Richards failed to state a cause of action for wrongful discharge.

"Under traditional common law rule, codified in Labor Code section 2922, an employment contract of indefinite duration is in general terminable at the will of either party.[2] Over the past several decades, however, judicial authorities in California and throughout the United States have established that under both common law and the statute an employer does not enjoy an absolute or totally unfettered right to discharge even an at-will employee. In a series of cases arising out of a variety of factual settings in which a discharge clearly violated an expressed statutory objective or undermined a firmly established principle of public policy, courts have recognized that an employer's traditionally broad authority to discharge an at-will employee 'may be limited by statute . . . or by considerations of public

[2] Labor Code section 2922 provides: "An employment, having no specified term, may be terminated at the will of either party on notice to the other. Employment for a specified term means an employment for a period greater than one month."

policy.'"' (Italics added; *Tamceny v. Atlantic Richfield Co., supra,* 27 Cal.3d at p. 172; *Shapiro v. Wells Fargo Realty Advisors, supra,* 152 Cal.App.3d at p. 475.)

A series of recent California cases have limited the application of Labor Code section 2922.¹ This court's decision in *Shapiro v. Wells Fargo Realty Advisors, supra,* 152 Cal.App.3d at pp. 475-476, set out the three distinct theories, to wit: (1) A tort cause of action for wrongful discharge in violation of public policy (*Tameny v. Atlantic Richfield Co., supra,* at p. 167; (2) a cause of action, sounding in both tort and contract, for employer's breach of the implied covenant of good faith and fair dealing (*Cleary v. American Airlines, Inc.* (1980) 111 Cal.App.3d 443 [168 Cal.Rptr. 722]); and (3) a cause of action for employer's breach of an implied-in-fact covenant to terminate only for good cause (*Pugh v. See's Candies, Inc.* (1981) 116 Cal.App.3d 311 [171 Cal.Rptr. 917].)

Because this writ petition does not concern the latter two exceptions to Labor Code section 2922, we focus on the public policy violation cause of action.

**(10)** "[W]hen an employer's discharge of an employee violates fundamental principles of public policy, the discharged employee may maintain a tort action . . . ." (*Tameny v. Atlantic Richfield Co., supra,* 27 Cal.3d at p. 170; *Newfield v. Insurance Co. of the West* (1984) 156 Cal.App.3d 440, 443-444 [203 Cal.Rptr. 9].)

In *Tameny,* the plaintiff alleged that he was discharged for failure to engage in price-fixing. As a retail sales representative for Atlantic Richfield Co., he allegedly was pressured to force independent dealers to lower their prices in a manner that would violate federal and state antitrust legislation. According to Tameny's complaint, his refusal to engage in price fixing was the sole reason for his discharge. (*Tameny v. Atlantic Richfield Co., supra,* at p. 171.)

The conduct of the employer in *Tameny* was wrongful because the motive for discharge was contrary to "some substantial public policy," evidenced by the fact that the discharge was in violation of a statute. (*Id.,* at p. 177.)

¹For a thorough discussion of these decisions, see Miller & Estes, *Recent Judicial Limitations on the Right to Discharge: A California Trilogy* (1982) 16 U.C. Davis L. Rev. 65; Rohwer, *Terminable-At-Will Employment: New Theories for Job Security* (1984) 15 Pacific L.J. 759.

"Although there is dictum in *Tameny* suggesting that there can be a public policy sufficient to support a cause of action for wrongful discharge absent statutory authority, no California cases have so held; however, one Court of Appeal case has expressly stated that courts have no power to declare public policy in wrongful discharge cases without statutory support. (See *Mallard v. Boring* (1960) 182 Cal.App.2d 390 . . . .)'" (*Shapiro v. Wells Fargo Realty Advisors, supra,* 152 Cal.App.3d at p. 477.)

**(6c)** Mere allegation of public policy violation of a statute does not suffice to state a cause of action. In *Pugh,* the plaintiff alleged three public policy violations caused by his discharges, two of which had basis in California code sections. (*Pugh v. See's Candies, Inc., supra,* 116 Cal.App.3d at pp. 322-324.) Although the *Pugh* court found breach of an implied-in-fact covenant to terminate only for good cause, it concluded that the evidence did not establish a prima facie and cognizable case of wrongful termination based upon public policy theory. (*Ibid.*)

In the instant case, Richards' complaint did not state expressly which public policy Tyco had allegedly violated by discharging him. The second amended complaint alleged that Tyco's acts, as alleged in paragraphs 1 through 12, "constituted a violation of public policy and a wrongful discharge. . . ."

The conclusionary allegation of public policy violation in the second amended complaint was explained in Richards' points and authorities in opposition to Tyco's demurrer as follows: ". . . If plaintiff has pleaded [*a cause of action for violation of labor code* [sic] *section 970,*] then a wrongful discharge predicated on that violation is equally viable. By the enactment of that code section, the legislature has expressed its intent that both *the* individual and the community must be protected from the harm that is inflicted when a fraudulently induced employment ceases, and the individual is left in a community without roots or resources and becomes a charge on that community." (Italics added.)

As indicated, we find no sufficient facts to support a cause of action for violation of section 970.

Conclusion

Because the trial court abused its discretion in overruling Tyco's demurrers to Richards' second amended complaint, we grant the Tyco's requested writ of mandamus.

Tyco Industries, Inc. v. Superior Court
164 Cal.App.3d 148; 211 Cal.Rptr 540 [Jan. 1985]

### Disposition

Let a peremptory writ of mandate issue, directing the superior court to vacate the portion of its order of June 20, 1984, overruling Tyco's demurrers, and enter a new and different order sustaining same.

Danielson, J., and Arabian, J., concurred.

A petition for a rehearing was denied February 21, 1985, and the petition of real party in interest for a hearing by the Supreme Court was denied April 24, 1985. Mosk, J., was of the opinion that the petition should be granted.

---

Lapp v. Transport Indemnity Co.
164 Cal.App.3d 161; 210 Cal.Rptr 135 [Jan. 1985]

[No. F003149. Fifth Dist. Jan. 28, 1985.]

GARY LAPP et al., Plaintiffs and Appellants, v. TRANSPORT INDEMNITY COMPANY, Defendant and Respondent.

[Opinion certified for partial publication.*]

### Summary

Motorists, who were injured in a collision with an uninsured motorist while driving a truck rented from a truck rental business, sought uninsured motorist benefits under an automobile insurance policy issued to the truck rental business as the named insured. The insurer and the named insured, at the time the policy was issued, entered into a waiver and deletion of uninsured motorist coverage, as authorized by Ins. Code, § 11580.2. The trial court entered a summary judgment in favor of the insurer. (Superior Court of Kern County, No. 179090, James G. Bowles, Judge.)

The Court of Appeal affirmed. The court held that as permissive users of the truck the injured motorists were bound by the named insured's waiver of uninsured motorist coverage. (Opinion by Brown (G. A.), P. J., with Woolpert and Best, JJ., concurring.)

### Headnotes

Classified to California Digest of Official Reports, 3d Series.

(1) **Insurance Contracts and Coverage § 61—Uninsured Motorist Insurance—Waiver of Uninsured Motorist Coverage—Binding Effect on Permissive User of Waiver by Named Insured.**—Motorists, who were injured in a collision with an uninsured motorist while driving a truck rented from a truck rental business, were not entitled to recover uninsured motorist benefits under an automobile insurance policy issued to the truck rental business as the named insured, where at the time the policy was issued the insurer and the named insured entered into a

---

*Part II of this opinion is not published, because it does not meet the standards for publication contained in California Rules of Court, rule 976(b).

## FAIR EMPLOYMENT AND HOUSING
Title 2

## Chapter 6

## DISCRIMINATION PROHIBITED

Article
1. Unlawful Practices, Generally ........... Section 12940
2. Housing Discrimination .................. 12955

*Chapter 6 was added by Stats.1980, c. 992, § 4.*

## Article 1

## UNLAWFUL PRACTICES, GENERALLY

Section
12940. Employers, labor organizations, employment agencies and other persons; unlawful employment practice; exceptions.
12940.1. Individuals with heart trouble; firefighting or law enforcement activities; presumption of inability to perform; burden of proof to overcome presumption.
12941. Age; unlawful employment practice by employers; exceptions.
12942. Continuation of employment beyond normal retirement date; effect on pension or retirement plans; compulsory retirement.
12943. School districts; unlawful employment practice based on pregnancy or temporary disability.
12944. Licensing boards; unlawful acts based on examinations and qualifications; determination of unlawfulness; inquiries; records.
12945. Pregnancy; childbirth or related medical condition; unlawful practice by employers; benefits and leaves of absence; transfer of position.
12945.2. Family care leave; definitions; conditions; unlawful employment practices.
12945.5. Unlawful employment practice; sterilization.
12946. Retention of applications, records and files for two years; failure to retain as unlawful practice by employers, labor organization and employment agencies.
12947. Child care services for employers and members; not an unlawful practice.
12948. Denial of civil rights as unlawful practice.
12950, 12951. Repealed.

*Article 1 was added by Stats.1980, c. 992, § 4.*

### Code of Regulations References

Particular employment practices, see 2 Cal. Code of Regs. § 7287.1 et seq.

**§ 12940. Employers, labor organizations, employment agencies and other persons; unlawful employment practice; exceptions**

It shall be an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California:

(a) For an employer, because of the race, religious creed, color, national origin, ancestry, physical handicap, medical condition, marital status, or sex of any person, to refuse to hire or employ the person or to refuse to select the

---

person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions or privileges of employment.

(1) Nothing in this part shall prohibit an employer from refusing to hire or discharging a physically handicapped employee, or subject an employer to any legal liability resulting from the refusal to employ or the discharge of a physically handicapped employee, where the employee, because of his or her physical handicap, is unable to perform his or her duties, or cannot perform those duties in a manner which would not endanger his or her health or safety of others.

(2) Nothing in this part shall prohibit an employer from refusing to hire c discharging an employee who, because of the employee's medical condition, is unable to perform his or her duties, or cannot perform those duties in a manner which would not endanger the employee's health or safety or the health or safety of others. Nothing in this part shall subject an employer to any legal liability resulting from the refusal to employ or the discharge of an employee who, because of the employee's medical condition, is unable to perform his or her duties, or cannot perform those duties in a manner which would not endanger the employee's health or safety or the health or safety of others.

(3) Nothing in this part relating to discrimination on account of marital status shall either (i) affect the right of an employer to reasonably regulate, for reasons of supervision, safety, security, or morale, the working of spouses in the same department, division, or facility, consistent with the rules and regulations adopted by the commission, or (ii) prohibit bona fide health plans from providing additional or greater benefits to employees with dependents than to those employees without or with fewer dependents.

(4) Nothing in this part relating to discrimination on account of sex shall affect the right of an employer to use veteran status as a factor in employee selection or to give special consideration to Vietnam era veterans.

(b) For a labor organization, because of the race, religious creed, color, national origin, ancestry, physical handicap, medical condition, marital status, or sex of any person, to exclude, expel or restrict from its membership the person, or to provide only second-class or segregated membership or to discriminate against any person because of the race, religious creed, color, national origin, ancestry, physical handicap, medical condition, marital status, or sex of the person in the election of officers of the labor organization or in the selection of the labor organization's staff or to discriminate in any way against any of its members or against any employer or against any person employed by an employer.

(c) For any person to discriminate against any person in the selection or training of that person in any apprenticeship training program or any other training program leading to employment because of the race, religious creed, color, national origin, ancestry, physical handicap, medical condition, marital status, or sex of the person discriminated against.

§ 12940  FAIR EMPLOYMENT AND HOUSING  Title 2

(d) For any employer or employment agency, unless specifically acting in accordance with federal equal employment opportunity guidelines and regulations approved by the commission, to print or circulate or cause to be printed or circulated any publication, or to make any non-job-related inquiry, either verbal or through use of an application form, which expresses, directly or indirectly, any limitation, specification, or discrimination as to race, religious creed, color, national origin, ancestry, physical handicap, medical condition, marital status, or sex, or any intent to make any such limitation, specification or discrimination. Nothing in this subdivision shall prohibit any employer from making, in connection with prospective employment, an inquiry as to, or a request for information regarding, the physical fitness, medical condition, physical condition or medical history of applicants if that inquiry or request for information is directly related and pertinent to the position the applicant is applying for or directly related to a determination of whether the applicant would endanger his or her health or safety or the health or safety of others.

(e) For any employer, labor organization, or employment agency to harass, discharge, expel, or otherwise discriminate against any person because the person has made a report pursuant to Section 11161.8 of the Penal Code which prohibits retaliation against hospital employees who report suspected patient abuse by health facilities or community care facilities.

(f) For any employer, labor organization, employment agency, or person to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part.

(g) For any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this part, or to attempt to do so.

(h) For an employer, labor organization, employment agency, apprenticeship training program or any training program leading to employment, or any other person, because of race, religious creed, color, national origin, ancestry, physical handicap, medical condition, marital status, sex, or age, to harass an employee or applicant. Harassment of an employee or applicant by an employee other than an agent or supervisor shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action. An entity shall take all reasonable steps to prevent harassment from occurring. Loss of tangible job benefits shall not be necessary in order to establish harassment. The provisions of this subdivision are declaratory of existing law, except for the new duties imposed on employers with regard to harassment. For purposes of this subdivision only, "employer" means any person regularly employing one or more persons, or any person acting as an agent of an employer, directly or indirectly, the state, or any political or civil subdivision thereof, and cities. However, "employer" does not include a religious association or corporation not organized for private profit. For other purposes of this subdivision as enumerated in subdivision (a), an employer remains as

208

§ 12940  DISCRIMINATION PROHIBITED  Div. 3

defined in subdivision (c) of Section 12926. Nothing contained in this subdivision shall be construed to apply the definition of employer found in this subdivision to subdivision (a).

(i) For an employer, labor organization, employment agency, apprenticeship training program, or any training program leading to employment, to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring.

(j) For an employer or other entity covered by this part to refuse to hire or employ a person or to refuse to select a person for a training program leading to employment or to bar or to discharge a person from employment or from a training program leading to employment, or to discriminate against a person in compensation or in terms, conditions, or privileges of employment because of a conflict between the person's religious belief or observance and any employment requirement, unless the employer or other entity covered by this part demonstrates that it has explored any available reasonable alternative means of accommodating the religious belief or observance, including the possibilities of excusing the person from those duties which conflict with his or her religious belief or observance or permitting those duties to be performed at another time or by another person, but is unable to reasonably accommodate the religious belief or observance without undue hardship on the conduct of the business of the employer or other entity covered by this part. Religious belief or observance, as used in this section, includes, but is not limited to, observance such as a Sabbath or other religious holy day or days, and reasonable time necessary for travel prior and subsequent to a religious observance.

(Added by Stats.1980, c. 992, § 4. Amended by Stats.1981, c. 11, p. 24, § 1; Stats.1981, c. 270, p. 1363, § 1; Stats.1981, c. 1184, p. 4219, § 1; Stats.1982, c. 1193, p. 4258, § 2; Stats.1984, c. 1754, § 2; Stats.1985, c. 1151, § 2; Stats.1987, c. 605, § 1; Stats.1989, c. 1309, § 3.)

### Historical and Statutory Notes

The 1981 amendments inserted subd. (a)(4) relating to veteran status;

Effect of amendment of section by two or more acts at the same session of the legislature, see Government Code § 9605.

Section 2 of Stats.1981, c. 270, p. 1365, provided:
"No sale funds shall be used to challenge the provisions of this act in the courts."

The 1982 amendment inserted subd. (e) relating to patient abuse reports; redesignated former subds. (c) to (g) as subds. (f) to (h); added subd. (i) (later designated subd. (h); see 1987 amendment note), and made nonsubstantive changes.

Under the provisions of § 4 of Stats.1982, c. 1193, the 1982 amendments of this section by c. 1184 and by the current section were incorporated in the form set forth in § 2 of c. 1193. An amendment of this section by § 1 of c.

Stats.1982, c. 1193, failed to become operative under the provisions of § 4 of that act.

Amendment of this section by § 2 of Stats.1982, c. 1184, p. 4221, failed to become operative under the provisions of § 5 of that Act.

The 1984 amendment substituted "non-job-related" for "nonjob-related" in subd. (d); inserted a comma following "expel" in subd. (f); inserted the exception in the fifth sentence and added the sixth through ninth sentences in subd. (i) (later designated subd. (h); see 1987 amendment note); and added subd. (j) (later designated subd. (i); see 1987 amendment note).

Section 1 of Stats.1984, c. 1754, provides:
"The Legislature finds and declares that it is the existing policy of the State of California to prohibit harassment and discrimination in employment on the basis of any protected classification. Such conduct whether intentional or

209

## § 12940 — FAIR EMPLOYMENT AND HOUSING — Title 2

unintentional is a violation of the civil rights of California citizenry and has been shown to decrease productivity in the workforce. It is the existing policy of the State of California, as declared by the Legislature, that productivity is established by which allegations of prohibited harassment and discrimination may be filed, timely and efficiently investigated, and fairly adjudicated, and that agencies and employers be required to establish affirmative programs which include prompt and remedial internal procedures and monitoring so that worksites are free of harassment and prohibited harassment and discrimination by their agents, administrators, and supervisors as well as by their nonsupervisors and clientele. To further this intent, the Legislature enacts this act."

The 1985 amendment made nonsubstantive word changes and added subd. (k) (later designated subd. (j); see 1987 amendment note).

The 1987 amendment, in subd. (f), deleted "on the grounds of race, religious creed" and inserted "or person", deleted "subd. (h) which read "For the governing board of a school district to violate Section 44066 or

### Cross References

Housing discrimination, see § 12955.
Other state or local laws relating to discrimination, construction with this part, see § 12993.

### Law Review Commentaries

Administrative and judicial nullification of federal affirmative action law. Russell W. Galloway, Jr. (1977) 17 Santa Clara L.Rev. 559.

Age discrimination in Employment Act of 1967. Jack Halgren (1968) 43 Los Angeles Bar Bull. 361.

Application of handicap discrimination laws to AIDS patients. 22 U.S.F.L.Rev. 317 (1988).

California FEPC. Michael C. Tobriner (1965) 16 Hast.L.J. 333.

California supreme court survey a review of decisions: July 1982–November 1982. (1983) 10 Pepperdine L.Rev. 835.

California's controls on employer abuse of employee political rights. (1970) 22 Stan.L.R. 1015.

California's Fair Employment and Housing Act: Viable state remedy for employment discrimination. Marjorie Gelb and JoAnne Frankfurt (1983) 34 Hast.L.J. 1055.

Child care as an employee fringe benefit: May an employer discriminate? 26 Santa Clara L.Rev. 647 (1986).

Constitutionality of procedure resulting in denial of government contracts under executive order 11,246. (1979) 52 So.Cal.L.R. 973.

87402 of the Education Code"; and redesignated the remaining subdivisions.

The 1989 amendment, in subd. (e), inserted "which prohibits retaliation against hospital employees who report suspected patient abuse by health facilities or community care facilities."

Amendment of this section by §§ 4, 5, 6 of Stats.1989, c. 1309, failed to become operative under the provisions of § 10 of that Act.

Former § 12940, added by Stats.1963, c. 1786, p. 3571, § 1, requiring the department to maintain records and other evidence of the state's title to all proprietary lands, was repealed by Stats.1965, c. 371, p. 1529, § 149. See § 14730.

**Derivation:** Labor C. former § 1420, added by Stats.1959, c. 121, p. 2002, § 1, amended by Stats.1967, c. 1593, p. 3819, § 1; Stats.1968, c. 1245, p. 2353, § 1; Stats.1969, c. 609, p. 1248, § 1; Stats.1970, c. 1508, p. 2995, § 4; Stats.1972, c. 1189, p. 2501, § 6; Stats.1973, c. 784, p. 1392, § 2; Stats.1974, c. 431, p. 925, § 5; Stats.1976, c. 1195, p. 5460, § 5; Stats.1977, c. 699, p. 2254, § 3; Stats.1978, c. 1190, p. 3841, § 1.

The effects test: new directions. David C. Hsia (1977) 17 Santa Clara L.Rev. 777.

Emerging law of social responsibility. Matthew O. Tobriner (Spring 1961) 1 Santa Clara L.Rev. 5.

Employment discrimination against lesbians: Municipal ordinances and other remedies. Andra Pearldaughter (1979) 8 Golden Gate L.Rev. 537.

Employment discrimination against women lawyers. Joan E. Baker (1973) 59 A.B.A.J. 1029.

Employment discrimination and wrongful discharge: Does the California Fair Employment and Housing Act displace common law remedies? David Benjamin Oppenheimer and Margaret M. Baumgartner, 23 U.S.F.L.Rev. 145 (1989).

Employment discrimination claims. Guy T. Saperstein and Gary R. Siriscalco (Nov.1982) 2 Cal.Lawyer No. 10, p. 30.

Employment protection and gender dysphoria: Legal definitions of unequal treatment on basis of sex and disability. Stuart A. Wein and Cynthia Lark Remmers (1979) 30 Hast.L.J. 1075.

Employment rights of women in toxic workplace. (1977) 65 C.I.R. 1113.

## § 12940 — DISCRIMINATION PROHIBITED — Div. 3

Enforcement of laws designed to protect the rights of disabled persons. Jack Achtenberg (1975) 4 San Fernando Valley L.Rev. 161.

"Good cause": California's new "exception" to the at-will employment doctrine. (1983) 23 Santa Clara L.Rev. 263.

Job-related sexual harassment and union women: What are their rights? (1980) 10 Golden Gate L.Rev. (Women's Law Forum).

Legal profession: New target for title VII? Bette Bardeen (1980) 55 S. Bar J. 360.

Monitoring employees for genetic alteration: Is state regulation essential? (1984) 15 Pacific L.J. 349.

(Mrs.) Alice doesn't work here anymore: No-spouse rules and the American working woman. (1981) 29 U.C.L.A. Law Rev. 199.

"Offer of judgment" rule in employment discrimination actions. (1980) 10 Golden Gate L.Rev. 963.

Prohibiting employment discrimination on the basis of disability: Need to expand California law. (1981) 14 U.C.D. Law Rev. 731.

### Library References

Civil Rights ⊜141 et seq.
WESTLAW Topic No. 78.

### WESTLAW Electronic Research

See WESTLAW Electronic Research Guide following the Preface.

### United States Code Annotated

Federal Fair Labor Standards Act, see 29 U.S.C.A. § 201 et seq.

### United States Supreme Court

Accumulated seniority, pregnancy leaves, see Nashville Gas Co. v. Satty, 1978, 98 S.Ct. 347, 434 U.S. 136, 54 L.Ed.2d 356.

Affirmative action, promoting female employee over male with higher test score, see Johnson v. Transportation Agency, Santa Clara County, California, 1987, 107 S.Ct. 1442, 480 U.S. 616, 94 L.Ed.2d 615.

Burden of proof, mixed motive cases, sexual stereotyping as discrimination under Title VII, see Price Waterhouse v. Hopkins, 1989, 109 S.Ct. 1775, 490 U.S. 228, 104 L.Ed.2d 268, on remand 737 F.Supp. 1202, affirmed 920 F.2d 967, 287 U.S.App.D.C. 173.

Disparate impact, racial imbalance, prima facie case, burdens of production and persuasion, see Wards Cove Packing Co., Inc. v. Atonio, 1989, 109 S.Ct. 2115, 490 U.S. 642, 104 L.Ed.2d 733.

Free speech, retaliatory discharge of union officers for statements opposing union leadership, see Sheet Metal Workers' Intern. Ass'n Lynn, 1989, 109 S.Ct. 639, 102 L.Ed.2d 700.

Peaceful distribution of handbills urging boycott, unfair labor practices, see DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council, 1988, 108 S.Ct. 1392, 485 U.S. 568, 99 L.Ed.2d 645.

Religious exemption to prohibition against religious discrimination in employment, establishment clause, see Corporation of Presiding Bishop v. Amos, 1987, 107 S.Ct. 2862, 483 U.S. 327, 97 L.Ed.2d 273.

Recovery of back pay under executive order 11,246. (1979) 52 So.Cal.L.R. 767.

Sex discrimination in academia: Representing the female faculty plaintiff. (1978–1979) 9 Golden Gate L.Rev. 481.

State actions for wrongful discharge: Overcoming barriers posed by Federal Labor Law preemption. (1983) 71 C.I.R. 942.

State equal rights provisions: Standards applied in reviewing sexually discriminatory legislation. (1977) 65 C.I.R. 1086.

Title VII consent decrees: affirmative inaction? (1978) 18 Santa Clara L.Rev. 517.

Unjust dismissal. (1980) 12 Pacific L.J. 693.

Veteran preferences. (1982) 13 Pacific L.J. 693.

Warning: California antismoking laws may be dangerous to your health—an analysis of nonsmokers' rights in the workplace. (1983) 14 Pacific L.J. 1145.

### Notes of Decisions

Affirmative action 14
Age discrimination 19
Aiding or abetting 12
Aliens 20
Ancestry 4
Application form 9

*See, also, Notes of Decisions under § 12965.*

211

210

## § 12935 Note 2

GOVERNMENT CODE

| Section | |
|---|---|
| 12941.. | Pregnancy, childbirth or related medical conditions; unlawful employment practice; employers; benefits and leaves of absence; transfer of position. |
| 12945.1 | Moore-Brown-Roberti Family Rights Act. |
| 12945.2 | Family care and medical leave; definitions; conditions; unlawful employment practices. |
| 12947.5 | Prohibition on wearing of pants based on gender as unlawful employment practice; exemptions. |
| 12948 | Denial of civil rights as unlawful practice. |
| 12950. | Sexual harassment; amendment of information sheet; distribution of information sheet; violations. |

### Law Review and Journal Commentaries

Triple play: Three types of insurance policies may cover claims against businesses in sexual harassment cases. Henry S. Zangwill, 17 L.A. Law 32 daily Aug 1994).

### United States Supreme Court

Civil rights, discrimination, same-sex sexual harassment under Title VII—Sandower Offshore Services, Inc., U.S.L.A.1998, 118 S.Ct. 998.

### § 12940. Employers, labor organizations, employment agencies and other persons; unlawful employment practice; exceptions

It shall be an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California:

(a) For an employer, because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, * * * sex, or sexual orientation of any person, to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment.

(1) * * * This part * * * does not prohibit an employer from refusing to hire or discharging an employee with a physical or mental disability, or subject an employer to any legal liability resulting from the refusal to employ or the discharge of an employee with a physical or mental disability, where the physical or mental disability, because of his or her physical or mental disability, is unable to perform his or her essential duties even with reasonable accommodations, or cannot perform those duties in a manner that would not endanger his or her health or safety or the health or safety of others even with reasonable accommodations.

(2) * * * This part * * * does not prohibit an employer from refusing to hire or discharging an employee who, because of the employee's medical condition, is unable to perform his or her essential duties even with reasonable accommodations, or cannot perform those duties in a manner that would not endanger the employee's health or safety or the health or safety of others even with reasonable accommodations. Nothing in this part shall subject an employer to any legal liability resulting from the refusal to employ or the discharge of an employee who, because of the employee's medical condition, is unable to perform his or her essential duties, or cannot perform those duties in a manner that would not endanger the employee's health or safety or the health or safety of others even with reasonable accommodations.

(3) Nothing in this part relating to discrimination on account of marital status shall do either of the following:

(A) Affect the right of an employer to reasonably regulate, for reasons of supervision, safety, security, or morale, the working of spouses in the same department, division, or facility, consistent with the rules and regulations adopted by the commission.

(B) Prohibit bona fide health plans from providing additional or greater benefits to employees with dependents than to those employees without or with fewer dependents.

(4) Nothing in this part relating to discrimination on account of sex shall affect the right of an employer to use veteran status as a factor in employee selection or to give special consideration to Vietnam-era veterans.

Additions or changes indicated by underline; deletions by asterisks * * *

70

GOVERNMENT CODE § 12940

(b) For a labor organization, because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, * * * sex, or sexual orientation of any person, to exclude, expel or restrict from its membership the person, or to provide only second-class or segregated membership or to discriminate against any person because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, * * * sex, or sexual orientation of the person in the election of officers of the labor organization or in the selection of the labor organization's staff or to discriminate in any way against any of its members or against any employer or against any person employed by an employer.

(c) For any person to discriminate against any person in the selection or training of that person in any apprenticeship training program or any other training program leading to employment because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, * * * sex, or sexual orientation of the person discriminated against.

(d) For any employer or employment agency to print or circulate or cause to be printed or circulated any publication, or to make any non-job-related inquiry of an employee or applicant, either verbal or through use of an application form, that expresses, directly or indirectly, any limitation, specification, or discrimination as to race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, * * * sex, or sexual orientation, or any intent to make * * * any such limitation, specification, or discrimination. Except as provided in the Americans with Disabilities Act of 1990 (Public Law 101-336) and the regulations adopted pursuant thereto, nothing in this subdivision shall prohibit any employer from making, in connection with prospective employment, an inquiry as to, or a request for information regarding, the physical fitness, medical condition, physical condition, or medical history of applicants if that inquiry or request for information is directly related and pertinent to the position the applicant is applying for or to determine whether the applicant would endanger his or her health or safety or the health or safety of others.

(e) For any person, labor organization, or employment agency to harass, discharge, expel, or otherwise discriminate against any person because the person has made a report pursuant to Section 11161.8 of the Penal Code. * * * that prohibits retaliation against hospital employees who report suspected patient abuse to health facilities or community care facilities.

(f) For any employer, labor organization, employment agency, or person to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part.

(g) For any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this part, or to attempt to do so.

(h)(1) For an employer, labor organization, employment agency, apprenticeship training program or any training program leading to employment, or any other person, because of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, * * * sex, or sexual orientation, to harass an employee, an applicant, or a person providing services pursuant to a contract. Harassment of an employee * * * an applicant, or a person providing services pursuant to a contract by an employee other than an agent or supervisor shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action. An entity shall take all reasonable steps to prevent harassment from occurring. Loss of tangible job benefits shall not be necessary in order to establish harassment.

(2) The provisions of this subdivision are declaratory of existing law, except for the new duties imposed on employers with regard to harassment.

(3)(A) For purposes of this subdivision "employer" means any person regularly employing one or more persons or regularly receiving the services of one or more persons providing services pursuant to a contract, or any person acting as an agent of an employer, directly or indirectly, the state, or any political or civil subdivision * * * of the state, and cities. The definition of "employer" in subdivision (d) of Section 12926 applies to all provisions of this section other than this subdivision.

(B) Notwithstanding subparagraph (A), for purposes of this subdivision, "employer" does not include a religious association or corporation not organized for private profit.

(C) For purposes of this subdivision, "harassment" because of sex includes sexual harassment, gender harassment, and harassment based on pregnancy, childbirth, or related medical conditions.

* * *

(i) For purposes of this subdivision, "a person providing services pursuant to a contract" means a person who meets all of the following criteria:

Additions or changes indicated by underline; deletions by asterisks * * *

71

§ 12940

## GOVERNMENT CODE

(A) The person has the right to control the performance of the contract for services and discretion as to the manner of performance.

(B) The person is customarily engaged in an independently established business.

(C) The person has control over the time and place the work is performed, supplies the tools and instruments used in the work, and performs work that requires a particular skill not ordinarily used in the course of the employer's work.

(f) For an employer, labor organization, employment agency, apprenticeship training program, or any training program leading to employment, to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring.

(g) For an employer or other entity covered by this part to refuse to hire or employ a person or to refuse to select a person for a training program leading to employment or to bar or to discharge a person from employment or from a training program leading to employment, or to discriminate against a person in compensation or in terms, conditions, or privileges of employment because of a conflict between the person's religious belief or observance and any employment requirement, unless the employer or other entity demonstrates that it has explored any available reasonable alternative means of accommodating the religious belief or observance, including the possibilities of excusing the person from those duties that conflict with his or her religious belief or observance or permitting those duties to be performed at another time or by another person, but is unable to reasonably accommodate the religious belief or observance without undue hardship on the conduct of the business of the employer or other entity covered by this part. Religious belief or observance, as used in this section, includes, but is not limited to, observance of a Sabbath or other religious holy day or days, and reasonable time necessary for travel prior and subsequent to a religious observance.

(h) For an employer or other entity covered by this part to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee. Nothing in this subdivision or in paragraph (1) or (2) of subdivision (a) shall be construed to require an accommodation that is demonstrated by the employer or other covered entity to produce undue hardship to its operation.

* * *

(j) For an employer or other entity covered by this part, to subject, directly or indirectly, any employee, applicant, or other person to a test for the presence of a genetic characteristic.

(Amended by Stats 1992, c. 912 (A.B.1286), § 5; Stats.1992, c. 913 (A.B.1077), § 23.1; Stats.1993, c. 711 (A.B.675), § 2; Stats.1998, c. 485 (A.B.2803), § 85; Stats.1999, c. 591 (A.B.1670), § 3; Stats.1999, c. 592 (A.B.1001), § 7.5.)

* * *

## Historical and Statutory Notes

### 1992 Legislation

The 1992 amendment, throughout the section, substituted "physical disability, mental disability" for "physical handicap, medical condition"; in subd. (a), in two places, substituted "physical disability or mental disability" for "physical handicap"; in subds. (a)(1) and (2) substituted "essential duties even with the provisions of..."

Legislative intent of Stats.1992, c. 913 (A.B.1077), see Historical and Statutory Notes under Business and Professions Code § 125.6.

Under the provisions of § 45 of Stats.1992, c. 913, the provisions of subds. (a), (b), (c), (d), (e), and (f) were given effect and incorporated in the former Code § 12 of Stats.1992, c. 913. Amendment of this section by § 85 of Stats.1992, c. 912, failed to become operative under the provisions of § 4 of that Act.

Amendment of this section by §§ 23, 23.1 and 23.4 of Stats.1992, c. 912, failed to become operative under the provisions of § 4 of that Act.

* * *

### 1993 Legislation

The 1993 amendment added subd. (h)(4), defining harassment of an employee, and made nonsubstantive changes throughout the section.

Amendment of this section by § 3 of Stats.1993, c. 711 (A.B.675), failed to become operative under the provisions of § 4 of that Act.

Section 1 of Stats.1993, c. 711 (A.B.675), provides:

The Legislature finds and declares the following:

"(a) A critical element in eliminating discrimination in the education and training of employees and employees.

"(b) A strong statement of the scope of this statutory prohibition against harassment and discrimination is a vital piece of information for employers and employees.

"(c) The legal prohibitions against harassment because of sex, race, religion, creed, ancestry, physical handicap, and pregnancy harassment."

### 1998 Legislation

Stats.1998, c. 485, made nonsubstantive changes to maintain the code.

Subordination of legislation by Stats.1998, c. 485 (A.B.2803) to other legislation, see Historical and Statutory Notes under Business and Professions Code § 6840.

### 1999 Legislation

Stats.1999, c. 592 (A.B.1001) rewrote the section, which formerly read:

"It shall be an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California:

"(a) For an employer, because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, or sex of any person, to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment.

"(1) Nothing in this part shall prohibit an employer from refusing to hire or discharging an employee with a physical or mental disability, or subject any employer to any legal liability resulting from the refusal to employ or the discharge of an employee with a physical or mental disability, where the employee, because of a physical or mental disability, is unable to perform his or her essential duties even with reasonable accommodations, or cannot perform those duties in a manner that would not endanger his or her health or safety or the health or safety of others even with reasonable accommodations.

"(2) Nothing in this part shall prohibit an employer from refusing to hire or discharging an employee who, because of the employee's medical condition, is unable to perform his or her essential duties, or cannot perform those duties in a manner that would not endanger the employee's health or safety or the health or safety of others even with reasonable accommodations.

"(3) Nothing in this part relating to discrimination on account of marital status shall do either of the following:

"(A) Affect the right of an employer to reasonably regulate, for reasons of supervision, safety, security, or morale, the working of spouses in the same department, division, or facility, consistent with the rules and regulations adopted by the commission.

"(B) Prohibit bona fide health plans from providing additional or greater benefits to employees with dependents than to those employees without or with fewer dependents.

"(C) Nothing in this part relating to discrimination on account of sex shall affect the right of an employer to use veteran status in applying selection or to give special consideration to Vietnam era veterans.

"(b) For a labor organization, because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, or sex of any person, to exclude, expel or restrict from its membership the person, or to provide only second-class or segregated membership or to discriminate against any person because of the race, religious creed,

§ 12940

color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, or sex of the person, against an employee or with the employer or any other person, or to discriminate against any person because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, or sex of the person in the election of its officers or of the labor organization's staff or to discriminate in any way against any of its members or the labor organization against any person employed by an employer.

"(c) For any person to discriminate against any person in the selection or training of that person in any apprenticeship training program or any other training program leading to employment because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, or sex of the person discriminated against.

"(d) For any employer or employment agency, unless specifically acting in accordance with federal equal employment opportunity guidelines or regulations approved by the commission, to print or circulate or cause to be printed or circulated any publication, or to make any non-job-related inquiry, either verbal or through use of an application form, that expresses, directly or indirectly, any limitation, specification, or discrimination as to race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, or sex, or any intent to make that limitation, specification or discrimination. Except as provided in the American with Disabilities Act of 1990 (Public Law 101-336) and the regulations adopted pursuant thereto, nothing in this subdivision shall prohibit any employer from making, in connection with prospective employment, an inquiry as to, or a request for information regarding, the physical fitness, medical condition, physical condition, or medical history of applicants if that inquiry or request for information is not used as a pretext for unlawful discrimination, and if the responses to the inquiry or request are not used to discriminate against the applicant on a basis prohibited by this part.

"(e) For any employer, labor organization, employment agency, or any other person to fail or refuse to provide reasonable accommodation for an applicant's or employee's religious belief or observance, unless the accommodation would impose an undue hardship on the person's business.

"(f) For any employer, labor organization, employment agency, apprenticeship training program or any training program leading to employment, for any employer or any other person, because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, age, or sex of any person, to harass an employee or applicant. Harassment of an employee or applicant by an employee other than an agent or supervisor shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action. An entity shall take all reasonable steps to prevent harassment from occurring. Loss of tangible job benefits shall not be necessary in order to establish harassment.

"(2) This subdivision is declaratory of existing law, except for the new duties imposed on employers with regard to harassment.

* * *

*Additions or changes indicated by underline; deletions by asterisks * * *

72

*Additions or changes indicated by underline; deletions by asterisks * * *

73

## § 12940

"(2)(A) For purposes of this subdivision only, 'employer' means any person regularly employing one or more persons, or any person acting as an agent of an employer, directly or indirectly, the state, or any political or civil subdivision thereof, and cities.

"(B) Notwithstanding subparagraph (A), for purposes of this subdivision, 'employer' does not include a religious association or corporation not organized for private profit.

"(C) For purposes of this subdivision, 'harassment' because of sex includes sexual harassment, gender harassment, and harassment based on pregnancy, childbirth, or related medical conditions.

"(4) For other types of discrimination as enumerated in subdivision (a) of this subdivision (a) as defined in subdivision (d) of Section 12926.

"(5) Nothing contained in this subdivision shall be construed to apply to the definition of employer found in this subdivision to subdivision (a).

"(I) For an employer, labor organization, employment agency, apprenticeship training program, or any training program leading to employment, or any other training program leading to employment, to print or circulate or cause to be printed or circulated any publication, or to make any non-job-related inquiry of an employee or applicant, either verbal or through use of an application form, that expresses, directly or indirectly, any limitation, specification, or discrimination as to race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, or sexual orientation or any intent to make any such limitation, specification, or discrimination.

"(j) For an employer or other entity covered by this part to fail or refuse to make a reasonable accommodation for the known physical or mental disability of an applicant or employee. Nothing in this subdivision or in paragraph (1) or (2) of subdivision (a) shall be construed to require an accommodation that is demonstrated by the employer or other covered entity to produce undue hardship to its operation.

ance without undue hardship on the conduct of the business of any person regularly employing one or more persons, or any person acting as an agent of an employer, directly or indirectly, the state, or any political or civil subdivision thereof, and cities.

"(B) Notwithstanding subparagraph (A), for purposes of this subdivision, employer does not include a religious association or corporation not organized for private profit.

"(k) For an employer or other entity covered by this part to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring.

"(l) For an employer or other entity covered by this part to refuse to hire or employ a person or to refuse to select a person for a training program leading to employment or to bar or to discharge a person from employment or from a training program leading to employment, or to discriminate against a person in compensation or in terms, conditions, or privileges of employment because of a conflict between the person's religious belief or observance and any employment requirement, unless an employer or other entity covered by this part demonstrates that it has explored any available reasonable alternative means of accommodating the religious belief or observance, including the possibilities of excusing the person from those duties that conflict with his or her religious belief or observance or permitting those duties to be performed at another time or by another person, but is unable to reasonably accommodate the religious belief or observance

Section 1 of Stats.1999, c. 591 (A.B.1670), provides:

"This act shall be known, and may be cited, as the California Civil Rights Amendments of 1999."

Legislative intent relating to Stats.1999, c. 591 (A.B.1670), see Historical and Statutory Notes under Government Code § 12920.

Under the provisions of § 16 of Stats.1999, c. 592, the 1999 amendments of this section by c. 591 (A.B.1670) and c. 592 (A.B.1856) were given effect and incorporated in the form set forth in § 7.5 of c. 592.

An amendment of this section by § 7 of Stats.1999, c. 592 (A.B.1001), failed to become operative under the provisions of § 16 of that Act.

Section affected by two or more acts at the same session of the legislature, see Government Code § 9605.

### Law Review and Journal Commentaries

Injury to the unborn—Reproductive hazards and employee rights. Deborah P. Koeffler and Anthony J. Amendola. 14 L.A.Law 28 (Nov. 1991).

Nonconsensual HIV testing in the health care setting: The case for extending the occupational protection of the Fair Employment and Housing Act to health care workers. Loy L.A.L.Rev. 1251 (1988).

Review of selected 1992 California legislation. 24 Pac. L.J. 502 (1993).

Review of selected 1993 California legislation. 25 Pac. L.J. 761 (1994).

Sexual harassment: The furor continues. Philip K. Berlin. 15 L.A.Law 38 (Nov. 1992).

Sexual harassment policy for legal employers. Lorraine L. Loder, 17 L.A.Law 22 (May 1994).

### Library References

### ALR Library

Appeal to racial or religious prejudice or fixing as violation of Title VII of Civil Rights Act of 1964 (42 U.S.C.A. § 2000e et seq.). 41 A.L.R. Fed 567.

## GOVERNMENT CODE

Discrimination 'because of handicap' or 'on the basis of handicap' under state employment discrimination or civil rights statute prohibiting employment discrimination on account of handicap. 81 A.L.R.4th 144.

What constitutes handicap under state legislation forbidding job discrimination on account of handicap. 82 A.L.R.4th 26.

Judicial construction and application of state legislation prohibiting religious discrimination in employment. 37 A.L.R.4th 349.

Liability for discharge of employee from private employment on ground of political views or conduct. 38 A.L.R.4th 89.

Racial discrimination in the hiring, retention, and assignment of teachers—Federal cases. 3 A.L.R. Fed 825.

Construction and application of provisions of Title VII of Civil Rights Act of 1964 (42 U.S.C.A. §§ 2000e et seq.) making sex discrimination in employment unlawful. 12 A.L.R. Fed 15.

Construction and application of § 704(a) of Civil Rights Act of 1964 (42 U.S.C.A. § 2000e-3(a)), making it unlawful employment practice to discriminate against individual for participation in equal employment opportunity activities. 11 A.L.R. Fed 1.

Discrimination on basis of marital status as constituting sex discrimination under § 703(a) of Civil Rights Act of 1964 (42 U.S.C.A. § 2000e-2(a)). 34 A.L.R. Fed 648.

Employee's inability to work particular hours due to disability as grounds for termination or refusal of employment, notwithstanding federal statute or regulation requiring employer to make reasonable accommodation. 116 A.L.R. Fed 499.

What constitutes business necessity justifying employer's discrimination on basis of sex in violation of Title VII of Civil Rights Act of 1964 (42 U.S.C.A. §§ 2000e et seq.). 98 ALR Fed 9.

Requirement that employee or prospective employee undergo psychiatric evaluation as unlawful employment practice violative of Title VII of Civil Rights Act of 1964 (42 U.S.C.A. §§ 2000e et seq.). 36 A.L.R. Fed 721.

Giving preference to relatives of employees when job vacancies occur as violation of Title VII of Civil Rights Act of 1964 (42 U.S.C.A. §§ 2000e et seq.). 37 A.L.R. Fed 15.

Sufficiency of defendant's nondiscriminatory reason to rebut inference of sex discrimination in promotion and demotion of employees as violation of Title VII of Civil Rights Act of 1964 (42 U.S.C.A. §§ 2000e et seq.). 111 A.L.R. Fed 1.

What constitutes sexual discrimination in termination of employee so as to violate § 703 of Title VII of Civil Rights Act of 1964 (42 U.S.C.A. §§ 2000e et seq.). 116 A.L.R. Fed 1.

What constitutes constructive discharge or employee due to sexual discrimination so as to constitute violation of Title VII of Civil Rights Act of 1964 (42 U.S.C.A. §§ 2000e et seq.). 116 A.L.R. Fed 1.

Sex discrimination in job assignment or transfer as violation of Title VII of Civil Rights Act of 1964 (42 U.S.C.A. § 2000e et seq.). 123 A.L.R. Fed 1.

## § 12940

What constitutes 'establishment' for purposes of § 6(d)(1) of Equal Pay Act of 1963 (29 U.S.C.A. § 206(d)(1)), prohibiting wage discrimination within establishment based on sex. 121 A.L.R. Fed 159.

When must specialized equipment or other workplace modifications be provided to qualified disabled employee or applicant as reasonable accommodation. 125 ALR Fed 629.

When must specialized testing, training, or other work procedures be provided for benefit of qualified disabled employee or applicant to fulfill employer's reasonable accommodation requirement. 127 ALR Fed 559.

### Legal Jurisprudences

Cal Jur 3d Civ R §§ 2, 3, 7, Costs § 6, Employer §§ 63, 79, 79.5, Torts §§ 107, Labor §§ 4, 43, 236, Pub Util § 3, Civ R § 80, Work Comp §§ 50, 62.

2 Am Jur 2d Civil Rights §§ 103 et seq., Labor and Labor Relations §§ 251-2.

### Treatises and Practice Aids

Witkin, Summary (9th ed) Agency §§ 184H, 303, 306, 309, 310.

Witkin, Summary (9th ed) Const Law §§ 757, 759, 760J, 760, 760R, Work Comp §§ 7, 762, 762A.

Witkin, Summary (9th ed) Contracts §§ 632R, 632G.

Witkin, Summary (9th ed) Torts §§ 131A, 1136, 1363.

Witkin, Summary (9th ed) Work Comp § 25.

Witkin, Procedure (4th ed) Admin Proc § 76.

Witkin, Evidence (3d ed) § 71.

The Rutter Group, Alternative Dispute Resolution (Knight, Fannin & Disco) § 8:266.

The Rutter Group, Insurance Litigation (Croskey, Kaufman, et al) § 7:1844.

The Rutter Group, Personal Injury (Flahavan, Rea, Kelly & Turner) §§ 2:857.1b, 2:864, 4:270.2a.

The Rutter Group, Professional Responsibility (Vapnek, Tuft, Peck & Wiener) §§ 1:357, 6:201.5, 6:201.6.

Miller & Starr, Cal Real Estate 2d § 33:19.

### Forms

B-W Cal Civil Practice: Civil Practice Civil Rights Litigation §§ 9:1, 9:3, 9:9.

B-W Cal Civil Practice: Employment Litigation §§ 2:2, 2:4, 2:35, 2:37, 2:56, 2:65, 2:67, 2:68, 2:70, 2:72, 2:79, 2:80, 2:82, 2:89, 2:90, 3:2, 3:6, 3:15, 3:18, 3:19, 3:23, 3:25, 3:26, 3:28, 3:60, 3:31, 3:80, 5:17, 5:20, 5:24, 5:31, 5:32, 5:34, 5:42, 5:80, 5:82, 5:86, 5:87, 5:80, 5:83, 5:84, 5:86, 6:2, 6:31, 8:9.

Cal Transactions Forms Business Transactions §§ 12:10, 12:11, 12:48.

### Additional References

Advising Calif Employers (CEB, 1981) §§ 1.10, 1.11.

Defending sexual harassment cases by controlling invasive discovery, 8 CEB Civ Lit Rep 167.

Workplace privacy: A guide for California employers, 5 CEB Bus L Practitioner No. 1 p.1.

Employers and Employees: Discrimination, 14 CFR Cal Bus L Rep 225.

Sexual harassment in professional relationships: a new status of Cal Civil law and new questions, 17 CEB Bus L Rep 229.

### [left page bottom]

Accommodation of pregnancy-related disabilities on the job. 15 Berkeley J.Employment & Lab L. 335 (1994).

No Liability for the Non-Harassing Supervisor?: Faragher, Ellerth, and Title VII's Equal Opportunity Escape Hatch. Danika L. McClelland, 33 U.S.F.L.Rev. 487 (1999).

Exacerbating the exasperating: Title VII liability of employers for sexual harassment committed by their supervisors. Benjamin Oppenheimer, 81 Cornell L.Rev. 66 (1996).

Family matters. Angel Gomez, III, and Margaret Ryan Kroeger. 17 L.A.Law 26 (July-Aug. 1994).

Gay civil rights: Are homosexuals adequately protected from discrimination in housing and employment? 24 Pac. L.J. 541 (1993).

Grayling of America: Age discrimination in the workplace. Dan Stormer and Anne Richardson. 26 U.West L.A.L.Rev. 189 (1995).

Civil Rights ⟐141 et seq.

WESTLAW Topic No. 78.

California Jury Instructions—Civil [BAJI].

**Additions or changes indicated by underline; deletions by asterisks * * * **

§ 970                          PRIVILEGES AND IMMUNITIES
                                                        Div. 2

§ 970.  Misrepresentations

No person, or agent or officer thereof, directly or indirectly, shall influence, persuade, or engage any person to change from one place to another in this State, or from any place outside to any place within the State, or from any place within the State to any place outside, for the purpose of working in any branch of labor, through or by means of knowingly false representations, whether spoken, written, or advertised in printed form, concerning either:

(a) The kind, character, or existence of such work:

(b) The length of time such work will last, or the compensation therefor;

(c) The sanitary or housing conditions relating to or surrounding the work;

(d) The existence or nonexistence of any strike, lockout, or other labor dispute affecting it and pending between the proposed employer and the persons then or last engaged in the performance of the labor for which the employee is sought.

(Stats.1937, c. 90, p. 209, § 970.)

**Historical Note**

**Derivation:** Stats.1903, c. 229, p. 269, § 1; Stats.1915, c. 45, p. 52, § 1; Stats.1923, c. 262, p. 514, § 1; Stats.1927, c. 268, p. 488, § 1.

**Library References**

Labor Relations ⟜1051.
WESTLAW Topic No. 232A.
C.J.S. Labor Relations § 1002 et seq.

**Notes of Decisions**

Construction and application 1
Lay-offs 4
Purpose 2
Statute of frauds 5
Temporary relocations 3

**1. Construction and application**

Although this section was enacted to protect migrant workers from abuses, especially involving false promises made to induce migrant workers to move in first instance, the section could apply to sales representative who alleged that company for whom she worked in Chicago as employee at will made misrepresentations inducing him to relocate to California and then terminated him after he moved. Tyco Industries, Inc. v. Superior Court (Richards) (App. 2 Dist.1985) 211 Cal.Rptr. 540, 164 C.A.3d 148.

**2. Purpose**

This section was enacted to protect migrant workers from abuses heaped upon them by devious employers and potential employers, especially abuses involving false promises made to induce migrant workers to move in first instance. Tyco Industries, Inc. v. Superi-

or Court (Richards) (App. 2 Dist.1985) 211 Cal. Rptr. 540, 164 C.A.3d 148.

**3. Temporary relocations**

This section relating to false representations inducing worker to "change from one place to another" and § 972 providing for double damages apply to temporary as well as permanent relocation of residence, and that change of residence might be for only two weeks would not affect qualitative misrepresentations nor render both sections inapplicable. Collins v. Rocha (1972) 102 Cal.Rptr. 1, 497 P.2d 225, 7 C.3d 232.

**4. Lay-offs**

Former employee did not satisfy requirements of this section, although employee was asked by employer to move from Pennsylvania to California to work at accounting position in recently acquired minicomputer facility in California, employer agreed to the move, and employer later decided to close the California plant and included employee among those laid off. Funk v. Sperry Corp., C.A.9 (Cal.) 1988, 842 F.2d 1129.

246

SOLICITATION OF EMPLOYEES
Pt. 3

**5. Statute of frauds**

Statute of frauds (Civ.C. § 1624) barred cause of action of former employee under this section et seq. pertaining to misrepresentation of employment opportunity based on allega-

tions that defendant employer orally promised three years' employment without intention to perform. Munoz v. Kaiser Steel Corp. (App. 4 Dist.1984) 203 Cal.Rptr. 345, 156 C.A.3d 965.

§ 971.  Violations; misdemeanor; penalty

Any person, or agent or officer thereof, who violates Section 970 is guilty of a misdemeanor punishable by a fine of not less than fifty dollars ($50) nor more than one thousand dollars ($1,000) or imprisonment for not more than six months or both.

(Stats.1937, c. 90, p. 209, § 971. Amended by Stats.1983, c. 1092, § 197, eff. Sept. 27, 1983, operative Jan. 1, 1984.)

**Historical Note**

The 1983 amendment increased the minimum fine from $25 to $50; and increased the maximum fine from $500 to $1,000.

**Derivation:** Stats.1903, c. 229, p. 270; Stats.1927, c. 268, p. 488, § 2.

**Cross References**

Misdemeanor defined, see Penal Code § 17.

§ 972.  Civil penalty

In addition to such criminal penalty, any person, or agent or officer thereof who violates any provision of section 970 is liable to the party aggrieved, in a civil action, for double damages resulting from such misrepresentations. Such civil action may be brought by an aggrieved person or his assigns or successors in interest, without first establishing any criminal liability.

(Stats.1937, c. 90, p. 209, § 972.)

**Historical Note**

**Derivation:** Stats.1903, c. 229, p. 270, § 2; Stats.1927, c. 268, p. 488, § 2.

**Library References**

Labor Relations ⟜1056.
WESTLAW Topic No. 232A.
C.J.S. Labor Relations § 1011.

**Forms**

See West's California Code Forms, Labor.

**Notes of Decisions**

Forum non conveniens 3
Penalty 2
Temporary relocations 1

**1. Temporary relocations**

Section 970 relating to false representations inducing worker to "change from one place to another" and this section providing for double

damages applies to temporary as well as permanent relocation of residence, for only two weeks would not affect qualitative misrepresentations nor render both sections inapplicable. Collins v. Rocha (1972) 102 Cal.Rptr. 1, 497 P.2d 225, 7 C.3d 232.

247